**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

| | | |
|---|---|---|
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : : : : : | **CASE NO.** **JUDGE** |
| **Plaintiffs,** | : : : | **PLAINTIFF'S COMPLAINT WITH JURY DEMAND** |
| **v.** | : : | |
| **WP COMPANY LLC d/b/a THE WASHINGTON POST,** | : : : | |
| **Defendant.** | : : : | |

**NOW COMES** Nicholas Sandmann, by and through his parents and natural guardians, Ted Sandmann and Julie Sandmann, and by and through his counsel, states his Complaint against Defendant, WP Company LLC d/b/a *The Washington Post* ("the *Post*") as follows:

**INTRODUCTION**

1.      The *Post* is a major American daily newspaper published in Washington, D.C. which is credited with inventing the term "McCarthyism" in an editorial cartoon published in 1950.  Depicting buckets of tar, the cartoon made fun of then United States Senator Joseph McCarthy's "tarring" tactics of engaging in smear campaigns and character assassination against citizens whose political views made them targets of his accusations.

2.      In a span of three (3) days in January of this year commencing on January 19, the *Post* engaged in a modern-day form of McCarthyism by competing with CNN and

NBC, among others, to claim leadership of a mainstream and social media mob of bullies which attacked, vilified, and threatened Nicholas Sandmann ("Nicholas"), an innocent secondary school child.

3.       The *Post* wrongfully targeted and bullied Nicholas because he was the white, Catholic student wearing a red "Make America Great Again" souvenir cap on a school field trip to the January 18 March for Life in Washington, D.C. when he was unexpectedly and suddenly confronted by Nathan Phillips ("Phillips"), a known Native American activist, who beat a drum and sang loudly within inches of his face ("the January 18 incident").

4.       Nicholas stood quietly and respectfully for several minutes after being targeted and bullied by Phillips and Nicholas' body language remained non-aggressive and passive throughout the incident.

5.       Nicholas is 16-years of age, is 5'9" in height and weighs 115 pounds.

6.       The school field trip to the Nation's capital was the first out-of-state trip Nicholas had ever taken without being with his family.

7.       In targeting and bullying Nicholas by falsely accusing him of instigating the January 18 incident, the *Post* conveyed that Nicholas engaged in acts of racism by "swarming" Phillips, "blocking" his exit away from the students, and otherwise engaging in racist misconduct.

8.       The *Post* ignored basic journalist standards because it wanted to advance its well-known and easily documented, biased agenda against President Donald J. Trump ("the President") by impugning individuals perceived to be supporters of the President.

9.       As a 16-year old secondary school student, Nicholas' political beliefs are anything but established and entrenched in his young mind.

10.     Nicholas has zero history of political activism or aggressiveness and did not exhibit any such conduct even when confronted with unbridled racist attacks by activist bullies at the National Mall.

11.     The *Post's* campaign to target Nicholas in furtherance of its political agenda was carried out by using its vast financial resources to enter the bully pulpit by publishing a series of false and defamatory print and online articles which effectively provided a worldwide megaphone to Phillips and other anti-Trump individuals and entities to smear a young boy who was in its view an acceptable casualty in their war against the President.

12.     Unlike the *Post's* abuse of the profession of journalism, Plaintiffs do not bring this lawsuit to use the judicial system to further a political agenda. This lawsuit is brought against the *Post* to seek legal redress for its negligent, reckless, and malicious attacks on Nicholas which caused permanent damage to his life and reputation.

13.     The *Post* bullied an innocent child with an absolute disregard for the pain and destruction its attacks would cause to his life.

14.     The *Post* proved itself to be a loud and aggressive bully with a bully pulpit.

15.     In this country, our society is dedicated to the protection of children regardless of the color of their skin, their religious beliefs, or the cap they wear.

16.     But the *Post* did not care about protecting Nicholas. To the contrary, the *Post* raced with a reckless disregard of the facts and truth because in this day and time there is a premium for being the first and loudest media bully.

17.     The *Post* wanted to lead the charge against this child because he was a pawn in its political war against its political adversary – a war so disconnected and beyond the comprehension of Nicholas that it might as well have been science fiction.

18.     The *Post* must be dealt with the same way every bully is dealt with and that is hold the bully fully accountable for its wrongdoing in a manner which effectively deters the bully from again bullying other children. In a civil lawsuit, punishment and deterrence is found in awarding money damages to the victim and target of the bully.

19.     In order to fully compensate Nicholas for his damages and to punish, deter, and teach the *Post* a lesson it will never forget, this action seeks money damages in excess of Two Hundred and Fifty Million Dollars ($250,000,000.00) – the amount Jeff Bezos, the world's richest person, paid in cash for the *Post* when his company, Nash Holdings, purchased the newspaper in 2013.

**THE JANUARY 18 INCIDENT**

20.     On January 18, 2019, Nicholas attended the March for Life on a school trip chaperoned by sixteen adults, nine of whom were faculty members at Nicholas' school, Covington Catholic High School ("CovCath").

21.     Nicholas and his classmates were instructed to meet at the steps of the Lincoln Memorial at the National Mall by 5:00 p.m. to catch their buses for the return trip to Kentucky.

22.     Nicholas was wearing a red cap Make America Great Again cap ("MAGA cap") that he had purchased that day as a souvenir.

23.     While at the National Mall, a small group of adult gentlemen who describe themselves as Hebrew Israelites – a known hate group – began verbally assaulting and taunting Nicholas and his CovCath classmates with, including but not limited to, threats of physical violence and vitriol, calling the students "incest babies," "dirty ass crackers," and "future school shooters."

- 4 -

24.     One of Nicholas' classmates requested and received permission from a school chaperone to engage in CovCath school sports cheers in an effort to ignore and drown out the hate speech being hurled at them by the Hebrew Israelites.

25.     The school cheer is intended and undertaken to promote unity and school pride and should have been correctly seen as a positive act, not a racist act.

26.     During the school cheer, Phillips and a small group of his companions – all of whom had been participating in the Indigenous Peoples March at the National Mall that day – instigated a confrontation with Nicholas and his CovCath classmates.

27.     Rather than focusing their attention on the Hebrew Israelites, who had been relentlessly insulting both the teenagers for almost an hour and the Native Americans attending the Indigenous Peoples March before that, Phillips and his activist companions approached the CovCath students from a distance while beating drums, singing, dancing, and carrying cameras to capture the confrontation on video.

28.     Apparently, Phillips, a phony war hero, was too intimidated by the unruly Hebrew Israelites to approach them, the true troublemakers, and instead chose to focus on a group of innocent children – a much safer endeavor for activist tactics of intimidation.

29.     When Phillips first approached them, many of the CovCath students "felt like he was coming into their group to join in with the students' cheers."

30.     Phillips intentionally walked up to the crowd of CovCath students.

31.     The CovCath students did not move toward Phillips or otherwise actively approach or surround Phillips.

32.     Nicholas and the students merely acquiesced in Phillips' election to enter their group and beat his drum within inches of Nicholas' face.

33.     Once within their group, Phillips freely moved about, briefly walking up to certain students within the group, which included many children who were not CovCath students.

34.     Phillips then walked directly up to where Nicholas was standing on the steps of the Lincoln Memorial so that he could confront Nicholas and bully him by getting in his face.

35.     Phillips, a 64-year-old man attired in Native American garb and a stranger to Nicholas, continued to beat his drum and sing loudly within inches of Nicholas' face for several minutes while staring at Nicholas.

36.     Contrary to his false statements in media interviews after the January 18 incident that he was trying to move to the top of the steps of the Lincoln Memorial, Phillips approached the students from a distance and walked past clear pathways to the steps to the Lincoln Memorial.

37.     Moreover, when Phillips then waded into the students' crowd and specifically confronted Nicholas, Phillips never made any attempt to move past, around, or away from Nicholas even though he could have done so at any time.

38.     Prior to being directly confronted by Phillips, Nicholas had not noticed Phillips at the National Mall.

39.     Nicholas did not confront Phillips.

40.     Nicholas did not move toward Phillips.

41.     Nicholas did not make any movement to block Phillips' path or prevent Phillips from physically moving wherever he wished.

42.     Nicholas was startled and confused by the actions of Phillips in singling him out and confronting him.

43.     During the confrontation instigated by Phillips, Nicholas stood still as he was concerned that turning away from Phillips might be considered a sign of disrespect.

44.     While he stood there with Phillips beating a drum near his face and singing loudly, Nicholas remained silent and did not utter a single word to Phillips.

45.     Nicholas did not make any gestures by hand or otherwise toward Phillips.

46.     Nicholas made only one gesture while being confronted by Phillips – he quietly signaled a classmate to refrain from responding to profanity-laced insults being directed at the student by one of Phillips' companions.

47.     At all times, Nicholas acted respectfully, responsibly, appropriately, and in a manner consistent with the values instilled upon him by his family and his religious faith.

48.     The confrontation ended when Nicholas and his fellow CovCath students were instructed to board the buses.

49.     Indeed, when Nicholas walked away quietly to board the bus, Phillips turned away from the Lincoln Memorial and outwardly celebrated some perceived "win" over Nicholas and his CovCath classmates, with his companion shouting "I got him, man, I got him! ... We won grandpa, we fucking won grandpa!"

50.     During the January 18 incident, Nicholas:

      (a)     did not swarm or otherwise actively surround Phillips;

      (b)     did not target or confront Phillips;

      (c)     did not assault or physically intimidate Phillips in any manner;

      (d)     did not move from where he was standing when Phillips approached him;

      (e)     did not block Phillips' path or egress;

      (f)     did not taunt or mock Phillips or anyone else present;

      (g)     did not utter a single word toward Phillips;

      (h)     did not engage in chanting, jeering, or clapping with or at Phillips;

      (i)     did not taunt or hurl any political chant or racial slur at anyone, including Phillips, any other Native American, or the Hebrew Israelites; and

      (j)     did not engage in any conduct whatsoever that could be accurately described or characterized as racist.

51.     On January 19, 20 and 21, the *Post* ignored the truth and falsely accused Nicholas of, among other things, "accost[ing]" Phillips by "suddenly swarm[ing]" him in a "threaten[ing]" and "physically intimidat[ing]" manner as Phillips "and other activists were wrapping up the march and preparing to leave," "block[ing]" Phillips path, refusing to allow Phillips "to retreat," "taunting the dispersing indigenous crowd," chanting "build that wall," "Trump2020," or "go back to Africa," and otherwise engaging in racist and improper conduct which ended only "when Phillips and other activists walked away."

## ONLINE VIDEOS OF THE JANUARY 18 INCIDENT

52.     On the evening of January 18, 2019, at 7:33 p.m., Kaya Taitano, a participant in the Indigenous Peoples March, posted online a selectively edited 59 second video depicting only a small portion of the interaction between Nicholas and Phillips, and later that night, she posted a 3 minute 44 second video. (collectively, the "Taitano Videos").

53.     The Taitano Videos did not show, among other things:

      (a)     the Hebrew Israelites' misconduct and homophobic, racist slurs directed to the CovCath students;

(b)    that Phillips had approached the students and inserted himself into their area before confronting Nicholas;

(c)    that the students were already engaged in school cheers at the time Phillips approached;

(d)    Nicholas engaging in any misconduct;

(e)    Nicholas making any gesture of any kind except to, at times, awkwardly smile;

(f)    Nicholas uttering any words to Phillips or his companions;

(g)    Nicholas moving into Phillips' path;

(h)    Nicholas blocking Phillips' exit; or

(i)    Nicholas physically or verbally threatening Phillips in any manner.

54.    At 11:13 p.m. on January 18, 2019, @2020fight, a fake Twitter account with a following of approximately 41,000, tweeted a 1 minute 1 second clip from the Taitano Videos with the comment "This MAGA loser gleefully bothering a Native American protestor at the Indigenous Peoples March."  (the "2020fight Video").

55.    The 2020fight Video, alone, is reported as having been viewed at least 2,500,000 million times, retweeted 14,000 times, and liked 27,000 times before the account was suspended by Twitter no later than January 21.

56.    Snapshots of the 2020fight video show it to have been viewed at least 10.6 million times.

57.    According to media reports, the @2020fight account was created in December 2016, tweeted an average of 130 times a day, and was suspicious for its high follower count, unusually high rate of tweets, highly polarized and yet inconsistent political messaging, and the use of someone else's image in the profile photo.

58.     In fact, as acknowledged by the *Post* on January 23, the @2020fight account was likely a fraudulent account available for sale on Shoutcart.com.

59.     By January 23, the *Post* conceded that the @2020fight account that was largely responsible for the edited video going viral *on social media* may have been purchased from Shoutcart.com for that specific purpose.

60.     With no investigation into the @2020fight account, the *Post* actively, negligently, and recklessly participated in making the 2020fight Video go viral on social media when on January 19 at 9:21 a.m., *Post* reporter Joe Heim re-posted the 2020fight Video.

61.     The *Post* was the one of the first, if not the first, mainstream media outlet to expand coverage of the January 18 incident from social media to mainstream media.

62.     *Post* reporter Heim was given credit for contributing to the *Post's* first online article within approximately four (4) hours of his retweet of the 2020fight Video and was listed on the by-line in the *Post's* first print article, along with Antonio Olivo and Cleve R. Wootson, Jr.

63.     An accurate video as to what occurred on January 18, 2019, was available online on January 19, 2019, when Shar Yaqataz Banyamyan, one of the Hebrew Israelites who was present for the encounter between Phillips and Nicholas, posted a 1 hour and 46-minute video on Facebook (the "Banyamyan Video").[1]

64.     A plethora of relevant video was also available online but ignored by the *Post* and the mainstream and social media mob of bullies which the *Post* sought to lead to further its biased agenda.

---

[1] *See* https://www.youtube.com/watch?v=t3EC1_gcr34&feature=youtu.be&t=523 (last visited February 17, 2019).

65.     From online video and fair use of media broadcasts, Nicholas' counsel produced a fourteen-minute video distilling what occurred on January 18, entitled "Nicholas Sandmann: The Truth in 15 Minutes" (the "Sandmann Video"), available at https://www.youtube.com/watch?v=lSkpPaiUF8s.

66.     The Banyamyan and Sandmann Videos accurately set forth the truth of the January 18 incident.

67.     The Banyamyan and Sandmann Videos demonstrate that this incident was intentionally instigated by Phillips and that Nicholas was targeted by a professional activist whose false accusations neatly fit the mainstream and social media's anti-Trump agenda.

68.     The Banyamyan and Sandmann Videos demonstrate that Nicholas did not engage in any of the misconduct described by the *Post*.

## NICHOLAS' STATEMENT AND NBC INTERVIEW

69.     On the afternoon of January 20, in an attempt to stem the threats of physical violence being made against him, his family, and his CovCath classmates, Nicholas made public a statement in which he provided a detailed and accurate factual description of the January 18 incident.  A copy of Nicholas' January 20 statement is attached hereto as Exhibit A.

70.     On January 23, in a further attempt to stem the threats of physical violence being made against him, his family, and his CovCath classmates, Nicholas gave an interview to Savannah Guthrie on the *Today* show on NBC, in which he reiterated his detailed and accurate factual description of his encounter with Phillips in the face of accusatory questioning by Guthrie.

## AN INVESTIGATION REVEALS THE TRUTH

71.     The *Post* did not conduct a proper investigation before publishing its false and defamatory statements of and concerning Nicholas.

72.     A false and defamatory statement of and concerning Nicholas was also published by the Diocese of Covington on January 19 before a proper investigation had been conducted by the Diocese.

73.     Subsequently, the Diocese of Covington retained through its counsel a third-party investigative firm, Greater Cincinnati Investigation, Inc. ("GCI"), to formally determine what occurred during the January 18 incident at the National Mall.

74.     On February 11, 2019, GCI issued its Final Investigative Report (the "GCI Report"), a true and correct copy of which is attached hereto as Exhibit B.

75.     On February 11, 2019, Diocese Bishop Foys released the GCI Report and said in a letter to the Covington Catholic parents that the GCI Report exonerated the students and demonstrated that the students did not instigate the incident at the Lincoln Memorial.  A true and correct copy of said letter is attached hereto as Exhibit C.

76.     The GCI Report is entirely consistent with all video evidence as well as statements issued by Nicholas and other CovCath students and chaperones.

77.     According to the GCI Report, four (4) licensed investigators spent approximately 240 man hours investigating the incident, interviewed 43 students and 13 chaperones, reviewed approximately 50 hours of Internet activity, and attempted to interview Phillips, who failed to respond to phone calls, emails, or investigators who waited outside his home for 6 hours and left a note asking him to contact them.

78.     The GCI Report made the following key findings:

(a)    Nicholas' January 20 statement accurately reflects the January 18 incident.

(b)    There was "no evidence that students responded [to the Black Hebrew Israelites] with any offensive or racist statements of their own."

(c)    The students asked their chaperones if they could perform school cheers to drown out the Hebrew Israelites' invective, and upon receiving approval, they performed the same cheers that are commonly performed at football or basketball games.

(d)    There was "no evidence that the students performed a 'Build the Wall' chant."

(e)    Defendant Phillips approached the Covington Catholic students.

(f)    There was "no evidence of offensive or racist statements by students to Mr. Phillips or members of his group."

(g)    The majority, if not all, of the MAGA hats being worn by students were purchased before, during, or after the March for Life.

(h)    In previous years, some students had purchased 'Hope' hats in support of President Obama.

(i)    "Mr. Phillips' public interviews contain some inconsistencies. . . ."

## PHILLIPS' INCONSISTENT AND FALSE CLAIMS

79.    Phillips is known to have given at least six interviews to mainstream media, including the *Post*, *CNN, The Associated Press, Detroit Free Press, MSNBC, and Democracy Now*.

80.    The accusations of Phillips and his companions, as published by the *Post* and the others identified above are remarkable in their inconsistency with each other.

81.     According to the first *Post* print article, Phillips stated that the students "suddenly swarmed around him as he and other activists were wrapping up the march."

82.     According to *The Associated Press*, Phillips stated that "he felt compelled to get between two groups with his ceremonial drum to defuse a confrontation."

83.     According to the first *Post* online article, Phillips said he was trying to "exit out of this situation and finish my song at the Lincoln Memorial."

84.     According to the second *Post* print article, "Phillips said he was trying to reach the top of the memorial, where friends were standing."

85.     According to *Democracy Now!*, Phillips stated that "I wasn't focusing on anybody except taking the youth out of there, the Indigenous youth that was with me, out of that situation, and that's when Mr. Sandmann stood in front of me and blocked my path."

86.     According to the first *Post* print article, Phillips stated that it "was getting ugly" and he needed to find "an exit out" of there, but Nicholas "blocked [his] way and wouldn't allow me to retreat."

87.     But according to the second *Post* print article, Phillips queried "why should I go around him?"

88.     Despite Phillips' claim that the students yelled "build that wall," "go back to Africa," and "go back to the reservation," no video evidence exists substantiating this accusation.

89.     Despite an attorney for the Lakota People Law Project, Chase Iron Eyes', claim as reported in the first *Post* print article that the incident "ended when Phillips and other activists walked away" and Phillips' claim that he was trying to reach the top of the

steps, the incident ended only when Nicholas left for his bus and Phillips then turned away from the top of the stairs and celebrated his perceived "win" with his companions.

90.     Despite Phillips' claims that the students left because they were "running from the police," the video evidence and statements of witnesses demonstrate that the students left to catch their buses.

91.     Although Phillips has previously claimed to have served in Vietnam, it is now evident that though Phillips was in the Marines, he was never deployed overseas.

## THE *POST* COVERAGE

92.     The *Post* rushed to lead the mainstream media to assassinate Nicholas' character and bully him, publishing their first article no later than 1:37 p.m. January 19. This story was not "hot" or "breaking news."  To the extent the *Post* performed any investigation at all into what occurred, its unreasonable investigation did not take long, and contrary information did not stop it from publishing its first story in its Sunday newspaper the next day.  One of the reporters on the story first retweeted the video approximately four hours before receiving credit for the *Post's* first article.  In the intervening time, the *Post* apparently managed to track down and interview Phillips, write a story, and fan the flames of the social media mob into a mainstream media frenzy of false attacks and threats against Nicholas.

93.     In the *Post's* own words – albeit a far cry from the true scope of the false and defamatory accusations it made against Nicholas – the readers of the *Post's* coverage were "licensed to conclude that the students saw [Phillips] from afar, targeted him and advanced."  Of course, the *Post's* readers were also licensed to falsely conclude that Nicholas physically and verbally assaulted Phillips while blocking his egress from a mob of students who were similarly engaged in racist conduct.

94.   The *Post*, whose coverage emphasized that Nicholas was wearing a "MAGA" hat, contributed to the rampant cyber-assault and cyber-bullying suffered by Nicholas in the aftermath of its initial reporting which was also undertaken in mass by the mob of other bullies made up of other members of the mainstream media, individuals tweeting on Twitter, church officials, celebrities, and politicians.

95.   Even the Twitter platform itself jumped into the bully pulpit and was influenced by early media coverage of the *Post*, as demonstrated when its "moment" feature falsely accused Nicholas and his classmates of "mocking" Phillips.  According to reports, a Twitter spokesperson stated "Twitter Curation strives to fairly and accurately contextualize the nature of large conversations on the platform ... The original Covington video appeared on Friday night.  However, the Curation team did not compile a Moment until additional news media reporting emerged to provide context to the video – this included a source video interview with Nathan Phillips, which was featured in the Moment."

## PARTIES, JURISDICTION, AND VENUE

96.   Nicholas Sandmann and his parents reside in Kenton County, Kentucky.

97.   Nicholas is a 16-year old 11th grade student who attends CovCath, an all-male Catholic high school in Park Hills, Kentucky.

98.   The *Post* is a foreign corporation existing under the laws of the State of Delaware with its principal place of business being located at 1301 K. Street NW, Washington, D.C. 20071.  The *Post* may be served by delivery of a copy of the summons and complaint to its duly-appointed registered agent, C T Corporation System, 1015 15th Street NW, Suite 1000, Washington, D.C. 20005.

99.     There exists complete diversity of citizenship between Plaintiffs and the *Post*.

100.    The amount in controversy greatly exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interests, costs, and attorneys' fees, as required to sustain subject-matter jurisdiction in this Court.

101.    This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

102.    The *Post* has one of the largest print circulations and number of online subscribers in the country.

103.    The *Post* transacts business in the State of Kentucky, including through the sale of print newspapers and online subscriptions, and committed the tortious acts identified herein in the State of Kentucky.

104.    The *Post* published the print and online articles identified herein in the State of Kentucky.

105.    The *Post* has intentionally sought and obtained benefits from their tortious acts in the State of Kentucky.

106.    The *Post* directed its unlawful and bullying conduct at Nicholas, a citizen of Kentucky.

107.    Nicholas suffered substantial reputational and emotional harm in this District.

108.    There is a reasonable and direct nexus between the *Post's* tortious conduct in Kentucky and the harm suffered by Nicholas in Kentucky and beyond.

109.    The *Post* is subject to the jurisdiction of this Court pursuant to KRS 454.210.

110.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the *Post* is subject to personal jurisdiction in this District and/or a substantial part of the events giving rise to this claim occurred in this District, including publication and injury.

## CAUSE OF ACTION FOR DEFAMATION

111.    Nicholas reasserts and incorporates by reference paragraphs 1 through 110 of this Complaint as if fully restated herein.

112.    The *Post* published to third parties without privilege no less than six false and defamatory articles of and concerning Nicholas, including two in its print newspaper and four online.  This number does not include those articles that the *Post* updated and changed after initial publication.

113.    On January 19, 2019, the *Post* published online its first false and defamatory article entitled "'It was getting ugly': Native American drummer speaks on MAGA-hat wearing teens who surrounded him" (the "First Article").  A true and correct copy of the First Article is attached hereto as Exhibit D.

114.    The First Article features Nicholas prominently by publication of the @2020fight and/or Taitano Videos and emphasizing his alleged involvement as the "one standing about a foot from the drummer's face wearing a relentless smirk."

115.    The First Article communicated the false and defamatory gist that Nicholas instigated a confrontation with Phillips and subsequently engaged in racist conduct.

116.    The First Article communicated the false and defamatory gist that Nicholas assaulted and/or physically intimidated Phillips.

117.    The First Article communicated the false and defamatory gist that Nicholas engaged in racist taunts.

118.    In its First Article, the *Post* published or republished the following false and defamatory statements:

(a)    The headline "'It was getting ugly': Native American drummer speaks on the MAGA-hat wearing teens who surrounded him."

(b)    "In an interview Saturday, Phillips, 64, said he felt threatened by the teens and that they suddenly swarmed around him as he and other activists were wrapping up the march and preparing to leave."

(c)    "Phillips, who was singing the American Indian Movement song of unity that serves as a ceremony to send the spirits home, said he noticed tensions beginning to escalate when the teens and other apparent participants from the nearby March for Life rally began taunting the dispersing indigenous crowd."

(d)    "A few people in the March for Life crowd began to chant 'Build that wall, build that wall,' he said."

(e)    "'It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial,' Phillips recalled. 'I started going that way, and that guy in the hat stood in my way and we were at an impasse.  He just blocked my way and wouldn't allow me to retreat.'"

(f)    "'It clearly demonstrates the validity of our concerns about the marginalization and disrespect of Indigenous peoples, and it shows that traditional knowledge is being ignored by those who should listen most closely,' Darren Thompson, an organizer for the [Indigenous Peoples Movement], said in the statement."

(g)     "Chase Iron Eyes, an attorney with the Lakota People Law Project, said the incident lasted about 10 minutes and ended when Phillips and other activists walked away."

(h)     "'It was an aggressive display of physicality.  They were rambunctious and trying to instigate a conflict,' he said.  'We were wondering where their chaperones were.  [Phillips] was really trying to defuse the situation.'"

(i)     "Phillips, an Omaha tribe elder who also fought in the Vietnam war, has encountered anti-Native American sentiments before . . . ."

119.    On January 20, the *Post* updated its Second Article (the "Second Article"). A true and correct copy of the Second Article is attached hereto as Exhibit E.

120.    The Second Article, as updated and in addition to the gists identified above in the First Article, communicated the false and defamatory gist that Nicholas' behavior violated the fundamental standards of his religious community and violated the policies of his school such that he should be expelled.

121.    In its false and defamatory Second Article, in addition to those identified in the First Article, the *Post* published or republished the following false and defamatory statements:

(a)     "'We [Bishop Foys and the Diocese of Covington] condemn the actions of the Covington Catholic High School students towards Nathan Phillips specifically, and Native Americans in general,' the statement said. 'The matter is being investigated and we will take appropriate action, up to and including expulsion.' ... The diocese's statement expressed regret that jeering, disrespectful students from a Catholic school had become the enduring image of the march."

122.    On January 20, 2019, the *Post* published in print its third false and defamatory article entitled "Marcher's accost by boys in MAGA caps draws ire" (the "Third Article").  A true and correct copy of the Third Article is attached hereto as Exhibit F.

123.    The Third Article was published in the *Post's* Sunday edition of its newspaper.

124.    The Third Article referenced the viral @2020fight and/or Taitano Videos that had gone viral, prominently featuring Nicholas, and emphasized Nicholas' alleged involvement as the "one standing about a foot from the drummer's face wearing a relentless smirk."

125.    The Third Article communicated the false and defamatory gist that Nicholas instigated a confrontation with Phillips and subsequently engaged in racist conduct.

126.    The Third Article communicated the false and defamatory gist that Nicholas assaulted and/or physically intimidated Phillips.

127.    The Third Article communicated the false and defamatory gist that Nicholas' behavior violated the fundamental standards of his religious community.

128.    The Third Article communicated the false and defamatory gist that Nicholas' behavior violated the policies of his school such that he should be expelled.

129.    In its Third Article, the *Post* published or republished the following false and defamatory statements:

      (a)    The headline "Marcher's accost by boys in MAGA caps draws ire."

      (b)    "In an interview Saturday, Phillips, 64, said he felt threatened by the teens and that they suddenly swarmed around him as he and other activists were wrapping up the march and preparing to leave."

(c)     "Phillips, who was singing the American Indian Movement song that serves as a ceremony to send the spirits home, said he noticed tensions beginning to escalate when the teens and other apparent participants from the nearby March for Life rally began taunting the dispersing indigenous crowd."

(d)     "A few people in the March for Life crowd began to chant 'Build that wall, build that wall,' he said."

(e)     "'It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial,' Phillips recalled.  'I started going that way, and that guy in the hat stood in my way and we were at an impasse.  He just blocked my way and wouldn't allow me to retreat.'"

(f)     "'It clearly demonstrates the validity of our concerns about the marginalization and disrespect of Indigenous peoples, and it shows that traditional knowledge is being ignored by those who should listen most closely,' Darren Thompson, an organizer for the [Indigenous Peoples Movement], said in the statement."

(g)     "'We [Bishop Foys and the Diocese of Covington] condemn the actions of the Covington Catholic High School students towards Nathan Phillips specifically, and Native Americans in general,' the statement said.  'The matter is being investigated and we will take appropriate action, up to and including expulsion.'"

(h)     "Chase Iron Eyes, an attorney with the Lakota People Law Project, said the incident lasted about 10 minutes and ended when Phillips and other activists walked away."

(i)      "'It was an aggressive display of physicality.  They were rambunctious and trying to instigate a conflict,' he said.  'We were wondering where their chaperones were.  [Phillips] was really trying to defuse the situation.'"

(j)      "In that role, he [Phillips] has encountered anti-Native American sentiment before . . . ."

130.    On January 20, 2019, the *Post* published online its fourth false and defamatory article entitled "Opposed to the dignity of the human person': Kentucky Catholic diocese condemns teens who taunted vet at March for Life" (the "Fourth Article").  A true and correct copy of the Fourth Article is attached hereto as Exhibit G.

131.    The Fourth Article referenced the viral @2020fight and/or Taitano Videos that had gone viral, prominently featuring Nicholas, and emphasized Nicholas' alleged involvement as being the "teen, shown smirking at him in the video, was blocking him from moving."

132.    The Fourth Article communicated the false and defamatory gist that Nicholas instigated a confrontation with Phillips and engaged in racist conduct.

133.    The Fourth Article communicated the false and defamatory gist that Nicholas assaulted Phillips.

134.    The Fourth Article communicated the false and defamatory gist that Nicholas' behavior violated the fundamental standards of his religious community.

135.    The Fourth Article communicated the false and defamatory gist that Nicholas' behavior violated the policies of his school such that he should be expelled.

136.    In its Fourth Article, the *Post* published or republished the following false and defamatory statements:

(a)   The headline "Opposed to the dignity of the human person': Kentucky Catholic diocese condemns teens who taunted vet at March for Life."

(b)   "A viral video of a group of Kentucky teens in 'Make America Great Again' hats taunting a Native American veteran on Friday ..."

(c)   "A few of the young people chanted 'Build that wall, build that wall,' the man said, adding that a teen, shown smirking at him in the video, was blocking him from moving."

(d)   "'We condemn the actions of the Covington Catholic high school students towards Nathan Phillips specifically, and Native Americans in general,' a statement by the Roman Catholic Diocese of Covington and Covington Catholic High School read. 'We extend our deepest apologies to Mr. Phillips. This behavior is opposed to the Church's teachings on the dignity and respect of the human person. The matter is being investigated and we will take appropriate action, up to and including expulsion.'"

137.   On January 20, 2019, the *Post* published online its fifth false and defamatory article entitled "Most young white men are much more open to diversity than older generations" (the "Fifth Article").  A true and correct copy of the Fifth Article is attached hereto as Exhibit H.

138.   The Fifth Article emphasized Nicholas' alleged involvement by stating that "one of their [the students'] members appeared to physically intimidate Nathan Phillips ..."

139.   The Fifth Article communicated the false and defamatory gist that Nicholas instigated a confrontation with Phillips and subsequently engaged in racist conduct.

- 24 -

140.    The Fifth Article communicated the false and defamatory gist that Nicholas assaulted and/or physically intimidated Phillips.

141.    In its Fifth Article, the *Post* published or republished the following false and defamatory statements:

(a)    "Friday's incident near the Lincoln Memorial in which a group of high school boys confronted an elderly Native American man sent a ripple of fear and anger across the country.  The image of a group of high school boys clad in 'Make America Great Again' hats, smirking and laughing as one of their members appeared to physically intimidate Nathan Phillips resurfaced tensions that have been simmering since President Trump's campaign began."

(b)    "At one point, some reportedly chanted, 'Build the wall!'"

(c)    "It's clear from Friday's incident on the Mall that the young men who confronted the Native American protester had somehow internalized that their behavior was acceptable."

142.    On January 21, 2019, the *Post* published in print its sixth false and defamatory article entitled "Fuller view emerges of conflict on Mall" (the "Sixth Article"). A true and correct copy of the Sixth Article is attached hereto as Exhibit I.

143.    The Sixth Article was published in the *Post's* Monday edition of its newspaper.

144.    The Sixth Article references Nicholas by name.

145.    The Sixth Article communicated the false and defamatory gist that Nicholas instigated a confrontation with Phillips and subsequently engaged in racist conduct.

146.    The Sixth Article communicated the false and defamatory gist that Nicholas assaulted and/or physically intimidated Phillips.

147.    The Sixth Article communicated the false and defamatory gist that Nicholas'
behavior violated the fundamental standards of his religious community.

148.    The Sixth Article communicated the false and defamatory gist that Nicholas'
behavior violated the policies of his school such that he should be expelled.

149.    In its Sixth Article, the *Post* published or republished the following false and
defamatory statements:

(a)    "The Israelites and students exchanged taunts, videos show.  The
Native Americans and Hebrew Israelites say some students shouted, 'Build the
wall!'"

(b)    "When I took that drum and hit that first beat ... it was a supplication
to God," said Nathan Phillips, a member of the Omaha tribe and a Marine
veteran.  'Look at us, God, look at what is going on here; my America is being
torn apart by racism, hatred, bigotry.'"

(c)    "While the groups argued, some students laughed and mocked them
. . . . 'They were sitting there, mocking me as I was trying to teach my brothers,
so yes the attention turned to them,' Israel told The Washington Post."

(d)    "Phillips said he and his fellow Native American activists also had
issues with the students throughout the day.  'Before they got centered on the
black Israelites, they would walk through and say things to each other, like, 'Oh,
the Indians in my state are drunks or thieves,' the 64-year-old said."

(e)    "Phillips said he heard students shout, 'Go back to Africa!'"

(f)    "'They were mocking my ancestors in a chant ...' he said."

(g)    "Jon Stegenga, a photojournalist who drove to Washington on Friday
from South Carolina to cover the Indigenous Peoples March, recalled hearing

students say 'build the wall' and 'Trump 2020.'  He said it was about that time that Phillips intervened."

(h)     "Most of the students moved out of his way, the video shows.  But Sandmann stayed still.  Asked why he felt the need to walk into the group of students, Phillips said he was trying to reach the top of the memorial, where friends were standing.  But Phillips also said he saw more than a teenage boy in front of him.  He saw a long history of white oppression of Native Americans. 'Why should I go around him?' he asked.  'I'm just thinking of 500 years of genocide in this country, what your people have done.  You don't even see me as a human being.'"

(i)     "'He [Phillips] was dealing with a lot of feelings, as he was being surrounded and not being shown respect,' the photographer said."

(j)     "School officials and the Catholic Diocese of Covington released a joint statement Saturday condemning and apologizing for the students' actions. 'The matter is being investigated and we will take appropriate action, up to and including expulsion,' the statement said."

150.   On January 21, 2019, the *Post* published online its seventh false and defamatory article entitled "Viral standoff between a tribal elder and a high schooler is more complicated than it first seemed" (the "Seventh Article").  A true and correct copy of the Seventh Article is attached hereto as Exhibit J.

151.   The Seventh Article references Nicholas by name.

152.   The Seventh Article communicated the false and defamatory gist that Nicholas instigated a confrontation with Phillips and subsequently engaged in racist conduct.

- 27 -

153.    The Seventh Article communicated the false and defamatory gist that Nicholas assaulted Phillips.

154.    The Seventh Article communicated the false and defamatory gist that Nicholas' behavior violated the fundamental standards of his religious community.

155.    The Seventh Article communicated the false and defamatory gist that Nicholas' behavior violated the policies of his school such that he should be expelled.

156.    In its Seventh Article, the *Post* published or republished the following false and defamatory statements:

(a)    "The Israelites and students exchanged taunts, videos show.  The Native Americans and Hebrew Israelites say some students shouted, 'Build the wall!'"

(b)    "When a Native American elder intervened, singing and playing a prayer song, scores of students around him seem to mimic and mock him, a video posted Monday shows."

(c)    "The Kentucky teens' church apologized on Saturday, condemning the students' actions."

(d)    "'When I took that drum and hit that first beat ... it was a supplication to God,' said Nathan Phillips, a member of the Omaha tribe and a Marine veteran.  'Look at us, God, look at what is going on here; my America is being torn apart by racism, hatred, bigotry.'"

(e)    "While the groups argued, some students laughed and mocked them . . . ."

(f)      "'They were sitting there, mocking me as I was trying to teach my brothers, so, yes, the attention turned to them,' Israel told The Washington Post."

(g)      "Phillips said he and his fellow Native American activists also had issues with the students throughout the day.  'Before they got centered on the black Israelites, they would walk through and say things to each other, like, 'Oh, the Indians in my state are drunks or thieves,' the 64-year-old said."

(h)      "Phillips said he heard students shout, 'Go back to Africa!'"

(i)      "'They were mocking my ancestors in a chant . . . .' he said."

(j)      "Jon Stegenga, a photojournalist who drove to Washington on Friday from South Carolina to cover the Indigenous Peoples March, recalled hearing students say 'build the wall' and 'Trump 2020.'  He said it was about that time that Phillips intervened."

(k)      "Most of the students moved out of his way, the video shows.  But Sandmann stayed still.  Asked why he felt the need to walk into the group of students, Phillips said he was trying to reach the top of the memorial, where friends were standing.  But Phillips also said he saw more than a teenage boy in front of him.  He saw a long history of white oppression of Native Americans.  'Why should I go around him?' he asked.  'I'm just thinking of 500 years of genocide in this country, what your people have done.  You don't even see me as a human being.'"

(l)      "'He [Phillips] was dealing with a lot of feelings, as he was being surrounded and not being shown respect,' the photographer said."

(m)    "School officials and the Catholic Diocese of Covington released a joint statement Saturday condemning and apologizing for the students' actions. 'The matter is being investigated and we will take appropriate action, up to and including expulsion,' the statement said."

157.    The First, Second, Third, Fourth, Fifth, Sixth, and Seventh Articles are collectively referred to herein as the "Articles."

158.    On January 19, 2019, the *Post* also posted to its Twitter page and published to approximately 13 million followers its First Article with the following false and defamatory captions, all within a span of 14 minutes, and all within the same thread:

(a)    "In an interview with The Post, Omaha Tribe elder Nathan Phillips says he 'felt like the spirit was talking through me' as teens jeered and mocked him."

(b)    "He was singing the American Indian Movement song of unity that serves as a ceremony to send the spirits home.  'It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial.'"

(c)    "Phillips, who fought in the Vietnam War, says in an interview 'I started going that way, and that guy in the hat stood in my way and we were at an impasse.  He just blocked my way and wouldn't allow me to retreat.'"

159.    These three tweets are collectively referred to herein as the "Tweets," true and correct copies of which are attached hereto as Exhibit K.

160.    In addition to the false and defamatory gists of the First Article, the Tweets also independently communicated the false and defamatory gists that Nicholas engaged in racist conduct and that Nicholas assaulted Phillips.

161.    The Tweets and Articles are collectively referred to herein as the "False and Defamatory Accusations."

162.    As the natural and foreseeable consequence of its actions, the *Post* knew and intended that its False and Defamatory Accusations would be republished by others, including media outlets and others on social media.

## NICHOLAS IS A PRIVATE FIGURE

163.    Nicholas is a private figure for the purposes of this defamation action, having lived his entire life outside of the public eye.

164.    Prior to the January 18 incident, Nicholas had no notoriety of any kind in the community at large.

165.    Nicholas did not engage the public's attention to resolve any public issue that could impact the community at large.

166.    Nicholas made no public appearances prior to the false accusations against him.

167.    Nicholas has not inserted himself into the forefront of any public issue.

168.    Nicholas' limited public statements after the accusations against him were reasonable, proportionate, and in direct response to the false accusations against him and do not render Nicholas a limited purpose public figure.

## THE *POST* PUBLISHED NEGLIGENTLY AND WITH ACTUAL MALICE

169.    The *Post* published its False and Defamatory Accusations negligently and with actual knowledge of falsity or a reckless disregard for the truth.

170.    As one of the world's leading news outlets, the *Post* knew but ignored the importance of verifying damaging, and in this case, incendiary accusations against a minor child prior to publication.

171.    The negligence and actual malice of the Post is demonstrated by its utter and knowing disregard for the truth available in the complete video of the January 18 incident which was available contemporaneously with the edited clip the Post chose because it appeared to support its biased narrative.

172.    Instead of investigation and publishing the true story, the *Post* recklessly rushed to publish its False and Defamatory Accusations in order to advance its own political agenda against President Trump.

173.    In doing so, the *Post* lifted the incident from social media and placed it in the mainstream media, giving its False and Defamatory Accusations credibility and permanence.

174.    The *Post* negligently published its False and Defamatory Accusations by departing from the reasonable standard of care employed by journalists, including those standards articulated by the Society of Professional Journalists' Code of Ethics.

175.    The *Post's* collective conduct demonstrates a purposeful avoidance of the truth and the publication of the False and Defamatory Accusations with actual knowledge of falsity following its review of the complete video evidence and Nicholas' statement no later than January 20.

176.    The *Post* negligently and recklessly published its False and Defamatory Accusations by failing to conduct a reasonable investigation prior to publication.

177.    The *Post's* failure to investigate is heightened where, as here, the January 18 incident was not breaking news and involved a minor child.

178.    The *Post* negligently and recklessly published its False and Defamatory Accusations by failing to conduct a reasonable investigation by not having a credible or reliable source for its publications.

- 32 -

179.    The *Post* negligently and recklessly published its False and Defamatory Accusations by relying on unreliable and biased sources with questionable credibility.

180.    Indeed, the *Post* negligently and recklessly relied upon only Phillips and other Native Americans with a biased pre-disposition.

181.    Phillips, himself, is wholly unreliable and lacks credibility as shown in part by his false claim to have served in Vietnam while a member of the military, as a professional activist with a known bias against President Trump and his supporters, his documented history of making similar false accusations, his use of the January 18 incident to promote his own political and personal agenda, the contradictions in his story established in his interviews, and that the video evidence that totally refute his story.

182.    The *Post* published its False and Defamatory Accusations in continued reliance upon those it knew to have political and personal biases, including Chase Iron Eyes of the Lakota People Law Project who was, in effect, managing and/or representing Phillips, Jon Stegenga who had also attended the Indigenous Peoples March, Deb Haaland who is a politician with a demonstrable bias against President Trump, and the Hebrew Israelites whose lack of credibility is widely known.

183.    The *Post* had obvious reasons to doubt the veracity of its purported firsthand sources, including because they are manifestly biased and because the short video evidence on which the *Post* relied did not show Nicholas or the students swarming Phillips, uttering the chants or slurs they were accused of making, or Nicholas or the students blocking Phillips' egress.

184.    The *Post* further had reason to doubt the veracity of its social media sources, including Kaya Taitano and @2020fight. Kaya Taitano also had a known bias having been

present to support the Indigenous Peoples March, and the @2020fight account bore all the hallmarks of being a fraudulent account with a political agenda, as later proven true.

185.   The *Post* consciously elected to ignore this contrary information in favor of its pre-conceived false narrative against President Trump and his supporters.

186.   The only category of individuals present at the January 18 incident that the *Post* chose not to rely upon were the CovCath students.

187.   The *Post* negligently and recklessly failed to consult publicly available information demonstrating its False and Defamatory Accusations to be false, including, without limitation, other video evidence available online demonstrating that Phillips specifically approached the students and specifically confronted Nicholas, and that Nicholas did not engage in swarming, surrounding, mocking, taunting, blocking, or otherwise physically intimidating Phillips or anyone else present.

188.   Not only was the *Post* aware that the snippets of video it reviewed did not support its False and Defamatory Accusations, but it was also aware that the video it reviewed was woefully incomplete, but the *Post* nonetheless published its accusations against Nicholas without any further investigation.

189.   The *Post* continued to publish its False and Defamatory Accusations with actual knowledge of falsity, having reviewed video evidence and statements of Nicholas Sandmann contradicting its False and Defamatory Accusations.

190.   The *Post* negligently and recklessly failed to seek information from other obvious sources who would have demonstrated its False and Defamatory Accusations to be false, including Nicholas, his classmates, and/or the chaperones present at the January 18 incident.

191.   The *Post* negligently and recklessly published its False and Defamatory Accusations despite internal inconsistencies in Phillips' claims as well as material differences in his statements to other outlets published January 19 and 20.

192.   The *Post* negligently and recklessly published its False and Defamatory Accusations in derogation of accepted principles of journalistic ethics, including by failing to use heightened sensitivity when dealing with juveniles.

193.   The *Post* negligently and recklessly published its False and Defamatory Accusations in derogation of accepted principles of journalistic ethics, including by failing to verify each before publication.

194.   The *Post* negligently and recklessly published its False and Defamatory Accusations in derogation of accepted principles of journalistic ethics, including by failing to take special care not to misrepresent or oversimplify its coverage, and by failing to provide any appropriate context to its False and Defamatory Accusations.

195.   The *Post* negligently and recklessly published its False and Defamatory Accusations in derogation of accepted principles of journalistic ethics, including by failing to avoid stereotyping.

196.   The *Post* negligently and recklessly published its False and Defamatory Accusations in derogation of accepted principles of journalistic ethics, including by failing to examine the way in which its own biases and agenda shaped its false reporting.

197.   The *Post* negligently and recklessly published its False and Defamatory Accusations in derogation of accepted principles of journalistic ethics, including by failing to treat Nicholas as a human being deserving of respect.

198.   The *Post* negligently and recklessly published its False and Defamatory Accusations in derogation of accepted principles of journalistic ethics, including by

wrongfully placing the anti-Trump, anti-Catholic, and pro-life agenda over the harm its False and Defamatory Accusations caused to Nicholas.

199.    At the time of its initial reporting of and concerning Nicholas, the Post did not know Nicholas' age and did not make any reasonable attempt to ascertain it despite the general knowledge that Nicholas was a high school student.

200.    Nicholas' counsel propounded a demand for retraction upon the *Post* on February 14, a copy of which is attached hereto as Exhibit L.

201.    The *Post's* actual malice is further evidenced by its failure to retract is False and Defamatory Accusations.

202.    The *Post* published its False and Defamatory Accusations with common law malice, including because it intended to harm Nicholas because he was a white, Catholic boy wearing a MAGA hat, and consciously ignored the threats of harm that it knew would inevitably ensue, in favor of its political agenda.

203.    The *Post* published its False and Defamatory Accusations with common law malice, demonstrated by its failure to retract its False and Defamatory Accusations despite the harm and danger it knew would be inflicted upon Nicholas.

204.    The *Post* published its False and Defamatory Accusations with common law malice, including because it callously ignored the consequences of its actions upon a minor child.

### DAMAGES

205.    The publication of the False and Defamatory Accusations directly and proximately caused substantial and permanent damage to Nicholas.

206.    The False and Defamatory Accusations were republished by third-parties and members of the mainstream and social media mob of other bullies, which was reasonably foreseeable.

207.    The False and Defamatory Accusations against Nicholas are defamatory *per se*, as they are libelous on their face without resort to additional facts, and as clearly demonstrated here, Nicholas was subjected to public hatred, contempt, scorn, obloquy, and shame.

208.    As a direct and proximate result of the False and Defamatory Accusations, Nicholas suffered permanent harm to his reputation.

209.    As a direct and proximate result of the False and Defamatory Accusations Nicholas suffers and will continue to suffer severe emotional distress.

210.    As a direct and proximate result of the False and Defamatory Accusations Nicholas is forced to live his life in a constant state of concern over his safety and the safety of his family.

211.    The *Post* published its False and Defamatory Accusations with actual malice and common law malice, thereby entitling Nicholas to an award of punitive damages.

212.    The *Post's* conduct was outrageous and willful, demonstrating that entire want of care that raises a conscious indifference to consequences.

213.    Nicholas is entitled to an award of punitive damages to punish the *Post* and to deter it from repeating such egregiously unlawful misconduct in the future.

**WHEREFORE**, Nicholas respectfully prays:

(a)    That judgment be entered against the *Post* for substantial compensatory damages in an amount not less than Fifty Million Dollars ($50,000,000.00);

(b)     That judgment be entered against the *Post* for punitive damages in an amount not less than Two Hundred Million Dollars ($200,000,000.00)

(c)     That Nicholas recover his reasonable attorneys' fees and expenses from the *Post*;

(d)     That all costs of this action be taxed to *Post*; and

(e)     That the Court grant all such other and further relief that the Court deems just and proper, including equitable relief.

Respectfully submitted this 19th day of February, 2019.

| | |
|---|---|
| **L. LIN WOOD, P.C.** | **HEMMER DEFRANK WESSELS PLLC** |
| */s/ L. Lin Wood* | */s/ Todd V. McMurtry* |
| L. Lin Wood (will seek admission *pro hac vice*) | Todd V. McMurtry |
| lwood@linwoodlaw.com | Kentucky Bar No. 82101 |
| G. Taylor Wilson (will seek admission *pro hac vice*) | tmcmurtry@hemmerlaw.com |
| twilson@linwoodlaw.com | Kyle M. Winslow |
| Jonathan D. Grunberg (will seek admission *pro hac vice*) | Kentucky Bar No. 95343 |
| jgrunberg@linwoodlaw.com | kwinslow@hemmerlaw.com |
| | |
| 1180 W. Peachtree Street, Ste. 2040 | 250 Grandview Drive, Ste. 500 |
| Atlanta, GA 30309 | Ft. Mitchell, KY 41017 |
| Tel: 404-891-1402 | Tel: 859-344-1188 |
| Fax: 404-506-9111 | Fax: 859-578-3869 |