UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

NICHOLAS SANDMANN, by and through
his parents and natural guardians, TED
SANDMANN and JULIE SANDMANN,

               Plaintiffs,

v.

WP COMPANY LLC, d/b/a THE
WASHINGTON POST,

               Defendant.

No. 2:19-cv-19-WOB-CJS

# THE WASHINGTON POST'S MEMORANDUM OF LAW
# IN SUPPORT OF THE MOTION TO DISMISS

Philip W. Collier
Bethany A. Breetz
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202
Telephone: (502) 587-3400

William G. Geisen
STITES & HARBISON, PLLC
100 East RiverCenter Boulevard
Suite 450
Covington, KY 41011
Telephone: (859) 652-7601

*Counsel for The Washington Post*

Kevin T. Baine (*pro hac vice* motion pending)
Thomas G. Hentoff (*pro hac vice* motion pending)
Nicholas G. Gamse (*pro hac vice* motion pending)
Katherine Moran Meeks (*pro hac vice* motion pending)
Whitney G. Woodward (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000

*Counsel for The Washington Post*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................3

    A.    The Complaint and the Post's Coverage .................................................3

        1.    The Post's Initial News Report—the First, Second and Third Articles.......5

        2.    The Fourth Article..................................................................6

        3.    The Fifth Article ....................................................................7

        4.    The Sixth and Seventh Articles..............................................7

        5.    The Tweets ...........................................................................11

        6.    Subsequent Post Coverage ...................................................11

    B.    The Retraction Demand and the Post's Response .................................12

GOVERNING STANDARDS.................................................................................13

ARGUMENT ........................................................................................................18

I.    THE POST'S OVERALL COVERAGE DID NOT DEFAME PLAINTIFF .................19

II.    THE FIRST, SECOND AND THIRD ARTICLES DID NOT DEFAME PLAINTIFF........................................................................................20

    A.    The Only Contested Statement in the Initial Report Concerning Plaintiff Was Substantially True .................................................20

    B.    The Only Contested Statement Concerning Plaintiff Was Not Defamatory *Per Se*, and Plaintiff Has Failed To Plead Special Damages .................................22

    C.    The Articles Are Not Reasonably Capable of Bearing the Defamatory Implications Alleged in the Complaint .................................24

    D.    The Other Challenged Statements Were Not "Of and Concerning" Plaintiff, Were Not Defamatory, or Were Statements of Opinion that Cannot Be Proven False .................................29

III.    THE FOURTH ARTICLE DID NOT DEFAME PLAINTIFF .........................................35

IV.    THE FIFTH ARTICLE DID NOT DEFAME PLAINTIFF ............................................36

V.    THE SIXTH AND SEVENTH ARTICLES DID NOT DEFAME PLAINTIFF .............37

    A.    The Sixth and Seventh Articles Are Not Reasonably Capable of Bearing the Defamatory Meanings Alleged in the Complaint .................................37

    B.    The Specific Statements Challenged in the Complaint Were Not "Of and Concerning" Plaintiff, Were Not Defamatory, or Were Statements of Opinion that Cannot Be Proven False .................................40

VI.    THE TWEETS DID NOT DEFAME PLAINTIFF .......................................................433

CONCLUSION ....................................................................................................45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................13, 14

*ATC Distribution Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*,
  402 F.3d 700 (6th Cir. 2005) ..........................................................................16

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................14

*Casale v. Nationwide Children's Hosp.*, 682 F. App'x 359 (6th Cir. 2017) ...............18

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087 (4th Cir. 1993)....................................27

*Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001) ............................17

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) ............................................................................4

*CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068 (W.D. Ky. 1995)...........................23

*Compuware Corp. v. Moody's Inv'rs Servs., Inc.*, 499 F.3d 520 (6th Cir. 2007).........38

*Desai v. Charter Comms., LLC*, 2019 WL 1421756 (W.D. Ky. Mar. 29, 2019).........29

*Farah v. Esquire Mag.*, 736 F.3d 528 (D.C. Cir. 2013) ..............................................14

*Forte v. Jones*, 2013 WL 1164929 (E.D. Cal. Mar. 20, 2013) ....................................25

*Gahafer v. Ford Motor Co.*, 328 F.3d 859 (6th Cir. 2003).....................................15, 24

*Gosling v. Conagra, Inc.*, 1996 WL 199738 (N.D. Ill. Apr. 23, 1996) .......................23

*Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6 (1970)......................................14

*Hazime v. Fox TV Stations, Inc.*, 2013 WL 4483485 (E.D. Mich. Aug. 19, 2013) ......17

*Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017) .........................14

*Lassiter v. Lassiter*, 456 F. Supp. 2d 876 (E.D. Ky. 2006)....................................17, 37

*Loftus v. Nazari*, 21 F. Supp. 3d 849 (E.D. Ky. 2014)................................................30

*Masson v. New Yorker Mag. Inc.*, 501 U.S. 496 (1991) .........................................18, 21

*Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990).......................................................17, 43

*Mirage Ent., Inc. v. FEG Entretenimientos S.A.*,
   326 F. Supp. 3d 26 (S.D.N.Y. 2018)......................................................44

*N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)..........................................17

*Nichols v. Moore*, 477 F.3d 396 (6th Cir. 2007).............................16, 27, 28

*O'Brien v. Williamson Daily News*, 735 F. Supp. 218 (E.D. Ky. 1990)............................ *passim*

*Ogle v. Hocker*, 279 F. App'x 391 (6th Cir. 2008)..........................................17

*Roche v. Home Depot U.S.A.*, 197 F. App'x 395 (6th Cir. 2006)...........................*passim*

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) .......................................................17

*Rubin v. U.S. News & World Report*, 271 F.3d 1305 (11th Cir. 2001)........................30

*Seaton v. TripAdvisor LLC*, 728 F.3d 592 (6th Cir. 2013) ......................17, 30

*Solo v. UPS Co.*, 819 F.3d 788 (6th Cir. 2016).................................6, 21, 22

*Squitieri v. Piedmont Airlines, Inc.*, 2018 WL 934829 (W.D.N.C. Feb. 16, 2018)....................26

*Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008) .........................4

*Tacket v. Delco Remy*, 937 F.2d 1201 (7th Cir. 1991)....................................24

*Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018)...........................................26

*White v. Fraternal Order of Police*, 909 F.2d 512 (D.C. Cir. 1990) ................16, 27, 28

## STATE CASES

*Abbott v. Vinson*, 20 S.W.2d 995 (Ky. 1929) ...............................................28

*Adelson v. Harris*, 402 P.3d 665 (Nev. 2017)................................................44

*Bell v. Courier-Journal & Louisville Times Co.*, 402 S.W.2d 84 (Ky. 1966) ...............18

*Better Built Garages, Inc. v. Ky. New Era, Inc.*, 2008 WL 4531037
   (Ky. Ct. App. Oct. 10, 2008).........................................................32

*Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732 (Ky. Ct. App. 2004) .........................25

*Cox v. Hatch*, 761 P.2d 556 (Utah 1988).....................................................27

*Dermody v. Presbyterian Church (U.S.A.)*, 530 S.W.3d 467 (Ky. Ct. App. 2017).....................24

*Doe v. Coleman*, 436 S.W.3d 207 (Ky. Ct. App. 2014) ...............................14

*Heidel v. Amburgy*, 2003 WL 21373164 (Ohio Ct. App. June 16, 2003)......................................36

*Hill v. Evans*, 258 S.W.2d 917 (Ky. 1953) .....................................................................23

*Jernigan v. Humphrey*, 815 So. 2d 1149 (Miss. 2002) .......................................................25

*Ky. Fried Chicken of Bowling Green, Inc. v. Sanders*, 563 S.W.2d 8 (Ky. 1978) .......................17

*Levant v. Whitley*, 755 A.2d 1036 (D.C. 2000).................................................................32

*Louisville Times v. Stivers*, 68 S.W.2d 411 (Ky. 1934)...........................................17, 31, 42

*McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882
    (Ky. 1981) ...............................................................................................15, 35, 40

*Morrison v. Poullet*, 227 A.D.2d 599 (N.Y. App. Div. 1996) ......................................................42

*Revis v. McClean*, 31 S.W.3d 250 (Tenn. Ct. App. 2000)............................................................28

*Rich for Rich v. Ky. Country Day, Inc.*, 793 S.W.2d 832 (Ky. Ct. App. 1990)..............................24

*Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392
    (Mich. App. Ct. 1992).................................................................................16, 27

*Sheliga v. Todd*, 2013 WL 869608 (Ky. Ct. App. Mar. 8, 2013) ...........................................15, 23

*Shields v. Booles*, 38 S.W.2d 677 (Ky. 1931)...................................................................15, 27

*Sweeney & Co. v. Brown*, 60 S.W.2d 381 (Ky. 1933)............................................................16, 29

*Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014)..............................................................13

*Towles v. Travelers Ins. Co.*, 137 S.W.2d 1110 (Ky. 1940) ...................................................16, 29

*Welch v. Am. Publ'g Co. of Ky.*, 3 S.W.3d 724 (Ky. 1999).............................................................14

*Yancey v. Hamilton*, 786 S.W.2d 854 (Ky. 1989).........................................................................38

## OTHER AUTHORITIES

Fed. R. Civ. P. 9(g) .............................................................................................16, 23

Ky. Rev. Stat. Ann. 503.050 ..........................................................................................22

*Prosser and Keeton on the Law of Torts* (5th ed. 1984).........................................................23, 27

Charles T. McCormick, *Handbook on the Law of Damages* (1935) ...........................................24

Restatement (Second) of Torts § 563....................................................................................16, 27

Restatement (Second) of Torts § 564A..................................................................................29, 42

Restatement (Second) of Torts § 566............................................................................................17

Restatement (Second) of Torts § 614............................................................................................14

Robert D. Sack, *Sack on Defamation* (5th ed. 2017)..............................................................14, 23

# INTRODUCTION

Nicholas Sandmann brought this libel suit against The Washington Post, complaining of his depiction in articles reporting on an incident at the Lincoln Memorial involving, among others, a group of Covington Catholic High School students who were in Washington for the March for Life and a group of Native Americans who were on the Mall to promote the rights of indigenous people.  Plaintiff, suing by and through his parents, complains of two news articles that were published online and in the newspaper (with slight variations), two shorter pieces of commentary that were published online, and three Twitter posts linking to the initial news article.

The news articles at issue were the first of several Post articles that provided ongoing coverage of the Lincoln Memorial incident and its aftermath as additional videos and additional accounts became available.  Plaintiff does not complain of the later news articles, but complains that the earlier ones included the observations and perspectives of the principal Native American participant in the incident and other eyewitnesses.  It was neither false nor defamatory, however, for the Post to report the comments of eyewitnesses, including the only participants who were speaking publicly about the matter on the day that videos of the event went viral on the internet.  Newspapers are often unable to publish a complete account of events when they first come to light.  Stories often develop over time, as more witnesses emerge.  On the day the video first circulated and drew media attention, for example, the Diocese of Covington and Covington Catholic High School issued a joint statement condemning the actions of the students, and that condemnation was reported by the Post.  When Plaintiff, whose identity was unknown on that first day, came forward the next day and issued a statement identifying himself to the public, the Post featured his account prominently in an article published on the front page.  When the Bishop of Covington issued another statement four days after that, apologizing for his earlier statement, the Post also reported

that fact.  And when an investigation commissioned by the Diocese produced findings generally supportive of Plaintiff's account, the Post published those findings—again, on the front page.

Whether judged as a whole or judged in isolation, the Post's articles did not defame Plaintiff.  Most of the statements that are the subject of the Complaint referred in general terms to a large group of students; they were not "of and concerning" Plaintiff in particular, as they must be to sustain a libel suit.  And most of the statements that referred to him were statements of the subjective feelings and motivation of the Native American man who saw himself as a peacemaker trying to calm a rowdy crowd of young people and protestors.  That man was entitled to offer his subjective point of view, and the Post had a right to report it—as it had a right to report the initial condemnation of the students' behavior by the responsible diocesan and school officials.

In addition, the Post's actual statements that are the subject of the Complaint do not convey the allegedly defamatory implications and meanings that the Complaint suggests.  The Complaint relies heavily upon allegations of "defamatory gists" that were simply not present in the Post's coverage, such as that Plaintiff engaged in "racist misconduct."  Compl. ¶ 7.  The Post must be judged upon the actual words of its coverage, not the charged interpretations of Plaintiff's lawyers.

In short, the articles at issue may not have been flattering of the Covington Catholic students, but they do not give rise to a defamation claim by Sandmann.  Indeed, the Post's overall coverage—including the articles that the Complaint fails to mention—was not only accurate; it was ultimately favorable to him.

Why, then, bring this lawsuit accusing the Post of engaging in "a modern-day form of McCarthyism," and demanding $250 million in damages—a number chosen, the Complaint explains, because it is the price Jeff Bezos paid for the Post in 2013?  *Id*. ¶¶ 2, 19.  The inflammatory rhetoric of the Complaint and the nonstop public promotion of the suit by Plaintiff's

counsel suggest one motive:  to strike a blow against the Post's allegedly "biased agenda against President Donald J. Trump."  *Id.* ¶ 8.  There is no fact alleged, however, to suggest that the Post's coverage was motivated by an anti-Trump bias—and the prominent, front-page coverage given to Plaintiff's version of events and the investigative findings in his favor belie any such motive. Politics has nothing to do with this case, and law warrants its dismissal.

## BACKGROUND

### A.    The Complaint and the Post's Coverage

The Complaint asserts a single cause of action for defamation, based on a series of articles in the Post reporting on an incident that took place at the foot of the Lincoln Memorial on January 18, 2019.  Plaintiff Nicholas Sandmann had traveled to Washington with fellow students from Covington Catholic High School to attend the March for Life, which was held that day.  Compl. ¶ 20.  They were chaperoned by 16 adults, nine of whom were faculty members at the school.  *Id.*

While waiting for their buses to bring them back to Kentucky, *id.* ¶ 21, the students became involved in a boisterous altercation with a group that calls itself the Hebrew Israelites, which in turn drew the attention of a group of Native American activists.  The altercation was captured on cameras, and videos of the incident went viral on social media within a matter of hours.  *Id.* ¶¶ 23–24, 27, 52–56.  According to the Complaint, one video, featuring a one-minute clip of a video shot by a participant in the Indigenous Peoples March, was viewed millions of times within three days of the incident.  *Id.* ¶¶ 52, 54–56.

Less than a day after the encounter, and before the Post had reported anything about it, multiple elected officials criticized the students' behavior.  For example, U.S. Rep. Deb Haaland of New Mexico, one of the first two Native American women elected to Congress, posted a tweet

denouncing the students' "display of blatant hate, disrespect, and intolerance."[1]  And Kentucky Secretary of State Alison Grimes released a statement and tweeted that she was "alarmed by circulating videos of young, Kentucky students taunting and harassing Native Americans at the Indigenous People's March on the National Mall."[2]

Like other major media outlets, the Post responded to the rapidly growing social media attention and commentary by seeking out participants and observers of the incident.[3]  The Post published its first report online on the afternoon of January 19, 2019, the day after the incident, and it continued to provide coverage of the incident and its aftermath in the weeks that followed— culminating in a front-page article on February 14 under the headline "Report finds 'no evidence'

---

[1] *See* https://twitter.com/repdebhaaland/status/1086662398071566337 (January 19, 2019, 11:31 a.m.).  Similarly, Congressman Ted Lieu of California tweeted:  "Dear Covington Catholic:  I went to a Catholic high school and am a follower of Christ.  Jesus taught us to act in the exact opposite manner of how your students behaved."  *See* https://twitter.com/tedlieu/status/ 1086700362499670017 (January 19, 2019, 2:02 p.m.).

[2] *See* https://twitter.com/kysecofstate/status/1086709792972963841 (January 19, 2019, 2:39 p.m.).

[3] Although the Complaint alleges that the Post "was one of the first, if not the first, mainstream media outlet" to cover the incident, Compl. ¶ 61, a number of major national and regional news organizations published reports before the Post, including the New York Times, USA Today, the Cincinnati Enquirer, and the Lexington Herald Leader, among others.  *See, e.g.*, Max Londberg and Sarah Brookbank, *NKY Catholic school faces backlash after video of incident at Indigenous Peoples March surfaces*, Cincinnati Enquirer, available at https://www.cincinnati.com/story/news/2019/01/19/video-shows-apparent-incident-indigenous-peoples-march/2623820002/ (Jan. 19, 2019, 11:48 a.m.).  The Court can take judicial notice of the fact of these publications, and the official tweets.  *See, e.g.*, *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1, 662 n.10 (6th Cir. 2005) (explaining that "[a] court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice," and taking judicial notice of the fact that various media articles were published); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (court may take judicial notice of "the *fact* that press coverage . . . or regulatory filings contained certain information, without regard to the truth of their contents").

of racist talk by students." Ex. 1.[4]  The Complaint, however, focuses solely on the Post's coverage from January 19 to 21.

### 1.    The Post's Initial News Report—the First, Second and Third Articles

The Post published its initial news report online at 4:22 p.m. on Saturday, January 19, under the headline "'It was getting ugly': Native American drummer speaks on the MAGA-hat wearing teens who surrounded him."  Compl. Ex. D ("First Article").  The Post updated that report a few hours later, Compl. Ex. E ("Second Article"), and published it in the newspaper on January 20 under the headline "Marcher's accost by boys in MAGA caps draws ire," Compl. Ex. F ("Third Article").[5]  These online and print articles did not name Plaintiff, and at the time he had not been named in any other major media publication.

The lead sentence of these articles reported:  "The images in videos that went viral on social media Saturday showed a tense scene near the Lincoln Memorial."  Exs. D, E, F.  The articles proceeded to describe the scene, in which "a Native American man steadily beats his drum," while "[s]urrounding him are a throng of young, mostly white teenage boys, several wearing Make American Great Again caps, with one standing about a foot from the drummer's face wearing a relentless smirk."  Ex. D; *see also* Ex. E, F (similar).

The Complaint does not challenge this description, but rather challenges the accuracy of the account provided by the Native American man, Nathan Phillips—that he approached the teens after they "and other apparent participants from the nearby March for Life rally began taunting"

---

[4] Citations to exhibit numbers are to the exhibits attached to this Memorandum, including two items published by the Washington Post.  The Court can take judicial notice of the fact of these publications.  *See* footnote 3, *supra*.

[5] The Complaint erroneously states that the Post initially published this article "no later than 1:37 p.m.," Compl. ¶ 92, mistakenly relying on a Pacific time stamp on a tweet linking to the article.  Exhibit D to the Complaint, however, shows the accurate 4:22 p.m. time.

the indigenous crowd, that he "felt threatened by the teens," that they "swarmed around him," and that one of them "blocked my way and wouldn't allow me to retreat." Compl. ¶ 118(b), (c), (e) (First Article); *id.* ¶ 121 (Second Article); *id.* ¶ 129(b), (c), (e) (Third Article).

The First Article quoted a spokeswoman for the Diocese of Covington saying: "We are just now learning about this incident and regret it took place. . . . We are looking into it." Ex. D. Later in the day on January 19, presumably after "looking into" the incident, the Diocese of Covington and Covington Catholic High School issued a joint statement condemning the actions of the students. Ex. 2.[6] The Post reported that statement in the updated version of its first news article which was published later on January 19, Ex. E (Second Article), and in the print version that ran in the January 20 newspaper, Ex. F (Third Article).

### 2.    The Fourth Article

The Post also reported the joint statement of the Diocese and school in a separate online article on January 20: "'Opposed to the dignity of the human person': Kentucky Catholic diocese condemns teens who taunted vet at March for Life." Compl. Ex. G ("Fourth Article"). The article quoted the statement as follows:

> We condemn the actions of the Covington Catholic high school students toward Nathan Phillips specifically, and Native Americans in general. . . . We extend our deepest apologies to Mr. Phillips. This behavior is opposed to the Church's teachings on the dignity and respect of the human person. The matter is being investigated and we will take appropriate action, up to and including expulsion. We know this incident also has tainted the entire witness of the March for Life and express our sincerest apologies to all those who attended the March and those who support the pro-life movement.

Ex. G.

---

[6] The statement is "incorporated into the Complaint by reference," and the Court may properly consider it on a motion to dismiss. *See, e.g.*, *Solo v. UPS Co.*, 819 F.3d 788, 794 (6th Cir. 2016) (internal quotation marks omitted); *see also* Compl. ¶¶ 72, 121(a), 129(g), 136(d), 149(j), 156(m).

### 3.   The Fifth Article

Also on Sunday, January 20, the Post's Philip Bump used the Lincoln Memorial incident as a departure point for an online analysis of the attitudes of the post-millennial generation toward racial and ethnic diversity.  *See* Compl. Ex. H ("Fifth Article").  His article, titled "Most young white men are much more open to diversity than older generations," described what the available videos appeared to show:  "a group of high school boys clad in 'Make America Great Again' hats, smirking and laughing as one of their members appeared to physically intimidate Nathan Phillips." Ex. H.

### 4.   The Sixth and Seventh Articles

On Sunday, January 20, and Monday, January 21, the Post published online and print articles based on additional investigation into the incident.  *See* Compl. Ex. I ("Sixth Article"); Ex. J ("Seventh Article").[7]  Noting that "people [had drawn] conclusions on social media before all the facts were known," Exs. I, J, the articles provided a more complete picture of what had happened at the Lincoln Memorial.  The print article bore the headline and sub-headline "Fuller view emerges of conflict on Mall: Three disparate groups crossed paths before a tense moment went viral." Ex. I.  The online version was titled "Viral standoff between a tribal elder and a high schooler is more complicated than it first seemed." Ex. J.  In these articles, the Post referred to Nicholas Sandmann by name for the first time—he had by then identified himself and issued a public statement—and included his account of what had taken place.

The articles explained that the incident began when the students exchanged taunts with the Hebrew Israelites—a group with "militant members and 'a long, strange list of enemies' that

---

[7] The online article was initially posted Sunday evening, January 20.  Exhibit J shows a January 21 date and time stamp because the online article had been updated.

includes whites, Jews, Asians, members of the LGBTQ community, abortion rights advocates and continental Africans, according to the Southern Poverty Law Center." Exs. I, J. The Post summarized what happened next, in an account that the Complaint does not allege to be false:

> When a Native American elder intervened, singing and playing a prayer song,[8] he found himself face to face with that dark-haired teen, whose frozen smile struck some as nervousness and others as arrogance. Neither budged. Video footage of the tense confrontation quickly went viral, stirring outrage across the political spectrum. The teens' church apologized on Saturday, condemning the students' actions. By Sunday, conservative columnists on social media were saying it was the students who had been wronged.
>
> The young man at the center of the video, who identified himself to the [Cincinnati] Enquirer as 11th-grader Nick Sandmann, said he and his classmates had been called "racists," "bigots" and worse, and he was "remaining motionless and calm" in hopes that things would not "get out of hand."
>
> The Native American elder said he was caught in the middle.

Ex. I; *see also* Ex. J (similar).

The articles then explained in more detail what had happened. The Hebrew Israelites had been "insulting the students," calling them "a bunch of Donald Trump incest babies," calling a black Covington student "'Kanye West' and the n-word," and telling him that "his friends will one day harvest his organs, an apparent reference to the racially fraught movie 'Get Out.'" Exs. I, J.

"At that point," the articles reported, "the students began chanting, jumping and shouting." One of the students "stripp[ed] off his shirt and shout[ed] as others cheered." Exs. I, J. Sandmann explained that the students were performing school cheers "'to drown out the hateful comments that were being shouted at us by the protesters.'" Exs. I, J (quoting his statement). The Post quoted

---

[8] The online version of the article added a link to a video and noted that "scores of students around him seem to mimic and mock him, *a video posted Monday shows*." Ex. J (emphasis added). The Complaint does not allege this statement to be false.

Sandmann as follows:  "The chants are commonly used at sporting events.  They are all positive in nature. . . .  We would not have done that without obtaining permission from the adults in charge of our group."  Ex. J; *see also* Ex. I.  But "the Hebrew Israelites took the performance as a racist impersonation," according to one of their members who was present.  Exs. I, J.  "'They were mocking my ancestors in a chant, one of them was jumping up and down like a cave man,' he said."  Exs. I, J.

An attorney from Florida, Jessica Travis, witnessed the scene with her mother.  The Post reported her perspective:  "'The kids really went into a mob mentality, honestly,' she said, adding that she didn't see any chaperones trying to control the situation.  She said she heard one student tell the Hebrew Israelites to 'drink the Trump water.'"  Exs. I, J.  John Stegenga, a photojournalist who had traveled from South Carolina to cover the Indigenous Peoples March, also told the Post that he heard students say "build the wall" and "Trump 2020" at about the time that Phillips intervened.  Exs. I, J.  The articles then continued:

> Another member of the Indigenous Peoples March suggested that Phillips start singing, the photographer said, and Phillips played a prayer song on a drum as he walked toward the students.
>
> Some of the students began doing a "Tomahawk chop" and dancing, the video shows.  Phillips said he found it offensive but kept walking and drumming.
>
> Most of the students moved out of the way, the video shows.  But Sandmann stayed still.
>
> Asked why he felt the need to walk into the group of students, Phillips said he was trying to reach the top of the memorial, where friends were standing.  But Phillips also said he saw more than a teenage boy in front of him.  He saw a long history of white oppression of Native Americans.
>
> 'Why should I go around him?" he asked.  "I'm just thinking of 500 years of genocide in this country, what your people have done.  You don't even see me as a human being."

Exs. I, J.  The articles then reported Phillips's and Sandmann's views of who was to blame for what had happened:

> Phillips said he blamed the students and the Hebrew Israelites for what happened.
>
> "If it wasn't for those Israelites being there in the first place, this wouldn't have happened," he said.  "And if it wasn't for the lack of responsibility from school chaperones, this wouldn't have happened either."
>
> Sandmann said Phillips bore responsibility too.
>
> "He locked eyes with me and approached me, coming within inches of my face," [Sandmann's] statement said.  "I did not speak to him. I did not make any hand gestures or other aggressive moves.  To be honest, I was startled and confused as to why he had approached me. We had already been yelled at by another group of protesters . . . I was worried that a situation was getting out of control where adults were attempting to provoke teenagers."

Exs. I, J (ellipsis in original).

After noting that the school and the Diocese had released a statement "condemning and apologizing for the students' actions," the articles quoted from a column written by Covington Mayor Joe Meyer:  "The videos being shared across the nation do NOT represent the core beliefs and values of this City."  Exs. I, J.  The articles then quoted Sandmann saying that he had received "death threats via social media, as well as hateful insults," and that he was "mortified that so many people have come to believe something that did not happen—that students from my school were chanting or acting in a racist fashion toward the African Americans or Native Americans."  Exs. I, J.  The articles ended with the Florida attorney's comment that the scene had "shocked her and her mother.  'It was really depressing,' she said, 'to see we are even more divided than ever.'" Exs. I, J.

### 5.     The Tweets

On January 19, the Post called attention to its initial report on the incident through three posts on its Twitter page each containing a quotation from Nathan Phillips that appeared in the initial news report.  Compl. Ex. K.

### 6.     Subsequent Post Coverage

The Post's coverage did not stop with the articles mentioned in the Complaint.  On January 25, the Post published an online article under the headline "Kentucky bishop apologizes to Covington Catholic students, says he expects their exoneration."[9]  The article reported that the Bishop acknowledged he had spoken "prematurely" when he condemned the students' actions and apologized to them, expressing his "hope and expectation that the results [of an investigation] will exonerate them."

On February 14, the Post published an article on the front page, titled "Report finds 'no evidence' of racist talk by students."  Ex. 1.  That article reported, among other things, that an investigation commissioned by the Diocese "concluded that neither Sandmann nor other Covington students had behaved in an offensive manner," although the investigatory report acknowledged that some teens had performed a "'tomahawk chop to the beat of Mr. Phillips' drumming.'"  Ex. 1 (quoting the report).  The article also reported a statement by the Bishop of Covington "that he was pleased 'that my hope and expectation' that the inquiry would 'exonerate our students so that they can move forward with their lives' has been realized.'"  Ex. 1.

---

[9] *See* Michelle Boorstein, *Kentucky bishop apologizes to Covington Catholic students, says he expects their exoneration*, Washington Post, available at https://www.washingtonpost.com/religion/2019/01/24/third-kentucky-bishop-apologizes-covington-catholic-high-school-students/?utm_term=.95c562b2dfbf (Jan. 25, 2019).

B.      **The Retraction Demand and the Post's Response**

On February 14, 2019, nearly a month after its initial reporting, the Post received from Plaintiff's counsel a demand that it retract and remove from its website the articles and social media posts that are the subject of this Complaint.  Compl. Ex. L.  In response, the Post published a series of Editor's Notes and updated online articles to provide additional information that was not available at the time of the initial publications.  Thus, for example, the Post added an Editor's Note at the top of the initial online news report (the Second Article),[10] explaining that subsequent reporting either contradicted or failed to confirm some witnesses' descriptions of the encounter, and providing hyperlinks to subsequent Post coverage, Plaintiff's statement, and the subsequent investigative findings and statements by the Bishop.[11]  Similar Editor's Notes were added to the other online articles,[12] and an Editor's Note was also published on page A2 of the newspaper on March 1, 2019, stating:

> A Jan. 20 Metro article provided an account from Native American
> activists about an encounter with a group of high school students

---

[10] As noted above, the Second Article, Ex. E, replaced the First Article, Ex. D, on the Post's website.

[11] *See* Cleve R. Wootson Jr., Antonio Olivio and Joe Heim, *'It was getting ugly': Native American drummer speaks on his encounter with MAGA-hat-wearing teens*, Washington Post, available at https://www.washingtonpost.com/nation/2019/01/20/it-was-getting-ugly-native-american-drummer-speaks-maga-hat-wearing-teens-who-surrounded-him/ (updated March 1, 2019).

[12] *See* Michelle Boorstein, *'Opposed to the dignity of the human person': Kentucky Catholic diocese condemns teens who taunted vet at March for Life*, Washington Post, available at https://www.washingtonpost.com/religion/2019/01/20/opposed-dignity-human-person-kentucky-catholic-diocese-condemns-teens-who-taunted-vet-march-life/ (updated March 1, 2019); Philip Bump, *Most young white men are much more open to diversity than older generations*, Washington Post, available at https://www.washingtonpost.com/politics/2019/01/20/most-young-white-men-are-much-more-open-diversity-than-older-generations/ (updated March 1, 2019); and Michael E. Miller, *Viral standoff between a tribal elder and a high schooler is more complicated than it first seemed*, Washington Post, available at https://www.washingtonpost.com/local/social-issues/picture-of-the-conflict-on-the-mall-comes-into-clearer-focus/2019/01/20/c078f092-1ceb-11e9-9145-3f74070bbdb9_story.html (updated March 1, 2019).

> from Covington, Ky. Subsequent reporting and video evidence contradicted or failed to corroborate that one of the activists was accosted and prevented from moving, that they had been taunted by the students in the lead-up to the encounter, that the students were trying to instigate a conflict, or that "March for Life" participants chanted "Build that wall."
>
> A Jan. 21 Page One article reported an account by one of the activists that he had heard students earlier make disparaging comments about Native Americans and had heard students shout "Go back to Africa!"  The story reported the denial of one student that he had heard any students say anything hateful or racist at any time.  The story should have noted that widely circulated video from that day does not corroborate that such statements were made.

Ex. 3.  The Post also deleted the third tweet in Exhibit K, which quoted Phillips as saying that a student had blocked his way and wouldn't allow him to retreat, and issued a new tweet that noted the deletion.[13]  The new tweet linked and directed readers to an Editor's Note concerning the Post's coverage.[14]

## GOVERNING STANDARDS

To state a claim for defamation, a plaintiff in Kentucky must plead and ultimately prove the following elements:  "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."  *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 281–82 (Ky. 2014) (internal quotation marks omitted).  The plaintiff must plead facts sufficient to support every element of the claim.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The

---

[13]  *See* https://twitter.com/washingtonpost/status/1101609186184646656 (March 1, 2019, 5:24 p.m.).

[14]  *See Editor's note related to Lincoln Memorial incident*, Washington Post, https://wapo.st/2EnDsUg (March 1, 2019).

allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). If the facts alleged, taken as true for purposes of the motion, would not "state a claim to relief that is plausible on its face," the complaint must be dismissed. *Iqbal*, 556 U.S. at 678.

Defamation actions are particularly susceptible to early dismissal on the merits. That is because, "unlike most litigation, in a libel suit the central event—the communication about which suit has been brought—is literally before the judge at the pleading stage." 2 Robert D. Sack, *Sack on Defamation* § 16.2.1, at 16-3 (5th ed. 2017). Moreover, because defamation claims challenge both speech and press rights, the First Amendment and the common law place "stringent limitations upon the permissible scope of such liability." *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 12 (1970). In recognition that the very pendency of defamation claims chills and inhibits free speech, courts in Kentucky and around the country have held that these actions should be resolved "expeditiously whenever possible." *Welch v. Am. Publ'g Co. of Ky.*, 3 S.W.3d 724, 729 (Ky. 1999); *see also, e.g.*, *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (Kavanaugh, J.) ("To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits."); *Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013). Accordingly, the law assigns a critical role to the Court in a libel case to determine at the outset whether the complaint states a claim.

- It is for the Court to decide as a matter of law "whether a communication is capable of bearing a particular meaning, and . . . whether that meaning is defamatory." Restatement (Second) of Torts § 614; *see also Doe v. Coleman*, 436 S.W.3d 207, 210–11 (Ky. Ct. App. 2014).

That determination is appropriately made on a motion to dismiss. *See Gahafer v. Ford Motor Co.*, 328 F.3d 859, 862–63 (6th Cir. 2003).

- Not every critical or embarrassing statement is defamatory. A "writing is defamatory if it tends to (1) bring a person into public hatred, contempt or ridicule; (2) cause him to be shunned or avoided; or, (3) injure him in his business or occupation." *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981). "It is an elementary principle of the law of libel that the defamatory matter complained of should be construed as a whole," and challenged statements "must be *measured* by their natural and probable effect on the mind of the average lay reader." *Id*.

- In Kentucky, there are two classes of defamation: *per se* and *per quod*. "In the former class, damages are presumed and the person defamed may recover without allegation or proof of special damages. In the latter class, recovery may be sustained only upon an allegation and proof of special damages, *i.e.*, actual injury to reputation." *Sheliga v. Todd*, 2013 WL 869608, at *2 (Ky. Ct. App. Mar. 8, 2013). "Whether a particular communication is actionable *per se* is a question of law to be determined by the courts." *Gahafer*, 328 F.3d at 861. "In determining whether a writing is libelous per se, courts must stay within the 'four corners' of the written communication. The words must be given their ordinary, natural meaning as defined by the average lay person. The face of the writing must be stripped of all innuendos and explanations." *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006); *see also Gahafer*, 328 F.3d at 861. "[D]efamatory words, to be libelous per se, must be of such a nature that the court can presume as a matter of law that they do tend to disgrace and degrade the person, or to hold him up to public hatred, contempt, or ridicule, or to cause him to be shunned and avoided." *Shields v. Booles*, 38 S.W.2d 677, 681 (Ky. 1931).

15

- All other claims are for defamation *per quod*. Defamation *per quod* includes "words reasonably susceptible of a defamatory meaning as well as an innocent one, and [which] may be defamatory by reason of their imputation, or by reason of certain extrinsic facts . . . ." *Sweeney & Co. v. Brown*, 60 S.W.2d 381, 384 (Ky. 1933). Thus, where "one might draw [a defamatory] inference from the language used," but the court "cannot presume as a matter of law that such inference would be drawn," then the court is "compelled to hold that the words complained of were not libelous per se," and therefore "[do] not state a cause of action," absent special damages. *Towles v. Travelers Ins. Co.*, 137 S.W.2d 1110, 1111 (Ky. 1940) (statement that insurance agency had been "suspended" was ambiguous and therefore could not be defamatory *per se*). Special damages must be alleged with particularity. Fed. R. Civ. P. 9(g); *see also Sweeney*, 60 S.W.2d at 384; *ATC Distribution Grp., Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 716 (6th Cir. 2005) (affirming grant of summary judgment where there was "no evidence of any pecuniary loss as a direct and proximate result of the defamation" (citing *Sweeney*, 60 S.W.2d at 383)).

- In addition, while a defamation claim can be based on an implied meaning, "'[t]he defendant is not responsible for every defamatory implication a reader might draw from his report of true facts, absent evidence that he intended the defamatory implication.'" *Nichols v. Moore*, 477 F.3d 396, 402 (6th Cir. 2007) (quoting *Royal Palace Homes, Inc. v. Channel 7 of Detroit, Inc.*, 495 N.W.2d 392, 396 (Mich. App. Ct. 1992)); *accord* Restatement (Second) of Torts § 563. "[C]ourts must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning." *White v. Fraternal Order of Police*, 909 F.2d 512, 519 (D.C. Cir. 1990).

- It is a fundamental principle of libel law that the allegedly libelous statement must be "of and concerning" the plaintiff, *Rosenblatt v. Baer*, 383 U.S. 75, 80–83 (1966); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 288 (1964); *Louisville Times v. Stivers*, 68 S.W.2d 411, 412 (Ky. 1934), and that issue is also commonly resolved on a motion to dismiss, *see, e.g.*, *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173 (2d Cir. 2001); *Hazime v. Fox TV Stations, Inc.*, 2013 WL 4483485, at *1 (E.D. Mich. Aug. 19, 2013). It is not enough that a publication disparages a large group of which the plaintiff is a member; the defamatory statement must make specific reference to the plaintiff. *See Ky. Fried Chicken of Bowling Green, Inc. v. Sanders*, 563 S.W.2d 8, 9 (Ky. 1978). As a general rule of thumb, the "group libel" doctrine bars claims by individual members in cases where the size of the group defamed is 25 persons or larger. *See, e.g.*, *O'Brien v. Williamson Daily News*, 735 F. Supp. 218, 222–23 (E.D. Ky. 1990) (holding that individual teachers could not maintain claim based on defamation of 29-member high school faculty), *aff'd*, 931 F.2d 893 (6th Cir. 1991).

- Only provably false statements of objective fact are potentially actionable. The First Amendment protects subjective statements of opinion that do not convey a "provably false factual connotation," as well as criticism consisting of "imaginative expression," "rhetorical hyperbole" or even "vigorous epithet." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 17 (1990). "A defamatory communication may consist of a statement in the form of an opinion . . . only if it implies the allegation of undisclosed defamatory facts as the basis of the opinion." Restatement (Second) of Torts § 566; *Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 881 (E.D. Ky. 2006). Thus, "statements of pure opinion, hyperbole, or rhetorical exaggeration will receive First Amendment protection." *Ogle v. Hocker*, 279 F. App'x 391, 397 (6th Cir. 2008). It is for the Court to enforce these constitutional protections at the very outset of a case. *See, e.g.*, *Seaton v. TripAdvisor LLC*,

728 F.3d 592, 601 (6th Cir. 2013) (affirming dismissal of defamation claim where statement was "protected, nonactionable opinion").

- A plaintiff cannot state a claim for libel by raising technical or literal objections. "[S]ubstantial truth" is all that the law requires. *Masson v. New Yorker Mag. Inc.*, 501 U.S. 496, 516 (1991). "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Id.* at 517. As Kentucky's highest court has emphasized: "Where the defendant is a newspaper, the rule is that it is not to be held to the exact facts or to the most minute details of the transactions that it reports. What the law requires is that the publication be substantially true." *Bell v. Courier-Journal & Louisville Times Co.*, 402 S.W.2d 84, 87 (Ky. 1966). Moreover, it is important for the Court to consider what the plaintiffs concede to be true in determining whether the alleged inaccuracies, even if proven, are actionable. *See, e.g.*, *Casale v. Nationwide Children's Hosp.*, 682 F. App'x 359, 368 (6th Cir. 2017) (emphasizing plaintiff's concession in finding that defendant's statement was substantially true).

## ARGUMENT

Nicholas Sandmann was one of a large group of students who participated in a three-way encounter on the national Mall that was captured openly on smart phones and spread rapidly through the world-wide tentacles of the internet. To a large degree, it was the students' own boisterous reaction to the initial insults of the Hebrew Israelites, and their continued celebratory response to Nathan Phillips's approach, that transformed what would otherwise have been a routine set of protests in the nation's capital into a social media sensation. It was, at the very least, predictable that in today's world of ubiquitous smart phones and instant communication, the student's rowdy display would attract attention beyond those present on the Mall that afternoon. It was equally predictable that the mainstream media would seek to report on what happened.

Sandmann was among the group of students from Covington Catholic who participated in the events that captured social and mainstream media attention.  He and others who were present may well have been embarrassed by the attention—and hurt by the criticism—they received.  But Sandmann does not have a cause of action for libel against The Washington Post.  He was one of a large group of students, some of whom engaged in certain behaviors while others did not, and his claim stands or falls based on what the Post said about him in particular.  What the articles actually say about Plaintiff is not actionable as defamation, either because it is not defamatory, it is substantially true, or it is a matter of opinion—and also because Plaintiff has failed to plead special damages.

## I.       THE POST'S OVERALL COVERAGE DID NOT DEFAME PLAINTIFF

The Complaint challenges six Post articles—more precisely, slightly varying versions of two news articles and two separate online commentaries—in a single cause of action.  Although it is more common for a complaint to state separate claims for each separate publication, the grouping of these articles together fairly reflects the fact that this story was an emerging one.  No one could possibly have understood the initial article as having told the whole story.  No one could have escaped the "fuller view" that was presented a day later on the front page.  And no one could have failed to notice the front-page report of the investigative findings in the students' favor.

Taken as a whole, the Post's coverage cannot reasonably be understood to bear the meanings alleged in the Complaint—that Plaintiff "instigated a confrontation with Phillips," that he "assaulted and/or physically intimidated Phillips," that he "engaged in racist taunts," or that he "violated the policies of his school such that he should be expelled."  Compl. ¶¶ 115–17, 120.  To the contrary, the Post reported on the front page that an investigation found that Plaintiff had not engaged in any such behavior, and that the Bishop who had earlier condemned the students' actions

19

declared them "exonerate[d]."   Ex. 1.   Nor, for the reasons explained below, did any of the challenged articles in isolation convey any false statements of fact that bear any of those meanings.

## II.      THE FIRST, SECOND AND THIRD ARTICLES DID NOT DEFAME PLAINTIFF

The Complaint challenges three versions of the Post's initial report about the Lincoln Memorial—an online article that first appeared at 4:22 p.m. on Saturday, January 19, that was updated repeatedly over the next day (the First and Second Articles), and that was published in the newspaper on Sunday, January 20 (the Third Article).   Most of the statements in that initial report, however, referred generally to a group of students, not to the particular unnamed student who turned out to be Plaintiff.   *See, e.g.*, *O'Brien*, 735 F. Supp. at 222.   And the only contested statement that specifically concerned Plaintiff cannot support a defamation claim for at least three reasons: it was not false, it was not defamatory *per se*, and it is not alleged to have caused special damages.

### A.      The Only Contested Statement in the Initial Report Concerning Plaintiff Was Substantially True

The only challenged statement in the initial report that was focused on the individual who turned out to be Sandmann (who was not himself named) was the following quote attributed to Nathan Phillips:   "I started going that way [toward the Lincoln Memorial], and that guy in the hat stood in my way and we were at an impasse.   He just blocked my way and wouldn't allow me to retreat."   Compl. ¶ 118(e) (First Article); *id.* ¶ 121 (Second Article); *id.* ¶ 129(e) (Third Article). Although Plaintiff asserts that the Post "falsely accused" him of "blocking Phillips' path" and "refusing to allow Phillips to retreat," Compl. ¶ 51, his own allegations show that Phillips's account was substantially true.   And it is not defamatory in any event to report that Sandmann blocked the other protestor's path.

There is no dispute in this case that Sandmann and Phillips had a face-to-face "confrontation," Compl. ¶¶ 27, 48, on the steps of the Lincoln Memorial.   Sandmann alleges that

Phillips "specifically confronted" him and "never made any attempt to move past, around, or away from [him] even though [Phillips] could have done so at any time." *Id.* ¶ 37. But neither did Sandmann move aside to let Phillips pass. To the contrary, Sandmann acknowledges that he "did not move from where he was standing when Phillips approached him." *Id.* ¶ 50(d). And the video of the confrontation compiled by Sandmann's lawyer—a video that is incorporated by reference into the Complaint and alleged to "accurately set forth the truth of the January 18 incident," *id.* ¶¶ 65, 66—likewise shows that Sandmann refused to move when Phillips approached.[15] As the video reveals, a perimeter of empty space opened behind Sandmann as the other teens backed away from Phillips and gave him space; only Sandmann stood his ground as Phillips sang and drummed. *Id.* ¶ 65 (minutes 4:29 to 4:54). The two remained locked in a face-off as the other students stood in a circle around them laughing, clapping, and recording the confrontation on their cell phones. *Id.* (minutes 5:20 to 5:48).

Sandmann takes the position that it was "false" for the Post to report that he "blocked" Phillips and would not "allow [him] to retreat" because Phillips "walked past clear pathways to the steps to the Lincoln Memorial," *id.* ¶ 36, and voluntarily "waded into the students' crowd," *id.* ¶ 37, where he "freely moved about," *id.* ¶ 33. But under settled defamation standards, it need not be literally true that Phillips had no way to maneuver around Sandmann: "substantial truth" is the standard. *See Masson*, 501 U.S. at 516–17. "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Id.* at 517. Here, Plaintiff himself alleges—and the video produced by his lawyer confirms—that he stood directly in

---

[15] Because the video is "incorporated into the complaint by reference," the Court may properly consider it on a motion to dismiss. *See, e.g.*, *Solo v. UPS Co.*, 819 F.3d 788, 794 (6th Cir. 2016) (internal quotation marks omitted). Paragraph 65 of the Complaint includes the following link to the video: https://www.youtube.com/watch?v=lSkpPaiUF8s.

Phillips's path and refused to move as Phillips ascended the stairs of the Lincoln Memorial.  In ordinary parlance, Phillips and Sandmann were blocking each other's way, even if it were physically possible for either of them to have moved around the other.  There is no meaningful difference between the pleaded truth and Phillips's statement, quoted in the Post, that "th[e] guy in the hat stood in my way, and we were at an impasse.  He just blocked my way and wouldn't allow me to retreat."  Compl. ¶ 118(e) (First Article); *id*. ¶ 121 (Second Article); *id*. ¶ 129(e) (Third Article).  That is all that is required for dismissal.

### B.    The Only Contested Statement Concerning Plaintiff Was Not Defamatory *Per Se*, and Plaintiff Has Failed To Plead Special Damages

Even if it were not substantially true, it is far from defamatory for the Post to report that Sandmann "stood in [Phillips's] way" or even "blocked" him from passing to the Lincoln Memorial.  Standing one's ground, even when offensive to others, is celebrated in American culture as a sign of strength and self-possession.[16]  Indeed, Plaintiff proudly defended his right to stand face-to-face with Phillips, publicly stating in a national television interview:  "As far as standing there, I had every right to do so."  *Today* Transcript, Ex. 4.[17]  He cannot simultaneously claim that it was defamatory to say that he did.

The statement is certainly not defamatory *per se*.  Stripped of all "innuendoes and explanations" that go beyond the "four corners" of the article, it is simply not the case that standing in or blocking another's way, however ill-mannered, "tend[s] to expose an individual to hatred, contempt or disgrace."  *See, e.g.*, *Roche*, 197 F. App'x at 399 (performance notice stating that

---

[16] Standing one's ground as a virtue is indeed embedded in many states' law books, including Kentucky's.  *See, e.g.*, Ky. Rev. Stat. Ann. 503.050 (Kentucky's "Stand Your Ground" law).

[17] Plaintiff's appearance on the *Today* show is incorporated into the Complaint by reference.  *See* Compl. ¶ 85 (describing Plaintiff's statements on the *Today* show as a "detailed and accurate factual description of his encounter with Phillips"); *see also Solo*, 819 F.3d at 794.

Plaintiff's coworker "feels harassed by [Plaintiff] and wants no contact" is not defamatory *per se*). Some might say that the unnamed student was stubborn or disrespectful in standing his ground before Phillips. But that is not enough to render the Post's account defamatory, much less defamatory *per se*. Defamation "necessarily . . . involves the idea of disgrace." *Prosser and Keeton on the Law of Torts* § 111, at 773 (5th ed. 1984). "There is common agreement that a communication that is merely unflattering, annoying, irksome, or embarrassing . . . is not actionable." 1 *Sack on Defamation* § 2.4.1; *see also, e.g.*, *Gosling v. Conagra, Inc.*, 1996 WL 199738, at *5 (N.D. Ill. Apr. 23, 1996) ("however personally unpleasant it may be, being called rude" is not defamatory *per se*); *Hill v. Evans*, 258 S.W.2d 917, 917 (Ky. 1953) (holding that city's statement that plaintiff had "us[ed] city water from a fireplug with four inch hose" and would have to "turn in the fire hose and plug wrench and pay for city water used" was not defamatory *per se* because it would not "subject [him] to public disgrace, ridicule, odium, or contempt").

If the words complained of are not defamatory *per se*, the claim cannot survive a motion to dismiss absent allegations of special damages. *See, e.g.*, *Roche*, 197 F. App'x at 398 (affirming dismissal where "claims did not constitute libel per se and [plaintiff] did not plead special damages"); *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995) ("Because [plaintiff] does not have evidence of a reasonably certain direct or proximate relationship between any communication of Defendants and lost profits by [plaintiff], it cannot prove the essential elements of defamation *per quod*."); *Sheliga*, 2013 WL 869608, at *3. These allegations must be "specifically stated." Fed. R. Civ. P. 9(g); *see also, e.g.*, 1 Sack on Defamation § 10.3.2 (collecting cases).

The Complaint here contains no allegation of special damages, much less a particularized one. Plaintiff generally alleges that he suffered "permanent harm to his reputation" and "severe

emotional distress," and that he must "live his life in a constant state of concern over his safety." Compl. ¶¶ 208–10.  But these are merely examples of "general damages relat[ing] to humiliation, mental anguish, etc.," as opposed to special damages "beyond mere embarrassment which support actual economic loss."  *Rich for Rich v. Ky. Country Day, Inc.*, 793 S.W.2d 832, 838 (Ky. Ct. App. 1990).  Courts have repeatedly held that such allegations cannot establish special damages as a matter of law.  *See, e.g.*, *id.*; *Dermody v. Presbyterian Church (U.S.A.)*, 530 S.W.3d 467, 475 (Ky. Ct. App. 2017) (claim "for public embarrassment and humiliation" and "adverse effects on [plaintiff's] future employment prospects and career" does not allege special damages); *Tacket v. Delco Remy*, 937 F.2d 1201, 1206 (7th Cir. 1991) ("'The special damage required in defamation cases must be some material or pecuniary injury.  Injury to reputation without more, humiliation, mental anguish, physical sickness—these do not suffice.'" (quoting Charles T. McCormick, *Handbook on the Law of Damages* § 114, at 419 (1935)).  Plaintiff's vague and generalized allegations of reputational harm and emotional injury fall far short of meeting his burden.

### C.   The Articles Are Not Reasonably Capable of Bearing the Defamatory Implications Alleged in the Complaint

Implicitly recognizing that the Post articles on their face cannot support a claim for defamation, Plaintiff seeks to expand the meaning of the initial articles beyond their actual words. He claims the articles *implied* that the student in the hat "assaulted and/or physically intimidated Phillips," "instigated a confrontation with Phillips," and "engaged in racist taunts" and "racist conduct."  Compl. ¶¶ 115–17.  That claim fails for three reasons, each of which provides an independent basis for dismissal:

1.    The articles cannot reasonably be understood to convey any of these meanings about Plaintiff.  *See Gahafer*, 328 F.3d at 862–63 (rejecting plaintiff's interpretation of challenged statements as unsupported by the text).  What the articles reported is that Phillips said Sandmann

"stood in [his] way" as Phillips walked toward the Lincoln Memorial.[18]  Exs. D, E, F.  It would be unreasonable to read these articles to imply that Plaintiff "instigated a confrontation" or "assaulted and/or physically intimidated Phillips."  Compl. ¶¶ 115–17, 120, 126.  The Post did not report that the teenager in the hat touched Phillips, said anything threatening to him, or made any threatening gesture toward him.

The articles reported that "Phillips, 64, said he *felt threatened* by the teens."  Exs. D, E, F (emphasis added).  But that is a statement of Phillips's subjective feelings based on the conduct of "the teens" in general; it is not a statement of *objective* fact that *this teen* had threatened him.  *See Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 737 (Ky. Ct. App. 2004) (defendant's alleged statement that he "felt like he had been conned by the world's greatest con man" was nonactionable statement of opinion); *Roche*, 197 F. App'x at 399 (affirming dismissal where subjective statement that employee "fe[lt] harassed" by co-worker was not defamatory); *Jernigan v. Humphrey*, 815 So. 2d 1149, 1153, 1155 (Miss. 2002) (en banc) (holding that statement that defendant "felt intimidated and threatened" was "based on truthful, non-defamatory facts").

The initial Post news report is no more capable of bearing the other defamatory meanings alleged in the Complaint.  The Post did not state or imply that the unnamed student who turned out to be the Plaintiff had "engaged in racist conduct" or "racist taunts."  Compl. ¶¶ 115, 117, 120, 125.  Rather, the articles reported that, according to Phillips, "*the teens and other apparent participants* from the nearby March for Life rally began taunting the dispersing indigenous crowd"—and that "*[a] few people* in the March for Life crowd began to chant, 'Build that wall,

---

[18] The Articles also state that Plaintiff was smirking, but he does not allege that this was false or defamatory.

build that wall.'" Exs. D, E, F (emphases added).  Neither of these statements referred in particular to Plaintiff.

In addition, the statement that the teens and others were "taunting" the indigenous crowd is "an opinion and not actionable in a defamation suit." *Turner v. Wells*, 879 F.3d 1254, 1264, 1270 (11th Cir. 2018) (dismissing claim that plaintiff engaged in "homophobic taunting"). Whether that taunting qualifies as "racist" is also a matter of opinion. *See Squitieri v. Piedmont Airlines, Inc.*, 2018 WL 934829, at *4 (W.D.N.C. Feb. 16, 2018) ("Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven verifiably true or false.") (collecting numerous cases); *Forte v. Jones*, 2013 WL 1164929, at *6 (E.D. Cal. Mar. 20, 2013) (same).

It is substantially true, in any event, that teenagers at the Lincoln Memorial engaged in conduct that was perceived by many as taunting or mocking the Native American protestors.  The voiceover in the video compiled by Plaintiff's lawyer—the one alleged to "accurately set forth the truth of the January 18 incident," Compl. ¶ 65–66—acknowledges that "*many* feel the boys crossed the line and *began mocking the Native Americans*, by doing a move known to sports fans as the Tomahawk Chop" as Phillips approached the crowd, *id.* ¶ 65 (emphasis added).[19]  And while the Post never intimated that Plaintiff himself was doing the tomahawk chop, Plaintiff's own video shows that he was.  *See* Ex. 5 (screenshots from video cited in Compl. ¶ 65, at approximately minutes 4:19–4:20).  If his own video shows Plaintiff engaged in conduct that many perceived to be "mocking the Native Americans," he cannot maintain that it is false to say he was "taunting" them.

---

[19] *See* https://www.youtube.com/watch?v=lSkpPaiUF8s (minute 4:14–4:20).

As for the Post's statement that "[a] few people in the March for Life crowd" chanted "Build that wall, build that wall"—the rallying cry popularized by the President of the United States—it is not actionable because it is not defamatory.  Exs. D, E, F.  A charge that a person engaged in a mainstream political chant, even if false, simply does not give rise to a compensable reputational injury.  *See, e.g.*, *Shields*, 38 S.W.2d at 682 (rejecting defamation claim based on false statement that a lawmaker voted for racetrack gambling because the measure "was a question upon which men of character held opposite opinions"); *Cox v. Hatch*, 761 P.2d 556, 562 (Utah 1988) (holding that it is not defamatory to falsely identify Democratic plaintiff as a Republican, since being a Republican is not "at odds with the fundamental social order") (citing *Prosser and Keeton on the Law of Torts* § 111 (5th ed. 1984)).  Moreover, the articles did not say that *Plaintiff* was chanting "build that wall."  And even if they had, it is difficult to perceive how Plaintiff could claim he was injured by articles that allegedly implied he was "chanting 'build that wall,'" Compl. ¶ 51, when he was wearing the red MAGA cap closely associated with the President who popularized that slogan.

2.      Even if a reader might somehow conclude that Plaintiff was guilty of physical assault or racist conduct, "[t]he defendant is not responsible for every defamatory implication a reader might draw from his report of true facts, absent evidence that he intended the defamatory implication."  *Nichols*, 477 F.3d at 402 (brackets and quotation marks omitted); Restatement (Second) of Torts § 563.  In a case like this, in which the underlying factual statements are "materially true," there must be "affirmative evidence" on the face of the publication that the publisher "*intended* or *endorsed*" the implied meaning.  *White v. Fraternal Order of Police*, 909 F.2d 512, 520–21 (D.C. Cir. 1990); *see also Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) ("The language must . . . affirmatively suggest that the author intends or endorses

the inference."); *Towles*, 137 S.W.2d at 1111 (dismissing claim where the court was "unable to agree" from the "the phraseology of the letter in question" that "it is apparent that appellees were *attempting to convey* to the public that appellant had been temporarily or permanently barred from his insurance business as agent for other companies") (emphasis added); *Abbott v. Vinson*, 20 S.W.2d 995, 996 (Ky. 1929) ("words . . . will be defined . . . as intended to be meant by the speaker and understood by the hearers"). Here, there is nothing in these articles or elsewhere to suggest that the Post intended to accuse Plaintiff of assault, a physical threat, or racist conduct.

The Post reported that a teenage boy in a MAGA cap stood "about a foot" from Phillips's face wearing "a relentless smirk" as Phillips drummed. Exs. D, E, F. The Complaint does not allege that either of these statements is false, nor could it. The statement that Plaintiff "smirk[ed]" is not a statement of fact at all, but an opinion that is not provably true or false. *See Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000) ("The description of the look on [plaintiff's] face is nothing more than [an] opinion."). And it is indisputable from the video circulated by Plaintiff's lawyer that Plaintiff stood "about a foot" from Phillips and did not move out of his way. Some readers may well have reached unfavorable judgments about Plaintiff, but the Post cannot be liable for defamation if those judgments arose from the readers' subjective response to the reporting of nonactionable opinions or materially true facts. *See Nichols*, 477 F.3d at 402; *White*, 909 F.2d at 520. Judgments or conclusions that draw on a reader's political leanings, dislike of President Trump, or personal convictions about how young people should respond to their elders are not chargeable to the Post.

3.   Finally, as noted above, in Kentucky a claim based on "words reasonably susceptible of a defamatory meaning as well as an innocent one" is a claim for libel *per quod* and

requires special damages, which have not been pleaded.  *See Sweeney*, 60 S.W.2d at 384.[20]  Thus, even if "one might draw [a defamatory] inference from the language used," because the court "cannot presume as a matter of law that [the defamatory] inference would be drawn," the court is "compelled to hold that the words complained of [are] not libelous *per se*" and "[do] not state a cause of action" absent special damages.  *Towles*, 137 S.W.2d at 1111.

### D.     The Other Challenged Statements Were Not "Of and Concerning" Plaintiff, Were Not Defamatory, or Were Statements of Opinion that Cannot Be Proven False

Plaintiff challenges a host of other statements in the Post's initial report, but these are not actionable because they refer only to the group of the teens at the Lincoln Memorial, not to Plaintiff specifically, and they are neither false nor defamatory in any event.  Exs. D, E, F.  It is well established that statements about a group are not "of and concerning" an individual member of that group—unless the statements are focused upon an individual in particular, or unless the group is so small that the statement can reasonably be understood to refer to every member of the group.  *See, e.g.*, *O'Brien*, 735 F. Supp. at 222; Restatement (Second) of Torts § 564A.  Here, the Post's initial report described the group of teens as a large one:  it referred to them as "a throng," Ex. D, and "the large group of boys," Ex. E.  *See Webster's Third New Int'l Dictionary* 2384 (2002) (defining "throng" as "a multitude of persons congregated into a close assemblage").

The fact that these articles mentioned one student in particular as "that guy in the hat" who was at "an impasse" with Phillips does not render *other* statements about "the teens" in general

---

[20] In a recent decision, the U.S. District Court for the Western District of Kentucky held that special damages need not be alleged "where the statement amounts to an accusation of theft, whether direct or indirect."  *Desai v. Charter Comms., LLC*, 2019 WL 1421756, at *6 (W.D. Ky. Mar. 29, 2019).  That decision misconstrued *Sweeney* and its precedential effect.  But in any event, that holding does not affect this case, in which the language at issue does not directly or indirectly impute theft.

"of and concerning" that teen in particular.  This Court confronted a similar fact pattern in *Loftus v. Nazari*, 21 F. Supp. 3d 849 (E.D. Ky. 2014), a case involving allegedly libelous online reviews that a patient posted about her plastic surgeon.  After this Court dismissed the statements actually about the physician as nonactionable opinion, it went on to hold that the physician could not recover for separate statements the patient directed only at state medical review boards or the medical profession more generally.  *Id.* at 853–54.  As this Court correctly recognized, "a member of a class has no claim against someone defaming the class as a whole," *id.* at 854, even if the publication at issue contains separate statements about the plaintiff in particular.  Rather, the plaintiff can maintain a claim for defamation only if the allegedly libelous statements are actually about him or her.  *See also Rubin v. U.S. News & World Report*, 271 F.3d 1305, 1308 (11th Cir. 2001) (concluding that statements in news report about smuggling in the gold industry did not implicate plaintiff, even though the report included a photo of him and quoted him as a source).

In addition to the statement discussed in Sections II.A–B, *supra*, Plaintiff challenges the following statements from the Post's initial report, all of which were directed either at "the teens" gathered at the Lincoln Memorial, "people in the March for Life crowd," or no one in particular.

(a)     The headline:  "'It was getting ugly':  Native American drummer speaks on the MAGA-hat wearing teens who surrounded him."   Compl. ¶ 118(a) (First Article); *id*. ¶ 121 (Second Article).

This headline contains no false statement of fact about Plaintiff.  It is a statement of pure opinion, reflecting the subjective assessment of the Native American drummer of the behavior of a large group, or "throng," of teens.  Ex. D; *see, e.g.*, *Seaton*, 728 F.3d at 601 (6th Cir. 2013) (dismissing claim concerning "protected, nonactionable opinion").  And even if it could somehow be understood to convey any facts, the headline refers only to the group of teens, not to Sandmann in particular.  As explained above, "a member of a class has no claim against someone defaming the class as a whole."  *Loftus*, 21 F. Supp. 3d at 854.

30

    (b)      "In an interview Saturday, Phillips, 64, said he felt threatened by the teens and that they suddenly swarmed around him as he and other activists were wrapping up the march and preparing to leave."  Compl. ¶ 118(b) (First Article); *id.* ¶ 121 (Second Article); *id.* ¶ 129(b) (Third Article).

This too is a statement of pure opinion, based on the disclosed fact that the teens surrounded him—a statement of fact that does not make specific reference to Plaintiff in particular and is not defamatory of anyone.  There is nothing disgraceful about swarming around a person who was "steadily beati[ng] his drum" and "singing a song of unity for indigenous people" at the end of a protest march on the national Mall.  *See, e.g.*, *Roche*, 197 F. App'x at 399.

    (c)      "Phillips, who was singing the American Indian Movement song of unity that serves as a ceremony to send the spirits home, said he noticed tensions beginning to escalate when the teens and other apparent participants from the nearby March for Life rally began taunting the dispersing indigenous crowd."  Compl. ¶ 118(c) (First Article); *id.* ¶ 121 (Second Article); *id.* ¶ 129(c) (Third Article).

Again, this is Phillips's subjective assessment of the mood among several groups of people, and it says nothing about this Plaintiff in particular.  Indeed, Phillips's statement refers to a large group of people—even larger than the group of teens.  Considering the size of the group and the vagueness of the description, the statement cannot "reasonably be understood to have personal reference and application to any member of it," including Sandmann.  *O'Brien*, 735 F. Supp. at 233; *see also Louisville Times*, 68 S.W.2d at 412 ("As the size of the group increases, it becomes more and more difficult for the plaintiff to show he was the one at whom the article was directed.").  Moreover, the statement is substantially true; the video compiled by Plaintiff's lawyer acknowledges that "many feel the boys crossed the line and began mocking the Native Americans,

by doing a move known to sports fans as the Tomahawk Chop."  Compl. ¶ 65.[21]  And the video

shows that the students participating in the tomahawk chop included Sandmann.  *Id.*[22]

> (d)     "A few people in the March for Life crowd began to chant 'Build that wall, build that wall,' he said."  Compl. ¶ 118(d) (First Article); *id*. ¶ 121 (Second Article); *id*. ¶ 129(d) (Third Article).

This statement does not even refer to the students from Covington Catholic, much less

Plaintiff in particular.  And as described above, to report that "[a] few people" chanted a mainstream

political slogan, however controversial, is not defamatory of anyone.  *See* Section II.C.1, *supra*.

> (e)     "'It clearly demonstrates the validity of our concerns about the marginalization and disrespect of Indigenous peoples, and it shows that traditional knowledge is being ignored by those who should listen most closely,' Darren Thompson, an organizer for the [Indigenous Peoples Movement], said in the statement."  Compl. ¶ 118(f) (First Article); *id*. ¶ 121 (Second Article); *id*. ¶ 129(f) (Third Article).

This is a statement about the overall behavior of a group of people, not a statement about

Plaintiff in particular.  The expressed concern that indigenous people are marginalized and not

respected is a classic statement of pure opinion.  And even if it were construed as something other

than pure opinion, accusing a person of being of being callous or rude does not rise to the level of

a defamatory statement under Kentucky law.  *See Better Built Garages, Inc. v. Ky. New Era, Inc.*,

2008 WL 4531037, at *3 (Ky. Ct. App. Oct. 10, 2008) (affirming grant of summary judgment to

defendants on defamation claim, even though publication used "sensational words and phrases"

and was "not particularly flattering"); *see also Levant v. Whitley*, 755 A.2d 1036, 1039, 1046 (D.C.

2000) (affirming finding that defendant's statement that plaintiff was "bringing shame" to her

office through "insubordinate and disrespectful acts" could not sustain defamation claim (internal

quotation marks omitted)).

---

[21] *See* https://www.youtube.com/watch?v=lSkpPaiUF8s (minute 4:14–4:20).

[22] *See* https://www.youtube.com/watch?v=lSkpPaiUF8s (minute 4:19–4:20); Ex. 5.

(f)     "Chase Iron Eyes, an attorney with the Lakota People Law Project, said the incident lasted about 10 minutes and ended when Phillips and other activists walked away." Compl. ¶ 118(g) (First Article); *id.* ¶ 121 (Second Article); *id.* ¶ 129(h) (Third Article).

There is nothing defamatory about this statement—certainly nothing defamatory of Plaintiff in particular. It is also substantially true, according to the investigative report Plaintiff attached as an exhibit to his Complaint. Although Plaintiff alleges that "[t]he confrontation ended when Nicholas and his fellow CovCath students were instructed to board the buses," Compl. ¶ 48, the private investigation commissioned by the Covington Diocese concluded, after interviewing 13 adult chaperones and reviewing "fifty (50) hours of internet activity," that "*[a]fter Mr. Phillips exited the area*, the students' attention turned back to the Black Hebrew Israelites." Compl. Ex. B (emphasis added). "Students were not instructed to 'move to the buses' until *after* the interactions with the Black Hebrew Israelites and Mr. Phillips." *Id.* (emphasis added).

(g)     "It was an aggressive display of physicality. They were rambunctious and trying to instigate a conflict,' he said. 'We were wondering where their chaperones were. [Phillips] was really trying to defuse the situation." Compl. ¶ 118(h) (First Article); *id.* ¶ 121 (Second Article); *id.* ¶ 129(i) (Third Article).

That Chase Iron Eyes thought "they" were rambunctious, engaged in "an aggressive display of physicality" and "trying to instigate a conflict" is his subjective assessment or interpretation of the incident. *See* Exs. D, E, F. Whether the students were "trying to instigate a conflict," and whether Phillips or Chase Iron Eyes were "trying to defuse the situation" are in the eyes of the beholder. *See* Exs. D, E, F. And the assessment of this observer was of the group of students throughout the 10-minute incident, not of Sandmann in particular, whose silent stance was anything but "rambunctious." *See* Exs. D, E, F.

33

(h)     "Phillips, an Omaha tribe elder who also fought in the Vietnam war, has encountered anti-Native American sentiments before . . . ." Compl. ¶ 118(i); *accord id.* ¶ 121 (Second Article); *id.* ¶ 129(j) (Third Article)[23].

This is a subjective interpretation of sentiments Phillips felt had been manifested in other encounters—not a factual statement about what happened at this one.   And even if it were construed to imply anything about this incident, it does not purport to comment on the sentiments that this particular student intended to express.

The Complaint cites the following additional statement from the Second Article, a portion of which was also included in the Third Article:

(i)     "'We [Bishop Foys and the Diocese of Covington] condemn the actions of the Covington Catholic High School students towards Nathan Phillips specifically, and Native Americans in general,' the statement said.  'The matter is being investigated and we will take appropriate action, up to and including expulsion.' . . .   The diocese's statement expressed regret that jeering, disrespectful students from a Catholic school had become the enduring image of the march."  Compl. ¶ 121(a) (Second Article); *id.* ¶ 129(g) (Third Article).

This was a formal public statement, issued to the news media for publication, reflecting the subjective judgment of responsible officials of Covington Catholic High School and the Diocese under whose auspices it operates.  These were the officials who presumably organized the students' trip to Washington, who arranged for the chaperones, who were responsible for reviewing and judging the students' behavior, and who had the ability to do so based on the first-hand accounts of the chaperones and students themselves.  There is no allegation here that the Post misquoted or mischaracterized their statement in any way.  The allegation, presumably, is that the judgment of these officials was wrong.  But Plaintiff's disagreement with the judgment expressed in their public statement does not transform it into a false statement of fact.  Nor does the fact that these officials

---

[23] The Third Article states: "In that role, he [Phillips] has encountered anti-Native American sentiment before."  Ex. F.

may have later changed their minds mean that the Post was not entitled to report the opinion they expressed at the time.

Finally, the Complaint challenges the headline of the Third Article, the print version of the initial report: "Marcher's accost by boys in MAGA caps draws ire." Comp. ¶ 129(a). A headline must be read together with the article that follows, *see McCall*, 623 S.W.2d at 884, and this headline adds nothing to the account in the article itself. To "accost" someone is to "to approach and speak to," "to confront, usu[ally] in a somewhat challenging or defensive way," or to "to address abruptly (as in a chance meeting) and usu[ally] with a certain degree of impetuosity or boldness." *Webster's Third New Int'l Dictionary* 12 (2002). By itself, it is not defamatory to accuse someone of accosting another. Accosting may be rude, depending on the circumstances, but it is not something that exposes a person to "public hatred, contempt or ridicule," or that "cause[s] him to be shunned or avoided." *McCall*, 623 S.W.2d at 884.

In sum, none of the challenged statements in the Post's initial report of this incident—the First, Second and Third Articles—is an actionable statement of fact about this particular Plaintiff.

## III.    THE FOURTH ARTICLE DID NOT DEFAME PLAINTIFF

The Fourth Article, which was published online on January 20, focused on the statement of the Diocese and school. Ex. G. Plaintiff complains of the headline, "'Opposed to the dignity of the human person': Kentucky Catholic diocese condemns teens who taunted vet at March for Life," which quoted from that statement. Compl. ¶ 136(a). He also complains of the lengthier quote from the statement that appeared in this online piece:

> "We condemn the actions of the Covington Catholic High School students towards Nathan Phillips specifically, and Native Americans in general," a statement by the Roman Catholic Diocese of Covington and Covington Catholic High School read. "We extend our deepest apologies to Mr. Phillips. This behavior is opposed to the Church's teachings on the dignity and respect of the

> human person.  The matter is being investigated and we will take
> appropriate action, up to and including expulsion."

Compl. ¶ 136(d).  The Post's accurate quotation of this public statement cannot give rise to a

defamation suit for all the reasons stated above.  *See* Section II.D, *supra*.

Plaintiff also complains of the reference to "[a] viral video of a group of Kentucky teens in

'Make America Great Again' hats taunting a Native American veteran on Friday," as well as the

following statement: "A few of the young people chanted 'Build that wall, build that wall,' the

man said, adding that a teen, shown smirking at him in the video, was blocking him from moving."

Compl. ¶ 136(b), (c).  References to "a group of Kentucky teens" and "a few of the young people,"

however, do not refer to Plaintiff in particular.  The statement that the teen who turned out to be

Plaintiff was "smirking" is one of interpretation—as the Post reported in another article,

Sandmann's "frozen smile struck some as nervousness and others as arrogance."  Ex. I.  As

explained above, *see* footnote 18, *supra*, Plaintiff does not actually contend that it was false to say

he was smirking.  And Phillips's perception that the student was "blocking" him from moving does

not bear the meanings alleged—that the student "assaulted Phillips" and "engaged in racist

conduct."  Compl. ¶¶ 132–33.

## IV.      THE FIFTH ARTICLE DID NOT DEFAME PLAINTIFF

The Fifth Article, titled "Most young white men are much more open to diversity than older

generations," contained only one reference to Plaintiff—that, *in an image of the incident*, he

"appeared to physically intimidate Nathan Phillips."  Ex. H.  As an initial matter, such a statement

is "sufficiently nebulous" that it cannot be considered a statement of fact.  *See, e.g.*, *Heidel v.

Amburgy*, 2003 WL 21373164, at *4 (Ohio Ct. App. June 16, 2003) (holding that statement that

plaintiff "intimidates children" was non-actionable opinion because the phrase was "imprecise"

and open to "various interpretations").  More fundamentally, in this context, the statement that *in*

*an image of the incident* Sandmann "appeared to physically intimidate Nathan Phillips," Compl. ¶ 141(a), was obviously the author's interpretation of that image. And because the image accompanied the article, readers could judge for themselves whether the student in the image appeared to physically intimidate Phillips or not. When "[t]he reader is in as good a position as the author to judge whether the conclusion . . . [i]s correct," the statement is one of protected opinion. *Lassiter*, 456 F. Supp. 2d at 882.[24]

## V.   THE SIXTH AND SEVENTH ARTICLES DID NOT DEFAME PLAINTIFF

### A.   The Sixth and Seventh Articles Are Not Reasonably Capable of Bearing the Defamatory Meanings Alleged in the Complaint

The Post's Sixth and Seventh Articles about the incident, published on January 21 after further investigation, were the first Post articles to name Plaintiff, and they included his account of what had happened. Indeed, the headlines to the online and print articles clearly stated their theme: "Fuller view emerges of conflict on Mall," Ex. I, and "Viral standoff between a tribal elder and a high schooler is more complicated than it first seemed," Ex. J.

The Complaint alleges that these articles, like the initial ones, implied that Plaintiff had "engaged in racist conduct" and "assaulted" or "physically intimidated" Phillips." Compl. ¶ 145–46 (Sixth Article); *id*. ¶¶ 152–53 (Seventh Article). If anything, however, these articles were even more clear that Sandmann was not aggressive towards Phillips. They said simply that "Sandmann stayed still" when Phillips "walk[ed] into the group of students." Exs. I, J. And then the report

---

[24] The Complaint also alleges that the Fifth Article defamed Plaintiff by stating that "some reportedly chanted, 'Build the wall!'" Compl. ¶ 141(b) (quoting the Fifth Article). For the reasons stated in Sections II.C and III, *supra*, this statement is not "of and concerning" Plaintiff, and is not defamatory in any event. The Complaint also alleges that the Article defamed Plaintiff by stating: "It's clear from Friday's incident on the Mall that the young men who confronted the Native American protester had somehow internalized that their behavior was acceptable." *Id.* ¶ 141(c) (quoting the Fifth Article). But a statement regarding what the students generally internalized is not "of and concerning" Plaintiff, and is too "nebulous" to be capable of a defamatory meaning.

quoted Phillips acknowledging that he was not prevented from walking around Sandmann: "'Why should I go around him?' he asked." Exs. I, J. There is nothing to suggest that Sandmann "assaulted" or "physically intimidated" Phillips. Plaintiff cannot build a viable defamation claim on such a "strained reading" of the publication. *See Compuware Corp. v. Moody's Inv'rs Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007).

Nor is there anything to suggest that Plaintiff "engaged in racist conduct." The article reported that "*[s]ome of the students* began doing a 'Tomahawk chop' and dancing," which "Phillips said he found . . . offensive." Exs. I, J (emphasis added). But there is no hint in the article that Sandmann was one of those students. In any event, it is substantially true that "some of the students" were doing a tomahawk chop—a fact that is explicitly acknowledged in the investigative report that Sandmann attaches to his Complaint. *See* Ex. B ("Some students performed a 'tomahawk chop' to the beat of Mr. Phillips' drumming and some joined in Mr. Phillips' chant."). As described in Section II.C.1, *supra*, the video produced by Plaintiff's counsel, which Plaintiff claims "accurately set[s] forth the truth," Compl. ¶ 66, itself concedes that "many feel the boys crossed the line and began mocking the Native Americans, by doing a move known to sports fans as the Tomahawk Chop," *id.* ¶ 65.[25]

Moreover, Phillips's statement that he found the students' actions "offensive" is pure opinion. *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989). The subjective nature of Phillips's account is underscored by his statement that when he saw Sandmann standing in his path, "Phillips . . . said he saw more than a teenage boy in front of him. He saw a long history of white oppression

---

[25] *See* https://www.youtube.com/watch?v=lSkpPaiUF8s (minute 4:14–4:20). The video shows that Sandmann did the tomahawk chop as well. *See id.* (minute 4:19–4:20); Ex. 5.

of Native Americans." Exs. I, J. That is simply Phillips's description of his own subjective state of mind; it says nothing about Sandmann's motivation.

Likewise, the articles reported that after the Hebrew Israelites hurled racially charged insults at the students, they began chanting a school cheer, which one of the Hebrew Israelites thought was "mocking my ancestors," Exs. I, J—a purely subjective judgment. And again, there is nothing in the article to indicate that Sandmann was one of the students chanting—much less that the chant was "racist." Quite the opposite: the students were depicted as *responding* to racist insults. And Sandmann himself was reported as having "remain[ed] motionless and calm" in the face of the insults that were directed at the students—"in hopes that things would not 'get out of hand.'" Exs. I, J.

The Complaint also alleges that these articles carried the message that Sandmann had "violated the fundamental standards of his religious community" and "violated the policies of his school such that he should be expelled." Compl. ¶¶ 145–147, 152–154. But that allegation is based on quotations from the same statement from the Diocese of Covington and Covington Catholic High School that was quoted in earlier articles, and those quotes are not actionable here for the same reasons noted above. At the time, school and diocesan officials had stated that the students' behavior was "opposed to the Church's teachings on the dignity and respect of the human person"—teachings that are obviously "fundamental"—and that the students did face disciplinary "action, up to and including expulsion." Ex. 2. To the extent that the article is alleged to have carried this message, it was certainly not false.

For these reasons—and for the additional reason that there is no allegation of special damages or intent to convey the alleged implications—these alleged implications cannot support a claim. *See* Section II.C, *supra*.

**B.    The Specific Statements Challenged in the Complaint Were Not "Of and Concerning" Plaintiff, Were Not Defamatory, or Were Statements of Opinion that Cannot Be Proven False**

The challenged statements in the Sixth and Seventh Articles are no more actionable than the challenged statements in the First, Second and Third Articles.  If anything, they are even less so.  Plaintiff challenges these statements:

(a)    "The Israelites and students exchanged taunts, videos show.  The Native Americans and Hebrew Israelites say some students shouted, 'Build the wall!' [although the chant is not heard on the widely circulated videos, and the Cincinnati Enquirer quoted a student at the center of the confrontation who said he did not hear anyone say it.]"[26]  Compl. ¶ 149(a) (Sixth Article); *see also id*. ¶ 156(a).

The reference to "students" and "some students" is not a reference to Plaintiff in particular.  The articles reported that there were "around 100 Covington students" in the group—far too large a group to permit the inference that Sandmann was one of the students exchanging taunts or shouting "Build the wall."  *See O'Brien*, 735 F. Supp. at 220 (noting that the court had "failed to find any case" permitting a libel claim to proceed where statements concerned a group larger than 25 persons).  In fact, the articles reported that Sandmann "was 'remaining motionless and calm,'" and that he did not even hear anyone say "Build the wall," much less say it himself. Exs. I, J.  And even if these articles had accused Plaintiff of saying "Build the wall," that would not be defamatory for the reasons explained above.  Nor would it be defamatory if the articles accused him of participating in the exchange of taunts; the articles make clear that the Israelites initiated the exchange by shouting racially charged insults at the students who, with "permission from the adults

---

[26] The words in brackets here and in other items appear in the article but are omitted from the quotations contained in the Complaint.  They are included here to provide necessary context for evaluating the publication.  *See McCall*, 623 S.W.2d at 884 (explaining that evaluating defamatory words necessarily requires looking at whether the article's "gist or sting" is defamatory).

in charge," merely responded with cheers "commonly used at sporting events."  Exs. I, J.  There is nothing defamatory about that.

(b)     "'When I took that drum and hit that first beat . . . it was a supplication to God,' said Nathan Phillips, a member of the Omaha tribe and a Marine veteran.  'Look at us, God, look at what is going on here; my America is being torn apart by racism, hatred, bigotry.'"  Compl. ¶ 149(b) (Sixth Article); *id*. ¶ 156(d) (Seventh Article).

This statement cannot reasonably be construed as a statement about Sandmann.  It was Phillips's personal reflection on the overall scene, in which only the Hebrew Israelites were reported as having shouted "hateful comments"—including calling a black Covington student "the n-word" and saying that his fellow students "will one day harvest his organs, an apparent reference to the racially fraught movie 'Get Out.'"  Exs. I, J.

(c)     "While the groups argued, some students laughed and mocked them, [according to Banyamyan and another Hebrew Israelite, Ephraim Israel, who came from New York for the event.  As tensions grew, the Hebrew Israelites started insulting the students.  'Tell them to come over in the lion's den instead of mocking from over there,' Banyamyan can be heard saying in the video.  'Y'all dirty ass little crackers, your day is coming.']  'They were sitting there, mocking me as I was trying to teach my brothers, so yes the attention turned to them,' Israel told the Washington Post."  Compl. ¶ 149(c) (Sixth Article); *id*. ¶ 156 (e), (f) (Seventh Article).

(d)     "Phillips said he and his fellow Native American activists also had issues with the students throughout the day.  'Before they got centered on the black Israelites, they would walk through and say things to each other, like, 'Oh, the Indians in my state are drunks or thieves,' the 64-year-old said."  Compl. ¶ 149(d) (Sixth Article); *id*. ¶ 156 (g) (Seventh Article).

(e)     "Phillips said he heard students shout, 'Go back to Africa!'  [Sandmann said in his statement that he 'did not hear any students chant 'build that wall' or anything hateful or racist at any time.  Assertions to the contrary are simply false.']"  Compl. ¶ 149(e) (Sixth Article); *id*. ¶ 156(h) (Seventh Article).

(f)     "'They were mocking my ancestors in a chant, [one of them was jumping up and down like a cave man,]' he said."  Compl. ¶ 149(f) (Sixth Article); *id*. ¶ 156(i) (Seventh Article).

(g)     "John Stegenga, a photojournalist who drove to Washington on Friday from South Carolina to cover the Indigenous Peoples March, recalled hearing students say 'build the wall' and 'Trump 2020.'  He said it was about that time that Phillips intervened."  Compl. ¶ 149(g) (Sixth Article); *id*. ¶ 156(j) (Seventh Article).

Again, the references to "students" and "some students" are general references to just some

of the "100 Covington students" on the scene, Exs. I, J; they do not pertain to Plaintiff in particular.

*See O'Brien*, 735 F. Supp. at 220; *Louisville Times*, 68 S.W.2d at 412; Restatement (Second) of

Torts § 564A cmt. b. There is nothing in the article to indicate that Plaintiff had uttered any of the

things mentioned in these passages. To the contrary, Plaintiff was reported as "remaining

motionless and calm" while "he and his classmates [were being] called 'racists,' bigots' and

worse"—and as having said that he "'did not witness or hear any students chant "build that wall"

or anything hateful or racist at any time.'" Exs. I, J.

> (h)     "Most of the students moved out of his way, the video shows. But Sandmann stayed
> still. Asked why he felt the need to walk into the group of students, Phillips said
> he was trying to reach the top of the memorial, where friends were standing. But
> Phillips also said he saw more than a teenage boy in front of him. He saw a long
> history of white oppression of Native Americans. 'Why should I go around him?'
> he asked. 'I'm just thinking of 500 years of genocide in this country, what your
> people have done. You don't even see me as a human being.'" Compl. ¶ 149(h)
> (Sixth Article); *id.* ¶ 156(k) (Seventh Article).

There is nothing defamatory about saying that "Sandmann stayed still" when Phillips

"walked[ed] into the group of students." Indeed, the quoted statement makes clear that Phillips

could have "go[ne] around him" but simply chose not to. In short, the Post explained that Phillips

was halted not by Sandmann, but by his own thoughts about "500 years of genocide [and] what

your people have done." Exs. I, J.

> (i)     "'He [Phillips] was dealing with a lot of feelings, as he was being surrounded and
> not being shown respect,' the photographer said." Compl. ¶ 149(i) (Sixth Article);
> *id.* ¶ 156(l) (Seventh Article).

This is not a false statement of fact about Sandmann. The article makes clear that Phillips

was being surrounded because he "walk[ed] into the group of students." Exs. I, J. Whether he

was "shown respect" is a matter of opinion, and saying that someone failed to show respect is not

defamatory in any event. *See, e.g.*, *Morrison v. Poullet*, 227 A.D.2d 599, 599 (N.Y. App. Div.

42

1996) (statements accusing plaintiff of "disrespectful, rude, and . . . verbally abusive" conduct were nonactionable opinion).

> (j)    "School officials and the Catholic Diocese of Covington released a joint statement Saturday condemning and apologizing for the students' actions.  'The matter is being investigated and we will take appropriate action, up to and including expulsion,' the statement said."  Compl. ¶ 149(j) (Sixth Article); *id.* ¶ 156(m) (Seventh Article).

Again, there is nothing actionable about reporting the opinions and stated intentions of the responsible school and Church officials.  *See* Ex. 2.

Plaintiff challenges two additional statements that appear only in the Seventh Article:

> (k)    "When a Native American elder intervened, singing and playing a prayer song, scores of students around him seem to mimic and mock him, a video posted Monday shows."  Compl. ¶ 156(b).

This is a statement about "scores of students" out of "[a] group of about 100 Covington students."  It is not a statement about one student in particular.  It cannot reasonably be construed as concerning Plaintiff.  *See O'Brien*, 735 F. Supp. at 220.  And the statement that students in a video "seem" to mimic and mock Phillips is one of opinion, which readers can judge by watching the video themselves.  *See Milkovich*, 497 U.S. at 31 (acknowledging that the "cautionary term 'apparently'" puts readers on notice that what follows is opinion).

> (l)    "The Kentucky teens' church apologized on Saturday, condemning the students' actions."  Compl. ¶ 156(c).

As noted previously, the Post has no liability for accurately reporting the subjective judgment of the responsible church officials.

## VI.    THE TWEETS DID NOT DEFAME PLAINTIFF

Plaintiff challenges three tweets sent out to alert readers to the Post's initial news report.  *See* Ex. K.  Those tweets provided clear hyperlinks to, referenced, and quoted the initial report, and are not actionable for all the same reasons the report is not—because they are not "of and

concerning" Plaintiff, they are statements of opinion, they are substantially true, and/or they are not defamatory.

Because all three of these tweets linked to the Post's initial news report, it would be "clear to any reader" the tweets were based on and must be understood in the context of the full report. *Mirage Ent., Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 38 (S.D.N.Y. 2018) (holding that tweet to underlying article provided disclosed facts necessary to support defendant's opinion defense); *see also, e.g.*, *Adelson v. Harris*, 402 P.3d 665, 669–70 (Nev. 2017) (holding that the defendant could assert the fair report privilege on the basis of statements contained in underlying article via hyperlink).

The first tweet, which says that Phillips "'felt like the spirit was talking through me' as teens jeered and mocked him," Ex. K, is not "of and concerning" Plaintiff. First, it refers only to "teens." Second, it must be understood in the context of the linked-to news report, which describes a "throng" of teens. The tweet is also not actionable because it conveys an opinion based on the substantially true fact that some of the teens, including Plaintiff, did the tomahawk chop, which Plaintiff concedes "many" people regarded as "mocking the Native Americans." *See* Section II.C.1, *supra*.

The second tweet similarly is not actionable. It quotes Phillips's subjective desire to "find myself an exit out of this situation" as it was "getting ugly." Ex. K. The tweet makes no reference to teens or students, let alone Plaintiff. It merely presents Phillips's perspective about the activity at the Lincoln Memorial at the time of the encounter. As discussed in section II.D, *supra*, his observations are protected statements of opinion.

The third tweet includes the quote from the Post's initial report, discussed in Section II.A–B, *supra*, in which Phillips gave his perspective on his face-to-face encounter with Plaintiff. *See*

44

Ex. K.  As discussed in that section, that quotation is not actionable because it is substantially true and is not defamatory in any event.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.


/s/ *Bethany A. Breetz*

Philip W. Collier
Bethany A. Breetz
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY  40202
Telephone:  (502) 587-3400

William G. Geisen
STITES & HARBISON, PLLC
100 East RiverCenter Boulevard
Suite 450 Covington, KY  41011
Telephone:  (859) 652-7601

*Counsel for The Washington Post*

April 9, 2019

Kevin T. Baine (*pro hac vice* motion pending)
Thomas G. Hentoff (*pro hac vice* motion pending)
Nicholas G. Gamse (*pro hac vice* motion pending)
Katherine Moran Meeks (*pro hac vice* motion pending)
Whitney G. Woodward (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000

*Counsel for The Washington Post*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 9, 2019, I electronically filed the foregoing Memorandum of Law in support of the Washington Post's Motion to Dismiss with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.

/s/ Bethany A. Breetz
*Counsel for The Washington Post*