**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

| | | |
|---|---|---|
| **NICHOLAS SANDMANN,** by and through his parents and natural guardians, **TED SANDMANN** and **JULIE SANDMANN,** | : | **CASE NO. 2:19-cv-19-WOB-CJS** |
| | : | |
| | : | **JUDGE WILLIAM O. BERTELSMAN** |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **WP COMPANY LLC d/b/a THE WASHINGTON POST,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**PLAINTIFF'S RESPONSE IN OPPOSITION**
**TO DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 6

I.    Nicholas Was a Victim, Not an Aggressor, at the January 18 Incident. ............................ 6

II.   The Public Record ............................................................................................................... 7

III.  Nicholas Was a Victim of the Post's Negligent Reporting. ............................................... 8

IV.   The Post Perpetuated the False Narrative Rather than Admitting Its Errors .................... 10

V.    Investigations by the Diocese and the Post Establish Falsity ......................................... 13

ARGUMENT .............................................................................................................. 13

I.    Legal Standards to Be Applied. ...................................................................................... 14

   A.   All Allegations of the Complaint Must Be Taken as True. ....................................... 14

   B.   Of and Concerning Is a Jury Issue if There Is Any Ambiguity. ............................... 14

   C.   Defamatory Meaning Is a Jury Issue if There Is any Ambiguity. ............................ 15

   D.   Truth or Falsity Is a Jury Issue Except in the Clearest Cases. .................................. 16

   E.   The Post Is Not Entitled to Report Lies Even if It Does so Accurately. .................... 17

II.   The False and Defamatory Accusations Are Of and Concerning Nicholas ................... 18

   A.   Nicholas Does Not Rely on His Status as a Member of the CovCath Group to Confer
   Standing and the Group Libel Doctrine Is Therefore Inapplicable. .............................. 19

   B.   Nicholas Was Identified by Name, Photograph, and Descriptive Circumstances ...... 20

III.  The Articles Are False and Defamatory. ...................................................................... 24

   A.   The Post Has Admitted that Its Articles Conveyed the Meanings Alleged by Nicholas
   and that Those Meanings Are False. .............................................................................. 24

   B.   The Articles Are Defamatory Per Se………………………………………………...27

   C.   The Articles Are Capable of a Defamatory Meaning……………………………......30

IV.   The Articles Are Not Protected Opinion ..................................................................... 35

   A.   The First, Second, and Third Articles Are Not Protected Opinion. .......................... 37

      1.   "Phillips, 64, said he felt threatened by the teens and that they suddenly swarmed
      around him as he . . . [was] preparing to leave." .................................................... 37

      2.   "[T]aunting the dispersing indigenous crowd." .................................................. 39

      3.   "It was getting ugly: Native American drummer speaks on the MAGA-hat wearing
      teens who surrounded him." ................................................................................... 41

      4.   "It was an aggressive display of physicality. They were rambunctious and trying to
      instigate a conflict,' he said." ................................................................................ 41

   B.   The Second and Third Articles' Diocese Statement Is Not Protected Opinion .......... 41

   C.   The Fifth Article Is Not Protected Opinion ............................................................. 42

i

D.      The Sixth and Seventh Articles Are Not Protected Opinion. ...................................... 44

E.      The Tweets Are Not Protected Opinion. .................................................................. 45

**CONCLUSION** ................................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Araya v. Deep Dive Media, LLC*, 966 F. Supp. 2d 582 (W.D.N.C. 2013) ................................... 14

*Arno v. Stewart*, 245 Cal. App. 2d 955 (1966) ........................................................................... 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 14

*Ball v. E.W. Scripps Co.*, 801 S.W.2d 684 (Ky. 1990) ............................................................... 32

*Biber v. Duplicator Sales & Service, Inc.*, 155 S.W.3d 732 (Ky. Ct. App. 2004) ....................... 31

*Boyles v. Mid-Florida Television Corp.*, 431 So. 2d 627 (Fla. Dist. Ct. App. 1983) ............. 35, 40

*Brokers Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125 (10th Cir. 2014) ............... 16

*Carey v. CSX Transportation, Inc.*, 2019 WL 181120 (E.D. Ky. Jan. 11, 2019) .................. 36, 38

*Cheney v. Daily News L.P.*, 654 Fed. App'x 578 (3d Cir. 2016) ........................................... 15, 22

*Clark v. Viacom Intern. Inc.*, 617 Fed. App'x 495 (6th Cir. 2015) ............................................. 16

*Competitive Enterprise Inst. v. Mann*, 150 A.3d 1213 (D.C. 2016) ........................................... 44

*Cromity v. Meiners*, 494 S.W.3d 499 (Ky. Ct. App. 2015) ........................................................ 35

*Desai v. Charter Commc'ns, LLC*, 2019 WL 1421756 (W.D. Ky. Mar. 29, 2019) ......... 16, 28, 29

*Digest Pub. Co. v. Perry Pub. Co.*, 284 S.W.2d 832 (Ky. 1955) ................................................ 28

*E.W. Scripps Co. v. Cholmondelay*, 469 S.W.2d 700 (Ky. Ct. App. 1978) ................................. 19

*Farrell v. Triangle Publ'ns, Inc.*, 399 Pa. 102 (1960) .......................................................... 15, 23

*Fortney v. Guzman*, 482 S.W.3d 784 (Ky. Ct. App. 2015) ......................................................... 34

*Heidel v. Amburgy*, 2003-Ohio-3073 ........................................................................................ 43

*Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250 (N.Y. Ct. App. 1995) .................................. 40

*Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302 (Ky. 2010) ......................................................... 14

*Holmes v. Curtis Pub. Co.*, 303 F. Supp. 522 (D.S.C. 1969) ..................................................... 22

*Jackson v. Consumer Publ'ns*, 11 N.Y.S.2d 462 (App. Div. 1939) ........................................... 22

*Jacobs v. Ethel Walker School Inc.*, 2003 WL 22390051 (Conn. Super. Ct. Sept. 30, 2003) ...... 42

i

*Kurd v. Republic of Turkey*, 2019 WL 1243731 (D.D.C. Mar. 18, 2019) .................................... 43

*Ky. Kingdom Amusement Co. v. Belo Ky., Inc.*, 179 S.W.3d 785 (Ky. 2005) ................. 16, 26, 31

*Lassiter v. Lassiter*, 456 F. Supp. 2d 876 (E.D. Ky. 2006) ........................................................... 44

*Little Rock Newspapers, Inc. v. Fitzhugh*, 330 Ark. 561 (1997) .................................................. 21

*Loftus v. Nazari*, 21 F. Supp. 3d 849 (E.D. Ky. 2014) ........................................................... 24, 44

*Louisville Times v. Stivers,* 68 S.W.2d 411 (Ky. 1934) ............................................................... 19

*MacElree v. Phila. Newspapers, Inc.*, 544 Pa. 117 (1996) .......................................................... 40

*Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686 (2008) .............................................. 39

*Marr v. Putnam*, 196 Or. 1 (1952) ........................................................................... 15, 20, 23, 27

*McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882 (1981) ..................... *passim*

*McGunigle v. City of Quincy*, 2013 WL 3892901 (D. Mass. July 25, 2013)................................ 42

*Milkovich v. Lorain Journal*, 497 U.S. 1 (1990).................................................................. *passim*

*Mullenmeister v. Snap-On Tools Corp.*, 587 F. Supp. 868 (S.D.N.Y. 1984) ............................... 35

*Nappier v. Jefferson Standard Life Ins. Co.*, 322 F.2d 502 (4th Cir. 1963) ................................ 21

*Nicholson v. Rust*, 52 S.W. 933 (Ky. 1899) ................................................................................... 1

*Norton v. City of Santa Ana*, 15 Cal. App. 3d 419 (1971) .......................................................... 42

*O'Brien v. Williamson Daily News*, 735 F. Supp. 218 (E.D. Ky. 1990).......................... 15, 20, 24

*Overhill Farms, Inc. v. Lopes*, 190 Cal. App. 4th 1248 (2010) .............................................. 38, 40

*Peck v. Tribune Co.*, 214 U.S. 185 (1909) ............................................................................... 21, 31

*Perryman v. Hackler*, 916 S.W.2d 105 (Ark. 1996) .................................................................... 42

*Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305 (11th Cir. 2001) ............................... 24

*Scheel v. Harris*, 2012 WL 3731263 (E.D. Ky. Aug. 28, 2012)................................................... 37

*Scott v. Cooper*, 226 A.D.2d 360 (N.Y. Ct. App. 1996)............................................................... 40

*Shields v. Booles*, 238 Ky. 673 (1931) ......................................................................................... 28

*Smith v. United States*, 593 A.2d 205 (D.C. 1991) ...................................................................... 38

*Stanton v. Metro Corp.*, 357 F. Supp. 2d 369 (D. Mass. 2005) ........................................ 20, 21, 22

*Stanton v. Metro Corp.*, 438 F.3d 119 (1st Cir. 2006) ........................................................ 21, 22

*StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334 (N.D. Ga. 2018) ............... 43

*Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781 (Ky. 2004) ................................ 19, 26, 34, 35

*Sweeney & Co. v. Brown*, 60 S.W.2d 381 (Ky. 1933) .................................................. 29

*TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175 (10th Cir. 2007) ............................................ 36

*Toikka v. Jones*, 2013 WL 978926 (E.D. Ky. 2013) ........................................................... 34

*Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014) ..................................................... 19, 34

*Toney v. WCCO Television, Midwest Cable and Satellite, Inc.*, 85 F.3d 383 (8th Cir. 1996) ...... 27

*Towles v. Travelers Insurance Co.*, 137 S.W.2d 1110 (Ky. 1940) ............................................. 29

*Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018) .......................................................... 40

*United States v. Hoxsey*, 17 M.J. 964 (A.F.C.M.R. 1984) ............................................... 42

*Vail v. The Plain Dealer Publishing Co.*, 1995-Ohio-187 ................................................. 44

*Wallace v. Media News Group, Inc.*, 568 Fed. App'x 121 (3d Cir. 2014) ................................. 21

*Washington Post Co. v. Kelly*, 38 F.2d 151 (D.C. Cir. 1930) ....................................... 32

*Welch v. American Publishing Co. of Kentucky*, 3 S.W.3d 724 (Ky. 1999) ......................... 29, 35

*Wesbrook v. Ulrich*, 90 F. Supp. 3d 803 (W.D. Wis. 2015) ......................................... 42

*Williams v. Blackwell*, 487 S.W.3d 451 (Ky. Ct. App. 2016) ....................................... 35

*Yancey v. Hamilton*, 786 S.W.2d 854 (1989) ........................................................ *passim*

*Yow v. National Enquirer, Inc.*, 550 F. Supp. 2d 1179 (E.D. Cal. 2008) ................................ 24

## Statutes

Kentucky Revised Statutes § 503.0350 ........................................................... 3

Minnesota Statutes § 609.749 ................................................................... 43

## Other Authorities

Kentucky Constitution § 8 ........................................................................ 14

Restatement (Second) of Torts § 559 ........................................................................... 31

Restatement (Second) of Torts § 566 ........................................................................... 35

Restatement (Second) of Torts § 578 ............................................................................. 1

Restatement (Second) of Torts § 564 ..................................................................... 19, 23

Restatement (Second) of Torts § 617 ..................................................................... 15, 16

Richard J. Conviser & Roger W. Meslar, "Obsolete on its Face: The Libel Per Quod Rule," 45 Ark. L. Rev. 1 (1992) ............................................................................................... 29

## **Rules**

Arkansas Superior Court Rule 1–5 ............................................................................... 42

## **Treatises**

1 Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 4:2.4 (5th ed. 2018) ......................................................................................................................... 44

## INTRODUCTION

"Tale bearers are as bad as tale makers."  *Nicholson v. Rust*, 52 S.W. 933, 934 (Ky. 1899). The Post ignores this longstanding rule of liability for republication and asks this Court to hold as a matter of law that a sixteen-year-old student cannot recover for the Post's negligent republication of agenda-driven lies that created an entirely false narrative.  In its Motion to Dismiss ("Motion"), the Post ignores that the Complaint sets forth a legal cause of action for negligent republication to third parties of false statements that in context, were defamatory of Plaintiff Nicholas Sandmann ("Nicholas"). The Post does not challenge Nicholas's status of a private figure plaintiff – nor could it do so successfully under the facts set forth in the Complaint.  The Post has no constitutional privilege shielding it from liability for the negligently republished false factual statements by third parties of and concerning a private figure such as Nicholas, even if the third parties are quoted accurately.  "It is an ancient rule that authors and publishers may not repeat false and defamatory matter and escape liability with the plea that they were but quoting a source deemed authentic." *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 894 (1981) (rejecting the doctrine of "neutral reportage" in Kentucky, which has no basis in the constitution and which, in any case, does not apply to private figures); Restatement (Second) of Torts ("Restatement") § 578 ("[O]ne who repeats or otherwise republishes defamatory matter is subject to liability as if he had originally published it.").  The Post was obliged to use reasonable care to ensure its coverage was accurate in the first instance, especially given the magnitude of the resulting public hatred, ill will, and contempt directed at Nicholas, a minor, that was foreseeable in the politically charged and polarized climate in which the Post sought to capitalize on this event in its reporting.

The Post's reporting was so obviously inaccurate that it made the rare decision to admit in multiple editor's notes that critical accusations it published are "contradicted" by the evidence,

1

which "called into question the entire substance of" its reporting.  Yet the Post now contradicts its editor's notes by asking this Court to hold on a motion to dismiss that its accusations are substantially true, a fact issue. The Post further contends Nicholas should be thrown out of court, claiming that as a matter of law, its false statements were non-defamatory, subjective opinions. The Post did not merely report subjective assessments, it republished demonstrable falsehoods, including that Nicholas accosted Native American Elder Nathan Phillips ("Phillips") when he and his Covington Catholic High School ("CovCath") classmates "suddenly swarmed" Phillips, who was merely singing a prayer song of unity; and that Nicholas then "blocked [Phillips'] way and wouldn't allow [him] to retreat" from the "aggressive" swarm of students, while Nicholas and his CovCath classmates taunted and mocked him.  (Compl. Exs. D-F).

Avoiding any discussion of the context in which these and other accusations against Nicholas were published, the Post's lawyers tell this Court that accusing Nicholas of this conduct is not actionable because "[s]tanding one's ground, even when offensive to others, is celebrated in American culture as a sign of strength and self-possession."  (Mot. at 22) (citing Kentucky's "Stand Your Ground" law).  Viewing the Post's false accusations in context reveals nothing about the Post's coverage that was celebratory, or even neutral, about Nicholas.  The Post did not initially report that Nicholas only respectfully "stood his ground" after being confronted with threats of physical harm by an adult stranger; to the contrary, it reported that Phillips peaceably "stood his ground" and prayed after being confronted with threats of physical harm and racist taunts by Nicholas.  *Cf.* KRS § 503.0350 (the use of physical force is justified if "necessary to protect himself against the … use of unlawful physical force.").  Context is fatal to the Post's Motion.

The Post knows that it literally reversed the truth, which is to say, it knows its coverage was false and provably so.  Indeed, when compared to its lawyers' briefing, the Post, its editorial

staff, and its journalists have been much more forthright in their "mea culpa" coverage regarding the indisputable falsity of the Post's accusations and the defamatory meaning of its coverage. Far from taking the position that the gist of its reporting was substantially true and non-defamatory, the Post instead characterized the meaning of its earlier coverage, in part, as follows:

> Given Phillips's comment to The Post that he was "swarmed" by the students, readers would be licensed to conclude that the students saw him from afar, targeted him and advanced. We learned later that Phillips himself had walked straight into the student group, making a swarm all but inevitable. Let's say a man jumps from a platform into an aquatic expanse. Did he dive into the water? Or did water surround and swarm him?

Https://wapo.st/2LJaCV7 (last visited May 7, 2019).

The Post's admission that its coverage gave readers a "license[] to conclude" that Nicholas targeted Phillips and advanced is virtually indistinguishable from the defamatory meaning standard to be addressed by the Court: whether a reasonable jury could conclude that the Post's coverage in context conveyed the defamatory meanings alleged in the Complaint. But this out-of-court admission still omits the full false context and the false narrative the Post promulgated and spread by republishing false statements of third parties: including that a "throng" of "white teenagers" wearing "MAGA" caps were "trying to instigate a conflict" when they "threatened" Phillips, while he was "singing the American Indian Movement song of unity," which, among other, conduct "clearly demonstrates the validity of our concerns about the marginalization and disrespect of Indigenous peoples" and mirrored "anti-Native American sentiments" Phillips previously encountered. (Compl. Exs. D-F).

And while the above admission alone justifies rejecting the Post's contentions that the gist and the specific statements creating that gist are substantially true and non-defamatory, the Post's "editor's notes" support finding that the statements are provably false and capable of a defamatory meaning. The Post admits in its Policies and Standards that it "is necessary to use . . . [an] editor's

note to inform readers whenever we correct a significant mistake," and editor's note is defined, in part, as a "correction that calls into question the entire substance of an article . . . ."[2]  As referenced by the Post on page 12 of its Motion, those editor's notes included the following:

> Subsequent reporting and video evidence contradicted or failed to corroborate that one of the activists was accosted and prevented from moving, that they had been taunted by the students in the lead-up to the encounter, that the students were trying to instigate a conflict, or that "March for Life" participants chanted "Build that wall."
>
> &ast;&ast;&ast;
>
> More complete video does not show that the student physically intimidated Phillips.
>
> &ast;&ast;&ast;
>
> Also, this version of the story has been revised to clarify that certain statements reported by Phillips are not corroborated by widely circulated video of the incident.[3]

Thus, despite admitting that upon investigation its damaging accusations against Nicholas are either contradicted or uncorroborated, the Post urges that its accusations against Nicholas are, somehow, substantially true on the one hand as a matter of law or are subjective opinions that cannot be proven false as a matter of law.  Further, while claiming that the defamatory meanings Nicholas ascribed to the Post's coverage are too strained – including, e.g., that Nicholas was trying to instigate a confrontation and physically intimidated and threatened Phillips – the Post itself uses nearly identical language while itself describing the "significant mistakes" it made in its articles.

The Post's assertion that its reporting constituted non-actionable protected opinion – its sole assertion that is not a clear fact issue for the jury – is not just belied by its editor's notes and other admissions by Post staff[4] that its coverage was unsubstantiated by the evidence; the reason

---

[2] *See* https://wapo.st/2YtB2Mg (last visited May 7, 2019).
[3] *See* the Post's Motion at pages 12 through 13 and footnotes 11 through 14.
[4] *See* Twitter account of Post columnist Megan McArdle, available at https://bit.ly/2DvJPW8 (last visited May 7, 2019) (stating, among other things: "Then a longer video surfaces, proving pretty incontrovertibly that almost none of . . . [what the Post stated in early coverage] happened;" "This is obviously not even close to what Phillips said happened, and also, very hard to confuse Phillips['] account; the discrepancies are not minor…;" "Any piece of information that comes from Phillips should be utterly discounted.  Journalists do not rely on sources who tell two different

the Post could investigate and disprove its own accusations is precisely because the offending articles convey falsifiable facts rather than subjective opinion. The Post's articles describe conduct and events that either happened or did not happen. Nicholas either "suddenly swarmed" Phillips or he did not. He either blocked Phillips' path and his retreat from a swarm of aggressive students or he did not. He either instigated the confrontation or he did not. He either taunted and mocked Phillips or he did not. Controlling case law does not provide a false statement with protection because it is self-servingly prefaced with "my opinion," "I think," or "I feel." The question is not whether the statements are described by the republisher as an opinion or belief, but whether the statements implied provably false facts. The Post has admitted in its editor's notes the latter.

Finally, the Post also ignored an entire body of law eviscerating its assertion that the group libel doctrine shields it from liability because it defamed too many teenagers to have specifically defamed Nicholas. All of the Post's articles prominently feature Nicholas by including or referencing a viral video of the incident in which Nicholas is the indisputable focus, and otherwise bring the reader's attention to Nicholas through textual signposts. Nicholas was the only student highlighted by the Post through words and pictures, and it is no obstacle that certain defamatory statements would also be understood to refer to other unidentified students. The Post's coverage portrayed Nicholas as the face of this alleged racist incident. The Post made Nicholas the poster child for the false narrative that some white, Catholic boys wearing MAGA caps had targeted and engaged in threatening racist conduct toward a peaceful elderly Native American praying to himself at a rally for Indigenous rights. Thus, each and every accusation the Post made against the

---

versions of major events in quick succession, after video has disproven the first account. For obvious reasons;" "But I don't think that 'wearing a MAGA hat' is in the same class as 'surrounding an elderly Native American man and implicitly threatening him';" and "Fighting racism is a good cause. It is a GREAT cause. It does not require us to believe things that are not true. And it cannot afford us to believe things that aren't true.")

CovCath students is reasonably understood to apply to Nicholas.

Because the Post failed to exercise reasonable care prior to republishing the false narrative of the tale makers, the motion to dismiss by the tale bearer must be denied.

### FACTUAL BACKGROUND

For good reason, the Post's Motion fails to address Nicholas's factual allegations regarding the falsity of the Post's accusations and, in doing so, avoids any discussion of the context created by its own publications and in which it published its accusations against Nicholas.[5]

I.     **Nicholas Was a Victim, Not an Aggressor, at the January 18 Incident.**

On January 18, 2019, Nicholas attended the March for Life on a high school trip with his CovCath classmates. (Compl. ¶¶ 3, 20). Nicholas and his classmates were instructed to meet at the steps of the Lincoln Memorial at the National Mall by 5:00 p.m. to catch their buses to return to Kentucky. (*Id.* ¶ 21). While waiting for the buses, Nicholas and his CovCath classmates were verbally assaulted by a known hate group who call themselves the Black Hebrew Israelites. (*Id.* ¶ 23). To drown out the Israelites' hate speech, one of Nicholas's CovCath classmates sought and received permission from a school chaperone to engage in school spirit cheers. (*Id.* ¶ 24).

During a school cheer, Phillips and a small group of his companions who had earlier attended the Indigenous Peoples March instigated a confrontation with Nicholas and his classmates when they approached from a distance beating drums, singing, dancing, and carrying cameras (the "January 18 incident"). (*Id.* ¶ 25). Phillips intentionally walked past clear pathways to the Lincoln Memorial and into the crowd of CovCath students, who merely acquiesced in his chosen course of conduct, including specifically confronting Nicholas and beating a drum within inches of

---

[5] The Post's Motion to Dismiss reads more like a motion for summary judgment, failing to acknowledge that for purposes of its Motion, Nicholas's allegations must be treated as true.

6

Nicholas's face while Nicholas stood silently.  (*Id.* ¶¶ 29-32, 34-36).  Phillips was free to move about the CovCath students and never made any attempt to move past, around, or away from Nicholas.  (*Id.* ¶¶ 33, 37).  Nicholas did not swarm Phillips, never moved toward Phillips, never made any movement to block Phillips' path, never prevented Phillips from physically moving wherever he wished, and never physically intimidated Phillips.  (*Id.* ¶¶ 39-42, 50).  Nicholas never uttered a word or made a gesture towards Phillips.  (*Id.* ¶¶ 43-46).  The interaction ended when Nicholas was instructed to move to the buses, at which time Phillips turned away from the Lincoln Memorial and outwardly celebrated some perceived "win" over Nicholas, with his companion yelling "I got him, man. . . . We won grandpa, we f***ing won grandpa!"  (*Id.* ¶¶ 48-49).

In fact, during the January 18 incident, Nicholas, a minor, was verbally assaulted with homophobic and racist insults by a group of adult strangers and political activists before being unexpectedly and without explanation physically confronted by a different group of adult strangers and political activists who filmed the encounter while their leader beat a drum inches from Nicholas's face, which he acquiesced in without turning away for fear doing so would be misconstrued as a sign of disrespect. Yet the Post turned Nicholas, the victim, into the aggressor.

## II.   **The Public Record.**

The Post relied, in part, on an unsourced, edited one-minute video of the January 18 incident posted to social media on the evening of January 18 by a person named Kaya Taitano, focusing exclusively on Nicholas's interaction with Phillips.  (*Id.* ¶ 52).  Later, a similar video focused entirely on the interaction between Nicholas and Phillips, was posted to Twitter by a fake, for sale Twitter account called @2020fight.  (*Id.* ¶¶ 54, 57-59).  The @2020fight video was viewed millions of times within a matter of days.  (*Id.* ¶¶ 55-56).[6]  The Viral Video did not show any of

---

[6] The Taitano and @2020fight videos are collectively referred to herein as the "Viral Video."

the defamatory conduct the Post alleged against Nicholas.  (*Id.* ¶ 53).  On January 19, 2019, one of the Black Hebrew Israelites posted a lengthy video accurately chronicling the January 18 incident.  (*Id.* ¶ 63).  On January 20, 2019, Nicholas issued a public statement that accurately related the facts of what occurred in the January 18 incident.  (*Id.* ¶ 69, Ex. B).

## III.   **Nicholas Was a Victim of the Post's Negligent Reporting.**

Throughout the Post's coverage, it relied on numerous tale makers to spread into the mainstream the false and defamatory narrative about Nicholas.  The Post's investigation into the January 18 incident was so shallow – to the extent any investigation was ever undertaken – that the Post did not even know Nicholas's name when it began attacking his reputation.  (*Id.* ¶ 92, Ex. D).  Its failure to investigate the serious claims made by biased tale makers can be explained, in part, by Nicholas wearing a souvenir MAGA cap and the Post's demonstrable bias against President Trump.[7]  (*Id.* ¶¶ 1-3, 11, 17).

On January 19, 2019, the Post published its first article entitled, "It was getting ugly': Native American drummer speaks on MAGA-hat wearing teens who surrounded him" ("First Article").  (*Id.* Ex. D). The Post was the tale bearer of false statements uttered by Phillips, Darren Thompson (an organizer for the Indigenous Peoples Movement), and Chase Iron Eyes (a Native American attorney).  Two variations of that article followed the next day, one online ("Second Article") (*id.* Ex. E), and one in print, entitled, "Marcher's accost by boys in MAGA caps draws ire" ("Third Article") (*id.* Ex. F), both of which added the Dioceses and CovCath to the list of tale makers.  These articles were a thoroughly one-sided account of the January 18 incident that

---

[7] The Post belittles Nicholas again by describing his complaint as being politically motivated to help President Donald J. Trump because it includes allegations regarding the Post's anti-Trump bias (a bias the Post does not deny in its Motion).  Bias is relevant to the Post's negligence and actual malice.  *See, e.g., Harris v. City of Seattle*, 152 Fed. App'x 565, 568 (9th Cir. 2005) (evidence of pre-conceived narrative "may often prove to be quite powerful evidence" of malice).

depicted Nicholas as a villain by republishing false and defamatory statements, including: (1) the "teens . . . surrounded" Phillips; (2) "Phillips, 64, said he felt threatened by the teens and that they suddenly swarmed around him as he and other activists were . . . preparing to leave"; (3) "the teens . . . began taunting the dispersing indigenous crowd"; (4) the teens "chant[ed] 'Build that wall, build that wall,'"; (5) "'[Nicholas] just blocked my way and wouldn't allow me to retreat'"; (6) "the incident . . . ended when Phillips and other activists walked away"; and (7) "'[i]t was an aggressive display of physicality.'" (*Id.* Exs. D-F).

The Post placed these false facts in a nefarious context, conveying to the reader that Nicholas's conduct was racist, and that Phillips was the "hero" of the story – a Native American elder and Vietnam veteran who was the victim of racist actions and white privilege but withstood it with quiet dignity. In the First Article, the Post wrote, among other things, that: (1) "Phillips, an Omaha tribe elder who also fought in the Vietnam War, has encountered anti-Native American sentiments before . . ."; (2) Nicholas was one of a "throng of young, mostly white teenage boys"; (3) Phillips "was singing the American Indian Movement song of unity that serves as a ceremony to send the spirits home"; (4) Phillips was "singing a song of unity for indigenous people to 'be strong' in the face of the ravages of colonialism"; and (5) the incident "demonstrates the validity of . . . concerns about the marginalization and disrespect of Indigenous peoples. . . .'" (*Id.*).

The first three articles conveyed the false and defamatory gists that: Nicholas(1) instigated a confrontation with Phillips and subsequently engaged in racist conduct; (2) assaulted and/or physically intimidated Phillips; and (3) engaged in racist taunts. (*Id.* ¶¶ 115-17, 120, 125-26).

The Second and Third Articles also included a statement by tale makers, the Diocese of Covington ("Diocese") and CovCath "school officials," who "condemned" the conduct of the students and threatened expulsion, and included false statements that the teens were behaving in a

manner "opposed to the Church's teachings on the dignity and respect of the human person," which the Diocese itself concedes is false.  (*Id.* Exs. B-C, E-F).  These articles conveyed the additional false and defamatory gists that Nicholas's behavior violated the fundamental standards of his religious community and the policies of his school, to such an extent that he may be subject to expulsion. (*Id.* ¶¶ 120, 127-28).

## IV.    **The Post Perpetuated the False Narrative Rather than Admitting Its Errors.**

No later than January 20, 2019, the Post had actual knowledge of the falsity of the accusations that Nicholas instigated a racist confrontation with Phillips during which he supposedly taunted and assaulted Phillips, as it eventually admitted in its editor's notes. (*Id.* ¶ 175). Nevertheless, the Post continued falsely defaming Nicholas.

On January 20, 2019, the Post published online its fourth false and defamatory article entitled, "'Opposed to the dignity of the human person': Kentucky Catholic diocese condemns teens who taunted vet at March for Life" ("Fourth Article"). (*Id.* Ex. G).  The tale-bearing Post told the lies of multiple tale makers, including Phillips, the Diocese, and CovCath.  This article included the following false and defamatory statements: (1) Nicholas "was blocking . . . [Phillips] from moving"; (2) "Kentucky Catholic diocese condemns teens who taunted vet at March for Life"; (3) the teens were "taunting a Native American veteran"; (4) "a few of the young people chanted 'Build that wall, build that wall'"; and (5) the teens' "behavior is opposed to the Church's teachings on the dignity and respect of the human person." (*Id.*)

The Fourth Article painted a false and defamatory picture, including by: (1) stating that pro-Trump elements in the pro-life movement have "led to moral decay that harms the movement"; (2) characterizing a longer video showing a Native American taunting a child as "unverified," while making no such qualification for the Viral Video; (3) stating that the CovCath students

wearing MAGA hats exhibited "racist, shameful, disrespectful behavior," including by "harassing a Native American elder and Vietnam Vet"; and (4) stating that the Diocese condemned the behavior towards Phillips and Native Americans, which may warrant expulsion. (*Id.*).

The Fourth Article conveyed the false and defamatory gists that Nicholas (1) instigated a confrontation with Phillips and engaged in racist conduct; (2) assaulted Phillips; (3) violated the fundamental standards of his religious community; and (4) broke the policies of his school justifying expulsion. (Compl. ¶¶ 132-35).

The defamatory onslaught against Nicholas continued with the January 20, 2019, online article entitled "Most young white men are much more open to diversity than older generations" ("Fifth Article").  (*Id.* Ex. H). The Fifth Article's false and defamatory statements include the following: (1) Nicholas "appeared to physically intimidate Nathan Phillips"; (2) the teens "confronted an elderly Native American man"; and (3) "some [teens] reportedly chanted, 'Build the wall!'" (*Id.*). The Fifth Article created a context to defame Nicholas, including by stating that: (1) the January 18 incident "sent a ripple of fear and anger across the country" and "resurfaced tensions that have been simmering since President Trump's campaign began"; and (2) Nicholas and the teens somehow internalized that their behavior was acceptable." (*Id.*)  The ensuing false and defamatory gists are that Nicholas instigated a confrontation with Phillips, subsequently engaged in racist conduct, and assaulted and/or physically intimidated him.  (Compl. ¶¶ 139-40).

On January 21, 2019, the Post published two nearly identical articles that gave the appearance of balanced reporting but continued to peddle the false narrative that Phillips was an innocent and elderly Native American seeking to defuse a dangerous situation, only to find himself surrounded by Nicholas and other racist, hateful, disrespectful, and mocking teenagers.  The sixth false and defamatory article, published in print, is entitled "Fuller view emerges of conflict on

Mall" ("Sixth Article") (*id.* Ex. I), and the seventh false and defamatory article, published online, is entitled "Viral standoff between a tribal elder and a high schooler is more complicated than it first seemed" ("Seventh Article") (*id.* Ex. J). The tale makers for these articles included Phillips, Shar Yaqataz Banyamyan (a Hebrew Israelite), Ephraim Israel (a Hebrew Israelite), and Jon Stegenga (a photojournalist who focuses on progressive causes), the Diocese, and CovCath.

The false and defamatory statements in these two articles include: (1) Phillips "'was being surrounded and not being shown respect'"; (2) "[t]he Israelites and students exchanged taunts"; (3) "some students shouted, 'Build the wall!'"; (4) "some students laughed and mocked [the Israelites]"; (5) "'Before the[ teens] got centered on the black Israelites, they would walk through and say things to each other, like, 'Oh, the Indians in my state are drunks or thieves'"; (6) the teens shout[ed], 'Go back to Africa!'"; (7) the teens "'were mocking . . . ancestors in a chant'"; (8) the teens said "'build the wall' and 'Trump 2020'" about the "time that Phillips intervened"; (9) "Phillips said he was trying to reach the top of the memorial." (*Id.*)

The context given in the Sixth and Seventh Articles contributed to the false and defamatory gists, including through statements that: (1) Phillips, "a member of the Omaha tribe and a Marine veteran" beat his drum as "a supplication to God," as "America [was] being torn apart by racism, hatred, bigotry'"; (2) Phillips "saw more than a teenage boy (Nicholas) in front of him," as "[h]e saw a long history of white oppression of Native Americans"; (3) the Diocese condemned Nicholas, threatening expulsion; and (4) Phillips contemplated, '[w]hy should I go around [Nicholas],' given "'500 years of genocide in this country, what . . . [Nicholas's] people have done'" and that he does not "'even see . . . [Phillips] as a human being.'" (*Id.*)

The Sixth and Seventh Articles conveyed the false and defamatory gists that Nicholas: (1) instigated a confrontation with Phillips and engaged in racist conduct; (2) assaulted and/or

physically intimidated Phillips; (3) violated the fundamental standards of his religious community; and (4) broke the policies of his school and should be expelled.  (Compl. ¶¶ 145-48, 152-55).

Finally, the Post tweeted the First Article on January 20, 2019, in a three-tweet thread ("Tweets") (*Id.* Ex. K).  In addition to communicating the false and defamatory statements and gists of the First Article, the Tweets independently made the false and defamatory statements, for which Phillips was again the tale maker, that: (1) the "teens jeered and mocked" Phillips; (2) "[Nicholas] stood in . . . [Phillip's] way; and (3) "[Nicholas] blocked" Phillips' "way and wouldn't allow . . . [him] to retreat." (*Id.*).   The Tweets also independently conveyed the false and defamatory gists that Nicholas engaged in racist conduct and assaulted Phillips. (Compl. ¶ 160).[8]

## V.   **Investigations by the Diocese and the Post Establish Falsity.**

In a practical demonstration that the accusations leveled by the Post are, indeed, provably false rather than subjective opinion, the Diocese retained a third-party investigative firm who spent 240-man hours investigating the January 18 incident.  (*Id.* ¶¶ 73-77).  That investigative firm found that Nicholas's January 20 statement accurately set forth the events of the January 18 incident and, in the Diocese's words, the findings "exonerated our students."  (*Id.* ¶¶ 75, 78, Exs. B-C).  As discussed in the introduction, *supra*, the Post also investigated its own claims and found many of the central accusations to be defamatory and contradicted or unsubstantiated by the evidence.

## **ARGUMENT**

Kentucky's Constitution recognizes a "fundamental right of private individuals to be free

---

[8]While relentlessly reporting false accusations against Nicholas regarding the January 18 incident, the Post failed entirely to tell its readers about the aggressive and agenda-driven actions of its principal source, including when he and many others attempted on the night of January 19 to interrupt mass at the Basilica of the National Shrine of the Immaculate Conception during which he called for Nicholas to be "reprimanded" by both CovCath and his "upcoming university." *See, e.g.*, https://bit.ly/2WR9QGw and https://bit.ly/2FLUgXT (last visited May 10, 2019).

from being defamed," mandating that "'[e]very person may freely speak, write and print on any subject, *being responsible for the abuse of that liberty*.'"  *McCall*, 623 S.W2d 882, 886 (quoting Ky. Const. § 8) (emphasis added). The Supreme Court of Kentucky has recognized that "some categories of speech are undeserving of any constitutional protection at all, including false, defamatory speech."  *Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 312 (Ky. 2010).

## I.     Legal Standards to Be Applied.

### A.     All Allegations of the Complaint Must Be Taken as True.

One error that is a constant throughout the Post's Motion is its refusal to acknowledge the breadth and detail of Nicholas's allegations and that Rule 12(b)(6) requires only plausibility.  To defeat a Rule 12(b)(6) motion, a complaint must contain enough factual matter to state a claim that is facially plausible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Facial plausibility exists when the factual allegations allow a court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Id.*   The plausibility standard applies to each of the elements of defamation individually.  *See, e.g.*, *Araya v. Deep Dive Media, LLC*, 966 F. Supp. 2d 582, 596-97 (W.D.N.C. 2013) (rejecting group libel defense and holding that plaintiff's identity was "plausibly 'ascertainable'" where she was not named or described in article but a photograph in the article of over one hundred individuals highlighted her in particular).  The Post ignores this standard in three of its four chief arguments – that the Articles are not "of and concerning" Nicholas, are substantially true, and not defamatory *per se*.

### B.     Of and Concerning Is a Jury Issue if There Is Any Ambiguity.

The Post showed, linked, and/or referenced the unsourced Viral Video in each of its Articles, and Nicholas was the face of the Post's reporting and the CovCath group, which is sufficient to establish standing.  The of and concerning inquiry is a question of law only "where there is no ambiguity in the language used in connection with all the attendant circumstances."

14

*Marr v. Putnam*, 196 Or. 1, 15 (1952).  If, after examining the libelous publication as a whole and in context, there exists any ambiguity as to whether the libel is of and concerning the plaintiff, the question must go to the jury.  *See, e.g.,* Restatement § 617 cmt. a ("[W]hether [publication] was of and concerning the plaintiff [is] ordinarily for the jury or trier of fact to determine."); *O'Brien v. Williamson Daily News*, 735 F. Supp. 218, 223-24 (E.D. Ky. 1990), *aff'd*, 931 F.2d 893 (6th Cir. 1991) (analyzing "the article as a whole" and finding that libelous "language can be understood to refer specifically to" the plaintiff and the "ultimate conclusion on the reasonableness of the allegedly libelous interpretation must lie with the finder of fact"); *Cheney v. Daily News L.P.*, 654 Fed. App'x 578, 581 (3d Cir. 2016) ("[W]e look at the context and ask whether 'the defamatory material was capable of being reasonably understood as intended to refer to the complainant."); *Farrell v. Triangle Publ'ns, Inc.*, 399 Pa. 102, 106 (1960) (collecting cases from ten jurisdictions for rule that of and concerning is generally jury issue).

### C.    Defamatory Meaning Is a Jury Issue if There Is any Ambiguity.

The Post similarly argues incorrectly that if the Articles are capable of more than one meaning, then a jury cannot determine that the Articles are defamatory per se. (Mot. at 15-16, 28-29). That argument has been rejected by the Kentucky Supreme Court:

> Although it is usually the court's function to determine whether a crime imputed by published statements is actionable as libel *per se*, where the words at issue are capable of more than one meaning, as they are here, the jury should decide which of the meanings a recipient of the message would attribute to it.
>
> . . .  'If it is capable of two meanings, one of which would be libelous and actionable and the other not, *it is for the jury to say, under all the circumstances, including extraneous facts admissible in evidence, which of the two meanings would be attributed* to it by those to whom it is addressed or by whom it may be heard.'

*Yancey v. Hamilton*, 786 S.W.2d 854, 858 (1989) (citations omitted) (emphasis in original). Indeed, a Western District decision earlier this year considered and expressly rejected the same

argument based upon the same two cases cited by the Post.  *See Desai v. Charter Commc'ns, LLC*, 2019 WL 1421756, at *5 (W.D. Ky. Mar. 29, 2019) ("Given the Kentucky Supreme Court's equally thorough and far more recent discussion in *Stringer*, on facts strikingly similar to those at issue here, the Court finds *Stringer* to be the more relevant precedent"); *see also Arno v. Stewart*, 245 Cal. App. 2d 955, 960 (1966) (where libelous per se and innocent construction both possible "it is error to charge that the publication is not actionable per se and put the plaintiff to proof of special damages where such proof would not be necessary if the jury accepted the defamatory meaning").  The Court's role is to determine whether the Articles are capable of a *per se* defamatory meaning, not whether it is the only possible meaning.

### D.   Truth or Falsity Is a Jury Issue Except in the Clearest Cases.

Finally, and perhaps most egregiously, the Post urges this Court to dismiss the Complaint because it contends that its Articles are "substantially true."  The doctrine of substantial truth applies "in very narrow and limited circumstances and relates only to incidental information and not to essential content."  *Ky. Kingdom Amusement Co. v. Belo Ky., Inc.*, 179 S.W.3d 785, 791 (Ky. 2005).  The question of substantial truth is a highly factual inquiry generally reserved for the jury and is not an issue to be resolved on a motion to dismiss where Nicholas's allegations of falsity must be accepted as true.  *See, e.g.,* Restatement § 617 cmt. a ("[T]he question of whether the defamatory imputations are true is ordinarily for the jury."); *Clark v. Viacom Intern. Inc.*, 617 Fed. App'x 495, 510 (6th Cir. 2015) (same); *Brokers Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1137 n.8 (10th Cir. 2014) (uncovering "no case in which a court dismissed a claim prior to discovery on the basis of substantial truth when substantial truth was contested").  Putting aside the Post's admission that critical accusations are contradicted by the evidence, Nicholas has exhaustively contested the falsity of the Articles' gist and discrete accusations, and the question of

substantial truth therefore cannot be resolved on a 12(b)(6) motion. *Cf. id.* (question can be resolved by the court when the "underlying facts as to the gist or sting are undisputed").

> E.   **The Post Is Not Entitled to Report Lies Even if It Does so Accurately.**

Because Nicholas is a private figure plaintiff, the standard to be applied is negligence – which the Post mentions only once in passing in its brief. *See, e.g., Yancey*, 786 S.W.2d at 859 . Without naming it for what it is, the Post attempts to rely on the "neutral reportage" doctrine. In its Introduction, the Post contends that "[i]t was neither false nor defamatory . . . for the Post to report the comments of eyewitnesses, including the only participants who were speaking publicly about the matter on the day that videos of the event went viral on the internet" and suggests it had a right to get it wrong first so long as it eventually got it right. (Mot. at 1-2, 19-20). The Post's contention that it was entitled to publish anything eyewitnesses were saying, without investigation, must be rejected, because that position invokes the neutral reportage doctrine, which was explicitly rejected by the Kentucky Supreme Court in *McCall*. 623 S.W2d 882, 886-87 (rejecting neutral reportage and concluding that "respondents' argument that they simply repeated allegations is without merit.") Justice Lukowsky, concurring, explained in more detail the issue regarding the doctrine of "neutral reportage" and how it would constitute a departure from well-established law:

> *It is an ancient rule that authors and publishers may not repeat false and defamatory matter and escape liability with the plea that they were but quoting a source deemed authentic.* They are not saved by accompanying the defamation with an expression of disbelief. The respondents submit that we should recognize an absolute constitutional privilege of "neutral reportage." The doctrine provides that the media are privileged to make reports of newsworthy charges even if they doubt their truth so long as they reasonably and in good faith believe that the charges are accurately conveyed. There are at least two flaws in this diamond: (i) the courts that have recognized the doctrine have limited its application to statements about public figures and public officers, and movant, as we will hereinafter demonstrate, is a private person, and (ii) the constitution does not require the recognition of such a privilege.

*Id.* at 894 (J. Lukowsky, concurring) (citations omitted) (emphasis added).

17

The Post's virtually identical argument that "the Post had a right to report" Phillips' and other false tale makers' accusations defies Kentucky law and must be rejected by this Court.  (Mot. at 2).  The Post could not rely upon this argument in a case involving a public figure, and it most certainly cannot here because Nicholas is a private figure.[9]

## II.      The False and Defamatory Accusations Are Of and Concerning Nicholas

The Post asserts that the group libel doctrine bars Nicholas' claims, but Nicholas was the face of the Post's reporting and the larger context of the January 18 incident.[10]  Each of the Articles singled out Nicholas from the rest of his classmates and emphasized his individual involvement by use of and reference to the Viral Video, as well as by specifically describing Nicholas's alleged conduct.  (Compl. ¶¶ 114, 124, 131, 138, 144, 151).  His image was directly and prominently featured in the First, Second, Fourth, and Seventh Articles.  (*Id.* ¶¶ 114, 119, Exs. D-E, G, J).[11] Each Article makes explicit reference to the Viral Video, often in the first sentence.[12] (*Id.* Exs. D-J).  The Sixth and Seventh Articles reference Nicholas by name.  (*Id.* ¶¶ 144, 151, Exs. I, J). Indeed, Nicholas was the *only* student in the CovCath group singled out by the Post, and *none* of the Post's Articles exclude Nicholas from the purported conduct of the students generally.  The

---

[9] It is similarly frivolous for the Post to argue that its later coverage somehow erased the defamation communicated by its earlier coverage.  To the extent the Post subsequently reported the truth, it is an indictment of the Post's earlier coverage, as are the Post's editor's notes, which alone are sufficient to defeat its defenses of substantial truth, opinion, and defamatory meaning.

[10] *See* the Post article stating "[t]his brings me to Nick Sandmann, a junior at Covington Catholic High School in Kentucky, who over the weekend became the national stand-in for privileged white Trump supporters everywhere."  Available at https://wapo.st/2PWvxCG (last visited May 7, 2019).

[11] Although Nicholas was forced to resort to archived versions of the First and Second Articles, he also alleged the Post's use of the Viral Video identifying Nicholas by his image.  The Court may view the First and Second Articles and the Post's use of the Viral Video at https://wapo.st/30cVLp2 (last visited May 7, 2019); the Fourth Article at https://wapo.st/2HlBxB8 (last visited May 7, 2019); and the Sixth Article at https://wapo.st/2E09lCK (last visited May 7, 2019).

[12] Plaintiff does not have the original Third or Sixth Articles from the Post's newspaper. Regardless, as set forth herein, it is irrelevant whether his image was actually on the page because each referenced the Viral Video and described Nicholas individually.

Post cannot now claim it is unreasonable to conclude the Articles apply to Nicholas specifically.

Whether or not the Court views the of and concerning inquiry through the lens of group libel, the same question remains: could a jury reasonably conclude "the defamatory words refer to some ascertained or ascertainable person?" *Louisville Times v. Stivers,* 68 S.W.2d 411, 412 (Ky. 1934).[13] "A defamatory communication is made concerning the person to whom its recipient correctly, or mistakenly but reasonably, understands that it was intended to refer." Restatement § 564. "[T]he plaintiff need not be specifically identified in the defamatory matter itself so long as it was so reasonably understood by plaintiff's 'friends and acquaintances . . . familiar with the incident.'" *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793-94 (Ky. 2004), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014). Though unnecessary in this case, the Court may look outside the four corners of the Articles to answer whether they are about Nicholas, which "does not affect whether the defamatory statement is per se or per quod." *E.W. Scripps Co. v. Cholmondelay*, 469 S.W.2d 700, 702 (Ky. Ct. App. 1978).

### A. Nicholas Does Not Rely on His Status as a Member of the CovCath Group to Confer Standing and the Group Libel Doctrine Is Therefore Inapplicable.

The group libel defense is inapplicable for the simple reason that Nicholas does not assert that his membership in the CovCath group independently establishes that the Post's accusations are "of and concerning" him, specifically. The group libel doctrine bars a claim only where a

---

[13] Ultimately, the result is the same whether the Court addresses of and concerning through the lens of the group libel doctrine or not. *See Church of Scientology v. Flynn*, 744 F.2d 694, 697 n.5 (9th Cir. 1984) (rejecting group libel doctrine but holding plaintiff's "claim would also fall within a well-established exception to the group libel rule that allows a group member to sue upon a showing that 'the circumstances of a publication reasonably give rise to the conclusion that there is particular reference to the member.' *Restatement (Second) of Torts* § 564A(b) (1977). This approach is not analytically different from our conclusion that the group libel rule does not apply. *See* Comment, *supra*, at 1536 (noting that this principle is not really an exception to the group libel rule, but rather 'is merely a recognition that one who is individually defamed can sue even if the defamation is disguised as a group slur'))."

plaintiff is not otherwise identified and resorts to relying on his membership in a group to independently establish standing. *See, e.g., O'Brien,* 735 F. Supp. at 222 ("Where a publication affects a class of persons *without any special personal application* . . . an individual member *not specifically imputed or designated* cannot maintain an action.") (emphasis added).

Here, the Post conceded that the text of its Articles have special personal application to Nicholas and otherwise specifically designate him when it stated, among other things, "the guy in the hat . . . blocked my way and wouldn't allow me to retreat," while altogether failing to address the juxtaposition of this and other statements alongside the use of Nicholas's likeness in the Viral Video. (*Compare*, e.g., Compl. Exs. D-F *with* Mot. at 29). Because the Post referred specifically to Nicholas, the group libel doctrine is inapplicable. *See, e.g., Stanton v. Metro Cop.* (*Stanton I*), 357 F. Supp 2d 369, 375-76 (D. Mass. 2005), *rev'd on other grounds*, 438 F.3d 119 (1st Cir. 2006) (holding plaintiff not "contending that her reputation was maligned by defamatory statements made about suburban teenagers in general," but instead that they harm her individually due to the use "of her picture in connection with the article"); *Marr*, 196 Or. at 19 ("[W]hen . . . defamatory matter points to a particular member of the group or class involved . . ., the person so singled out is entitled to redress, . . . [regardless] that the language used may also apply to others"). It is no defense to Nicholas's individual claims that the Post defamed *too many* teenagers.

**B.    Nicholas Was Identified by Name, Photograph, and Descriptive Circumstances.**

Courts routinely find articles to be of and concerning the plaintiff where the defendant utilizes the plaintiff's likeness in connection with the article or otherwise singles him out within the article, even where the offending publication refers only to an indiscriminate class. Indeed, even if the Post had not singled out Nicholas within the text of its Articles, the use of and reference to the Viral Video prominently featuring Nicholas ends this inquiry. *See, e.g., Stanton v. Metro*

Corp. (*Stanton II*), 438 F.3d 119, 128 (1st Cir. 2006) (entire article may be of and concerning by use of plaintiff's photograph "*even in the absence of any express textual connection between the statement and the [plaintiff's] photograph*") (emphasis added).

The rule that the juxtaposition of the plaintiff's photograph with a defamatory article creates an issue of fact on the issue of "of and concerning" was settled no later than 1909. *Peck v. Tribune Co.*, 214 U.S. 185, 188-89 (1909) ("[o]f course, the insertion of the plaintiff's picture in the place and with the concomitants that we have described imported that she was the nurse and made the statements set forth," despite plaintiff's photograph being captioned with another's name); s*ee also Nappier v. Jefferson Standard Life Ins. Co.*, 322 F.2d 502, 504 (4th Cir. 1963) ("These aims could not be fully achieved if only disclosure of one's proper name was forbidden."); *Wallace v. Media News Group, Inc.,* 568 Fed. App'x 121, 124 (3d Cir. 2014) (same); *Little Rock Newspapers, Inc. v. Fitzhugh*, 330 Ark. 561, 569-70 (1997) (collecting cases).

Of the many cases on point, the decisions rendered in the case of *Stanton v. Metro Corp.* are perhaps the most illustrative.  There, an article, headlined "The Mating Habits of the Suburban High School Teenager," indiscriminately referred only to high school students and teenagers "in the Boston area."  *Stanton v. Metro Corp.* (*Stanton I*), 357 F. Supp. 2d 369, 372 (D. Mass. 2005), *rev'd and remanded*, 438 F.3d 119 (1st Cir. 2006).  Despite the plaintiff "not [being] named anywhere in the article" and the presence of seven photographs depicting sixteen students, the group libel defense was rejected because the plaintiff "is the central female figure in the most prominent illustration, not an unidentified member of a large and undifferentiated group," and "[b]ased on that juxtaposition alone, a reasonable reader conclude that the teenage girl depicted in the photograph" was the target of the accusations.  *Id.* at 380-81.

Ultimately, however, the district court erroneously concluded that a disclaimer on the first

page of the article explicitly stating that the "individuals pictured are unrelated to the people or events described in this story" negated the otherwise existing impression that the article was about the plaintiff. *Id.* On this point, the First Circuit reversed the district court, holding that "the presence of the disclaimer does not permit the conclusion, as a matter of law, that the article is not of and concerning Stanton." *Stanton II*, 438 F.3d at 129. Thus, despite not naming the plaintiff, referring indiscriminately to teenagers in suburban Boston high schools, the presence of at least seven photographs depicting at least sixteen people, an express and conspicuous disclaimer on the front page stating the individuals in the photographs were entirely unrelated to the article, and the fact that "the article draws no literal connection between the subjects of the photograph and the subjects of its story," the First Circuit held that a "reasonable reader could believe that Stanton . . . is in fact one of the teens whose promiscuous behavior is described in its text." *Id.* at 128, 130.

Similar holdings finding an article *in its entirety* to be of and concerning the plaintiff by use of his or her photograph – even in the absence of any textual reference to the plaintiff – are commonplace. *See, e.g., Cheney*, 654 Fed. App'x 578, 581 (article stating a sex scandal "implicates dozens of city employees, including . . . firefighters" held reasonably capable of concerning plaintiff firefighter whose photo accompanied article); *Holmes v. Curtis Pub. Co.*, 303 F. Supp. 522, 523, 527 (D.S.C. 1969) (jury issue for of and concerning where article included plaintiff's photograph at table with four others even though the article "does not identify or otherwise refer to plaintiff" except by his picture); *Jackson v. Consumer Publ'ns*, 11 N.Y.S.2d 462, 464 (App. Div. 1939) (jury issue where article only identified plaintiff by his picture and referred generally to dishonest auctioneers).

Even where the Post may have only referenced the Viral Video rather than include it within the body of an Article, such reference still rendered the entirety of the Article of and concerning

Nicholas because many readers were aware of the incident already.  (Comp. Exs. D-J).  The Viral

Video was viewed millions of times (*id.* ¶¶ 55-56), and it is reasonable to believe that, to the extent

any readers did not previously know of Nicholas's involvement, they then sought to discover it

with the aid of the Post's reference.  *See, e.g.,* Restatement § 564A cmt. d ("Even when the group

or class defamed is a large one, there may be circumstances that are known to the readers . . . which

give the words . . . personal application to the individual that he may be defamed as effectively as

if he alone were named."); *Marr*, 196 Or. 1, 28 (article referring generally to "radio dealers and

repair plants" of and concerning plaintiff because "persons with a knowledge of the circumstances

could reasonably have understood . . . that it referred to the plaintiffs"); *Farrell*, 399 Pa. 102, 109

("Moreover, it is not unreasonable to conclude that many other Upper Darby readers of the Inquirer

who, prior to the defamatory article, had not known [plaintiff's] identity . . . were impelled . . . to

make inquiry and find out" plaintiff's identity.").

Finally – in a superfluous addition to the circumstances set forth above making Nicholas

individually identifiable and ascertainable – a contextual reading of the Articles often mandates

that statements about the teens generally apply to Nicholas specifically.  For instance, the Post

asserts on page 31 of its Motion that Nicholas was not referenced in the statement that "the teens

. . . suddenly swarmed around [Phillips] as he and other activists were wrapping up the march and

preparing to leave." That assertion is nonsensical since the Viral Video shows Nicholas face-to-

face with Phillips, and it is Nicholas that the Post specifically accused of blocking Phillips' retreat

from the swarm of students.  There is literally no meaning available to this juxtaposition other than

that Nicholas, specifically, was involved in "suddenly swarming" Phillips and, in fact, led the

swarm. The January 18 incident was one discrete event, and is entirely unreasonable to suggest

that readers would not identify Nicholas as having engaged in the conduct described at that single

event and instead universally assume he was an innocent bystander.  *Cf. Yow v. National Enquirer, Inc.*, 550 F. Supp. 2d 1179, 1182-83, 1190 (E.D. Cal. 2008) (accusations against group capable of applying to plaintiff even where only mention of her was non-defamatory and article left open possibility that defamatory occurrence took place on another occasion when plaintiff not present).

The three cases relied on by the Post do not change the analysis, and, in fact, support Nicholas's position.  The Post relies on *O'Brien* for its group libel defense, but *O'Brien* found that the reference to one particular teacher within a large group of teachers (Mr. Hunt), coupled with a contextual reading that "arguably leaves the impression that the fight and the sexual misconduct were somehow related," defeated the defendant's motion as to that plaintiff.  735 F. Supp. 218, 223-24.  The Post also relies on *Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305 (11th Cir. 2001), which has literally nothing to do with the group libel doctrine.  In *Rubin*, there was no question that the plaintiff was identifiable and ascertainable – he was voluntarily pictured and quoted. Instead, the court found that, in context, the accusations against an unidentified group of drug traffickers who use the gold industry to launder money did not implicate the plaintiff, who was an on the record source for the article as the owner of a gold refinery (not a member of a group of drug trafficking money launderers).  Finally, the Post cites this Court's decision in *Loftus v. Nazari*, 21 F. Supp. 3d 849 (E.D. Ky. 2014), asserting that it is "a similar fact pattern." (Mot. at 30).  While *Loftus* at least addressed the group libel doctrine, its facts are not similar to and do not control this case.  In *Loftus*, a contextual reading made clear the defendant had asserted that unspecified *other doctors* were covering up for *her doctor* (plaintiff) in refusing to hold her responsible, which, unlike here, described separate occurrences.

III.  **The Articles Are False and Defamatory.**

A.  **The Post Has Admitted that Its Articles Conveyed the Meanings Alleged by Nicholas and that Those Meanings Are False.**

The Post's brief makes the incredible statement that its "coverage cannot reasonably be understood to bear the meanings alleged in the Complaint – that Plaintiff 'instigated a confrontation with Phillips,' that he 'assaulted and/or physically intimidated Phillips,' that he 'engaged in racist taunts,' or that he 'violated the policies of his school such that he should be expelled.'" (Mot. at 19). Yet the Post's editor's notes – which are used for "significant mistakes" that "call into question the entire substance of an article" – draw the same meanings from its coverage, stating, among other things, "[s]ubsequent reporting and video evidence **contradicted or failed to corroborate** that **one of the activists was accosted and prevented from moving**, that **they had been taunted by the students** in the lead-up to the encounter, **that the students were trying to instigate a conflict**, or that 'March for Life' participants chanted 'Build that wall.'" (Mot. at 13) (emphasis added).[14]

Thus, the Post's lawyers in this litigation are making an argument that has already been contradicted by the Post's editors, who plainly recognized that: (1) the gists of the Articles are that Phillips was "accosted" and "prevented from moving," that the students "taunted" Phillips and his companions, that Nicholas and the CovCath students "were trying to instigate a conflict," and that Nicholas "physically intimidated" Phillips; and (2) that these gists conveyed by the Post were so inaccurate that the entire substance of the Articles was called into question and the Post did not meet the its own standards. Counsel for the Post cannot reasonably expect this Court to adopt a legal argument that plainly contradicts the position already taken by its client's editorial staff.

The Post attempts to squeeze certain of its accusations into the doctrine of substantial truth but in doing so avoids any discussion of the 12(b)(6) standard and Nicholas's allegations as well

---

[14] As referenced in the Introduction, the Post also published varying versions of this editor's note online, including, *inter alia*, the admission that Nicholas did not "physically intimidate" Phillips.

as the substantial truth standard, itself, which applies only "in very narrow and limited circumstances and relates only to incidental information and not to essential content." *Ky. Kingdom*, 179 S.W.3d 785, 791. Moreover, a defendant is entitled to judgment only "if the evidence supports, without contradiction or room for reasonable difference of opinion, the defense that these statements were substantially true." *Stringer*, 151 S.W.3d 781, 796.

In this regard, the Post targets only two particular statements:  that Nicholas blocked Phillips' path and would not allow him to retreat (Mot. at 20) and that Nicholas was mocking or taunting Phillips with a tomahawk chop (*id.* at 26).  Contrary to the Post's contorted presentation of the facts in asserting it was substantially true to accuse Nicholas of "blocking" Phillip's path to the Lincoln Memorial and his escape from an aggressive swarm of students, Nicholas's allegations and the video evidence[15] confirm that: (1) it was Phillips who confronted Nicholas after passing up open space to ascend to the Lincoln Memorial (Compl. ¶¶ 26-27, 30, 34-36, 39, 50); (2) Nicholas never made any movement toward Phillips or to block his path, at all (*id.* ¶¶ 40-41, 43-46, 50); (3) Phillips never attempted to move past or around Nicholas and was never denied freedom of movement (*id.* ¶¶ 33, 37), and (4) Phillips never actually attempted to move to the Lincoln Memorial, and instead turned around and celebrated his perceived victory over Nicholas when Nicholas left the scene.  (*Id.* ¶¶ 48-49).  Moreover, the Post's position ignores the falsity of the meaning of its reporting arising from the text of the Articles themselves, including that Nicholas was alleged to have targeted Phillips from afar and otherwise physically intimidated him in a manner amounting to assault.  *See, e.g., McCall*, 623 S.W.2d 882, 884 ("We must, therefore, analyze the article in its entirety and determine if its gist or sting is defamatory."); *cf.* https://wapo.st/2LJaCV7 ("[R]eaders would be licensed to conclude that the students saw him

---

[15] Nicholas published his own video showing the truth of the January 18 incident.  (Compl. ¶ 65).

from afar, targeted him and advanced.") (last visited May 7, 2019).  As discussed herein, Nicholas

did not instigate a conflict or target Phillips from afar, as the Post has admitted in its editor's notes.

(*See, e.g.*, Compl ¶¶ 26, 31, 43,50, 67, 75).

In its second point, the Post asserts that it was substantially true to accuse the CovCath

students of mocking and taunting Phillips (despite its admission in its editor's note that the verbal

taunts stated in the Post's coverage did not occur), by performing a tomahawk chop.  To support

its position, the Post cobbled together some still frames from the video Nicholas's published

purporting to show Nicholas performing a single chopping motion.  (Mot. at 26, Ex. 5).  Those

still frames patently do not conclusively show Nicholas engaged in a chop, and Nicholas has

specifically alleged that he did not mock or taunt Phillips.  (Compl. ¶ 50).  Moreover, the Post

cannot assert that it was substantially true as to Nicholas because other students appear to have

performed a chop.  *See, e.g., Marr*, 196 Or. at 28 ("If the defendant's words have in fact injured

the plaintiff's reputation, it is no defense to an action that the defendant intended to refer to some

one else.  He should have been more explicit; his secret intention is immaterial.").[16]

### 1.  The Articles Are Defamatory Per Se.

The Post argues incorrectly that the statements in the complaint are not defamatory per se.

The Post, relying on statements taken entirely out of context – the cardinal rule of construction –

urges this Court to hold (1) that the Articles are not false and defamatory "per se" because certain

---

[16] On the basis of substantial truth, the Post attempts to pigeonhole Nicholas's claim as one for
defamation by implication (Mot. at 27), but that rule only applies where the defamatory meaning
arises from the juxtaposition of *true facts* rather than from the reasonable meaning of false
statements themselves.  Here, the defamatory meanings arose directly from the Post's publication
of false facts, and those facts, themselves, conveyed in context the defamatory meanings.  *See,
e.g., Nichols v. Moore*, 477 F.3d 396, 402 (6th Cir. 2007); *Toney v. WCCO Television, Midwest
Cable and Satellite, Inc.*, 85 F.3d 383, 386–87 (8th Cir. 1996) ("[T]he touchstone of implied
defamation claims is an artificial juxtaposition of two true statements or the material omission of
facts that would render the challenged statement(s) non-defamatory.").

of the statements are capable of an innocent construction and (2) that, because Nicholas failed to plead special damages, this Court should dismiss the Complaint. Although the Articles are not reasonably capable of an innocent construction as to Nicholas, it is irrelevant whether such a construction is possible because they are indisputably capable of a defamatory construction.

Kentucky common law has an expansive definition of statements that are libel per se and thus actionable without proof of reputational damage:

> The test to determine whether a written publication is libelous per se has been various expressed. The general proposition is that words, written or printed, are libelous and actionable per se, justifying a recovery without allegations of special damages, if they tend to degrade and disgrace the person about whom they are written or printed, or tend to expose him to public hatred, ridicule, contempt, aversion, or disgrace, or to induce an evil opinion of him in the minds of right-thinking persons and to deprive him of their friendly intercourse and society. In order to be libelous per se, it is not essential that the words involve an imputation of crime. . . .

*Shields v. Booles*, 238 Ky. 673, 681 (1931) (holding statements per quod because article only defamatory upon reference to a fact not present in the article); *see also Digest Pub. Co. v. Perry Pub. Co.*, 284 S.W.2d 832, 834 (Ky. 1955). The logic is clear, if the statements on their face would tend to hold the plaintiff up to public hatred, contempt, or ridicule, etc., then the statements at issue undeniably have caused reputational damage to the plaintiff. If, on the other hand, the statements do not hold the plaintiff up to public hatred, contempt, or ridicule, etc., without knowledge of information outside the article at issue, then the plaintiff must plead and prove that information necessary to make the statements defamatory, i.e., to establish that the plaintiff has been damaged.

The Western District of Kentucky issued an opinion earlier this year that carefully, and correctly, analyzes this issue and holds adverse to the Post's position. *Desai*, 2019 WL 1421756 (W.D. Ky. Mar. 29, 2019). In that case, the question was whether the term "Printer-gate" could constitute defamation per se. Analogous to the Post's argument in this case, in *Desai*, the

defendant's "overarching argument is that the 'Printer-gate' reference in [the] presentation cannot constitute defamation per se because it requires consideration of extrinsic circumstances."  *Id.* at *4.  The court in *Desai* noted that – exactly like the Post in this case – the defendant "cites two Kentucky cases, *Sweeney & Co. v. Brown*, 60 S.W.2d 381 (Ky. 1933), and *Towles v. Travelers Insurance Co.*, 137 S.W.2d 1110 (Ky. 1940) (which followed *Sweeney*), for the proposition that an ambiguous statement cannot constitute defamation per se. Specifically, [defendant] points to the *Sweeney* court's definition of libel per quod as "words reasonably susceptible of a defamatory meaning as well as an innocent one."  *Id.* at *5.  The Court rejected this argument, citing to the Kentucky Supreme Court's "equally thorough and far more recent discussion in *Stringer* on facts strikingly similar to those at issue here."  *Id.* at *5.  "*Stringer* upheld a finding of defamation per se based on a statement capable of interpretation as either defamatory or not . . . .'  *Id.* at *7; *see also Welch v. American Publishing Co. of Kentucky*, 3 S.W.3d 724, 736 (Ky. 1999) (analyzing whether statement was per se and holding "we laid this issue to rest in *Yancey* . . . in which we held that 'if the words at issue are capable of more than one meaning . . . the jury should decide which of the meanings a recipient of the message would attribute to it'").

An excellent illustration of the requirement of extrinsic information that would render a statement defamatory per quod instead of defamatory per se is found in a headline reading, "Boyfriend Sues for Raffle Prize; Sweeter Than Love?"  Richard J. Conviser & Roger W. Meslar, "Obsolete on its Face: The Libel Per Quod Rule," 45 Ark. L. Rev. 1, 1 (1992).  The man who was named as the boyfriend was also married, which was a fact that was not disclosed in the article. *Id.* Thus, the claim was for defamation was per quod, as the boyfriend's status as a married man was an extrinsic fact without which the statement at issue was false but not defamatory. *Id.*

In this case, there are no extrinsic facts necessary to establish that the Post's accusations

about Nicholas were capable of a defamatory meaning – all information necessary to make that determination is contained within the four corners of the Articles.  The Post contends in its Motion that the following statements are not defamatory per se because they require extrinsic evidence to establish a defamatory meaning: (1) "I started going that way [toward the Lincoln Memorial], and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat" (Mot. at 20); and (2)  that Nicholas "assaulted and/or physically intimidated Phillips," "instigated a confrontation with Phillips," and "engaged in racist taunts" and "racist conduct" (Mot. at 24, 28-29).

These accusations do not need any information beyond the four corners of the Articles to establish that they are defamatory, Nicholas has not alleged any extrinsic facts that are necessary to transform these statements into defamatory allegations, and the Post has not identified any extrinsic facts that would be necessary to transform these statements into defamatory allegations. As discussed below, the Post's accusations are defamatory on their face.  The Post falsely accused Nicholas, a white, Catholic student wearing a MAGA hat, of, among other things, targeting, threatening, and blocking a Native American Elder and not then allowing him to retreat from a throng of rambunctious, taunting teenagers. As is obvious and more fully set forth below, these accusations unquestionably hold Nicholas up to public hatred, contempt, or ridicule without knowledge of any other facts.

### 2.  The Articles Are Capable of a Defamatory Meaning.

Context is fatal to the Post's position, and so it would have this Court look only to the words used without context to hold that "standing in or blocking another's way" is not defamatory. (Mot. at 22).  Indeed, the Post would have this Court view the statements in an entirely *different* context – such as "Kentucky's 'Stand Your Ground' law."  (Mot. 22, n.17). Despite the Post's

30

ardent desire to turn its own words into something entirely different, Kentucky law is clear that this Court must examine the statements in the context in which they were published.  *See, e.g., Biber v. Duplicator Sales & Service, Inc.*, 155 S.W.3d 732, 738 (Ky. Ct. App. 2004) ("Alleged defamatory statements must be construed in the context of the entire communication"); *Ky. Kingdom*, 179 S.W.3d 785, 791 ("A jury . . . must consider the broadcasts in their entirety when determining whether the statements and inferences within it are false and defamatory.").  The Articles did not involve the Post praising Nicholas for defending himself in the face of imminent harm: these Articles skewered Nicholas for physically intimidating and blocking the escape of a peaceful Native American elder who was merely praying at a rally supporting Indigenous rights.

Moreover, though not at issue here, defamatory meaning is not a matter of "majority vote," it suffices if a respectable minority finds the content defamatory. *See, e.g, Peck*, 214 U.S. 185, 190 (1909); Restatement § 559 cmt. e ("substantial and respectable minority" is sufficient).

All of the Post's Articles were imbued with language conveying to the reader that Nicholas was responsible for instigating a threatening confrontation, which was racially motivated and reprehensible, and that Phillips was the "hero" of the story – an Indigenous elder and Vietnam veteran who was the victim of racist actions and white privilege.  In the First, Second, and Third Articles, the Post wrote, among other things, that Phillips was "singing a song of unity for indigenous people to 'be strong' in the face of the ravages of colonialism"; that Nicholas was one of a "throng of young, mostly white teenage boys"; that Phillips "was singing the American Indian Movement song of unity that serves as a ceremony to send the spirits home"; that "participants from the nearby March for Life rally began taunting the dispersing indigenous crowd"; and that "Phillips, an Omaha tribe elder who also fought in the Vietnam War, has encountered anti-Native American sentiments before. . . ."  (Compl. Exs. D-F).

31

In the Fourth Article, the Post wrote, among other things, about "a group of Kentucky teens in 'Make America Great Again' hats taunting a Native American veteran"; that the incident related to the question of "whether the close affiliation of many antiabortion leaders with President Trump . . . has led to moral decay that harms the movement"; and about "a throng of young, mostly white teenage boys, several wearing [MAGA] caps."  (*Id.* Ex. G).

In the Fifth Article, the Post wrote, among other things, about "a group of high school boys [who] confronted an elderly Native American man" "smirking and laughing as one of their members appeared to physically intimidate Nathan Phillips"; and that the "young men who confronted the Native American protester had somehow internalized that their behavior was acceptable." (*Id.* Ex. H).

In the Sixth and Seventh Articles, the Post wrote, among other things, about "Catholic schoolboys from Kentucky – some wearing Make America Great Again hats"; that "they came together in an incident that would echo nationwide for its ugliness"; that "a Native American elder intervened, singing and playing a prayer song"; that Phillips was "a member of the Omaha tribe and a Marine veteran"; that "Phillips played a prayer song on a drum"; and that Phillips "saw a long history of white oppression of Native Americans." (*Id.* Exs. I-J).[17]

In its Tweets, the Post wrote, among other things and in addition to linking to the Articles, that "Omaha tribe elder Nathan Phillips says he 'felt like the spirit was talking through me' as

---

[17] To the extent the Post argues that its Sixth and Seventh Articles are not defamatory because they included Nicholas's account of what happened, that argument fails.  Perpetuating the false narrative alongside some of the truth does not erase the defamatory meanings raised by the false accounts.  *See, Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 686 (Ky. 1990) ("There is also a comment from Ball next to his picture, but the comment has little impact in offsetting the overall defamatory character of the article"); *McCall*, 623 S.W.2d 882, 894 ("They are not saved by accompanying the defamation with an expression of disbelief"); *Washington Post Co. v. Kelly*, 38 F.2d 151, 152 (D.C. Cir. 1930) ("libelous character of the article was not changed by the somewhat equivocal suggestions that its truth was denied by appellee").

teens jeered and mocked him"; that Phillips was "singing the American Indian Movement song of unity"; and that Phillips "fought in the Vietnam War." (*Id.* Ex. K).

These statements – all within the "four corners" of the Articles – provide the context within which the Post's accusations were published. It is impossible to attribute a non-defamatory meaning to the Post's accusation that Nicholas was "block[ing] [Phillips'] path" and his "retreat" when you consider that the statement was made within the context of Articles that went to great pains to make it clear that Nicholas was a white Catholic student wearing a MAGA hat who had attended the March for Life, a controversial event associated with President Trump; that Phillips was a Native American elder and Vietnam veteran who was singing and playing a prayer song of unity; and that the throng of white Catholic boys was taunting the Indigenous people as they concluded a march celebrating their culture while the elder thought about the "various threats facing indigenous communities" and had experienced similar "anti-Native American sentiment before."[18] That was the story – absent the express themes of race, politics, and abortion, there would have been nothing interesting at all about Nicholas "block[ing] [Phillips'] path" at the Lincoln Memorial. But those lightning-rod issues that the Post repeated throughout the entirety of the Articles are the context in which the Articles must be judged.

Within that context, all of the other accusations targeted by the Post in its Motion (as well as those not specifically addressed) must also be considered defamatory, or at the very least capable of a defamatory meaning, including as examples: (1) chanting "Build that wall"; (2) "swarming" around Phillips; (3) "[a]ccost[ing]" Phillips; (4) "[e]xchang[ing] taunts"; and (5) not showing "respect" to Phillips. This was not a political rally. According to the Post, Nicholas and his

---

[18] At the very least, the False and Defamatory Accusations, when considered in context, are *capable* of a defamatory meaning such that they cannot be disposed of on a motion to dismiss.

classmates were chanting "build that wall" as taunts *toward* the Indigenous people and these various actions constituted "anti-Native American sentiment."  While accusations of any of these actions might not be considered defamatory in different contexts, accusing Nicholas of them in the context of these Articles – which were inundated with statements making clear the races and the politics were of the individuals involved – is certainly defamatory.

Moreover, the Court must examine the gist or sting of the Articles when assessing defamatory meaning.  *McCall*, 623 S.W.2d at 884.  The accusations that Nicholas was "trying to instigate a conflict" in "an aggressive display of physicality," during which Phillips was "threatened" when he was swarmed and then his path and retreat blocked by Nicholas while Phillips was engaged in song and prayer, alongside claims that Nicholas engaged in various racist taunts, anti-Native American sentiment, and violated the fundamental standards of his church and school, renders the Articles susceptible to the meanings alleged by Nicholas that he instigated the confrontation, assaulted Phillips, engaged in racist conduct, and violated the fundamental standards of his communities.  (Compl. ¶¶ 115-17, 120, 125-28, 132-35, 130-40, 145-48, 152-55).

These accusations clearly could and did hold Nicholas open "to public hatred, contempt, scorn, obloquy, or shame."  *Stringer*, 151 S.W.3d 781, 795.  Indeed, the Post does not and cannot seriously contest that accusations of specific racist conduct, racist speech, and assault are routinely held to be actionable per se.  *See, e.g., Fortney v. Guzman*, 482 S.W.3d 784, 789-90 (Ky. Ct. App. 2015) ("When the communication concerns untrue allegations of criminal behavior . . . the communication is libelous per se"); *Toikka v. Jones*, 2013 WL 978926, at *3 (E.D. Ky. 2013) (statement defendants "witnessed [plaintiff] push Evelyn Jones and call her a bitch" libelous per se because it meets definition of assault, which is "an unlawful offer of corporeal injury to another by force . . . ."); *Toler*, 458 S.W.3d 276, 280 (accusation of racist comments in the workplace"

held defamatory per se); *Mullenmeister v. Snap-On Tools Corp.*, 587 F. Supp. 868, 874 (S.D.N.Y. 1984) (collecting cases and holding that "[c]ourts have readily held allegations of racism . . . to constitute libel per se, at least when founded on specific incidents"); *Boyles v. Mid-Florida Television Corp*., 431 So. 2d 627, 634–35 (Fla. Dist. Ct. App. 1983), *approved*, 467 So. 2d 282 (Fla. 1985) (the accusation "taunting[19] the retarded patients" "is something that would tend to subject one to contempt or disgrace," without regard to innuendo).

The republished Diocese and CovCath statements are also libelous per se, as they are a proclamation that Nicholas's conduct violated the fundamental standards of his religious community and the policies of his school, which necessarily tends to injure Nicholas "in his reputation or to expose him to public hatred, contempt, scorn, obloquy, or shame" in his community.  *Stringer*, 151 S.W.3d at 795.

**IV.   The Articles Are Not Protected Opinion.**

The Post cannot rely on an opinion defense to escape liability for its attacks against Nicholas that imply false and defamatory facts or that are based on false or incomplete facts.  The Supreme Court's decision in *Milkovich v. Lorain Journal* is the guidepost for determining if a statement of opinion is actionable rather than protected.  497 U.S. 1 (1990).[20]

---

[19] "Jeered" and "mocked" are synonyms of "taunted."  *See* Merriam-Webster (defining "taunt" as "to reproach or challenge in a mocking or insulting manner : jeer at) (available at https://bit.ly/2VuJaih) (last visited May 8, 2019); Thesaurus.com (listing "jeer" and "mock" among the "most relevant" synonyms for the verb "taunt") (available at https://www.thesaurus.com/browse/taunt) (last visited May 8, 2019).

[20] Before *Milkovich* was decided, the Kentucky Supreme Court adopted the Restatement § 566, which does not protect an opinion that "implies the allegation of undisclosed defamatory fact as the basis for the opinion." *Yancey*, 786 S.W.2d 854, 857.  The Kentucky Supreme Court, the Kentucky Court of Appeals, and Kentucky federal courts have since followed *Milkovich*, recognizing that "it took a position consistent with [*Yancey*]." *Williams v. Blackwell*, 487 S.W.3d 451, 454 (Ky. Ct. App. 2016), *as modified* (Mar. 4, 2016); *see also Welch*, 3 S.W.3d 724, 730 (applying *Milkovich* rather than the Restatement); *Cromity v. Meiners*, 494 S.W.3d 499, 503 (Ky. Ct. App. 2015), *review denied* (Aug 17, 2016) (recognizing consistency between *Milkovich* and

*Milkovich* held that an opinion is actionable if (1) it implies a connotation that "is sufficiently factual to be susceptible of being proved true or false," and (2) it can "reasonably [be] interpreted as stating actual facts" about the plaintiff.[21] *Id.* at 21. This first requirement is at issue in this case, as the Post argues that some of its statements are too subjective to be proven true or false. The second requirement, however, is not, because the Post does not argue its statements were merely "rhetorical hyperbole," "vigorous epithet," or "imaginative expression." *See id.* at 20 (explaining the second requirement follows the *Bresler–Letter Carriers–Falwell* line of cases).

The Supreme Court explains the difference between an opinion bereft of a disclosed basis – which itself implies the existence of undisclosed facts – and an opinion that discloses the basis:

> If a speaker says, 'In my opinion John Jones is a liar,' *he implies a knowledge of facts* which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, *if those facts are either incorrect or incomplete, or if his assessment of them is erroneous*, the statement may still imply a false assertion of fact.

*Id.* at 18-19 (internal citations omitted) (emphasis added).

The *Milkovich* standard is clear: an opinion stating that an objectively verifiable event occurred necessarily implies the existence of undisclosed facts to support the opinion, unless the opinion's basis is disclosed. Even then, if the disclosed basis is false or incomplete, the opinion remains actionable. The fundamental question is whether a defendant makes an accusation about a verifiable event that either happened or did not – i.e., it can be proven true or false. Thus, "[i]n my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and

---

*Yancey*); *Carey v. CSX Transportation, Inc.*, 2019 WL 181120, at *3–4 (E.D. Ky. Jan. 11, 2019) (applying *Milkovich* and refusing to protect an opinion based on "nothing more than [an expert's] own unsupported conclusions"). Or, as the Tenth Circuit put it, "the difference between . . . [*Milkovich* and the Restatement] is more apparent than real." *TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1185 (10th Cir. 2007).

[21] This second *Milkovich* requirement is not at issue in this case, as it protects statements that are mere "rhetorical hyperbole," "vigorous epithet," or "imaginative expression."

Lenin," *id.* at 20, is a protected opinion because whether someone is considered ignorant is a subjective determination that is in the eye of the beholder. But an opinion that a person engaged in conduct – such as perjury, assault, or instigating a confrontation – speaks of objectively verifiable events and is thus actionable if its basis is undisclosed or its basis is false or incomplete.

When determining if an opinion is actionable, a court examines the "whole context" of a publication. *Yancey*, 786 S.W.2d at 857. In *Yancey*, the defendant newspaper quoted another defendant's statements that the plaintiff "'"*was a con artist*"'" and "'"*I would never lend him money*."'" *Id.* at 856 (emphasis in original). In context, "con artist" was an actionable opinion because it implied the existence of facts showing that the plaintiff defrauded people. *Id.* at 858.

A.    **The First, Second, and Third Articles Are Not Protected Opinion.**

1.    **"Phillips, 64, said he felt threatened by the teens and that they suddenly swarmed around him as he . . . [was] preparing to leave."**

This statement is actionable because it implies defamatory facts and is based on false and incomplete facts. The Post erroneously argues (1) that "felt threatened" is a statement of subjective feelings and thus does not imply defamatory facts and (2) that "felt threatened" and "suddenly swarmed" are protected opinions based on the disclosed fact that teens surrounded Phillips.

It is black letter law that communicating one "feels" or "believes" something happened may imply the existence of defamatory facts. In *Scheel v. Harris*, the defendant "said he *felt* he was blackmailed . . . and he didn't trust [the plaintiff] enough to know what she might do." 2012 WL 3731263, at *7 (E.D. Ky. Aug. 28, 2012) (emphasis added). This was actionable because, in context, it could "'imply that the speaker had particular and articulable reasons for believing' that [the plaintiff] engaged in coercive techniques to achieve her professional goals." *Id.* (quoting *Yancey*, 786 S.W.2d at 858). Or, as *Milkovich* held: "couching a statement in terms of opinion does not dispel [the factual implications]." 497 U.S. at 19.

Here, just like *Scheel*, the statement that Phillips "felt" threatened implied defamatory facts that Nicholas threatened Phillips' personal safety – particularly given the context stating Nicholas "blocked [Phillips'] way and wouldn't allow [him] to retreat" as Phillips was "suddenly swarmed" in "an aggressive display of physicality." "Felt threatened" is *not* a purely subjective opinion, such as whether someone is ignorant. It communicates, *inter alia*, that a crime occurred under D.C. law – intent-to-frighten assault – which is proven, in part, by showing that "a defendant's conduct produces fear in the victim." *See Smith v. United States*, 593 A.2d 205, 206 (D.C. 1991); *see also Yancey*, 786 S.W.2d at 858 (holding that "con man" implied facts of "'Theft by Deception'").

Even if, as the Post argues, "felt threatened" and "suddenly swarmed" are opinions based on the disclosed fact that Nicholas and other children "surrounded" Phillips, the statement is still actionable because this basis is false:  Nicholas and the teens did not surround Phillips. *See, e.g.*, *Carey*, 2019 WL 181120, at *4 (opinion actionable when based on "unsupported conclusions"); *see also Overhill Farms, Inc. v. Lopes*, 190 Cal. App. 4th 1248, 1263-64 (2010) (finding no protected opinion for accusation of racism where "statements [did] not fully and accurately disclose the facts").  In context, "surrounded" communicated that Nicholas actively closed in on Phillips who was trying to leave, when, in fact, Phillips purposefully waded into the group of children who made way for him, until Phillips decided to plant himself in front of Nicholas.

"Felt threatened" and "suddenly swarmed" are also actionable because they are based on incomplete facts.  The first three articles referenced or linked to the Viral Video which contained a short video clip showing Phillips pounding his drum in Nicholas's face while children smiled, clapped, and jumped to the beat.[22]  The obviously incomplete clips omit Nicholas and others being berated by Hebrew Israelites, and Phillips bypassing a clear path to the Lincoln Memorial,

---

[22] *See* https://www.instagram.com/p/Bsy80cfFVAR/.

inserting himself in the crowd of children, zeroing in on Nicholas, and then gloating with his profanity spewing comrades once the children boarded their school buses.

### 2. "[T]aunting the dispersing indigenous crowd."

The First, Second, and Third Articles communicated that before Phillips marched into the group of children, Nicholas and others were "taunting the dispersing indigenous crowd." The Post argues that "taunting" is too subjective to be actionable – despite its editor's note conceding that race-based "taunting" is objective enough to be proven true or false. (Mot. at 13 n.4). The Post also concedes that "taunting" is factual by arguing that it is "substantially true" that Nicholas and the children "engaged in conduct that was perceived by many as taunting or mocking." (*Id.* at 26). If "taunting" can be proven true, it is necessarily a provably false fact.

Even if "taunting" could be considered opinion, it implies the existence of defamatory facts that Nicholas was actively instigating a conflict[23] with Phillips and others because of their race. Indeed, the First, Second, and Third Articles frame the incident as an example of "anti-Native American sentiment," a validation "of our concerns about the marginalization and disrespect of Indigenous peoples," and an "aggressive display of physicality [in which] [t]hey were rambunctious and trying to instigate a conflict."

Whether racist "taunting" occurred is objectively verifiable: "[t]his either happened or it did not." *Mamou v. Trendwest Resorts, Inc.*, 165 Cal. App. 4th 686, 728 (2008). While generically calling someone "racist" may, in some circumstances, be non-actionable opinion, when an article characterizes specific factual occurrences as racist, the line between protected opinion and

---

[23] The editor's notes also admit that the First, Second, and Third Articles conveyed the falsifiable fact that the CovCath students were trying to "instigate a conflict," and that this fact was either contradicted or unable to be confirmed. And, ultimately, the bases allegedly disclosed for "felt threatened" themselves convey the same defamatory gist of assault and racist conduct.

actionable fact is crossed.  *See, e.g.*, *Overhill Farms, Inc.*, 190 Cal. App. 4th at 1262 (rejecting opinion defense for "accusation of concrete, wrongful conduct" for statement about "racist *firings*" and "'discriminatory abuse against Latina women immigrants'"); *MacElree v. Phila. Newspapers, Inc.*, 544 Pa. 117, 126-27 (1996) (statement that "appellant was acting in a racist manner in his official capacity as district attorney" held actionable); *Scott v. Cooper*, 226 A.D.2d 360, 360-61 (N.Y. Ct. App. 1996) (accusation of "racial discrimination" did "not constitute personal opinion"); *Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250, 261 (N.Y. Ct. App. 1995) (accusations plaintiff "was anti-Semitic and biased in her treatment of Jew[s]" held actionable).[24]

The Post erroneously relies on *Turner v. Wells*, 879 F.3d 1254 (11th Cir. 2018) to argue that "taunting" must be protected opinion.  *Turner* held that an accusation of "homophobic taunting" was a "protected subjective assessment of [the defendant's] conduct and is not readily capable of being proven true or false," and it was also protected as being based on true facts.  *Id.* at 1264.  In *Turner*, the plaintiff's own concession also required a finding that "homophobic taunting" was protected opinion, because he argued that his undisputed conduct could be seen as merely a joke. *Id.*  Unlike *Turner*, here, it is false that Nicholas or the other children engaged in conduct taunting the Native Americans, particularly before Phillips inserted himself into the crowd of children waiting for their bus.[25]  But, like *Turner*, the Court should hold the Post to its admissions and find that the accusation of racist taunting is sufficiently factual to be actionable.

---

[24] The Post ignores this wealth of case law about actionable accusations of racist conduct, citing instead to two unpublished cases and arguing that generally labeling a person "racist" is protected opinion.  *See Squitieri v. Piedmont Airlines, Inc.*, 2018 WL 934829, at *4 (W.D.N.C. Feb. 16, 2018) (discussing the label, "racist," not allegedly racist conduct); *Forte v. Jones*, 2013 WL 1164929, at *6 (E.D. Cal. Mar. 20, 2013) (accusations of racist conduct—i.e., membership in the Ku Klux Klan—is actionable, while labeling someone a "racist" is non-actionable).

[25] Under Florida law, falsely accusing someone of "taunting" based on an immutable characteristic may be defamatory without regard to issues of opinion. *See Boyles*, 431 So. 2d 627, 634-35.

### 3. "It was getting ugly: Native American drummer speaks on the MAGA-hat wearing teens who surrounded him."

The Post declares that the statement that Nicholas and others "surrounded" Phillips is merely a subjective assessment. Even if this factual assertion could be considered an opinion, "surrounded" implies the existence of an objective fact: Nicholas either surrounded Phillips, or he did not. Read alongside the other statements in the first three Articles, "surrounded" communicates, *inter alia*, that Nicholas assaulted Phillips by targeting him from afar and then blocking his retreat from a threatening throng of white teenagers.

### 4. "It was an aggressive display of physicality. They were rambunctious and trying to instigate a conflict,' he said."

Like the taunting accusation, this is a provably false statement of fact. The Post admitted as much in the editor's note, which conceded that the available information either contradicted or failed to confirm conduct that "the students were trying to instigate a conflict."

### B. The Second and Third Articles' Diocese Statement Is Not Protected Opinion.

The Post argues that the Second and Third Articles' republication and summary of the Diocese and CovCath's statement condemning Nicholas and others was not a statement of fact and is thus protected opinion. But, given the quintessentially per se defamatory nature of the statement, as described above, it implies the existence of provably false defamatory facts. By "condemn[ing]" Nicholas and the other students' "*actions*" towards Phillips and Native Americans, and by threatening "expulsion," the statement implied that actual facts existed to warrant subjecting Nicholas to public hatred, contempt, scorn, obloquy, or shame. The implication of underlying defamatory facts is all the more pronounced because a reasonable reader would understand that Nicholas's own Diocese and school – which supervised the trip to D.C. – would know what happened. Ultimately, the Post's republication of the Diocese's and CovCath's statement is a

41

proclamation that Nicholas's *conduct*, as a matter of fact, violated the standards of his religious community and the policies of his school, which takes it out of the realm of protected opinion.

The Post then added its own gloss on the tale makers', Diocese and CovCath, statement, cementing provably false and defamatory factual implications by accusing students of "jeering" and being "disrespectful." As discussed above, "jeered" is a synonym of "taunted." And according to the editor's note, taunting is provably false. *Cf. Jacobs v. Ethel Walker School Inc*., 2003 WL 22390051, at *8 (Conn. Super. Ct. Sept. 30, 2003) (denying summary judgment for defendant who accused plaintiff of "mocking" homosexual students). Moreover, whether someone has disrespected another is not just a matter of opinion; it is a matter of fact that can lead to criminal sanctions and professional discipline. *See United States v. Hoxsey*, 17 M.J. 964, 965 (A.F.C.M.R. 1984) (criminal violation for "disrespectful behavior"); *Norton v. City of Santa Ana*, 15 Cal. App. 3d 419, 425 (1971) ("disrespect" may warrant dismissal from police department); *Perryman v. Hackler*, 916 S.W.2d 105, 108 (Ark. 1996) ("The only authority for sanctioning comments in a brief is when they are disrespectful to a trial court. Ark. Sup. Ct. R. 1–5.").

### C.     The Fifth Article Is Not Protected Opinion

The Post contends that only one statement in the Fifth Article is protected opinion: arguing that the accusation that Nicholas "appeared to physically intimidate Nathan Phillips" is too nebulous to be a statement of fact and is a protected interpretation of an image of Nicholas.

First, "physically intimidate" is factual and thus susceptible of being proven or false. *Wesbrook v. Ulrich*, 90 F. Supp. 3d 803, 813 (W.D. Wis. 2015) (no protected opinion for accusation that plaintiff used "intimidation towards those who disagreed with him"); *McGunigle v. City of Quincy*, 2013 WL 3892901, at *3 (D. Mass. July 25, 2013) (accusation of witness intimidation "is factual, rather than opinion"). The factual nature of "intimidate" is clear because

it can be an element of a criminal offense in the very jurisdiction where the incident occurred.  *See, e.g.*, *Kurd v. Republic of Turkey*, 2019 WL 1243731, at \*14 (D.D.C. Mar. 18, 2019) (holding that "non-assaultive intimidating" activities, including the use of racist symbols, can be a "designated act" under a hate crime statute); *see also* Minn. Stat. Ann. § 609.749 subd. 1 ("'[S]talking' means to engage in conduct [that] . . . would cause the victim under the circumstances to feel *frightened, threatened, oppressed, persecuted, or intimidated*.") (emphasis added).

Second, even if the word "appeared" signals opinion, "[s]imply couching such statements in terms of opinion does not dispel the[] [factual] implications." *Milkovich*, 497 U.S. at 19; *see also StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1352 (N.D. Ga. 2018) (holding "'this *appears* to be insurance fraud'" is not protected opinion) (emphasis added).

Third, the Post argues "physically intimidate" is not actionable because the basis is disclosed.  While it is unclear what that basis is – beyond a general reference to "[t]he image" of Nicholas and other students – it is evident the basis is incomplete and false and the opinion is thus actionable. There is not one image that captures the January 18 incident, as a single image cannot show, *inter alia*: the Hebrew Israelites hurling racist insults at the children and the Native Americans; Phillips bypassing a path to the Lincoln Memorial; Phillips intentionally inserting himself into the group of children; Phillips zeroing in on Nicholas, who was standing on a stair; and Nicholas signaling to his friend not to engage Phillips' comrade, who took a break from filming the scene to curse at children. For this reason, any single image would also be a false and misleading portrayal of the January 18 incident.

The Post relies on inapposite cases to erroneously argue that the statement is protected opinion, such as a case from Ohio addressing the phrase "intimidated children." *See Heidel v. Amburgy*, 2003-Ohio-3073, ¶¶ 10, 21.  The Post does not disclose that in Ohio "*opinion is*

*nonactionable per se*," whereas under *Milkovich* opinion does not have blanket protection.   1 Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 4:2.4, at 4-49 & n.93 (5th ed. 2018) (citing *Vail v. The Plain Dealer Publishing Co.*, 1995-Ohio-187). Thus, *Heidel* sheds no light on whether "physically intimidated" is actionable under Kentucky law.

Nor does the reasoning in this Court's order in *Lassiter v. Lassiter* apply here.  456 F. Supp. 2d 876, 882 (E.D. Ky. 2006), *aff'd*, 280 Fed. App'x 503 (6th Cir. 2008).   In *Lassiter*, an opinion was protected under the Restatement when it was based on disclosed facts that were not "denied." *Id.*[26]  The reader was thus "in as good a position as the author to judge whether the conclusion she reached – that adultery had been committed – was correct."   *Id.* Here, to the extent the general reference to "the image" even disclosed the basis for "physically intimidated," the incomplete and false nature of the disclosed facts renders the Post's statement actionable. *See Competitive Enterprise Inst. v. Mann*, 150 A.3d 1213, 1246 (D.C. 2016) ("[T]he facts on which the purported opinion is based must be accurate and complete.") (citing *Milkovich*, 497 U.S. at 18-19).

### D.    The Sixth and Seventh Articles Are Not Protected Opinion.

The statement that Phillips "was being surrounded and not being shown respect" is provably true or false and is thus actionable. "Surrounded" and "disrespected" are factual assertions about conduct that either occurred or did not. The Post does not argue that the Sixth and Seventh Articles disclosed a basis for accusing Nicholas of disrespecting Phillips.  But these articles do emphasize just how serious this accusation is: "'In Native American culture, respect of elders is everything.'"  These articles thus imply the existence of undisclosed defamatory facts that Nicholas engaged in, *inter alia*, racist conduct that rose to the level of one of the most serious

---

[26] This courts well-reasoned order in *Loftus v. Nazari*, is likewise distinguishable because the opinion's factual basis was not challenged as false. 21 F. Supp. 3d 849, 853-54.

violations for Native American people. The Sixth and Seventh Articles also published the Diocese's and CovCath's statement, which, as discussed above, is not protected opinion.

### E.     The Tweets Are Not Protected Opinion.

The Post's Three Tweets linking to the First Article are not protected opinion, particularly when read in the context of that article (as the Post concedes the Court must do).  The First Tweet stated that "teens jeered and mocked" Phillips.  While the Post now argues this is an opinion based on true disclosed facts, its editor's note negates that proposition: i.e., "jeered" and "mocked" are merely synonyms of "taunted," which the editor's note concedes is provably false.

As for the Third Tweet, the Post vaguely argues that it is protected opinion because it links to the First Article and thus is based on disclosed facts. This strains credulity. The false and defamatory factual statement in the Third Tweet consists of two sentences that also appeared in the First Article: "I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat."  When discussing the First Article, the Post did not argue that these very same two sentences are protected opinion—with reason. Whether Nicholas blocked Phillips' retreat is an objectively falsifiable factual event: it either happened or it did not.  The editor's note admits that this statement is either false or factually unsupported: i.e., the facts "contradict[] or fail[] to confirm . . . that Native American activist Nathan Phillips was prevented by one student [Nicholas] from moving on."  Moreover, the Post's own First Article cannot be the basis for protecting its First Tweet.  To the contrary, the First Tweet is actionable, in part, because it linked to the defamatory material in the First Article.

### CONCLUSION

For the reasons identified herein, the Post's Motion should be denied.

Respectfully submitted this 14th day of May, 2019.

**L. LIN WOOD, P.C.**

*/s/ L. Lin Wood*
L. Lin Wood (*pro hac vice*)
lwood@linwoodlaw.com
Nicole Jennings Wade (*pro hac vice*)
nwade@linwoodlaw.com
G. Taylor Wilson (*pro hac vice*)
twilson@linwoodlaw.com
Jonathan D. Grunberg (*pro hac vice*)
jgrunberg@linwoodlaw.com

1180 W. Peachtree Street, Ste. 2040
Atlanta, GA 30309
Tel: 404-891-1402
Fax: 404-506-9111

**Hemmer DeFrank Wessels PLLC**

*/s/ Todd V. McMurtry*
Todd V. McMurtry
Kentucky Bar No. 82101
tmcmurtry@hemmerlaw.com
Kyle M. Winslow
Kentucky Bar No. 95343
kwinslow@hemmerlaw.com

250 Grandview Drive, Ste. 500
Ft. Mitchell, KY 41017
Tel: 859-344-1188
Fax: 859-578-3869

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2019, I electronically filed the foregoing document with

the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to

registered CM/ECF participants.


/s/ Todd V. McMurtry
Plaintiff's Counsel