IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION AT COVINGTON

CIVIL ACTION NO. 2:19-00019 (WOB-CJS)

NICHOLAS SANDMANN                                    PLAINTIFF

VS.                          OPINION AND ORDER

WP COMPANY LLC, d/b/a
THE WASHINGTON POST                                  DEFENDANT

This is a defamation action arising out of events that occurred in our nation's capital on January 19, 2019, among various groups who were exercising their rights to free assembly and speech.  In this age of social media, the events quickly became the subject of posts, squares, tweets, online videos, and — pertinent here — statements published by major media outlets.

As a result, plaintiff Nicholas Sandmann ("Sandmann") found himself thrust into the national spotlight.  He has filed suit against defendant WP Company LLC d/b/a The Washington Post ("The Post"), alleging that The Post negligently published false statements about him that were defamatory in relation to the events in question.[1]

This case is currently before the Court on The Post's motion to dismiss Sandmann's complaint on several legal grounds.  (Doc.

---

[1] Sandmann has also filed suit against the Cable News Network, Inc. (Cov. Case No. 19cv31) and NBC Universal Media, LLC (Cov. Case No. 19cv56).

27).   This matter is fully briefed, and the Court heard formal oral arguments on July 1, 2019.   (Doc. 44).

After further study, the Court now issues the following Opinion and Order.

### Factual and Procedural Background

On January 18, 2019, a group of students from Covington Catholic High School in Park Hills, Kentucky attended the March for Life in Washington, D.C., accompanied by sixteen adults. (Compl. ¶ 20).  Among the students was plaintiff Nicholas Sandmann, who was wearing a "Make America Great Again" ("MAGA") hat that he had bought as a souvenir.  (*Id.* ¶ 22).

Sandmann and his classmates were instructed to wait at the steps of the Lincoln Memorial for the buses to arrive for their return trip to Kentucky.  (*Id.* ¶ 21).  While the students waited, a group of men from an organization called the Black Hebrew Israelites began yelling racial epithets and threats of violence towards them.  (*Id.* ¶¶ 23, 78(b)).

When this yelling had been going on for almost an hour, a third group of individuals — Native Americans who had been attending the Indigenous Peoples March on the National Mall that day — began approaching the students, singing and dancing, and recording a video.  (*Id.* ¶ 27).  At the front of the group was a Native-American activist named Nathan Phillips ("Phillips").  (*Id.* ¶¶ 3, 26).  Phillips was beating a drum and singing.

When the Native Americans reached the students, Sandmann was at the front of the student group.  Phillips walked very close to Sandmann, beating his drum and singing within inches of Sandmann's face.  (*Id.* ¶¶ 34-35) Sandmann did not confront Phillips or move toward him, and Phillips made no attempt to go past or around Sandmann.  (*Id.* ¶¶ 37-41, 50).  Sandmann remained silent and looked at Phillips as he played his drum and sang.  The encounter ended when Sandmann and the other students were told to board their buses.  (*Id.* ¶ 48).

That evening, Kaya Taitano, a participant in the Indigenous People's March, posted online two short videos showing portions of the interaction between Sandmann and Phillips.  (*Id.* ¶ 52).

At 11:13 p.m., a Twitter account tweeted a short excerpt from Taitano's videos with the comment "This MAGA loser gleefully bothering a Native American protestor at the Indigenous Peoples March."  (*Id.* ¶ 54).

On Saturday, January 19, 2019, one of the Hebrew Israelite members who had been at the demonstration posted on Facebook a 1-hour, 46-minute video of the incident with Sandmann and Phillips, which Sandmann alleges accurately depicts those events.  (*Id.* ¶ 63).

That same day, the Post published the first of seven articles that Sandmann alleges were defamatory in various respects: one article on January 19; four on January 20; and two on January 21.

3

(Doc. 1 ¶¶ 111-162; Doc. 1-5 through Doc. 1-11).   The Post also published three Tweets on its Twitter page on January 19 which Sandmann alleges were likewise defamatory.   (Doc. 1 ¶¶ 158-161).

On January 20, 2019, Sandmann made a public statement describing his version of the events concerning Phillips.   (Doc. 1 ¶ 69).   Three days later, Sandmann gave an interview to Savannah Guthrie on the *Today* show on NBC, again relating his version of the encounter with Phillips.   (*Id.* ¶ 70).[2]

Sandmann filed suit against The Post on February 19, 2019, alleging a single cause of action for defamation and seeking compensatory damages of $50,000,000.00 and punitive damages of $200,000,000.00.   (Doc. 1 at 37-38).

The Court must now determine whether Sandmann's allegations state a viable claim for relief.   These are purely questions of law that bear no relation to the degree of public interest in the underlying events or the political motivations that some have attributed to them.

### *Analysis*

#### A. <u>Rule 12(b)(6)</u>

On a motion to dismiss under Fed. R. Civ. P 12(b)(6), this Court must "construe the complaint in the light most favorable to the nonmoving party, accept the well-pled factual allegations as

---

[2] The Complaint contains many other allegations, but the Court will not lengthen this Opinion by recounting them because the Court does not find them to be relevant to the legal issues presented by The Post's motion.

true, and determine whether the moving party is entitled to judgment as a matter of law." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (internal quotation marks and citation omitted). The Court need not, however, "accept the plaintiff's legal conclusions or unwarranted factual inferences as true." *Id.* "To state a valid claim, a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Id.*

"[A] court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *E.g., Stein v. hhgregg, Inc.*, 873 F.3d 523, 528 (6th Cir. 2017) (citation omitted). Thus, "if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion . . . Fairness and efficiency require this practice." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014). Where an exhibit "contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations." *See, e.g., Kreipke v. Wayne State Univ.*, 807 F.3d

768, 782 (6th Cir. 2015) (citation and internal quotation marks omitted); 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34(2) (Matthew Bender 3d ed. 2018) [hereinafter "MOORE'S"].

Accordingly, in ruling on The Post's motion, the Court may consider the seven articles, the Tweets, and the two YouTube videos because these materials are either referenced in or attached to the Complaint and Sandmann relies on them in support of his defamation claim. The Court excludes all other materials attached to the parties' briefs.

### B. Kentucky Defamation Law[3]

In Kentucky, a cognizable claim for defamation requires:

> (a) a false and defamatory statement concerning another;
> (b) an unprivileged publication to a third party;
> (c) fault amounting at least to negligence on the part of the publisher; and
> (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014) (internal footnote omitted) (quoting RESTATEMENT (SECOND) OF TORTS § 558 (AM. LAW INST. 1977)) (hereafter "REST. 2D."). But a "defamation claim against a media defendant cannot derive from 'a statement of opinion relating to matters of public concern [that] does not contain a provably false factual connotation'" unless "the

---

[3] Because this Court "is sitting in diversity, we apply the law of the forum state." *Croce v. The New York Times Co.*, No. 18-4158, 2019 WL 3214077, at *2 (6th Cir. July 17, 2019) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003)).

challenged statement connotes **actual, objectively verifiable facts**." *Compuware Corp. v. Moody's Inv'rs Servs.*, 499 F.3d 520, 529 (6th Cir. 2007) (alteration in original) (emphasis added) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

The Court notes that the present motion does not require the Court to address the elements of truth/falsity, publication (which is not disputed), or negligence. At issue are only whether the statements are about Sandmann, whether they are fact or opinion, and whether they are defamatory.

Before turning to the merits, the Court must first discuss these important legal principles in more detail.

### 1.   "About" or "Of and Concerning" the Plaintiff

The first element of a defamation claim requires that the challenged statements be "about" or "concerning" the plaintiff. *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004), *overruled on other grounds by Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014); *see also Rosenblatt v. Baer*, 383 U.S. 75, 81 (1966).

Generally, "the plaintiff need not be specifically identified in the defamatory matter itself so long as it was so *reasonably understood* by plaintiffs 'friends and acquaintances . . . familiar with the incident.'" *Stringer*, 151 S.W.3d at 794 (alteration in original) (emphasis added) (quoting *E. W. Scripps Co. v. Cholmondelay*, 569 S.W.2d 700, 702 (Ky. Ct. App. 1978)). But this

7

rule is limited by the principle, now memorialized in the Restatement,[4] that "where defamatory statements are made against an aggregate body of persons, an individual member not specially imputed or designated cannot maintain an action." *See, e.g., Louisville Times v. Stivers*, 68 S.W.2d 411, 412 (Ky. 1934) (citation omitted).

For an individual plaintiff to bring a defamation action based on such comments, the Kentucky Supreme Court has instructed that "the statement must be applicable to every member of the class, and if the words used contain no reflection upon any particular individual, no averment can make them defamatory." *Kentucky Fried Chicken, Inc. v. Sanders*, 563 S.W.2d 8, 9 (Ky. 1978). This determination should be made "in the context of the whole article." *Id.*

### 2. The "Falsity" Requirement is Met Only Where the Words Used State Verifiable Facts, Not Opinions

The first element of a defamation claim also requires that the allegedly libelous statement be objectively false. Under Kentucky law, a statement in the form of an opinion can be defamatory, but it is "actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."

---

[4] REST. 2d § 564A cmt. a ("no action lies for the publication of defamatory words concerning a large group or class of persons" and "no individual member of the group can recover for such broad and general defamation."); *id.* at cmt. c ("the assertion that one man out of a group of 25 has stolen an automobile may not sufficiently defame any member of the group, while the statement that all but one of a group of 25 are thieves may cast a reflection upon each of them").

*Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989) (quoting Rest. 2d § 566).[5]

In *Milkovich v. Loraine Journal Co.*, however, the Supreme Court subsequently held that "'a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection' and that 'statements that cannot reasonably [be] interpreted as stating actual facts, are not actionable.'" *Jolliff v. N.L.R.B.*, 513 F.3d 600, 610 (6th Cir. 2008) (internal quotation marks omitted) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).

Here, The Post's articles concern groups of citizens who were assembled in the nation's capital to support or oppose various causes of importance to them. This is inherently a matter of public concern.[6]

Thus, "the falsity requirement is met only if the statement in question makes an assertion of fact—that is, **an assertion that**

---

[5] The Kentucky Supreme Court, in *Yancey,* 786 S.W.2d at 857, expressly adopted the Restatement's "fact-opinion distinction" almost a year before *Milkovich* was decided. Under the Restatement, "A defamatory communication may consist of a statement in the form of an opinion, but . . . only if it implies the allegation of undisclosed defamatory fact as the basis for the opinion." *Id.* (quoting Rest. 2d § 566).

[6] "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal citations and quotation marks omitted); *cf. Friends of the Vietnam Veterans Mem. v. Kennedy*, 116 F.3d 495, 496 (D.C. Cir. 1997) (noting that the Mall's "location in the heart of the nation's capital makes it a prime location for demonstrations.")

is capable of being proved objectively incorrect," *Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 508 (6th Cir. 2015) (emphasis added) (citing *Milkovich*, 497 U.S. at 20), or otherwise "connotes actual, objectively verifiable facts." *Compuware Corp.*, 499 F.3d at 529.

Kentucky Courts adhere to *Milkovich*'s "provable as false" standard. *See, e.g., Welch v. American Publ'g Co.*, 3 S.W.3d 724, 730 (Ky. 1999); *Williams v. Blackwell*, 487 S.W.3d 451, 454 (Ky. Ct. App. 2016); *Cromity v. Meiners*, 494 S.W.3d 499, 503–04 (Ky. Ct. App. 2015).

In addition, Kentucky has rejected the doctrine of "neutral reportage"; that is, a newspaper may still be held liable for quoting "newsworthy statements" of third parties. *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 886–87 (Ky. 1981).

### 3. The Publication, Evaluated as a Whole, Must be Defamatory, Not Merely False

Lastly, to satisfy the first element of a defamation claim, the language in question must "be both false *and defamatory*. A statement that is false, but not defamatory is not actionable; a statement that is true is not actionable even if defamatory." *Dermody v. Presbyterian Church U.S.A.*, 530 S.W.3d 467, 472–73 (Ky. Ct. App. 2017) (emphasis added).[7]

---

[7] Kentucky law has long distinguished between two categories of actionable statements: libel *per se* and libel *per quod*. *Stringer*, 151 S.W.3d at 794–95 (citing *Hill v. Evans*, 258 S.W.2d 917, 918 (Ky. Ct. App. 1953)). "In the former class, damages are presumed and the person defamed may recover without

Sandmann alleges that the challenged statements "are defamatory *per se*, as they are libelous on their face without resort to additional facts." (Compl. ¶ 207).

"[Kentucky] common law treats a broad[] class of written defamatory statements as actionable *per se*." *Stringer*, 151 S.W.3d at 794-95. But in order for a defendant's written statement to be "actionable per se justifying a recovery without averments of special damages," it must be more than annoying, offensive, or embarrassing; the words must "tend to expose the plaintiff to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people," *Digest Publ'g Co. v. Perry Publ'g Co.*, 284 S.W.2d 832, 834 (Ky. 1955), or the statement must "impugn one's competence, capacity, or fitness in the performance of his profession," *Welch*, 3 S.W.3d at 735.[8]

---

allegation or proof of special damages. In the latter class, recovery may be sustained only upon *an allegation and* proof of special damages." *Hill*, 258 S.W.2d at 918 (emphasis added). Thus, with libel *per quod*, in order to satisfy the fourth element a plaintiff must plead and ultimately prove, special damages. *Toler*, 458 S.W.3d at 282; *Dermody*, 530 S.W.3d at 475; *Rich v. Ky. Country Day Inc.*, 793 S.W.2d 832, 837-38 (Ky. Ct. App. 1990).

"Special damages are those beyond mere embarrassment which support *actual economic loss;* general damages relate to humiliation, mental anguish, etc." *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 274 (Ky. Ct. App. 1981) (emphasis added).

Here, "there is no allegation of special damages, and [so] unless the publication may be considered as actionable per se," the Court must dismiss the action. *Hill*, 258 S.W.2d at 918; *Dermody*, 530 S.W.3d at 475; *Bell v. Courier-Journal & Louisville Times Co.*, 402 S.W.2d 84, 86 (Ky. 1966).

[8] With written statements, "it is not necessary that the words imply a crime or impute a violation of laws, or involve moral turpitude or immoral conduct." *Digest Publ'g Co.*, 284 S.W.2d at 834; *Stringer*, 151 S.W.3d at 795.

The Restatement explains that what constitutes actionable defamation is not subject to the whims of those in society who are faint of heart:

> Although defamation is not a question of majority opinion, neither is it a question of the existence of some individual or individuals with views sufficiently peculiar to regard as derogatory what the vast majority of persons regard as innocent. The fact that a communication tends to prejudice another in the eyes of even a substantial group is not enough if the group is one whose standards are so anti-social that it is not proper for the courts to recognize them.

REST. 2d § 559 cmt. e. "[T]he fact that a person who is prone to think evil of others, hearing words obviously intended to be innocent, by an unreasonable construction attaches to them a derogatory meaning, does not render the language defamatory." REST. 2d § 563 cmt. c.

"In determining whether a writing is libelous per se [under Kentucky law], **courts must stay within the four corners of the written communication**." *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006) (emphasis added) (citations and internal quotation marks omitted). "The words must be given their ordinary, natural meaning as defined by the average lay person. The face of the writing must be stripped of all innuendoes and explanations." *Id.*; *Dermody*, 530 S.W.3d at 475.[9]

---

[9] A publication is considered libelous *per quod* if one must resort to "extrinsic evidence of context or circumstances" in order to comprehend the defamatory nature of the written words. *Stringer*, 151 S.W.3d at 795; *Disabled Am. Veterans, Dep't of Ky., Inc. v. Crabb*, 182 S.W.3d 541, 547 (Ky. Ct. App. 2005).

Finally, the Court must "analyze the article in its entirety and determine if its gist or sting is defamatory." *McCall*, 623 S.W.2d at 884; *Biber v. Duplicator Sales & Serv.*, 155 S.W.3d 732, 738 (Ky. Ct. App. 2004).

## C. **The Post Articles**

As noted, the Complaint in this matter challenges seven articles and three Tweets. In total, these publications contain thirty-three statements that Sandmann alleges are defamatory. A chart setting forth the statements, drawn from the Complaint, is attached for reference. This discussion will refer to the statements by their number on the chart.

### 1. **Article One**

The first three articles that Sandmann challenges have in common nine statements: statements 1-3, 8, 10, 13, and 15-17.[10]

#### a. **Statements Not "About" Sandmann**

The First Article does not mention Sandmann by name, there is no identifiable description of him, and there is no picture of Sandmann in the article.

Instead, statement numbers 1-3, 8, 13, 15, and 16 refer to "hat wearing teens"; "the teens"; "teens and other apparent participants"; "A few people"; "those who should listen most closely"; and "They." These statements are not actionable because

---

[10] Statement 17 requires no discussion as it does not refer to Sandmann or the events in question.

they are not about Sandmann. *See Sanders*, 563 S.W.2d at 9 (affirming dismissal of defamation complaint where newspaper published derogatory statements about KFC's gravy because there was "nothing in the present article which identified" or made "direct reference to" plaintiff's particular restaurant location); *Stivers*, 68 S.W.2d at 411-12 (holding that plaintiff's defamation claim should have been dismissed because statement that the "Stivers clan" had been involved in "fist fights and gun battles" was toward a group or class and not actionable as a matter of law); *O'Brien v. Williamson Daily News*, 735 F. Supp. 218, 220 (E.D. Ky. 1990) (dismissing defamation claims of teachers not identified in an article that mentioned "teachers having affairs with students" because the article referred to "no identifiable group member and does not impugn the reputation of any specific member"), *aff'd*, 931 F.2d 893 (6th Cir. 1991).

Like the statements about groups or classes such as "the Stivers clan"; Kentucky Fried Chicken restaurants; and "teachers," statements such as "hat wearing teens," are clearly "made against an aggregate body of persons," *Stivers*, 268 S.W.2d at 412, and thus "an individual member not specially imputed or designated cannot maintain an action." *Id.* Sandmann is not specifically mentioned in the article. Therefore, because "the words used contain no reflection upon any particular individual, no averment can make them defamatory." *Sanders*, 563 S.W.2d at 9.

These statements are also not actionable for other reasons, discussed below.

### b. Opinion versus Fact

Few principles of law are as well-established as the rule that statements of opinion are not actionable in libel actions.

This rule is based on the right to freedom of speech in the First Amendment to the United States Constitution. *See* David A. Elder, *Kentucky Tort Law: Defamation and the Right of Privacy* § 2.04 (1983); 13 David J. Leibson, *Kentucky Practice (Tort Law)* § 15:2 (1995).

This Court has had occasion to address this issue several times. *See Loftus v. Nazari*, 21 F. Supp.3d 849, 853-54 (E.D. Ky. 2014) (holding that patient's statements regarding allegedly poor results of plastic surgery were protected opinion); *Lassiter v. Lassiter*, 456 F. Supp. 2d 876, 881-82 (E.D. Ky. 2006) (holding that woman's statement that her ex-husband had committed adultery was protected opinion because the facts on which she based that statement were all disclosed in the publication in question), *aff'd*, 280 F. App'x 503 (6th Cir. 2008).

In *Lassiter*, this Court quoted *Leibson* on this point:

> Pure opinion . . . occurs where the commentator states the facts on which the opinion is based, or where both parties to the communication know or assume the exclusive facts on which the comment is based.

*Lassiter*, 456 F. Supp. 2d at 881 (alteration in original) (quoting

13 David J. Leibson, *Kentucky Practice (Tort Law)* § 15:2 at 449 (1995)).

Under these authorities, the statements that Sandmann challenges constitute protected opinions that may not form the basis for a defamation claim.

First, statements 1-3, 10, 13, 16, 17 are not actionable because they do not state or imply "actual, objectively verifiable facts." *Compuware Corp.*, 499 F.3d at 529; *Yancey*, 786 S.W.2d at 857.

Instead, these statements contain terms such as "ugly," "swarmed," "taunting," "disrespect," "ignored," "aggressive," "physicality," and "rambunctious." These are all examples of "loose, figurative," "rhetorical hyperbole" that is protected by the First Amendment because it is not "susceptible of being proved true or false." *Milkovich*, 497 U.S. at 17, 21; *Seaton v. TripAdvisor LLC*, 728 F.3d 592, 597 (6th Cir. 2013).

The above terms are also "inherently subjective," like "dirtiest," *Seaton*, 728 F.3d at 598, or "squandered" and "broke," *Welch*, 3 S.W.3d at 730, all of which are "not so definite or precise as to be branded as false." *Id.*; *see also Turner v. Wells*, 879 F.3d 1254, 1270 (11th Cir. 2018).

Next, statement 2 quotes Phillips as saying he "felt threatened" when he was "swarmed." And statement 10 quotes this assertion:

> It was getting ugly, and I was thinking: "I've got
> to find myself an exit out of this situation and
> finish my song at the Lincoln Memorial," Phillips
> recalled.   I started going that way, and **that guy
> in the hat stood in my way and we were at an
> impasse.  He just blocked my way and wouldn't allow
> me to retreat.**

(Doc. 1-5 at 3) (emphasis added).

Again, even if these statements could be construed to refer
to Sandmann, they do not convey "actual, objectively verifiable
facts." *Compuware*, 499 F.3d at 529; *Yancey*, 786 S.W.2d at 857.
How Phillips "felt" is obviously subjective, and whether Phillips
was "swarmed" or "blocked" is simply not "capable of being proved
objectively incorrect."   *Clark*, 617 F. App'x at 508 (citing
*Milkovich*, 497 U.S. at 20).

The word "block" is a transitive and "figurative" verb meaning
"to obstruct or close with obstacles."[11] "Swarm" simply means to
"come together in a swarm or dense crowd."[12]  And one individual
obviously cannot "swarm" another.

Sandmann admits he was standing in silence in front of
Phillips in the center of a confusing confrontation between the
students and the Indigenous Peoples group.   (Doc. 1 ¶¶ 39-44).
Sandmann's intent, he avers, was to diffuse the situation by

---

[11] *Block*, OXFORD ENGLISH DICTIONARY, OED (Oxford Univ. Press 2019), https://
www.oed.com/view/Entry/20348?rskey=wenAWZ&result=1&isAdvanced=fa
lse#eid (last visited May 30, 2019) [hereinafter "OXFORD ENGLISH
DICTIONARY"].
[12] *Swarm*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/195493?
rskey=WxwUnf&result=1&isAdvanced=false#eid (last visited May 31,
2019).

remaining motionless and calm. (Doc. 1-2 at 2). Phillips, however, interpreted Sandmann's action (or lack thereof) as blocking him and not allowing him to retreat.

In statement 10, Phillips disclosed the reasons for his perception: the size of the crowd, the tense atmosphere, taunts directed at his group, and his memories of past discrimination. (Doc. 1-5). There were no undisclosed facts, and the reader was in as good a position as Phillips to judge whether the conclusion he reached — that he was "blocked" — was correct. *See Lassiter*, 456 F. Supp.2d at 882. The statement is thus pure opinion.

A case from another federal district court illustrates this principle. *See Macineirghe v. County of Suffolk*, No. 13-cv-1512, 2015 WL 4459456 (E.D.N.Y July 21, 2015). While not binding, the Court finds its reasoning highly persuasive.

In *Macineirghe*, two brothers and their father sued numerous defendants for claims arising out of their confrontations with local police and persons employed by a local hospital. As relevant here, the father ("Tomas") asserted a libel claim against a hospital nurse ("Benavides") who gave a statement to the police in the wake of the plaintiffs' arrest. *Id.* at *7. That statement provided Benavides's observations of events inside and outside the hospital:

> The older of the two individuals [Tomas] told [his son] "Get out of here, run!" In an attempt to evade police and security the younger individual ran away and got

18

into a yellow SUV in the parking lot. **The older individual then blocked the police vehicle from attempting to chase the yellow SUV.** I then saw the older man throw himself to the ground in an attempt to fake being struck by a police car. However, the police car never made contact with the older individual. I heard the older man say "I never said that the car hit my foot."

*Id.* (emphasis added).

The father testified that his foot simply "gave way," causing him to fall, and that the nurse's statement that he "blocked" the police car was defamatory. *Id.* at *4. The Court held, however, that the statement was "pure opinion" because all the underlying facts on which the nurse based the "blocked" statement were disclosed:

> Indeed, there can be no question that an ordinary reader would not reasonably understand Benavides's words to imply undisclosed facts justifying the opinions. On the contrary, Benavides clearly supplies the factual predicate for his opinions, which is based on his personal knowledge, the truthfulness of which the Plaintiffs do not materially dispute.
>
> . . .
>
> Benavides's opinion that Tomas was attempting to "block" Knudsen's squad car from pursuing Ian's vehicle is premised on his observations of Ian running out of the Hospital away from the police officers; Ian getting into a vehicle; police officers indicating that they "were going to chase" Ian . . .; Knudsen getting into his squad car; Tomas falling to the ground in the vicinity of Knudsen's squad car before he could put it into motion; and Tomas's conflicting remarks, initially claiming to have been struck by Knudsen's car, and subsequently claiming that he had a pre-existing injury.

*Id.* at *14.

19

The Court reaches the same conclusion here regarding Phillips's "blocked" statement: it is a protected, nonactionable opinion implying no undisclosed facts.

### c.   Defamatory Meaning

Even assuming, *arguendo*, that the above statements are "about" Sandmann and that they convey objectively provable facts, "there is no allegation of special damages, [so] unless the publication may be considered as actionable per se," the Court must dismiss the action. *Hill*, 258 S.W.2d at 918; *Dermody*, 530 S.W.3d at 475; *Bell*, 402 S.W.2d at 86.

As noted, "[i]n determining whether a writing is libelous per se [under Kentucky law], **courts must stay within the four corners of the written communication.** The words must be given their ordinary, natural meaning as defined by the average lay person. The face of the writing must be stripped of all innuendoes and explanations." *Roche v. Home Depot U.S.A.*, 197 F. App'x 395, 398 (6th Cir. 2006) (emphasis added) (citations and internal quotation marks omitted); *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 863 (6th Cir. 2003).

Then, the Court must "analyze the article in its entirety and determine if its gist or sting is defamatory." *McCall*, 623 S.W.2d at 884.

Sandmann alleges that the "gist" of the First Article is that he (1) "assaulted" or "physically intimidated Phillips"; (2)

"engaged in racist conduct"; and (3) "engaged in taunts." (Doc. 1, ¶¶ 115-17). But this is not supported by the plain language in the article, which states none of those things.

Instead, Sandmann's reasoning is precisely the type of "explanation" and "innuendo" that "cannot enlarge or add to the sense or effect of the words charged to be libelous, or impute to them a meaning not warranted by the words themselves." *Dermody*, 530 S.W.3d at 475 (internal quotation marks omitted).

And while unfortunate, it is further irrelevant that Sandmann was scorned on social media.  That is "extrinsic evidence of context or circumstances" outside the four corners of the article that renders the publication libel *per quod*.  *Stringer*, 151 S.W.3d at 795; *Crabb*, 182 S.W.3d at 547.

First, the article cannot reasonably be read as charging Sandmann with physically intimidating Phillips or committing the criminal offense of assault. *Cf. Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin*, 418 U.S. 264, 285-86 (1974).  At best, Phillips is quoted in the article as saying that he "felt threatened" and "that guy in the hat . . . blocked my way." As in *Roche*, where an individual stated he "feels harassed by [the plaintiff] and wants no contact," here, Phillips' statement that he "felt threatened" is merely "a third party's subjective feelings" and that "would not tend to expose [Sandmann] to public hatred or to suggest his unfitness to work" and therefore "does

21

not constitute libel per se." *Roche*, 197 F. App'x at 398-99.

Second, it is unreasonable to construe the article as meaning that Sandmann "engaged in racist conduct." (Doc. 1 ¶ 115). The article, at most, quotes Phillips, who stated that an individual in a hat "blocked" his path and "we were at an impasse." It is irrelevant that others may have attributed a derogatory meaning to this statement. There is nothing defamatory about being party to a stubborn "impasse." *See Cline v. T.J. Samson Cmty. Hosp.*, No. 2014-CA-001856, 2016 WL 3226325, at *6 (Ky. Ct. App. June 3, 2016) (statement that an employee was "angry" and "agitated" is not defamatory).

As the Restatement and Kentucky law make clear: if individuals, "by an unreasonable construction" attach a "derogatory meaning," this "does not render the language defamatory." REST. 2d § 563 cmt. c. The law of defamation is not "a question of the existence of some individual or individuals with views sufficiently peculiar to regard as derogatory what the vast majority of persons regard as innocent." REST. 2d § 559 cmt. e. Instead, "[t]o be libelous per se the defamatory words must be of such a nature that courts can presume as a matter of law that they do tend to degrade or disgrace [the plaintiff], or hold him up to public hatred, contempt or scorn." *Digest Publ'g Co.*, 284 S.W.2d at 834. The words in the article fall short of that mark.

Finally, the article does not state that Sandmann "engaged in

racist taunts." (Doc. 1 ¶ 117). The article makes a vague reference to teens and other participants "taunting" the "indigenous crowd" and then merely states that "[a] few people . . . began to chant build that wall,"[13] a political statement on an issue of public debate and often associated with party affiliation. This is not defamatory.

Even if false, attributing to an individual "membership in a political party in the United States that is a mainstream party and not at odds with the fundamental social order is not defamatory." *Cox v. Hatch*, 761 P.2d 556, 562 (Utah 1988) (citing PROSSER AND KEETON ON THE LAW OF TORTS, § 111 (5th ed. 1984); *see also Shields v. Booles,* 38 S.W.2d 677, 682–83 (Ky. 1931) (rejecting a defamation lawsuit because it was not libelous per se "to state incorrectly how a representative had voted upon a particular measure," *i.e.*, "in favor of legalized gambling").

The statements here, in the context of the whole article, are nothing like the words Kentucky courts have recognized as defamatory *per se. See, e.g., Stringer*, 151 S.W.3d at 792–93, 795 (written and oral statements that employees "had been fired for stealing" or "for an integrity issue"); *Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 687–88 (Ky. 1990) (Commonwealth attorney accused of "turn[ing] [criminals] right back, and they commit crime after

---

[13] Statement 8.

crime; they couldn't have a better friend"); *McCall*, 623 S.W.2d at 885 (finding it defamatory to accuse an attorney of "fix[ing] the cases" or "brib[ing] a judge"); *Crabb*, 182 S.W.3d at 547 (accusations that employee engaged in a "sexual liaison" with one of her co-workers and "misappropriated" funds); *Shrout v. The TFE Group*, 161 S.W.3d 351, 355–57 (Ky. Ct. App. 2005) (continuing to report false positive result of plaintiff's drug test); *Columbia Sussex Corp.*, 627 S.W.2d at 272–73 (general manager's words which conveyed strong assertion that either hotel manager or one of her employees was involved in the hotel robbery); *Cholmondelay*, 569 S.W.2d at 701–02 (newspaper falsely stated that a minor had "pounded" another child's head "over and over again against the pavement" and "savagely beaten [him] into insensibility," thus describing the commission of a violent crime).[14]

In sum, taking the "ordinary, natural meaning" of the words in the "four corners" of the article, and when "stripped of all

---

[14] *See also Smith v. Pure Oil Co.*, 128 S.W.2d 931, 932 (Ky. 1939) (a billboard accusing a prosecuting attorney of being a "fee grabber," thus imputing unlawful motives and dishonest means of obtaining fees and compensation from travelers); *Louisville Taxicab & Transfer Co. v. Ingle*, 17 S.W.2d 709, 710 (Ky. 1929) (a taxicab driver accused of being "discharged for drinking"); *Dixon v. Chappell*, 118 S.W. 929, 930 (Ky. 1909) (an article accusing a judge of being a "graft," a word that was commonly understood to mean "the fraudulent obtaining of public money unlawfully by the corruption of public officers"); *Fred v. Traylor*, 72 S.W. 768, 768 (Ky. 1903) (accusation that a miller "beat me out of $ 1,100 in three months," suggesting the miller was a dishonest tradesmen).

innuendoes and explanations," *Roche*, 197 F. App'x at 398, the "gist or sting" of the article would not "tend to expose [Sandmann] to public hatred, ridicule, contempt or disgrace, or to induce an evil opinion of him in the minds of right-thinking people," *Digest Publ'g Co.*, 284 S.W.2d at 834, or "impugn [Sandmann]'s competence, capacity, or fitness in the performance of his profession," *Welch*, 3 S.W.3d at 735.

Therefore, the First Article is not defamatory.[15]

### 2. Articles Two and Three

Articles Two and Three merely repeat the statements contained in Article One, with the exception that they add statement 18 — a quote from the joint statement released by Covington Catholic High School and the Diocese of Covington — and Article Three adds statement 22, a headline.

Statement 18, as set forth in the attached chart, does not mention Sandmann but speaks only of "students," and as such it is not actionable. *See Sanders*, 563 S.W.2d at 9. Further, the

---

[15] Sandmann has made no claim for special damages. He merely asserts that the Post's articles are defamatory *per se* (Compl. ¶ 207), and he seeks general damages for "permanent harm to his reputation"; "severe emotional distress"; and the concern for his "safety." *Id.* at ¶¶ 208-10. These are not special damages. *See, e.g., Dermody*, 530 S.W.3d at 475 (dismissing defamation claim because plaintiff "made no claim in his complaint for special damages but sought damages generally only 'for public embarrassment and humiliation [and] adverse effects on his future employment prospects and career, and . . . for the adverse effect on his future earnings and financial stability . . . .'" (alterations in original)). "Special damages are those beyond mere embarrassment which support *actual economic loss*; general damages relate to humiliation, mental anguish, etc." *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 274 (Ky. Ct. App. 1981); Rest. 2d § 575 cmt. b.

adjectives "jeering" and disrespectful" are subjective opinions,
and the balance of the statement conveys only that the speakers
are investigating the matter and will take "appropriate action, up
to and including expulsion." Sandmann alleges that the statement
coveys that he "violated the fundamental standards of his religious
community and violated the policies of his school such that he
should be expelled." (Compl. ¶ 120). But the statement, in fact,
conveys the opposite: the speakers had reached *no* conclusion about
what occurred and were investigating the matter. As noted with
respect to Article One, Sandmann's allegation attempts to insert
innuendo not found within the four corners of the publication.

Finally, statement 22 is the headline on the Third Article:
"Marcher's accost by boys in MAGA caps draws ire." (Doc. 1-7 at
2). This headline does not identify Sandmann but refers only to
"boys," which is nonactionable for the reasons already discussed.

Further, the headline "Marcher's accost by boys in MAGA caps
draws ire" is laden with rhetorical hyperbole. *See Clark*, 617 F.
App'x at 508. And the word "accost" has various meanings, including
"To approach and speak to . . . in a bold, hostile, or unwelcome
manner; to waylay a person in this way; to address . . . . To draw
near to or unto; to approach."[16]

Finally, statement 22 carries no defamatory meaning for the

---

[16] *Accost*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/view/Entry/1184?rskey
=7GqmTF&result=2&isAdvanced=false#eid (last visited June 7, 2019).

reasons stated with respect to Article One.

### 3. <u>Articles Four, Five, Six, Seven and the Tweets</u>

These publications contain substantially the same statements as in Articles One through Three. The only notable differences in the statements are as follows:

- Statements 6 and 7 include a statement of opinion from Sandmann.

- Statement 12 quotes Phillips as saying, "Why should I go around him?"

- Statement 26 quotes Phillips as stating that he heard "students" say such things as "the Indians in my state are drunks or thieves."

In addition, Sandmann asserts that these publications convey the same defamatory gist alleged in connection with the First, Second, and Third Articles. Therefore, the same analysis as outlined above applies to Articles Four through Seven, as well as the Tweets.

Articles Six and Seven, however, are different in a legally significant way in that these articles name Sandmann. But this simply means that some of the statements in these articles may be "about" Sandmann. The rest of the above analysis applies.

Accordingly, Sandmann cannot maintain a claim based on any of the Post's publications, and the Court will dismiss the Complaint in its entirety.

### *Conclusion*

As the Court explained at the oral argument on this motion, in modern libel law there are many affirmative defenses, even for claims based on defamatory statements. These defenses are calculated to protect defendants, especially the press, from strict liability.

The defense that a statement of opinion is not actionable protects freedom of speech and the press guaranteed by the First Amendment.

The Court accepts Sandmann's statement that, when he was standing motionless in the confrontation with Phillips, his intent was to calm the situation and not to impede or block anyone.

However, Phillips did not see it that way. He concluded that he was being "blocked" and not allowed to "retreat." He passed these conclusions on to The Post. They may have been erroneous, but, as discussed above, they are opinion protected by the First Amendment. And The Post is not liable for publishing these opinions, for the reasons discussed in this Opinion.

Therefore, having reviewed this matter carefully, and being fully advised,

**IT IS ORDERED** that The Post's motion to dismiss (Doc. 27) be, and is hereby, **GRANTED**.

This 26th day of July 2019.

WILLIAM O. BERTELSMAN

| Statement No. | Compl. ¶ | Challenged Statement | Basis for Dismissal |
|---|---|---|---|
| 1. | 118(a)<br>(1st Article) | Headline: "'It was getting ugly': Native American drummer speaks on the MAGA-hat wearing teens who surrounded him" | Not "about" Sandmann<br><br>"surrounded" and "ugly" are matters of opinion<br><br>Not defamatory |
| 2. | 118(b)<br>129(b)<br>(1st & 3rd Article) | "In an interview Saturday, Phillips, 64, said he felt threatened by the teens and that they suddenly swarmed around him as and [sic] other activists were wrapping up the march and preparing to leave." | Not "about" Sandmann<br><br>"felt threatened" and "swarmed" are subjective matters of opinion<br><br>Not defamatory |
| 3. | 118(c)<br>129(c)<br>(1st & 3rd Article) | "Phillips, who was singing the American Indian Movement song of unity that serves as a ceremony to send the spirits home, said he noticed tensions beginning to escalate when the teens and other apparent participants from the nearby March for Life rally began taunting the dispersing indigenous crowd." | Not "about" Sandmann<br><br>What constitutes "taunting" is a subjective matter of opinion<br><br>Not defamatory |
| 4. | 136(a)<br>(4th Article) | Headline: "'Opposed to the dignity of the human person': Kentucky Catholic diocese condemns teens who taunted vet at March for Life." | Not "about Sandmann"<br><br>What constitutes "taunting" is a subjective matter of opinion<br><br>Not defamatory |
| 5. | 136(b)<br>(4th Article) | "A viral video of a group of Kentucky teens in 'Make America Great Again' hats taunting a Native American veteran on Friday has heaped fuel on a long-running, intense argument among abortion opponents as to whether the close affiliation of many antiabortion leaders with President Trump since he took office has led to moral decay that harms the | Not "about" Sandmann<br><br>What constitutes "taunting" is a subjective matter of opinion<br><br>Not defamatory |

|  |  | movement." |  |
|---|---|---|---|
| 6. | 149(a)<br>(6th Article) | "The Israelites and students exchanged taunts, videos show. The Native Americans and Hebrew Israelites say some students shouted, 'Build the wall!' although the chant is not heard on the widely circulated videos, and the Cincinnati Enquirer quoted a student at the center of the confrontation who said he did not hear anyone say it." | Not "about" Sandmann<br><br>What constitutes "taunting" is a subjective matter of opinion<br><br>Not defamatory |
| 7. | 156(a)<br>(7th Article) | The Israelites and students exchanged taunts, videos show. The Native Americans and Hebrew Israelites say some students shouted, 'Build the wall!' But the chant is not heard on the widely circulated videos, and the Cincinnati Enquirer quotes Nick Sandmann, the student at the center of the confrontation, saying he did not hear anyone utter the phrase." | What constitutes "taunting" is a subjective matter of opinion<br><br>Not defamatory |
| 8. | 118(d)<br>129(d)<br>(1st & 3rd Article)<br><br>141(b)<br>(5th Article) | "A few people in the March for Life crowd began to chant 'Build that wall, build that wall,' he [Phillips] said."<br><br>"At one point, some reportedly chanted, "Build the wall!" | Not "about" Sandmann<br><br>Not defamatory |
| 9. | 149(g)<br>156(j)<br>(6th & 7th Article) | Jon Stegenga, a photojournalist who drove to Washington on Friday from South Carolina to cover the Indigenous Peoples March, recalled hearing students say 'build the wall' and 'Trump 2020.' He said it was about that time that Phillips intervened." | Not "about" Sandmann<br><br>Not defamatory |
| 10. | 118(e)<br>129(e)<br>(1st, 2nd, 3rd Article) | "'It was getting ugly, and I was thinking: 'I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial,' Phillips recalled. 'I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat.'" | Not "about" Sandmann<br><br>What constitutes "ugly" and "blocked" are both subjective matters of opinion<br><br>Not defamatory |

| 11. | 136(c) 131 (4th Article) | "A few of the young people chanted 'Build that wall, build that wall,' the man said, adding that a teen, shown smirking at him in the video, was blocking him from moving." | Not "about" Sandmann<br><br>What constitutes "smirking" and "blocking" are matters of opinion<br><br>Not defamatory |
|---|---|---|---|
| 12. | 149(h) 156(k) (6th & 7th Article) | "Most of the students moved out of his way, the video shows. But Sandmann stayed still. Asked why he [Phillips] felt the need to walk into the group of students, Phillips said he was trying to reach the top of the memorial, where friends were standing. But Phillips also said he saw more than a teenage boy in front of him. He saw a long history of white oppression of Native Americans. 'Why should I go around him?' he asked. 'I'm just thinking of 500 years of genocide in this country, what your people have done. You don't even see me as a human being.'" | What Phillips saw in Sandmann is a matter of opinion<br><br>Not defamatory for Phillips to recite historical facts |
| 13. | 118(f) 129(f) (1st & 3rd Article) | "'It clearly demonstrates the validity of our concerns about the marginalization and disrespect of Indigenous peoples, and it shows that traditional knowledge is being ignored by those who should listen most closely,' Darren Thompson, an organizer for the group [the Indigenous Peoples Movement], said in the statement." | Not "about" Sandmann<br><br>What constitutes "disrespect" and "ignor[ance]" are matters of personal opinion<br><br>Not defamatory |
| 14. | 141(c) (5th Article) | "It's clear from Friday's incident on the Mall that the young men who confronted the Native American protester had somehow internalized that their behavior was acceptable. It's hard to read from that one scenario how they look at issues of race more broadly. But if part of the incident on the Mall reflected opposition to diversity, those views would be in the minority." | Not "about" Sandmann<br><br>What constitutes "confront[ing]" and "internalized" are subjective matters of opinion<br><br>Not defamatory |
| 15. | 118(g) 129(h) (1st & 3rd Article) | "Chase Iron Eyes, an attorney with the Lakota People Law Project, said the incident lasted about 10 minutes and ended when Phillips and other activists | Not "about" Sandmann<br><br>Not defamatory |

| | | walked away." | |
|---|---|---|---|
| 16. | 118(h) 129(i) (1st & 3rd Article) | "'It was an aggressive display of physicality. They were rambunctious and trying to instigate a conflict,' he [Chase Iron Eyes] said. 'We were wondering where their chaperones were. [Phillips] was really trying to defuse the situation.'" (second alteration in original). | Not "about" Sandmann<br><br>What constitutes "aggressive," "physicality," and "rambunctious" are subjective matters of opinion<br><br>Not defamatory |
| 17. | 118(i) (1st Article)<br><br><br><br>129(j) (3rd Article) | "Phillips, an Omaha tribe elder who also fought in the Vietnam war, has encountered anti-Native American sentiments before: . . . ."<br><br>"[Phillips] has encountered anti-Native American sentiment before: . . . ." | Not "about" Sandmann<br><br>What constitutes an "anti-Native American sentiment" is in the eye of the beholder<br><br>Not defamatory |
| 18. | 121(a) (2nd Article)<br><br><br><br><br><br><br><br>129(g) (3rd Article) | "'We [CovCath school officials and the Diocese of Covington] condemn the actions of the Covington Catholic High School students towards Nathan Phillips specifically, and Native Americans in general,' the statement said. 'The matter is being investigated and we will take appropriate action, up to and including expulsion.' . . . . The diocese's statement expressed regret that jeering, disrespectful students from a Catholic school had become the enduring image of the march."<br><br>(same, except that the last sentence was omitted in the 3rd Article) | Not "about" Sandmann<br><br>Opinion<br><br>What constitutes "jeering" and "disrespectful" are subjective matters of opinion |
| 19. | 136(d) (4th Article) | "'We condemn the actions of the Covington Catholic high school students towards Nathan Phillips specifically, and Native Americans in general,' a statement by the Roman Catholic Diocese of Covington and Covington Catholic High School read. 'We extend our deepest apologies to Mr. Phillips. This behavior is opposed to the Church's teachings on the dignity and | Not "about" Sandmann<br><br>Opinion<br><br>Not defamatory |

| | | | |
|---|---|---|---|
| | | respect of the human person. The matter is being investigated and we will take appropriate action, up to and including expulsion. We know this incident also has tainted the entire witness of the March for Life and express our sincere apologies to all those who attended the March and those who support the pro-life movement.'" | |
| 20. | 149(j) 156(m) (6th & 7th Article) | "School officials and the Catholic Diocese of Covington released a joint statement Saturday condemning and apologizing for the students' actions. 'The matter is being investigated and we will take appropriate action, up to and including expulsion,' the statement said." | Opinion <br><br> Not defamatory |
| 21. | 156(c) (7th Article) | "The Kentucky teens' church apologized on Saturday, condemning the students' actions." | Opinion <br><br> Not defamatory |
| 22. | 129(a) (3rd Article) | Headline: "Marcher's accost by boys in MAGA caps draws ire." | Not "about" Sandmann <br><br> "accost" has many meanings and is a matter of subjective opinion <br><br> Not defamatory |
| 23. | 141(a) (5th Article) | "Friday's incident near the Lincoln Memorial in which a group of high school boys confronted an elderly Native American man sent a ripple of fear and anger across the country. The image of a group of high school boys clad in 'Make America Great Again' hats, smirking and laughing as one of their members appeared to physically intimidate Nathan Phillips resurfaced tensions that have been simmering since President Trump's campaign began." | Not "about" Sandmann <br><br> "Rhetoric" or "hyperbole" <br><br> What constitutes "smirking" and what it means to "physically intimidate" another, are both matters of opinion <br><br> Not defamatory |
| 24. | 149(b) 156(d) (6th & 7th Article) | "When I took that drum and hit that first beat . . . it was a supplication to God," said Nathan Phillips, a member of the Omaha tribe and a Marine veteran. 'Look at us, | Phillip's opinion of the nation's status <br><br> Labeling someone a |

| | | | |
|---|---|---|---|
| | | God, look at what is going on here; my America is being torn apart by racism, hatred, bigotry.'" (ellipsis in original) | racist is a matter of opinion |
| 25. | 149(c) 156(e)–(f) (6th & 7th Article) | "While the groups argued, some students laughed and mocked them, according to Banyamyan and another Hebrew Israelite, Ephraim Israel, who came from New York for the event. As tension grew, the Hebrew Israelites started insulting the students. . . . 'They were sitting there, mocking me as I was trying to teach my brothers, so yes the attention turned to them,' Israel told The Washington Post." | What constitutes "mock[ing]" is Banyamyan's subjective opinion <br><br> Not defamatory |
| 26. | 149(d) 156(g) (6th & 7th Article) | "Phillips said he and his fellow Native American activists also had issues with the students throughout the day. 'Before they got centered on the black Israelites, they would walk through and say things to each other, like, 'Oh, the Indians in my state are drunks or thieves,' the 64-year-old said." | What constitutes "issues" is a matter of opinion <br><br> Not defamatory |
| 27. | 149(e) 156(g) (6th & 7th Article) | "Phillips said he heard students shout, 'Go back to Africa!'" | Not "about" Sandmann <br><br> Not defamatory |
| 28. | 149(f) 156(i) (6th & 7th Article) | "'They were mocking my ancestors in a chant, one of them was jumping up and down like a cave man,' he [Banyaman] said." | What constitutes "mocking" is a matter of personal opinion <br><br> Statement is hyperbole <br><br> Not defamatory |
| 29. | 149(i) 156(l) (6th & 7th Article) | "Stegenga described Phillips as emotional. 'He [Phillips] was dealing with a lot of feelings, as he was being surrounded and not being shown respect,' the photographer [Stegenga] said." | What constitutes "respect" and being "surrounded" are matters of opinion <br><br> Not defamatory |
| 30. | 156(b) (7th Article) | "When a Native American elder intervened, singing and playing a prayer song, scores of students around him seem to mimic and mock him, a video posted Monday shows." | What constitutes "mimic[king]" and "mock[ing]" are matters of subjective opinion and rhetorical hyperbole |

| | | | Not defamatory |
|---|---|---|---|
| **31.** | 158(a) (Tweet) | "In an interview with The Post, Omaha Tribe elder Nathan Phillips says he 'felt like the spirit was talking through me' as teens jeered and mocked him." | Not "about" Sandmann<br><br>What constitutes "jeer[ing]" and "mock[ing] are subjective matters of opinion<br><br>Not defamatory |
| **32.** | 158(b) (Tweet) | "He was singing the American Indian Movement song of unity that serves as a ceremony to send the spirits home. 'It was getting ugly, and I was thinking: I've got to find myself an exit out of this situation and finish my song at the Lincoln Memorial.'" | Not "about" Sandmann<br><br>What constitutes "ugly" is a matter of opinion<br><br>Not defamatory |
| **33.** | 158(c) (Tweet) | "Phillips, who fought in the Vietnam War, says in an interview 'I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat.'" | Not "about" Sandmann<br><br>What constitutes "block[ing]" is a matter of opinion<br><br>Not defamatory |