**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

| | | |
|---|---|---|
| **NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN,** | : | **CASE NO. 2:19-cv-00019-WOB-CJS** |
| | : | |
| | : | **JUDGE WILLIAM O. BERTELSMAN** |
| | : | |
| | : | **JUDGE MAGISTRATE SMITH** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **WP COMPANY LLC d/b/a THE WASHINGTON POST,** | : | |
| | : | |
| **Defendant.** | : | |

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**MOTION FOR RELIEF FROM JUDGMENT,**
**FOR RECONSIDERATION OF DISMISSAL WITH PREJUDICE,**
<u>**AND FOR LEAVE TO AMEND COMPLAINT**</u>

## INTRODUCTION

On July 26, 2019, this Court granted the motion to dismiss filed by Defendant WP Company, LLC, d/b/a The Washington Post (the "*Post*"), and dismissed Plaintiff's complaint ***with prejudice*** (the "Order"). [Doc. 47].  Plaintiff contends that it was an error to dismiss the Complaint with prejudice without providing Plaintiff an opportunity to file an amended complaint.  Dismissal with prejudice is a particularly Draconian result given that Plaintiff has not previously sought leave to amend his Complaint, and it certainly is not in the spirit of the Federal Rules of Civil Procedure, which require courts to permit amendments liberally. The Court entered judgment on the same day, [Doc. 48], thereby precluding any attempt by Plaintiff to seek further relief from the Court, including seeking leave to file an amended complaint, prior to entry of judgment.  Plaintiff, therefore, brings this timely motion requesting that the Court (1) set aside the judgment entered in this matter, (2) reconsider the grant of dismissal, particularly dismissal with prejudice, and (3) grant Plaintiff leave to amend his Complaint.  A proposed First Amended Complaint is attached hereto as **Exhibit A** for the Court's consideration.

The Court's Order and entry of judgment is incorrect in three key respects and should be reconsidered in order to correct manifest errors of fact and law.  **First**, the Court incorrectly determined that the False and Defamatory Accusations identified in the Complaint (the "accusations") were not "of and concerning" Nicholas, as required to support a claim for defamation. This holding includes factual errors and demonstrates an apparent misapprehension by the Court of the import of certain allegations in Plaintiff's Complaint.  Plaintiff specifically pled in his Complaint that Nicholas was identified by the *Post* in its articles as the subject of its accusations.  By embedding the "Taitano Video" in the articles published online, the *Post* included a still frame showing a close-up of Nicholas' face and a video that focused primarily on Nicholas'

face.  In the Order, however, the Court incorrectly held that the articles did not include a "picture" of Nicholas.  The Court also indicated that it relied on "two YouTube videos" in reaching its decision.  While there are two videos identified in the Complaint with YouTube links, the Taitano Video was not one of those two videos – and it is primarily through the publication of the Taitano Video that the *Post* identified Nicholas as the subject of its accusations. This error requires that the judgment be set aside, the grant of the motion to dismiss be reversed, and the motion for leave to amend be granted.  A review of Plaintiff's proposed First Amended Complaint demonstrates very clearly that all of the *Post*'s accusations include a "picture" of Nicholas in the form of a still frame from a video and the video itself such that Nicholas was readily identifiable by the public, and certainly by friends and acquaintances, as the "teen" who was the subject of the *Post*'s accusations.

**Second**, the Court incorrectly determined that the accusations by the *Post* were not capable of being proven true or false and were therefore protected opinion.  This determination was based on both factual and legal errors.  As a factual matter, the Court failed to take judicial notice of the Editor's Notes and Corrections (the "Editor's Notes") upon which both the *Post* and Plaintiff relied in arguing the motion to dismiss.  Those Editor's Notes were not published until March 1 – approximately ten (10) days after Plaintiff filed his Complaint against the *Post*.  The Editor's Notes demonstrate that the *Post*'s own editors, after reviewing Plaintiff's Complaint, the *Post*'s articles, and the available evidence, determined that certain key accusations against Nicholas were proven false by that evidence.  Not only did they make that determination, but they advised their readers that those accusations were statements of fact that had been proven false. As one example, the Editor's Note added to the online Fourth Article states clearly that the editors revised the article "to eliminate **Nathan Phillips's claim that one student blocked him** from moving, which is

**contradicted by available video**" (emphasis added). The Court engaged in an extensive analysis of the *Post*'s use of the word "blocked" – including considering dictionary definitions and inapplicable unpublished foreign case law – but failed to take into account that the *Post*'s own editors determined after thorough review that whether Phillips was "blocked" is in fact a statement "capable of being proved objectively incorrect."

The *Post* presented the Editor's Notes to the Court first by attaching them to its motion to dismiss, and because both parties made written and oral arguments based on the Editor's Notes, Plaintiff reasonably believed that the Court would in fact consider them.  Because the Court refused to consider them, however, Plaintiff should be granted leave to file his proposed First Amended Complaint, which sets out the text of all of the Editor's Notes, clearly establishing which accusations the *Post* itself advised its readers were false statements of fact.

As a legal matter, the Court misapprehended in a few respects Plaintiff's allegations about Nathan Phillips' false and defamatory statements that were republished by the *Post*.  The Court improperly determined that Phillips was making truthful statements about his feelings and factual observations and that the *Post* had no reason to doubt the veracity of his statements.  However, Plaintiff alleged in his Complaint that Phillips was lying and was not trustworthy, and it was therefore improper for the Court to find that "Phillips did not see it that way" or that Phillips "concluded that he was being 'blocked' and not allowed to 'retreat.'"  Plaintiff alleged – and has been more explicit in making these allegations in his proposed First Amended Complaint – that Phillips was purporting to give a factual narrative of the January 18 events in his interviews and that his entire narrative was fabricated.  The factual events did not occur as Phillips said they did, and he was not actually frightened or threatened by Nicholas or his classmates.  Instead, Phillips intentionally created a false narrative for the express purpose of stirring up a public controversy,

3

similar to the controversy he started in Michigan a few years ago by making similar accusations against a group of college students.  Thus, when this Court made a determination about how Phillips "felt" or how he "interpreted" Nicholas' actions, the Court was implicitly giving credibility to Phillips' statements – which is improper on a motion to dismiss where Plaintiff has pled that Phillips was lying and did not actually feel or interpret any of the events in the way he stated.

Indeed, everyone agrees on one thing – Nicholas stood still when Phillips walked up to him and stopped directly in front of him.  If Nicholas stood still, then *any* statement that characterizes his standing still as some type of action – whether that action is described as taunting or swarming or blocking – must necessarily be false. Nicholas took no action whatsoever, and any statement that describes him as taking any action is provably false.  Moreover, because Phillips stopped in front of Nicholas and made no effort to pass through or by him, it is absolutely false for Phillips to have claimed that he was blocked.

Additionally, the *Post* had significant cause to be suspicious of Phillips' narrative.  A simple Google search for Phillips' name would have revealed that Phillips is a prolific protester – the *Post* even had previously published articles about Phillips' protest activities.  This Court found that Phillips disclosed the reasons for his "perceptions," including his "memories of past discrimination," such that there were "no undisclosed facts," but that finding is incorrect.  Plaintiff alleged in his Complaint that Phillips had an ulterior motive for lying about the January 18 incident and that the *Post* should have known that, but those allegations were not recognized by the Court in its Order.  In his proposed First Amended Complaint, Plaintiff has added significant detail to those allegations – including Phillips' prior episode of very similar allegations against students, his criminal background, his lies about serving in Vietnam, his inconsistent and contradictory

4

statements about the January 18 incident, and his extensive protest history, even including a protest on the steps of the Trump International Hotel in Washington, D.C. in 2017. The *Post*'s readers had none of these facts, which would have put them in a better position to judge whether Phillips was being truthful in his narrative about the January 18 events or whether he was inventing the entire story, including his purported "feelings." The *Post* knew, or should have known, that Phillips was an unreliable witness as a result of his bias and that it would be negligent to publish his narrative as fact without any investigation. As a result of these factual and legal errors, the Court incorrectly concluded that the accusations were opinion because they were not capable of being proven true or false, and Plaintiff should be granted relief from the Court's Order and judgment so that he can file his First Amended Complaint, which adds allegations that more clearly define this issue.

**Third**, the Court incorrectly held that the accusations about Nicholas were not capable of a defamatory meaning that would constitute defamation *per se*. This incorrect holding also was based on both legal and factual errors. As a factual matter, the Court failed to take into account the overall context within which the accusations were published when the Court found that "it is unreasonable to construe the article as meaning that Sandmann 'engaged in racist conduct.'" Taken completely out of context – as both the *Post* and the Court did with their "charts" of the false statements – a reasonable reader might conclude that the accusations were not defamatory. But the law is settled that the accusations must be read in context. Plaintiff's initial Complaint included allegations describing the context, but the proposed First Amended Complaint describes the context with more particularity. At a different time in history, it likely would not be considered defamatory to say that someone is wearing a "Make America Great Again" cap or is chanting "Build the wall." In today's social climate, however, those accusations are absolutely defamatory

5

– indeed, the January 18 events would never have become the subject of such extensive media coverage and public scrutiny had it not been for the fact that Nicholas' actions were portrayed by the *Post* and other outlets as being racist.  This Court's holding that those accusations constitute nothing more than "attributing to an individual 'membership in a political party'" ignores the entire context of the articles and of those particular accusations.  Plaintiff's proposed First Amended Complaint includes specific allegations, including by citing articles published by the *Post*, that many people today consider the MAGA cap or the "Build the Wall" chant to be explicitly racist. Indeed, the MAGA cap has been compared to a "white hood" – certainly such a comparison exemplifies the extent to which the MAGA cap is considered to be racist.

The First Amended Complaint also highlights the context with respect to the tweet from President Donald Trump just days earlier regarding Senator Elizabeth Warren.  Throughout its reporting, the *Post* linked the January 18 incident with President Trump's tweet.  President Trump was broadly criticized for referring to Sen. Warren as "Pocahontas" and for making a comment about the Native American massacre at Wounded Knee.  In that context, the *Post*'s portrayal of Nicholas as a white, Catholic, pro-life student wearing a MAGA cap takes on an entirely larger meaning when the purported "victim" is a Native American elder and purported Vietnam veteran. And that Native American elder is the one who made the false accusation regarding the "Build the wall" chant.  It is not necessary to look outside the four corners of the articles for this context – the comparison is made repeatedly throughout the *Post*'s articles about Nicholas and the January 18 incident.

In addition to these factual errors relating to the overlooked context of the articles, the Court committed legal errors in holding that the accusations were not defamatory.  The Court's charge on a motion to dismiss is to determine whether challenged statements, in the context of the

entire publication, are *capable* of bearing a defamatory meaning.  If the statements are capable of bearing more than one meaning, the determination of which meaning a reasonable reader would attribute to the statement is for a jury.  A number of the cases cited by the *Post* and the Court are cases that were adjudicated on summary judgment or after trial.  But a motion to dismiss should be granted only if no reasonable reader could attribute a defamatory meaning to the accusations.

Although that is a legal question in the first instance, it cannot be "irrelevant that Sandmann was scorned on social media," as this Court indicated in its Order.  The very question of whether statements are defamatory in Kentucky is whether they tend to expose the plaintiff to "public hatred, contempt, scorn, obloquy, or shame."  If Nicholas was subject to scorn on social media as a result of the *Post*'s accusations, as this Court explicitly recognized that he was, then the accusations were by definition defamatory.  "Social media" no longer describes a minority fringe group and certainly is not a group like those referenced by the Court "whose standards are so anti-social that it is not proper for the courts to recognize them."  Nor can a reasonable reader be defined to exclude someone "who reads the Internet and posts comments" as the *Post* urged the Court during oral argument.  The *Post* maintains a huge presence on "social media" with nearly 90 million different individuals visiting its website every month, and it publishes its articles electronically to over 20 million people who follow or subscribe to its Twitter pages, Facebook pages, and YouTube channels.  A recent survey by Pew Research Center indicated that 72% of American adults use social media and that more individuals get news from social media than from print newspapers.  It is clear by reading the *Post*'s own articles about the January 18 incident that Nicholas was subject to public hatred, contempt and scorn, not only on social media but generally by the public.  It is not necessary to go outside the four corners of the articles to determine that the

accusations against Nicholas were defamatory, and these allegations have been clarified and amplified in the proposed First Amended Complaint.

## ARGUMENT

Plaintiff's three-part motion is aimed at achieving a single goal – the vacating of the judgment so that the Court can reconsider the dismissal of the Complaint, particularly the dismissal **with prejudice**, and grant Plaintiff leave to amend his Complaint by filing the attached First Amended Complaint.  To that end, Plaintiff will first address the standards to be applied in considering each of the three motions.  Then Plaintiff will address the substantive errors in the Order that satisfy the requirements for the grant of each of the three motions.

## I.   STANDARD FOR GRANTING MOTIONS

### A.  Motion for Relief from Judgment

Federal Rule of Civil Procedure 60(b) provides in relevant part that:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

> (1)  mistake, inadvertence, surprise, or excusable neglect;
> • • •
> (6) any other reason that justifies relief.

A motion for relief for judgment under Rule 60(b) provides an "opportunity for the court to correct manifest errors of law or fact. . . ."  *GEICO Indem. Co. v. Crawford*, 36 F. Supp. 3d 735, 738 (E.D. Ky. 2014) (citation omitted).  Rule 60(b)(1) applies where a substantive legal error is asserted.  *See, e.g., Jones v. Kolb*, 91 Fed. Appx. 367 (6th Cir. 2003).  Rule 60(b)(6) applies where the other 5 reasons are not applicable but the court determines that "extraordinary circumstances" are present that justify the requested relief.  *Id.*

In this case, Plaintiff seeks relief under Rule 60(b)(1) and (6) to correct this situation where the Court overlooked and/or misapprehended certain of Plaintiff's allegations, which resulted in

8

an order granting a motion to dismiss that did not take as true all of Plaintiff's well-pled allegations. It is particularly appropriate to grant relief in this case where the Court granted the *Post*'s motion to dismiss **with prejudice** and entered judgment on the same day without providing Plaintiff any opportunity to request leave to amend his Complaint after learning of the Court's misapprehensions but before judgment was entered.  As set forth in detail below, the expanded allegations in Plaintiff's proposed First Amended Complaint clarify all of the issues raised in the Order, and Plaintiff should therefore be entitled to relief from the judgment in order to file his First Amended Complaint.

### B.  Motion for Reconsideration of Order

Plaintiff also seeks reconsideration of this Court's Order granting the *Post*'s motion to dismiss pursuant to Federal Rule of Civil Procedure 59(e), which provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment."

The grant of relief under Rule 59(e) is appropriate where "the court has misapprehended the facts, a party's position, or the controlling law."  *Barber ex. rel. Barber v. Colorado Dept. of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009).  The grant of relief under Rule 59(e) is also appropriate where it is determined that the judgment should be reversed so that a plaintiff can be granted leave to file an amended complaint.  *See, e.g., Foman v. Davis*, 83 S. Ct. 227 (1962) (reversing court of appeals' denial of plaintiff's Rule 59(e) motion "in order to allow amendment of the complaint").

As discussed *supra*, it is particularly appropriate to grant such relief here, where the Court granted the dismissal of Plaintiff's Complaint **with prejudice** without permitting Plaintiff an opportunity to seek leave to amend his Complaint prior to entering judgment.

### C.  Motion for Leave to Amend Complaint

Federal Rule of Civil Procedure 15(a)(2) governs obtaining leave of court to amend a complaint and provides that "the court should freely give leave when justice so requires."  The United States Supreme Court has instructed that "this mandate is to be heeded." *Foman*, 83 S. Ct. at 228.  The only bases for denying a motion for leave to amend are "if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Malloy v. Watchtower Bible & Tract Soc'y*, 2019 WL 190344, at *1 (6th Cir. Jan. 2, 2019).  The Sixth Circuit has held that "[d]elay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself, to disallow an amendment of a pleading." *Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986).

Granting leave to amend would not be futile in this case, and the request is not interposed in bad faith.  Plaintiff has attached a copy of his proposed First Amended Complaint and highlights in this brief what changes have been made and how those changes would cure the deficiencies identified in the Court's Order. *See, e.g., Alexander v. Eagle Mfg. Co., LLC*, 714 Fed. Appx. 504, 510 (6th Cir. 2017) (finding motion for leave to amend futile where plaintiff did not specify what changes the amendment would make by attaching copy of proposed amendment to its motion).  As discussed in detail *infra*, the First Amended Complaint would clarify and expand upon a number of issues, correcting the instances where the Court relied upon inaccurate facts or assumptions based on a misunderstanding or overlooking of allegations in Plaintiff's Complaint.

## II.  THE ORDER CONTAINS LEGAL AND FACTUAL ERRORS

### A.  The Court Incorrectly Held That the Articles Were Not Of And Concerning Nicholas.

This Court incorrectly held that Plaintiff's Complaint should be dismissed with respect to the First Article because "Sandmann is not specifically mentioned in the article." [Doc. 47 at 14].

The Court held that the Second, Third, Fourth, and Fifth articles were subject to the same analysis as the First Article.  [Doc. 47 at 27].  The Court relied on its incorrect factual conclusion that "[t]he First Article does not mention Sandmann by name, there is no identifiable description of him, and there is no picture of Sandmann in the article."  [Doc. 47 at 13].

It appears that the Court reached this erroneous conclusion at least in part because it did not take into account the Taitano Video, which is the primary mechanism through which the *Post* identified Nicholas and published his face as the "face" of its accusations.  The Court indicated that it considered only "the seven articles, the Tweets, and the two YouTube videos. . . ."  [Doc. 47 at 6].  In his initial Complaint, Plaintiff included YouTube links[1] for two videos – the Banyamyan Video and the Sandmann Video.  [*See* Doc. 1 at ¶ 63 n.1 and ¶ 65].  While the Complaint included numerous allegations about the Taitano Video and the *Post*'s use of it in all of its online reporting, it did not include a YouTube link for that video.  Thus, it appears from the Order that the Court failed to consider the Taitano Video, which results in manifest error given Plaintiff's extensive reliance on the Taitano Video in his Complaint.

Plaintiff alleged in his Complaint that the First Article identified Nicholas and singled him out from the rest of his CovCath classmates as follows:

> The First Article features Nicholas prominently by publication of the @2020fight and/or Taitano Videos and emphasizing his alleged involvement as the 'one standing about a foot from the drummer's face wearing a relentless smirk.'

[Doc. 1 at ¶ 114].  Plaintiff made similar allegations with respect to all of the Articles in the Complaint and alleged that Nicholas' image was directly and prominently featured in the First, Second, Fourth, and Seventh Articles.  [*See* Doc. 1 at ¶¶ 114, 119, 124, 131, 138, 144, 151 and Ex.

---

[1] A "link" is a specific website address for the relevant content, including but not limited to URL links, URI links, and hyperlinks.

D-J].  Plaintiff also alleged the origin and shortcomings of the Taitano Videos, including that they were misleading because they showed "only a small portion of the interaction between Nicholas and Phillips. . . ."  [Doc. 1 at ¶ 52].  The Taitano Video was a very short and misleading clip of video that supported the false narrative that Nicholas caused the confrontation because it failed to show the entire context of the incident, including the fact that it was Phillips who approached and stopped directly in front of Nicholas.  Although Plaintiff made the allegations in the Complaint, the version of the First Article attached to the Complaint was an archived version that did not include the photographs or video cover images that would have been included when the article was originally published online.  [*See* Doc. 1 at Ex. D].

All of the online Articles – five (5) of the seven (7) Articles – embedded the Taitano Video. [*See, e.g.,* Doc. 46 at 18 (Counsel for the *Post*: "Every online article had a video that accompanied it.")].  Because the videos were embedded, they played from within the article, and there was not simply a hyperlink printed in the body of the article.  Instead, the "placeholder" for the video was a still image from the video that was displayed before the video plays, which is referred to as a "video cover image," or sometimes as a "thumbnail."  Every time the *Post* embedded the Taitano Video in each of its online Articles, the video cover image was a still image of a close-up of Nicholas' face with Phillips standing directly in front of him and banging his drum.

All of the *Post* online articles about the January 18 incident have been edited, and the *Post* online articles are not generally archived or cached online; therefore, it is difficult to locate versions of the articles as they were originally published.  Because the *Post* policy provides that notices of correction generally are not included in changes to online articles, it can be difficult to ascertain what changes the *Post* has made to an online article and when those changes were made. *See* https://www.washingtonpost.com/policies-and-standards/#correctionspolicy (last visited Aug.

12

21, 2019).  Following the Court's Order, however, with its erroneous assertion that Nicholas was

not sufficiently identified in the *Post* articles, Plaintiff has redoubled his efforts and has located

additional evidence regarding the original articles.[2]  The proposed First Amended Complaint

includes numerous supplemental allegations regarding how Nicholas was pictured and identified

in the *Post* articles.  For example, Plaintiff has located and included an archived version of the

First Article from 6:32 pm on January 19 that includes a photograph of Nicholas' face.  [*See* First

Amended Complaint at Exhibit A ("First Am. Compl.") at ¶ 252].  Plaintiff has included a number

of screenshots in his proposed First Amended Complaint, including from the archived article and

from a page that still exists on the *Post* website showing the Taitano Video as it appeared when it

was initially posted on January 19 – with a close-up of Nicholas' face as the video cover image.

Plaintiff has updated the proposed First Amended Complaint with allegations throughout,

including with photographs and attached copies of articles, making it very clear that the *Post*'s

articles singled out and identified Nicholas, and only Nicholas, primarily through publication of

his face in the Taitano Video and the Taitano Video cover image included in all of the *Post* articles.

[*See* First Am. Compl. at ¶¶ 75, 77, 274, 287-88, 302, 305-06].

---

[2] In the instance of the Fifth Article, the original article that Plaintiff has recently located is substantively very different from the revised version of the article that was the basis of the allegations in the initial Complaint.  The revised version of the Fifth Article that was included in the initial Complaint describes the CovCath students and says that "one of their members *appeared to* physically intimidate Nathan Phillips."  [*See* First Am. Compl. at ¶ 312 and Ex. K-2 (emphasis added)].  In connection with the motion to dismiss, counsel for the *Post* repeatedly addressed the fact that the article included the words "appeared to."  [*See, e.g.,* Doc. 27-1 at 37; Doc. 46 at 50 (Counsel for the *Post*: "The Post had said, as I said before, an image appeared to show that Mr. Sandmann was physically intimidating Mr. Phillips.")].  In fact, however, the original Fifth Article, which Plaintiff has now located in an archived format, does not include the words "appeared to" but instead asserts as an absolute matter of fact that "one of their members physically intimidated Nathan Phillips. . . ."  [First Am. Compl. at 312 and Ex. K-1].

In Kentucky, the plaintiff does not have to be identified specifically in a defamatory article as long as the plaintiff's "friends and acquaintances . . . familiar with the incident" would understand that the statements were about the plaintiff.  *See Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 794 (Ky. 2004) (citation omitted), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014).  If, after examining the libelous publication as a whole and in context, there exists any ambiguity as to whether the libel is of and concerning the plaintiff, the question must go to the jury.  *See, e.g.,* Restatement (Second) of Torts § 617 cmt. a ("[W]hether [publication] was of and concerning the plaintiff [is] ordinarily for the jury or trier of fact to determine."); *O'Brien v. Williamson Daily News*, 735 F. Supp. 218, 223-24 (E.D. Ky. 1990), *aff'd*, 931 F.2d 893 (6th Cir. 1991) (analyzing "the article as a whole" and finding that libelous "language can be understood to refer specifically to" the plaintiff and the "ultimate conclusion on the reasonableness of the allegedly libelous interpretation must lie with the finder of fact").

The allegations in the proposed First Amended Complaint demonstrate clearly that Nicholas was specifically targeted by the *Post*'s accusations related to the January 18 incident, and Plaintiff should be granted leave to amend his complaint to assert these allegations.

### B. The Court Incorrectly Held That The Articles Were Opinion and Not Capable of Being Proven True or False.

The Court incorrectly dismissed the Complaint, with prejudice, after concluding that the *Post*'s accusations were protected opinion because they were not statements of fact capable of being proven true or false.  This holding was based on both factual and legal errors.

### 1.  The Court did not consider the *Post*'s Editor's Notes.

The Court did not consider the *Post*'s Editor's Notes, which establish that the *Post* editors determined – and advised their readers – that certain of their accusations against Nicholas were false statements of fact. [*See* Doc. 47 at 6 ("The Court excludes all other materials attached to the

14

parties' briefs.")].  The *Post* published several different Editor's Notes – different versions for each of the online Articles, one in its print newspaper, and one in a stand-alone page on its website, as well as the deletion of a tweet. All of the original online Articles have been edited by the *Post* so that the current versions include one of these Editor's Notes as a preface to the Article.   The Editor's Notes were all published on March 1 – approximately ten (10) days after Nicholas filed his lawsuit against the *Post*.  Therefore, they could not have been included in the initial Complaint.

The *Post* submitted two of the Editor's Notes to the Court as part of its brief in support of its motion to dismiss the Complaint, and it identified and provided links for the Court to all of its Editor's Notes.  [Doc. 27-1 at 12-13 and Ex. 3].  The *Post* indicated that the Editor's Notes were added to the Articles "in response" to Plaintiff's retraction demand sent on February 14.  [Doc. 27-1 at 12].  Plaintiff discussed the Editor's Notes in his brief in opposition to the *Post*'s motion to dismiss.  [Doc. 36 at 3-5].  Both sides argued the implications of the Editor's Notes at length during the hearing on the *Post*'s motion to dismiss.  [Doc. 46 at 29-32, 48-51].  Because the Editor's Notes are now part of the current version of the online Articles, because they were published well after Plaintiff filed his Complaint, and because both sides argued the impact of the Editor's Notes, Plaintiff reasonably believed that this Court would take into account the Editor's Notes in ruling on the *Post*'s motion to dismiss.

Because the Court did not consider the Editor's Notes, however, it is necessary for Plaintiff to amend his Complaint to allege them.  As indicated, they form a part of the current version of the Articles that are available online, and they indicate what the *Post* editors – not its litigation counsel – determined when they examined the Articles and the accusations about Nicholas contained therein.  The proposed First Amended Complaint reproduces each of the Editor's Notes and expressly alleges the relevance of the Editor's Notes to each of the accusations identified in

15

the Complaint. [*See* First Am. Compl. at ¶¶ 216-229, 262, 270, 285, 300, 311, 324, 333, 340 and Ex. F thereto].

The Editor's Notes belie the *Post*'s litigation strategy claiming that its accusations against Nicholas were opinion and not facts capable of being proven true or false. For example, the Court spent significant effort, both during the hearing and in the Order, analyzing the *Post*'s republication of Phillips' accusation that Nicholas "blocked" his way. [*See, e.g.,* Doc. 46 at 37 (Court "Now, here's the key statement. 'He just blocked my way and wouldn't allow me to retreat.'"); Doc. 47 at 17-20 (discussing at length the term "blocked")]. But the Court did not take into consideration the *Post*'s own Editor's Note addressing the very question of whether Phillips' accusation that Nicholas "blocked" him was a statement of fact capable of being proven true or false. In the Editor's Note appended to the Fourth Article, the editors indicate that the article has been changed "to eliminate Nathan Phillips's claim that **one student blocked him** from moving, which is **contradicted by available video**." [First Am. Compl. at ¶ 224 (emphasis added)]. This Editor's Note directly addresses the question by determining that the accusation that Nicholas "blocked" Phillips from moving can be "contradicted by available video," which necessarily means that it is a fact capable of being proven true or false.

Plaintiff should be granted leave to amend his Complaint so that the Court can take into consideration the *Post*'s own conclusions about which of its accusations are statements of fact capable of being proven true or false.

## 2. The Court improperly determined that Phillips was a reliable witness and that his statements were credible.

The Court also determined that Phillips was a credible witness and improperly presumed in ruling on the motion to dismiss that Phillips' statements were truthful – despite the fact that

16

Plaintiff alleged in his Complaint that Phillips' narrative was a lie invented to further Phillips' own activist agenda.[3]

The Court indicated during oral argument, when questioning Plaintiff's counsel, that he was giving credibility to Phillips' statements:

> THE COURT:  Do you not agree that Phillips was being sincere when he was of the opinion that he was being blocked and not allowed to retreat, but Mr. Sandmann was of the opinion that he was just standing there and Phillips could go wherever he wanted?

[Doc. 46 at 39].  The Order indicates in several places that the Court did make the determination that Phillips was being sincere:

- "Phillips, however interpreted Sandmann's action (or lack thereof) as blocking him and not allowing him to retreat."  [Doc. 47 at 18];

- "Phillips disclosed the reasons for his perception: the size of the crowd, the tense atmosphere, taunts directed at his group, and his memories of past discrimination."  [*Id.*].

- "There were no undisclosed facts, and the reader was in as good a position as Phillips to judge whether the conclusion he reached – that he was 'blocked' – was correct."  [*Id.*].

- "Phillips' statement that he 'felt threatened' is merely 'a third party's subjective feelings'. . . ."  [Doc. 47 at 21];

- "Phillips did not see it that way. He concluded that he was being 'blocked' and not allowed to 'retreat.'  He passed these conclusions on to The *Post*.  They may have been erroneous, but, as discussed above, they are opinion protected by the First Amendment. . . ."  [Doc. 47 at 28].[4]

---

[3] The Court also appears to improperly give the *Post* the benefit of the neutral reportage doctrine, which has been specifically rejected by Kentucky courts.  *See, e.g., McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882 (1981) ("It is an ancient rule that authors and publishers may not repeat false and defamatory matter and escape liability with the plea that they were but quoting a source deemed authentic. They are not saved by accompanying the defamation with an expression of disbelief.") (J. Lukowsky, concurring) (citations omitted). However, Plaintiff will not relitigate that issue in the context of this Motion.

[4] It is, of course, contradictory for the Court to hold that Phillips' statement that Nicholas "blocked" him is an opinion that cannot be proven true or false but then state that Phillips'

17

The Court also implicitly, if not explicitly, determined that the *Post* was justified in relying on Phillips' false narrative. [*See, e.g.,* Doc. 47 at 43 ("THE COURT: But if they can show they thought it was a reliable source, then they wouldn't be negligent, would they?")].

At the motion to dismiss stage, the Court must "construe the complaint in the light most favorable to the nonmoving party [and] accept the well-pled factual allegations as true. . . ." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (citation omitted). Plaintiff did plead in his initial Complaint that Phillips' narrative was a lie invented by Phillips to further his own political agenda. [*See, e.g.,* Doc. 1 at ¶¶ 34-37, 79-91, 180-81]. However, those allegations apparently were overlooked by the Court when it instead reached a factual conclusion in ruling on the motion to dismiss that Phillips' statements were truthful.

In the proposed First Amended Complaint, Plaintiff expands on and clarifies his allegations that Phillips' narrative was intended to be a factual recitation of events but was completely fabricated to further Phillips' own activist agenda. [*See, e.g.,* First Am. Compl. at ¶¶ 103-107, 113-131, 141-152, 357, 370]. It is Plaintiff's contention that, as a factual matter, Phillips fabricated his entire narrative of the January 18 incident – Phillips did not actually feel threatened, he did not actually feel blocked, he was not really trying to defuse a tense situation, etc. To the contrary, Plaintiff contends that Phillips saw an opportunity to create a media controversy – much like he did in Michigan with college students several years ago – and he invented a narrative that would generate that controversy. [*Id.*]. He then changed his story when confronted with facts that exposed his false narrative. [*See* First Am. Compl. at ¶¶ 156-168].

---

conclusion "may have been erroneous." [See also Doc. 46 (after reading Phillips' statement that he was blocked to counsel for the *Post*, "THE COURT: Now, this turned out to be inaccurate. You agree with that, don't you?")].

Plaintiff also expanded greatly on his allegations that the *Post* was negligent in relying on Phillips' narrative as a result of his bias and background.  [*See, e.g.,* First Am. Compl. at ¶¶ 20-21, 108-168, 355-356, 371-373].  Plaintiff's proposed First Amended Complaint provides significant additional detail to counter the Court's inclination to credit Phillips' narrative as truthful and sincere.  Phillips is a long-time activist who has protested against projects sponsored by President Trump – including by beating his drum and singing during a protest on the steps of the Trump International Hotel in Washington, D.C.  [First Am. Compl. at ¶ 121].  The *Post* previously published articles about Phillips' activism.  [First Am. Compl. at ¶¶ 108-112].  Phillips protested at a Catholic Church in Washington, D.C., and attempted to lead his group of followers into the church, the night following the January 18 incident, demanding reparations for Indigenous Peoples and punishment for Nicholas and his classmates, while singing the AIM song and beating his drum.  [First Am. Compl. at ¶¶ 125-131].  Phillips has a criminal history including assault, and he incontrovertibly lied about being a Vietnam veteran.  [First Am. Compl. at ¶¶ 132-140, 153-155].  Phillips also was at the center of a very similar incident in 2015 when he claimed – also during a racially charged climate – that he was harassed by college students in a situation that he described very similarly to the January 18 incident.  [First Am. Compl. at ¶¶ 141-152].

Plaintiff could not anticipate that the Court would overlook the factual allegations in his Complaint about Phillips' false narrative, and it is therefore necessary to grant him relief from the judgment and the dismissal with prejudice and grant leave to amend his Complaint to add detail about Phillips' background and why he was a patently unreliable witness.  When this additional background is considered, it is clear that the Court's determination that "[t]here were no undisclosed facts" is inaccurate.

19

**C. The Court Incorrectly Held That The Accusations Were Not Defamatory *Per Se*.**

The Court also incorrectly held that the accusations were not capable of a defamatory meaning and cannot constitute defamation *per se*. The Court reached this conclusion by improperly overlooking the context in which the accusations were published and by applying an improper legal standard with respect to what a "reasonable reader" would believe was being conveyed.

**1.  The Court overlooked the applicable context.**

The Court overlooked the context that must be considered in determining whether the accusations are capable of a defamatory meaning and whether they constitute defamation *per se*, and Plaintiff should be permitted to amend his Complaint to describe more explicitly the context of the accusations.

It is black-letter law that defamatory statements must be analyzed in context.  *See, e.g., Ky. Kingdom Amusement Co. v. Belo Ky., Inc.*, 179 S.W.3d 785, 791 (Ky. 2005) ("A jury in this type of action must consider the broadcasts in their entirety when determining whether the statements and inferences within it are false and defamatory"); *Biber v. Duplicator Sales & Service, Inc.*, 155 S.W.3d 732, 738 (Ky. App. 2004) ("Alleged defamatory statements must be construed in the context of the entire communication").  The *Post* led this Court to error by submitting with its reply brief a "chart" that isolates each individual false and defamatory statement identified by Plaintiff and completely ignores the context and the overall gists of the Articles created by the juxtaposition of the false and defamatory statements with other statements, images, and videos. [*See* Doc. 37-1].  The Court essentially copied the chart[5] and instead of analyzing the Articles in

---

[5] Oddly, the formatting of the Court's chart almost exactly matches the formatting of the chart submitted by CNN in support of its Motion to Dismiss filed in Civil Action No. 2:19-cv-31-WOB-CJS.  [*See* Doc. 31-10].  CNN filed its chart on May 15, prior to the *Post* filing its own similar chart on June 4.

their entirety, the Court pulled out the individual statements and analyzed each of them completely out of context.[6]  After taking the statements out of context, the Court then held that nearly every identified statement was "Not defamatory."  [*See* Doc. 47 at 30-36].  Indeed, the Court deemed as "Not defamatory" numerous statements that even the *Post* did not contend were not defamatory. [*See, e.g.,* Doc. 47 at 35 (finding the statement "Phillips said he heard students shout, 'Go back to Africa!'" to be "Not defamatory")].

Perhaps most egregiously, the Court held that the *Post*'s continuous references to Nicholas as wearing a MAGA cap and chanting "Build that wall!" are not capable of a defamatory meaning and cannot be construed as meaning that Nicholas engaged in racist conduct.  [Doc. 47 at 23].  The Court found that chanting "Build that wall!" is "a political statement on an issue of public debate. . . ." and therefore not defamatory.  [*Id.*].  This assessment ignores the context that is inherent in the Articles and is the very reason the January 18 incident became the subject of so many articles published by the *Post* and other media – "[v]ideos of a white boy wearing a MAGA hat while smiling in front of a Native American tribal elder and not budging immediately triggered an emotional response."  [*See* First Am. Compl. at ¶ 203 (quoting *Post* article)].  Indeed, part of the context that must be considered is that Phillips is the one who accused Nicholas and his classmates of chanting "Build that wall!" and Phillips obviously considered that chant to be racist.

Although Plaintiff did allege in his initial Complaint that the statements about the MAGA hat and "Build that wall!" chants were defamatory, the allegations in the proposed First Amended Complaint are more expansive and clearly spell out why the accusations by the *Post* are not simply

---

[6] Although the Court indicates that the statements in its chart are "drawn from the Complaint," eight (8) of the statements in the Court's chart include language not included in the statements as specifically enumerated in the Complaint.  [*See* Doc. 47 at 30-36, Statements No. 5, 6, 7, 14, 19, 25, 28, 29].

run-of-the-mill assertions that someone belongs to a particular political party.  [*See, e.g.,* First Am. Compl. at ¶¶ 197-200].  One aspect of the context available within the four corners of the Articles that is made explicit in the proposed First Amended Complaint is that the January 18 incident came just six (6) days after another media uproar about racism toward Native Americans when President Trump tweeted about Senator Elizabeth Warren, referring to her as "Pocahontas" and referencing the Wounded Knee massacre of Native Americans.  [*See* First Am. Compl. at ¶ 201].  Many of the Articles published by the *Post* about the January 18 incident include a direct comparison between President Trump's tweet and the January 18 incident – clearly casting Nicholas' MAGA hat and purported actions as racist.  [*See,e.g.,* First Am. Compl. at ¶ 202(a) (Fourth Article says that "[t]he Friday incident happened less than a week after Trump made light of the 1890 Wounded Knee massacre of several hundred Lakota Indians by the U.S. cavalry in a tweet that was meant to mock Sen. Elizabeth Warren (D-Mass.), whom Trump derisively calls 'Pocahontas.'")].  The fact that the *Post* explicitly compared Nicholas' actions to President Trump's tweet about Senator Warren demonstrates the light in which all of the accusations against Nicholas were made.  There was nothing "innocent" about the accusations of a Catholic boy "blocking" a Native American elder within the context of these Articles.

Part of the "context" of the Articles also includes what additional material is included by the *Post* on the webpage that includes the accusations.  In this case, as further evidence that the accusations were intended by the *Post* to convey that Nicholas was involved in racist actions, the *Post* provided links to several articles with racist themes under the "Read more" section directly following the article.  [*See* First Am. Compl. at ¶ 207].  Those linked "Read more" articles include stories about a "soccer team appearing to give Nazi salutes" and an "[a]pparent Nazi salute at prom."  [*Id.*].  The fact that the *Post* considered articles about students giving Nazi salutes to be

22

comparable to the articles about Nicholas "blocking" Phillips and engaging in "Build that wall!" chants demonstrates additional context within which the accusations must be viewed.

While this context is in the Articles themselves and therefore was part of the initial Complaint, Plaintiff should be granted leave to add allegations specifically pointing out this context within the Articles that necessarily impacted what the accusations conveyed to a reasonable reader.

**2. The Court applied an incorrect legal standard to determine whether the statements were capable of a defamatory meaning.**

In assessing whether the accusations are capable of a defamatory meaning, the Court incorrectly treated "social media" as being a separate audience from the *Post*'s readers, but nothing could be further from the truth.

In the second sentence of the Order, the Court stated that: "In this age of social media, the events quickly became the subject of posts, squares, tweets, online videos, and – pertinent here – statements published by major media outlets."  [Doc. 47 at 1]. The Court apparently failed to comprehend the fact that "pertinent here" are not only "statements published," but also posts, tweets, and online videos published by the *Post*.[7]  Although Plaintiff included allegations in his initial Complaint about the *Post*'s online presence and the publication of the Articles online, together with video, tweets, and posts, the Court apparently misapprehended the import of those allegations.  In the proposed First Amended Complaint, Plaintiff makes it clear that the *Post*'s readers are not just *incidentally* online – they are *primarily* online.  [*See* First Am. Compl. at ¶¶169-191].  The *Post* "publishes" its newspaper in electronic format so that it can be accessed and read anywhere.  [*Id.* at ¶ 171].  The *Post*'s website had 86.6 million unique visitors in January 2019,

---

[7] It is unclear to what the Court was referring with the use of the term "squares" in this context.

with 616.7 million views, and 74.5 million mobile visitors.  [*Id.* at ¶¶ 176-77].  The *Post* has Comments sections following its articles and actively "welcomes reader contributions," which are reviewed by an "audience engagement team," and the *Post* even hosts live chats online with *Post* reporters.  [*Id.* at ¶¶ 178-79].  Indeed, part of the *Post*'s reporting of the January 18 incident was conducted via Twitter when *Post* reporter Antonio Olivo solicited someone from the Indigenous Peoples group via tweet on the morning of January 19.  [*See* First Am. Compl. at ¶ 182].  The *Post*'s website and publications <u>are</u> social media, and the two cannot be separated.

It was therefore improper for the Court to treat "social media" users as a fringe group who cannot provide insight as to what meaning a "reasonable reader" would believe the *Post*'s accusations conveyed. The Court stated in its Order that "what constitutes actionable defamation is not subject to the whims of those in society who are faint of heart" and quoted a long section from the Restatement that says that defamation is not "a question of the existence of some individual or individuals with views sufficiently peculiar to regard as derogatory what the vast majority of persons regard as innocent. . . . if the group is one whose standards are so anti-social that it is not proper for the courts to recognize them." [Doc. 47 at 12 (quoting Restatement 2nd § 559 cmt. e)].  The Order also indicated that "while unfortunate, it is further irrelevant that Sandmann was scorned on social media." [Doc. 47 at 21].[8]

In Kentucky, "where the words at issue are capable of more than one meaning, as they are here, the jury should decide which of the meanings a recipient of the message would attribute to it." *Yancey v. Hamilton*, 786 S.W.2d 854, 858 (1989).  *See also Welch v. American Pub. Co. of Kentucky*, 3 S.W.3d 724, 735 (Ky. 1999) ("[W]e laid this issue to rest in *Yancey v. Hamilton* … in

---

[8] During oral argument, the Court recognized that Nicholas and his family had received death threats as a result of this "scorn."  [*See* Doc. 46 at 16 ("THE COURT: Apparently it was enough that people called him with death threats.")]. Plaintiff submits that is far beyond "unfortunate."

which we held that 'if the words at issue are capable of more than one meaning… the jury should decide which of the meanings a recipient of the message would attribute to it.'"); *Desai v. Charter Comms., LLC*, 381 F. Supp. 3d 774, 786-76 (W.D. Ky. 2019) (analyzing Kentucky law and quoting *Yancey* to hold that the determination of whether a statement capable of two meanings is defamatory *per se* must be made by a jury).  Plaintiff's proposed First Amended Complaint adds many allegations of instances in which individuals – including *Post* readers, editors, and reporters – interpreted the *Post*'s accusations against Nicholas as being defamatory.  [*See, e.g.,* First Am. Compl. at ¶¶ 192-207].  At this stage of the proceedings, on a motion to dismiss, when taking into account the allegations in the proposed First Amended Complaint, the Court cannot say as a matter of law that <u>no</u> reasonable reader would attribute defamatory meanings to the accusations.

**CONCLUSION**

For the reasons identified herein, Plaintiff's Motion should be granted:  the judgment [Doc. 48] should be set aside; the Order [Doc. 47] should be reconsidered; and Plaintiff should be granted leave to amend his Complaint and submit for filing the attached First Amended Complaint.

Respectfully submitted this 23th day of August, 2019.

**L. LIN WOOD, P.C.**

*/s/ L. Lin Wood*
L. Lin Wood (*pro hac vice*)
lwood@linwoodlaw.com
Nicole Jennings Wade (*pro hac vice*)
nwade@linwoodlaw.com
G. Taylor Wilson (*pro hac vice*)
twilson@linwoodlaw.com
Jonathan D. Grunberg (*pro hac vice*)
jgrunberg@linwoodlaw.com

1180 W. Peachtree Street, Ste. 2040
Atlanta, GA 30309
Tel: 404-891-1402
Fax: 404-506-9111

**HEMMER DEFRANK WESSELS PLLC**

*/s/ Todd V. McMurtry*
Todd V. McMurtry
Kentucky Bar No. 82101
tmcmurtry@hemmerlaw.com
Kyle M. Winslow
Kentucky Bar No. 95343
kwinslow@hemmerlaw.com

250 Grandview Drive, Ste. 500
Ft. Mitchell, KY 41017
Tel: 859-344-1188
Fax: 859-578-3869

*Trial attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.


*/s/ Todd V. McMurtry*
Plaintiff's Counsel