UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

| | |
|---|---|
| NICHOLAS SANDMANN, by and through his parents and natural guardians, TED SANDMANN and JULIE SANDMANN, | : CASE NO. 2:19-cv-19-WOB-CJS :  : JUDGE WILLIAM O. BERTELSMAN : |
| Plaintiffs, | : |
| v. | : |
| WP COMPANY LLC d/b/a THE WASHINGTON POST, | : |
| Defendant. | : |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF
MOTION FOR RELIEF FROM JUDGMENT,
FOR RECONSIDERATION OF DISMISSAL WITH PREJUDICE,
<u>AND FOR LEAVE TO AMEND COMPLAINT</u>**

## INTRODUCTION

The *Post*'s opposition brief follows the same "divide and distract" strategy that the *Post* has pursued throughout this litigation – carve out and focus on various snippets in isolation to mischaracterize Nicholas' arguments and obscure the bigger picture and context. The *Post* has not successfully refuted any of the points raised in Plaintiff's motion and does not make an effort even to address many of them. It is clear from the face of the Order that the Court misapprehended a number of facts and legal arguments that entitle Nicholas to the relief requested in this motion and that the Court did not properly recognize that the initial and amended Complaints state a plausible cause of action for negligent republication of false and defamatory accusations:[1]

(1) The Court's failure to consider the Taitano Video and to acknowledge that it was embedded in all of the *Post*'s online articles – which means that a still image of Nicholas' face was contained in all but one of the *Post*'s articles – skewed the Court's entire analysis of whether the accusations were "of and concerning" Nicholas, and the *Post* does not really dispute that fact. When the headlines and accusations are considered in context, *i.e.*, connected to the close-up images of Nicholas' face, there can be no dispute that the accusations were of and concerning Nicholas. This is made clear in Plaintiff's proposed First Amended Complaint.

(2) The Court's failure to consider the *Post*'s Editor's Notes led to the Court's improper analysis of whether the accusations in context are capable of being proven true or false, but the *Post* stubbornly and self-servingly refuses to concede that the Court clearly excluded those Editor's Notes as established by the statement in the Order that "[t]he Court excludes all other materials attached to the parties' briefs," which includes the Editor's Notes. In determining whether a particular statement published by the *Post* is capable of being proven

---

[1] There are other legal and factual findings in the Court's Order with which Plaintiff disagrees. For purposes of this Motion, however, Plaintiff has limited the issues to those that would justify relief under Fed. R. Civ. P. 59 and 60. Plaintiff reserves his right to challenge other holdings in the event of an appeal.

1

true or false, it cannot be ignored that the *Post* itself announced and admitted to its readers that statements at issue were proven false. Similarly, in determining whether an article is capable of the defamatory meaning urged by Plaintiff, it cannot be ignored that the *Post* itself announced and admitted to its readers the necessity to retract that very defamatory meaning. The proposed First Amended Complaint incorporates those Editor's Notes, which were appended to the original articles by the *Post* after the initial Complaint was filed, so that they can and must be properly considered on motion to dismiss.

(3) The Court's oversight of Phillips' inherent unreliability led to the Court's improper determination on motion to dismiss that Phillips was credible and that "the reader was in as good a position as Phillips to judge" whether his statements were correct. Contrary to the Court's finding, there were undisclosed facts, including background information about Phillips and longer videos which disproved Phillips' factual narrative. These longer videos were available at the time the *Post* published its accusations about Nicholas, and although the *Post* referred to multiple "videos" in its articles and purported to describe what those videos showed, the *Post* never linked to those longer videos or explained that they proved Phillips' accusations to be false. Nor did the *Post* ever disclose to its readers that Phillips lied about serving in Vietnam – indeed, the *Post* continues the charade by representing to this Court that Phillips' lie about having served in Vietnam was nothing more than an "exaggerated account of his Vietnam War record." The clear inferences from these undisclosed facts, including the implicit endorsement of Phillips as a legitimate witness, is set forth more explicitly in the proposed First Amended Complaint.

(4) The Court did not consider Nicholas' allegations that Phillips' statements were intended to convey a factual narrative of the January 18 events and not Phillips' opinions. Resolution of that issue is the responsibility of the finder of fact based on a full factual record developed in discovery. The context of the publication of Phillips' statements by the *Post* supports this conclusion – Phillips' statements were published by a reputable mainstream media news outlet and presented as facts in the form of "news."

2

(5) The Court did not consider the overall context of the articles in making its determination that the accusations were incapable of a defamatory meaning that would constitute defamation *per se*. The *Post* set the scene for its accusations by highlighting the fact that Nicholas was wearing a "Make America Great Again" cap, that he had been attending a pro-life march, and that he is a white, Catholic student. The *Post* also set the stage by comparing Nicholas to President Trump, particularly as it relates to the President's tweet just a few days earlier referring to Senator Warren as "Pocahontas." This tweet was the subject of significant and widespread condemnation, although the *Post* now characterizes it as merely "a spat between President Trump and one of his political opponents." When the accusations made by the *Post* are considered in context, as they must be, it becomes clear that the finder of fact could reasonably conclude that what might be innocuous statements in another situation were not innocuous statements about Nicholas in this situation. Plaintiff's proposed First Amended Complaint highlights and identifies all of these elements of context that must be considered in determining whether the accusations are defamatory.

(6) The Court did not recognize the fact that the *Post* is a news organization that reaches its readers primarily through the Internet. The Court dismissed "social media" as a group to be ignored (while acknowledging that the allegations caused Nicholas to suffer public ridicule, contempt and scorn among that group), ostensibly because its "standards are so anti-social that it is not proper for the courts to recognize them." That sentiment ignores the fact that the *Post* actually has a very limited readership for its printed newspaper but reaches nearly 100 million people each month through its website, Facebook page, Twitter feed, and YouTube channels. Individuals on the Internet who read and comment on articles online are precisely the intended audience for the *Post*'s articles. The *Post* has not disputed these facts but instead re-hashes its initial and nonsensical arguments urging that its own readers are not a legitimate gauge of a "reasonable" reader. Nicholas' initial and proposed First Amended Complaint clearly sets out the scope and nature of the *Post*'s readers so that the Court can

employ the proper standard in ascertaining whether the accusations were capable of a defamatory meaning.

(7) The Court did not accept Plaintiff's well-pleaded allegations as true and instead reached conclusions as to issues on a motion to dismiss that are properly reserved for determination on summary judgment based on a fully developed factual record.

These legal and factual errors entitle Nicholas to relief under Fed. R. Civ. P. 59 and 60, and this Court should vacate the judgment, reverse the dismissal with prejudice, and grant Nicholas leave to amend his Complaint. Nothing in the *Post*'s opposition brief supports a contrary result.

## ARGUMENT

I. **The Juxtaposition of Headlines and Accusations Next to the Still Image of Nicholas' Face Identifies Nicholas as a Focus of the *Post*'s Accusations.**

Nicholas' First Amended Complaint bolsters support requiring a finding that the articles were "of and concerning" Nicholas by illustrating that the image of Nicholas' face dominated the *Post*'s publication of the accusations in a manner making clear to readers that the false and defamatory statements referred to Nicholas. The *Post* says in its opposition brief that "[i]f there was any error here, it was Plaintiff's, since the 'true and correct' copies of the articles he attached to the complaint showed no such images or video." [Doc. 50 at 6]. That is the very point of Nicholas' request for leave to amend his Complaint – to clarify, supplement and establish an accurate record in order for the Court to consider the true facts about the *Post*'s articles and tweets about Nicholas.[2]

---

2 Notably, the *Post* does not dispute the accuracy of any of the articles attached to Plaintiff's First Amended Complaint and does not dispute that all of the articles and tweets, with the single exception of the Third Article (which was one of two articles in the printed newspaper), contained a photograph or video still of Nicholas' face. [Doc. 50 at 11 n.3].

The *Post* is the only source for the complete and unedited versions of the articles as initially published online. Plaintiff has pled the contents of those articles to the extent that he could do so at the time of the initial filing and is entitled to discovery to obtain the complete articles as originally published – only then can the Court truly assess the context in which the articles were published. At this stage of the proceedings, however, the Court is bound to accept as true

The *Post* does not even reference in its opposition brief the fact that the Court apparently did not consider the Taitano Video in its initial analysis of the Complaint. The Court was very specific in stating that it would consider only "the seven articles, the Tweets, and **the two YouTube videos**. . . ." in ruling on the *Post*'s motion to dismiss the Complaint. [*See* Doc. 47 at 6 (emphasis added)]. There were two YouTube videos cited and linked to in Plaintiff's Complaint – but neither of those was the Taitano Video. One was the Sandmann Video, and the other one was the Banyamyan Video. [Doc. 1 at ¶ 63 n.1 and ¶ 65]. The Taitano Video was referenced repeatedly throughout the Complaint, but it was not directly linked to in the initial Complaint, which has been changed in the First Amended Complaint.

If the Court did not consider the Taitano Video in its dismissal of Nicholas' Complaint, then the Court did not consider the video still image of Nicholas' face that dominated all of the *Post*'s online articles. That failure explains the Court's erroneous assertion that "[t]he First Article does not mention Sandmann by name, there is no identifiable description of him, and there is no picture of Sandmann in the article." [Doc. 47 at 13]. The still image of Nicholas' face is the primary reason why this case is not governed by the group libel doctrine. The group libel doctrine does not apply here because Nicholas is "specially imputed or designated" by the *Post*'s articles – primarily through the publication of the still image of his face along with the false and defamatory accusations. Kentucky law is clear that this determination must be made "in the context of the whole article." *Kentucky Fried Chicken, Inc. v. Sanders*, 563 S.W.2d 8, 9 (Ky. 1978).

Nicholas has pleaded the image in detail in his proposed First Amended Complaint and those allegations cannot be ignored on a motion to dismiss. Statements that the *Post* describe as being about a group of teens take on an entirely different connotation when viewed in context with each other and next to a still image of Nicholas' face. For example, the First Article included the still image of Nicholas' face printed within the text of the article. Just above Nicholas' face was a

---

Plaintiff's factual allegations about the context of the articles. The *Post* certainly did not provide copies of the original articles for the Court to review, which it obviously could have done, and almost certainly would have done if the content had been helpful to the *Post*.

sentence that included the phrase "the teens and other apparent participants from the nearby March for Life rally began taunting the dispersing indigenous crowd." [Doc. 49-2 at ¶ 252 and Ex. G-2]. Directly to the right of the still image of Nicholas' face, the article says "[a] few people in the March for Life crowd began to chant 'Build that wall, build that wall, build that wall,' he [Phillips] said." [*Id.*]. Just below the image of Nicholas' face are Phillips' quotes that "it was getting ugly" and "that guy in the hat stood in my way and we were at an impasse. He blocked my way and wouldn't allow me to retreat." [*Id.*]. Only by taking the accusations completely out of context and ignoring the images of Nicholas, as the *Post* and the Court have done, can one find support for an erroneous finding that the reference to "teens" would not necessarily be understood as a reference to Nicholas. However, when analyzing "the article as a whole," which this Court must do, it is clear that a reader could – and most likely would – reasonably interpret that Nicholas is prominently identified by the *Post* as one of "the teens" taunting the indigenous persons and one of the "few people" chanting "Build that wall," given the still image of Nicholas in front of Phillips and Phillips' narration of events that centers around the purported "impasse," which is shown in the image, and his specific identification of Nicholas as "that guy in the hat." At a minimum, the allegations raise a question of fact – particularly at the motion to dismiss stage – as to whether the accusations were about Nicholas.

The *Post* misrepresents Nicholas' brief in opposition to the motion to dismiss as taking the position "that an article is about Plaintiff '*in its entirety,*' simply because it identifies him in some way." [Doc. 50 at 10 (citing Doc. 36 at 29)]. The actual sentence in Nicholas' brief was that "[s]imilar holdings finding an article *in its entirety* to be of and concerning the plaintiff by use of his or her photograph – even in the absence of any textual reference to the plaintiff – are commonplace." [Doc. 36 at 29]. Nicholas does not contend that the inclusion of a photograph automatically makes every statement in an article about him – but when viewed in context, and when the article is viewed "in its entirety," the inclusion of the image of Nicholas' face into these articles renders them reasonably capable of a jury finding that the statements at issue are "of and concerning" Nicholas.

6

The Court based its holding on the incorrect belief that "[t]he First Article does not mention Sandmann by name, there is no identifiable description of him, and there is no picture of Sandmann in the article" and that "Sandmann is not specifically mentioned in the article." [Doc. 47 at 13, 14]. The First Amended Complaint corrects this inaccurate factual holding.

## II.     The Accusations are Defamatory and Are Not Protected Opinion.

The Court erroneously held that the accusations were protected opinion and not defamatory based on incorrect legal and factual findings, none of which can be explained away by the *Post*.

### A.     The Editor's Notes

The Editor's Notes impact a number of the *Post*'s accusations against Nicholas.[3]  Contrary to the Court's express statement in its Order, the *Post* clings to the contention that the Court did consider the Editor's Notes simply because the parties discussed the Editor's Notes in their oral argument and briefing.  The *Post* ignores the fact that the Order specifically stated that the Court refused to consider exhibits to the parties' briefing (which includes the Editor's Notes, which were attached to the Post's motion to dismiss) and did not make any mention whatsoever of the Editor's Notes in the Order.  Nicholas relies on the actual statements in the Order while the *Post* urges an implicit meaning contrary to the Court's explicit statement that it did not consider any exhibits to the parties' briefing on the *Post*'s motion to dismiss. [Doc. 47 at 6].

The Editor's Notes must be considered by the Court in determining whether the accusations are capable of being defamatory.  As of March 1, all of the Editor's Notes are part of the articles, and some of the corrections were added very quickly by the *Post* after the articles were published, although the dates of corrections are not always made clear in the articles.  The Editor's Notes are therefore part of the "context" within which viewers read the articles.

---

[3] As is typical throughout its briefing, the *Post* misrepresents that "Plaintiff argues that the editor's notes affect only one specific holding: that Phillips stated an opinion when he asserted that Plaintiff 'blocked my way.'" [Doc. 50 at 14].  To the contrary, Nicholas indicated that "[t]he proposed First Amended Complaint reproduces each of the Editor's Notes and expressly alleges the relevance of the Editor's Notes to each of the accusations identified in the Complaint." [Doc. 49-1 at 16-17].  Nicholas refers to the Editor's Note addressing Phillips' false accusation that Nicholas "blocked" him merely as <u>one</u> example. [Doc. 49-1 at 17].

7

Although Nicholas recognizes that whether statements are capable of having a defamatory meaning is a proper issue before the court, nevertheless, how the *Post* itself viewed the statements is relevant, probative and cannot be ignored. The *Post* materially changed the articles with the corrections, ostensibly based on "additional video." However, Nicholas has alleged – and this is more detailed in the proposed First Amended Complaint – that the "additional video" was available when the articles were initially published. The *Post* admits via the corrections, *inter alia*, that "Phillips's claim that one student blocked him from moving . . . is contradicted by available video" [Doc. 49-8 at 9]; that "[m]ore complete video does not show that the student physically intimidated Phillips" [*Id.* at 10]; and that "certain statements reported by Phillips are not corroborated by widely circulated video of the incident." [*Id.* at 14]. The *Post* even "deleted" a tweet that contains the statement focused on by the Court: "Phillips, who fought in the Vietnam War, says in an interview 'I started going that way, and that guy in the hat stood in my way and we were at an impasse. He just blocked my way and wouldn't allow me to retreat.'" The *Post* tweeted that "[w]e've also deleted this Jan. 19 tweet in light of later developments." [*Id.* at 15].

Although the *Post*'s conclusions regarding the gists conveyed in its articles and which statements are provable as true or false do not automatically control the outcome, their admissions are now well-pleaded and cannot be ignored by the Court – particularly since those conclusions became part of the online context of the articles at some point.[4] The proposed First Amended Complaint puts these Editor's Notes squarely before the Court.

---

[4] The two cases cited by the *Post* are inapplicable here. [Doc. 50 at 14]. Neither of those cases actually discusses the use of post-publication statements. Instead, both cases reference in passing that there was an apology or retraction, but that fact was irrelevant to the holdings in both cases. *See Va. Citizens Defense League v. Couric*, 910 F.3d 780 (4th Cir. 2018) (issue was whether statements were defamatory while apology addressed whether statements were true); *Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445 (S.D.N.Y. 2018) (issue was defense of substantial truth, while retraction was because story was not subjected to appropriate editorial scrutiny). In this case, the issue of whether the *Post* determined that a statement is false or that an article conveyed a certain gist is certainly related to whether the statement conveyed fact versus opinion and whether the article is capable of a defamatory meaning.

8

B.  **Reliability of Phillips**

Phillips' lack of credibility is relevant to at least two areas of Nicholas' defamation claims – negligence and opinion. On the motion to dismiss, it is necessary for this Court to assume as true Nicholas' allegations that Phillips is a liar, but the Court failed to do that. The *Post* proves this point by stating that the Court "held that Phillips expressed his subjective perceptions of the encounter at the Lincoln Memorial. . . ." [Doc. 50 at 17]. That is <u>precisely</u> what the Court is not entitled to do when Nicholas has alleged that Phillips was lying and was not actually expressing his subjective perceptions of anything. Instead, the Complaint contends – and the First Amended Complaint alleges in much more detail – that Phillips was manufacturing the entire incident, including his purported "perceptions" of what factually occurred, to further his political agenda.

The *Post* makes the incredibly simplistic statement that "[t]he law does not recognize a claim for publishing an unreliable opinion." [Doc. 50 at 17]. That is inaccurate where, as here, the case involves a media defendant, a private plaintiff, an "opinion" that is capable of being proven true or false, and negligence by the media defendant in publishing that purported "opinion."

The *Post* continues its farce regarding Phillips by referencing his "exaggerated account of his Vietnam War record," which the *Post* claims is "entirely beside the point." [Doc. 50 at 17]. Phillips has ***no*** Vietnam War record, because he never went to Vietnam, and he was never in a war. Phillips' statements that he served in the Vietnam War must be called what they are – lies. There is no "exaggeration." And these lies are not "beside the point."[5] The *Post* has a legal duty to publish accusations against a private individual without negligence, and if the *Post* wants to contend that statements it publishes are opinion, then it must disclose the facts upon which those opinions are based. The Court recognized this when it held that "[t]here were no undisclosed facts" because the *Post* published Phillips' purported reasons for his "perception" – "the size of the crowd, the tense atmosphere, taunts directed at his group, and his memories of past

---

[5] The Court did not address Phillips' credibility problems or his lies concerning his non-existent service in Vietnam. Presumably these facts are among the "many other allegations" in the Complaint that the Court did not recite because it "does not find them to be relevant to the legal issues presented by The Post's motion." [Doc. 47 at 4 n.2].

9

discrimination." [Doc. 47 at 18]. However, Plaintiff contends that aside from the size of the crowd, all of these purported reasons are lies invented to further Phillips' political agenda by use of a false narrative. The *Post* – like this Court – gave Phillips undeserved credibility by falsely portraying him as a "Vietnam veteran." A determination of credibility is the province of the finder of fact based on a fully developed factual record created by discovery.

By holding Phillips out as a reliable witness, the *Post* implied that it had a factual basis for asserting that Phillips was in fact a reliable witness. This was false. The *Post* failed to initially disclose to its readers the many lies and false narrative urged by Phillips to support his activist agenda. Even to this day, the *Post* continues to cover up for Phillips by referring to his "exaggerated account of his Vietnam War record." Phillips had no "Vietnam War record" as alleged in Nicholas' initial Complaint and made clearer in the proposed First Amended Complaint.

### C. The *Post* Did Not Disclose All Available Video

The Court's oversight of the Taitano Video also bears on the Court's determination that all facts were disclosed to support a finding that Phillips' statements were protected opinion. One of Nicholas' primary bases for alleging that all facts were not disclosed by the *Post* is the fact that there were longer videos readily available to the *Post* showing more of the interaction between Nicholas and Phillips and how the January 18 events began. It was misleading for the *Post* to link only to the Taitano Video in an attempt to support Phillips' false narrative, without disclosing the wealth of other available video that proved that Phillips' narrative was false. Indeed, while the *Post* acknowledged in its articles that multiple videos existed, it linked its readers only to the short Taitano Video to support Phillips' false narrative by hiding the fact that Phillips targeted Nicholas from a distance and then confronted him without trying to move away before the students left to meet their bus.

Although the Court did reference the Banyamyan Video briefly, [Doc. 47 at 3], it did not otherwise discuss or disclose the content of the longer videos or the fact that the *Post* referenced multiple videos in its articles but only linked to the one, misleading video. Nicholas' proposed First Amended Complaint clearly sets forth more extensive allegations describing how the *Post*

impliedly conveyed to its readers that it had undisclosed information, in the form of additional videos, that allegedly supported Phillips' false narrative while misleading its readers by providing to them only the short, Taitano Video. [*See*, *e.g.*, Doc. 49-2 at ¶¶ 258-61, 269, 280-84, 294-99, 310, 316-18].

### III. The Court Must Consider the Context of the Defamatory Statements.

The Court did not properly consider the context of the accusations. Despite the *Post*'s attempt to conflate different elements, a determination of "context" is not the same as going outside the "four corners" of the article or turning to "extrinsic evidence." In Kentucky, as in every other jurisdiction, "[i]t is an elementary principle of the law of libel that the defamatory matter complained of should be ***construed as a whole***" and that the court "must, therefore, analyze the article ***in its entirety*** and ***determine if its gist or sting is defamatory***." *McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 884 (Ky. 1981), *cert. denied,* 456 U.S. 975 (1982) (emphasis added). The Kentucky Supreme Court has made it clear that a court cannot simply look to certain words or phrases used in an article to determine if those words or phrases are defamatory – instead, the court must examine the article in context to determine if the gist or sting of the article is defamatory. *See, e.g., Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 794 n.38 (Ky. 2004), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014) (recognizing established law that "in arriving at the sense in which the defamatory language is employed, it is proper to consider the circumstances surrounding its publication and the entire language used" and "the defamatory matter complained of should be construed as a whole . . . in the light of the conditions and circumstances under which it was published" (citations omitted)). The Kentucky Supreme Court's admonition is directly contrary to what the *Post* urges and this Court held in its Order by relying on a chart that cherry-picked certain words or phrases out of context to assess their defamatory potential in a piecemeal fashion without consideration of the full context.

The Restatement (Second) of Torts (the "Restatement") § 563 cmt. d (1977) addresses context, indicating that:

11

> In determining the meaning of a communication, **words . . . are to be construed together with their context**. Words which standing alone may reasonably be understood as defamatory may be so explained or qualified by their context as to make such an interpretation unreasonable. So too, **words which alone are innocent may in their context clearly be capable of a defamatory meaning** and may be so understood. The context of a defamatory imputation includes all parts of the communication that are ordinarily heard or read with it.

(Emphasis added). The Restatement also makes clear that "context" and "extrinsic circumstances" are two different things:

> Both the judge and jury . . . take into account all the circumstances surrounding the communication of the matter complained of as defamatory. Thus **the context of written or spoken words is an important factor in determining the meaning** that they reasonably might convey to the person who heard or read them. **So too, the extrinsic circumstances surrounding the publication are important** in determining the understanding of the recipient of the communication.

Restatement § 614 cmt. d (emphasis added); *accord Clark v. Am. Broad. Companies, Inc.*, 684 F.2d 1208, 1213-14 (6th Cir. 1982), *cert. denied*, 460 U.S. 1040 (1983), *disapproved of on other grounds by Bichler v. Union Bank & Tr. Co. of Grand Rapids*, 745 F.2d 1006 (6th Cir. 1984) (reversing where "[t]he district court should also have viewed Plaintiff's appearance in the context of the focus on street prostitution" in the program and denied summary judgment where juxtaposition of video of plaintiff in the street with a focus on prostitution could be interpreted as labeling plaintiff a prostitute); *Desai v. Charter Comms., LLC*, 381 F. Supp.3d 774 (W.D. Ky. 2019).

In *Desai*, the District Court for the Western District of Kentucky addressed – and rejected – the defendant's "overarching argument [] that the 'Printer-gate' reference in [the] presentation cannot constitute defamation per se because it requires consideration of extrinsic circumstances." *Id.* at 783. The court in *Desai* conducted a detailed analysis of Kentucky law and determined that consideration of the context of a defamatory statement does not amount to extrinsic circumstances that would determine whether a statement was defamatory *per se* or *per quod*:

> In other words, certain types of statements – including false accusations of theft – are presumed to have damaged the plaintiffs' reputations, and thus no proof of injury resulting from such statements is required: they are "actionable per se." . . .

> [Defendant]'s contention that the per se/per quod determination turns on whether extrinsic proof is needed to interpret the statement as defamatory is thus misguided; it is instead "the proof necessary to demonstrate an injury to reputation" that "varies depending upon the characterization of the defamatory language" as defamation per se or per quod.
>
> . . .
>
> Charter cites two Kentucky cases, *Sweeney & Co. v. Brown*, 249 Ky. 116, 60 S.W.2d 381 (Ky. 1933), and *Towles v. Travelers Ins. Co.*, 282 Ky. 147, 137 S.W.2d 1110 (Ky. 1940) (which followed *Sweeney*), for the proposition that an ambiguous statement cannot constitute defamation per se.
>
> . . . Given the Kentucky Supreme Court's equally thorough and far more recent discussion in *Stringer* on facts strikingly similar to those at issue here, the Court finds *Stringer* to be the more relevant precedent.
>
> . . .
>
> Clearly, the words "there was more to it than that" are not, on their face, defamatory. Nor was the statement an obvious reference to theft even if placed in context: an assistant manager, "when asked whether [the plaintiffs] had been terminated for eating candy from the claims area, responded that 'there was more to it than that' and that he couldn't talk about it." Indeed, as in this case, the context . . . likely would not have been understood by a non-employee. Yet because another employee testified that she interpreted the statement "as an assertion that [the plaintiffs] had stolen items in addition to claims candy," it was sufficient to support a verdict in favor of the plaintiffs. [Defendant]'s contention that the jury could not properly consider the context in which "Printer-gate" was discussed is therefore unavailing.

*Desai*, 381 F. Supp. 3d at 784-86 (citations omitted). Thus, the court held that it was appropriate for the jury to make the determination as to "whether the communication in question actually conveyed a defamatory message to the reader." *Id.* (citation omitted).[6]

In this case, the context of the accusations in the online articles includes the photographs, graphics, videos and other material on the webpage that includes the defamatory statements. *See, e.g., Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) ("Just as a reader must absorb a printed

---

[6] In his proposed First Amended Complaint, Nicholas has included allegations about his specific damages in the event his claims are determined to allege defamation *per quod*. [*See* Doc. 49-2 at ¶ 402]. Although the *Post* objects that these damages are *de minimus*, when it is considered that these damages were caused by injury to the mental and emotional well-being of a 16-year-old child, which injuries may worsen with the passage of time, as a result of the *Post*'s false and defamatory accusations about him, it is offensive and insulting to describe his presently suffered damages as *de minimus*.

13

statement in the context of the media in which it appears, a computer user necessarily views web pages in the context of the links through the which the user accessed those pages."); *Cheney v. Daily News, L.P.*, 654 Fed. Appx. 578, 582 n.1 (3d Cir. 2016) ("Under the standard articulated by the Pennsylvania Supreme Court, we must decide how a reasonable person would understand the article and its accompanying photograph. In this case, however, we have the benefit of [plaintiff]'s specific allegation that he was flooded with messages from his colleagues, family, and friends after the story was published. Although these reactions are not conclusive proof that a reasonable person would understand the publication to concern [plaintiff], they are nonetheless relevant to our determination. And under the motion to dismiss standard, we must accept them as true.").

The Court did not consider the context of the accusations because it took phrases and analyzed them outside the context of the articles, wholly failing to consider the effects that today's social climate would have on the readers. Given the context presented by the *Post* that Nicholas was wearing a MAGA cap, was attending a pro-life march, and attended a Catholic school, the *Post*'s accusations that Nicholas was blocking, intimidating, and taunting a Native American elder constitute defamatory statements that convey the gist that Nicholas was committing racist actions, as well as the other gists set forth in Nicholas' Complaint and First Amended Complaint.

The Court must consider the ***context*** of the defamatory statements to ascertain whether they are capable of conveying a defamatory meaning, and the Court did not do so in its Order.

## IV.   The *Post*'s Arguments Concerning Substantial Truth Are Inapplicable.

The *Post* indicates that its motion to dismiss also could have been granted based on its affirmative defense of substantial truth, but "the trial court does not determine the truth or falsity of an allegedly defamatory publication. That determination is ordinarily reserved for the jury." *Better Built Garages, Inc. v. Kentucky New Era, Inc.*, No. 2007-CA-001432-MR, 2008 WL 4531037, at *4 (Ky. App. 2008) (summary judgment). Certainly such an inquiry is impermissible on a motion to dismiss. The Court in its Order correctly indicated that "the present motion does not require the Court to address the elements of truth/falsity. . . ." [Doc. 47 at 7].

The *Post*'s contention that it would not be false "to convey the gist that [Nicholas] 'engaged in racist conduct' when wearing" the MAGA hat demonstrates the entire problem with the *Post*'s reporting and is an attempt to completely twist the additional allegations contained in Nicholas' proposed First Amended Complaint. [*See* Doc. 50 at 25-26]. The fact that certain people view the MAGA cap as problematic is part of the context of the articles in which the *Post* repeatedly highlighted that Nicholas was wearing a MAGA cap. If Nicholas had been wearing a Nike cap, for example, would the *Post* have used headlines like "Marcher's accost by boys in Nike caps draws ire" or "'It was getting ugly': Native American drummer speaks on the Nike-hat wearing teens who surrounded him"? Of course not. The *Post* intentionally highlighted the fact that Nicholas was wearing a MAGA cap in an attempt to stir up racial issues and convey racial overtones to its accusations that Philips, a Native American, was "accosted" or "surrounded." The fact that Nicholas was wearing a MAGA cap does not establish that Nicholas was engaged in racist misconduct, and it is deplorable that the *Post* cannot comprehend that.

## CONCLUSION

For the reasons identified herein, Nicholas' Motion should be granted: the judgment [Doc. 48] should be set aside; the Order [Doc. 47] should be reversed; and Nicholas should be granted leave to amend his Complaint and submit for filing the proposed First Amended Complaint.

Respectfully submitted this 27th day of September, 2019.

| | |
|---|---|
| **L. LIN WOOD, P.C.** | **HEMMER DEFRANK WESSELS PLLC** |
| */s/ L. Lin Wood* | |
| L. Lin Wood (*pro hac vice*) | */s/ Todd V. McMurtry* |
| lwood@linwoodlaw.com | Todd V. McMurtry |
| Nicole Jennings Wade (*pro hac vice*) | Kentucky Bar No. 82101 |
| nwade@linwoodlaw.com | tmcmurtry@hemmerlaw.com |
| G. Taylor Wilson (*pro hac vice*) | Kyle M. Winslow |
| twilson@linwoodlaw.com | Kentucky Bar No. 95343 |
| Jonathan D. Grunberg (*pro hac vice*) | kwinslow@hemmerlaw.com |
| jgrunberg@linwoodlaw.com | |
| | 250 Grandview Drive, Ste. 500 |
| 1180 W. Peachtree Street, Ste. 2040 | Ft. Mitchell, KY 41017 |
| Atlanta, GA 30309 | Tel: 859-344-1188 |
| Tel: 404-891-1402, Fax: 404-506-9111 | Fax: 859-578-3869 |

## CERTIFICATE OF SERVICE

  I hereby certify that on September 27, 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to registered CM/ECF participants.

                */s/ Todd V. McMurtry*
                Plaintiff's Counsel