1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   NORTHERN DIVISION AT COVINGTON
                                  - - -
 3
     NICHOLAS SANDMANN, by and through his :  Docket No. 19-CV-19
 4   parents and natural guardians,        :
     TED SANDMANN and JULIE SANDMANN,      :  Covington, Kentucky
 5                                          :  October 16, 2019
                            Plaintiffs,    :  1:00 p.m.
 6            versus                        :
                                           :
 7   WP COMPANY, LLC, d/b/a                 :
     THE WASHINGTON POST,                   :
 8                                          :
                            Defendant.     :
 9
                                  - - -
10
                     TRANSCRIPT OF ORAL ARGUMENT
11                 BEFORE WILLIAM O. BERTELSMAN
                    UNITED STATES DISTRICT JUDGE
12
                                  - - -
13   APPEARANCES:

14   For the Plaintiffs:        TODD V. McMURTRY, ESQ.
                                Hemmer, DeFrank, Wessels PLLC
15                              250 Grandview Drive
                                Suite 500
16                              Ft. Mitchell, KY 41017

17                              L. LIN WOOD, ESQ.
                                NICOLE JENNINGS WADE, ESQ.
18                              L. Lin Wood, PC
                                1180 W. Peachtree Street
19                              Suite 2040
                                Atlanta, GA 30309
20

21   For the Defendant:         KEVIN T. BAINE, ESQ.
                                KATHERINE M. MEEKS, ESQ.
22                              THOMAS G. HENTHOFF, ESQ.
                                Williams & Connolly
23                              725 12th Street, N.W.
                                Washington, DC 20005
24

25
</pre>

```
 1                              PHILIP W. COLLIER, ESQ.
                                BETHANY A. BREETZ, ESQ.
 2                              Stites & Harbison, PLLC
                                400 West Market Street
 3                              Suite 1800
                                Louisville, KY 40202
 4

 5      Court Reporter:         JOAN LAMPKE AVERDICK, RDR, CRR
                                Official Court Reporter
 6                              35 W. Fifth Street
                                Covington, KY 41011
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24          Proceedings recorded by mechanical stenography,
        transcribed by computer.
25
```

1          (Proceedings commenced at 1:00 p.m.)

2          THE COURT:  All right.  Good afternoon, everybody.

3    We're here, of course, on the lawsuit by Mr. Sandmann today

4    against the Washington Post.

5          By way of background -- I see a lot of spectators.  I

6    don't know how much you know what's going on with this

7    particular incident that occurred in Washington, but I have

8    five lawsuits arising out of this incident.  Three of them are

9    against newspapers.  Two of them are against people who posted

10   comments on newspaper websites or other websites, one of which

11   is by a United States senator who's running for president.

12         So we're confronted with a novel situation here.  You

13   have a conflict of principles of law.  You have this incident

14   that occurred.  We haven't had any evidence on it yet, but

15   it's my understanding that this resulted in a lot of

16   harassment by the public of the plaintiff, even death threats.

17   Had to have police at the school, have police, as I understand

18   it, at his mother's place of employment.

19         But on the other hand, what I have to deal with is

20   principles of libel law that we've all known for centuries and

21   didn't have a case like this in mind.  For instance, a

22   statement of an opinion cannot be libel.  That's a rule that

23   goes back a couple hundred years.  And there are other similar

24   rules.

25         So there's a great deal of difficulty reconciling this

4

1    situation with the principles of libel law.  And that's why I

2    got a 95-page post-amended complaint and a 65-page brief on

3    each side.  And you've got good lawyers on both sides who are

4    raising every point they can think of in favor of their

5    client.

6        So it's a very complicated situation all arising out of

7    something that apparently occurred in about 10 to 15 minutes

8    there in Washington.  Plus comments, of course, that were made

9    about it.

10        So as you know, we had the original complaint, and we

11    went over that and applied these principles of libel law and

12    decided that while the incident was unfortunate, it did not

13    reach the standards of libel law, especially the part about

14    you can't sue on the basis of an opinion.

15        Now there has been tendered a motion to reconsider that,

16    along with an amended complaint that goes into a lot more

17    detail.  The amended complaint runs 95 pages, which I have

18    read several times, much to the stress of my eyes, but I have

19    done it.

20        So this is what we have to deal with today.  And I think

21    everybody's in good will.  We have excellent lawyers.  Each of

22    them have made excellent arguments.  I'm doing the best I can.

23    And we'll have to deal with the situation as we have it, and

24    I'll do what I've been doing for 40 years and try to deal with

25    it on an equal basis.

1        Okay.  So before the Court is the plaintiff's motion to

2   reconsider the dismissal and file a first amended complaint.

3   So you may proceed with that, sir.

4        MR. McMURTRY:  Thank you, Your Honor.  Todd McMurtry

5   here on behalf of Nicholas Sandmann.

6        May I speak from the podium?

7        THE COURT:  Yes, please.  Keep your voice up so we

8   can hear you.  You can raise that podium.  There's a switch on

9   the side.  You can raise that.

10        MR. McMURTRY:  Thank you.

11        Well, again, good afternoon, Your Honor.  I want to begin

12   by reintroducing to you my client, Nicholas Sandmann, who is

13   seated here.

14        THE COURT:  Mr. Sandmann.

15        MR. McMURTRY:  Along with his parents, Ted and Julie,

16   who are over there in the back row.  And I'm also joined by my

17   co-counsel, Lin Wood and Nicole Wade, both who are joining us

18   from Atlanta today.

19        Your Honor, in your order, you said that I could divide

20   my 30 minutes of argument, and what I'd like to do is take 20

21   now and then save 10 for the end.

22        THE COURT:  Okay.

23        MR. McMURTRY:  Thank you.

24        Again, to begin, Your Honor, thank you for granting us

25   this opportunity to discuss with you why we think you should

1    reconsider your judgment dismissing Nicholas Sandmann's claims

2    with prejudice.

3         As the Sixth Circuit has held, a grant of dismissal --

4              THE COURT:  Let's stop there.  With prejudice, all

5    that means is it's on the merits.  It doesn't mean you can't

6    make a motion -- well, you did tender another complaint.

7              MR. McMURTRY:  Yes.

8              THE COURT:  It doesn't mean you can't have -- matter

9    of fact, you have tendered a complaint so you must realize

10   that.

11             MR. McMURTRY:  Correct.  Yes, we do.  And that's the

12   point that I wanted to make, simply that implicit, we do seek

13   to tender our amended complaint under the standard.  So we

14   accept that and agree with what Your Honor has said.

15        And as we've argued in our motion, in our response, we

16   believe that this Court should exercise its considerable

17   discretion to allow Nicholas Sandmann to file his first

18   amended complaint.

19        Grant of this motion would, in essence, acknowledge that

20   the plaintiff's first amended complaint is properly brought

21   and that the plaintiff should be granted an opportunity under

22   these circumstances to more fully allege his claims.  And as

23   the Court said, factually speaking, it's simple to look at;

24   but needless to say, there was a lot happening in and around

25   the Washington Mall on January 18th of this year.

1      Our argument in support of this motion focuses on three

2  key points:

3      First, the clear inclusion of Nicholas Sandmann and his

4  picture in six of the seven publications that are referenced

5  in our complaint make the complaint -- or make those

6  publications of and concerning Nicholas Sandmann.  And we

7  allege with respect that the Court overlooked these pictures

8  that we referenced in our complaint, were part of the -- the

9  pictures and viral video were part of the articles that the

10  Washington Post published online, and as well his picture did

11  appear in one of the print publications.  So that's the first

12  point.

13      The second point is that the editor's notes came out

14  about ten days or so after we filed our complaint.  Those were

15  addressed in the motions and introduced by the Washington Post

16  and also were addressed in our response to the initial motion

17  to dismiss the complaint.  And we think that by allowing us to

18  include those in our amended complaint, it provides for a more

19  complete factual statement of what occurred, and it's helpful

20  to the Court and to others in assessing Mr. Sandmann's claims.

21  And we think that the Court should permit us to include those

22  by way of an amended complaint.

23      And then the third point is, is that we allege that the

24  Court failed to look at the arguments that were -- to the

25  statements that are alleged to Mr. Phillips, or the statements

1    Mr. Phillips made in his complaint; that the Court, when it

2    looked at those in a spreadsheet, that it didn't take the

3    statements in the context of the entire article and,

4    therefore, missed the gist of those statements.

5        So we allege, just for purposes of seeking this motion

6    for leave, that simply the attachment of the, you know,

7    sentences taken away from their context is something that is

8    in error of this Court.

9            THE COURT:  Well, I believe you also add considerable

10   materials on the background of Mr. Phillips --

11           MR. McMURTRY:  Correct, we did.

12           THE COURT:  -- that weren't in the original

13   complaint.

14           MR. McMURTRY:  That's right.

15           THE COURT:  At least you expanded on them.

16           MR. McMURTRY:  Correct.  And the reason that we're

17   seeking --

18           THE COURT:  About ten pages worth.

19           MR. McMURTRY:  I know.  There's doubling down,

20   there's tripling down, and there's quadrupling down.

21           THE COURT:  I don't blame you.

22           MR. McMURTRY:  I think that that's what we were

23   trying to do here.

24       And when you look at the additional allegations of Mr.

25   Phillips, really the goal of that is to seek to take his

1    statements from what the Court has described as opinion to

2    being, in essence, a false factual narrative that was put

3    forward for the specific political purpose and, therefore, not

4    protected as an opinion statement.  That's part of the reason

5    why we put so much of Mr. Phillips' history as a professional

6    protester into the complaint.

7              THE COURT:  All right.

8              MR. McMURTRY:  So, you know, moving forward, Your

9    Honor, we do believe that under Rule 59 and 59(e) and 60(b),

10   that the Court has considerable discretion to grant this,

11   especially in light of kind of the fluidity of what happened,

12   the fact that these editor's notes came out after the fact,

13   and the fact that this is really an unprecedented

14   circumstance.  So we hope that the Court will exercise its

15   considerable discretion and allow us to proceed with an

16   amended complaint and allow Mr. Sandmann back into this court.

17      So that's the basis under the law that we seek this.

18   Also, under Rule 15, we do not believe that it would be futile

19   for us to do this.

20             THE COURT:  Well, that's what we're here today to

21   discuss, or will be.

22             MR. McMURTRY:  Be happy to jump to that.

23             THE COURT:  The defendant, of course, has an opposing

24   view.

25             MR. McMURTRY:  Yes.

1     THE COURT:  That's a principal issue when you tender

2  an amended complaint.

3     MR. McMURTRY:  Right.  So in this circumstance, we do

4  not think it would be futlie.  And I'll just hit on the key

5  reasons and then go into some more detail on those.

6     First, our amended complaint contains expanded

7  allegations that are related to the Taitano video.  And the

8  Taitano video is the viral video that was embedded into the

9  online Washington Post articles.

10    THE COURT:  Okay.  Now, let's get these videos

11  straight.

12    MR. McMURTRY:  Okay.

13    THE COURT:  I told you before, presumably someone

14  provided two DVDs.  One is a very long one involving the

15  altercation with the African American Israelites, whatever

16  they call themselves.  Another one was really short, and it

17  showed Mr. Sandmann standing there and Mr. Phillips

18  standing there.  There's a bunch of kids around.  Mr. Phillips

19  standing there, beating on the drum, close up to Mr. Sandmann.

20  It only lasts a couple minutes.  But that's all it showed.

21    It didn't show whether Phillips had an opportunity to

22  retreat, unlike what he said.  So it didn't really show

23  whether he was trying to get by, like you said, which is why I

24  said it seemed like since this video didn't show anything that

25  seemed out of the ordinary, that it's his opinion that he was

1    blocked.  I mean, that was a principal point of the original

2    judgment.  So why don't you address that.

3              MR. McMURTRY:  Okay.  Well --

4              THE COURT:  That was the viral videos?

5              MR. McMURTRY:  There are two videos that are very

6    similar.  There is a video that's a little bit longer than a

7    minute, and there's a video --

8              THE COURT:  This was a little bit longer, about five

9    minutes.

10             MR. McMURTRY:  Okay.  There is an unsourced edited

11   viral video that was incorporated into the Washington Post

12   initial reporting on this story that is -- is, in essence, you

13   know, kind of a falsified statement of what went on because it

14   only shows a snippet of what actually went on.

15             THE COURT:  What do you mean by a viral video?  It

16   went to a lot of people who were interested in it and looked

17   at it?  Is that what you mean?

18             MR. McMURTRY:  Tens of millions of people saw the

19   video.

20             THE COURT:  Is that what makes it viral?

21             MR. McMURTRY:  Yes.  It goes out on Twitter.

22             THE COURT:  What if a lot of people saw other videos?

23   How are we going to know which one we're talking about?

24             MR. McMURTRY:  Well, we know which one is viral

25   because we do have evidence which one was passed around

1     Twitter and which one ended up on the Washington Post website.

2         But the one that ended up on the Washington Post website

3     is the shortest, edited video that was seen by tens of

4     millions of people that the Washington Post basically took off

5     of the Internet and placed into the story on their Washington

6     Post website.  That's the one I don't think the Court has

7     seen.  And we've corrected that in our amended complaint by

8     specifically referencing and providing the -- you know, the

9     path through your computer to go look at that video.  It's

10    still available on YouTube and other places.

11            THE COURT:  Why don't you, when you get through here,

12    go back and put that one on a DVD and send it to me.  Run it

13    by opposing counsel.

14            MR. McMURTRY:  Yes, I agree.  I will do that

15    immediately.  And I apologize for not doing it the first time.

16        What we did provide you, Your Honor, initially, to

17    address this point on the videos, is we provided you a video

18    that was entitled "The Truth in 15 Minutes," but I think you

19    referenced that in your order.

20            THE COURT:  I think I looked at that.

21            MR. McMURTRY:  Yes.  And that is a video that we

22    created to show what actually happened, more broadly what

23    actually happened.  And we think if you look at that video,

24    you take what Mr. Phillips said from an opinion to a, you

25    know, false factual narrative.

1       And moreover, if you add onto that the fact that Phillips

2  is a professional protester, as we allege in our complaint the

3  Washington Post should have known, then we believe that to

4  declare what he said as opinion for purposes of this motion to

5  dismiss is not a correct assessment of what actually happened.

6       Instead, we believe that Mr. Phillips went out to the

7  Washington Post and to others and made -- recounted what he

8  characterized as a factual assessment of what happened there.

9  When you look at the longer video compared to the shorter

10 video, it clearly shows that his factual assertions are false

11 and, therefore, should not be treated as opinion, as protected

12 as opinion by this Court.  That's how we have approached that

13 issue.

14      So there are other reasons why we think that our amended

15 complaint would not be futile.  The second one is that the

16 complaint contains more pictures photo-captured off of the

17 Internet and inserted in the complaint of what the Washington

18 Post said online and what the articles actually looked like if

19 you were an online subscriber.

20      And part of the problem with the first complaint is that

21 it's difficult to always get all that stuff to work right, but

22 we did, and the amended complaint is more careful and more

23 thorough in that regard, and it's showing you explicit

24 pictures of the cover image of the Taitano video.

25      And just to be clear what I'm saying, Your Honor, is if

1  you had gone on the Internet the day after this event and you

2  had gone onto the Washington Post website and you had pulled

3  up this article, you would see a picture of Nicholas Sandmann

4  contained in the article, and you would be able to press a

5  button, and it would show the unedited, unsourced, short viral

6  video.  And so that's part of our argument I'll make later is

7  why these articles are properly determined to be of and

8  concerning Nicholas Sandmann.  So that's another thing that we

9  do with our amended complaint.

10      The third key point to show that there's not futility in

11  bringing our amended complaint is that the editor's notes were

12  not fully incorporated into our first complaint.  As I said

13  before, they came out afterwards.  One of the editor's notes

14  was referenced in the oral argument.  I spoke at length --

15      THE COURT:  I don't understand them to be arguing

16  that those initial stories, that those are accurate.  They

17  admit they weren't accurate.

18      MR. McMURTRY:  Yes, I agree.

19      THE COURT:  So we don't need to spend a lot of time

20  on that.  The question is whether -- the main question seems

21  to be, Phillips says that I was blocked and not allowed to

22  retreat, whether that was an opinion --

23      MR. McMURTRY:  And that was --

24      THE COURT:  -- or was it the truth.  Is it his

25  perception?  And the videos that I watched didn't show that.

1       It just showed two people standing there.

2               MR. McMURTRY:  Correct.

3               THE COURT:  Which is why I said that it didn't show

4       that.

5               MR. McMURTRY:  But there is a more complete video of

6       record.  There are a couple of longer videos, one that's as

7       long as an hour, one that's 15 minutes, that shows in great

8       detail that what Mr. Phillips said was a false factual

9       narrative of the events and, therefore, not a protected

10      opinion.

11          And I agree that the Washington Post, in its editor's

12      notes, did admit that its initial reporting was incorrect.

13      And therefore, it being incorrect and the context of the

14      reporting and the gist of the reporting, combined with the

15      false factual narrative, we believe, brings the publications

16      of the Washington Post to the point of being defamatory.

17          So, you know, that's, in broad scope, what we're saying.

18      We think that the videos take this matter from being one of

19      opinion to one of being a false factual narrative.

20          Now -- so I made that point.  I won't make it again.

21          Also in our amended complaint, we have expanded

22      allegations that Mr. Phillips did not actually feel

23      threatened; that he was not trying to diffuse anything; that

24      instead, he was trying to create a media controversy.

25          So we allege this in the amended complaint.  And I think

1    it goes to the point of addressing the Court's consideration

2    of his statements as being opinion by again demonstrating that

3    he was, in essence, a professional protester and provocateur

4    who was looking for a problem and then making up a story.

5        I mean, he was all over the media for days after that

6    becoming a celebrity, in essence, and we think that's what his

7    intent was.  But we really won't know until we depose him.  So

8    that's part of why we would like to be able to continue

9    forward in this case, is to offer more about what Mr. Phillips

10   was doing, who was paying his bills, things like that.  So I

11   think that there's much to be gained there, but I'm getting a

12   little bit off track.

13       Another point on why we are not facing futility in this

14   circumstance is that the amended complaint contains many

15   allegations of -- not allegations, but instances in which

16   individuals, including the Washington Post readers, editors,

17   and reporters, interpreted the Washington Post's accusations

18   against Nicholas Sandmann as being defamatory.  And I think

19   we've said that earlier when you said the Washington Post has

20   admitted that.  So we think that that also goes toward the

21   issue of futility.

22       And then finally, our amended complaint --

23       THE COURT:  You understand that if somebody posts

24   something on their website, that the Post said something

25   libelous, they are not liable for that under the

1   Communications Decency Act?

2           MR. McMURTRY:  Yes, I agree that's absolutely true.

3   So if you look at --

4           THE COURT:  It's not a very good law, in my opinion,

5   but it's the law.

6           MR. McMURTRY:  I think we can agree on that.  I don't

7   know if the Post would agree on that.

8        But, you know, from our perspective, when we talk about

9   the outrage that was shown on social media and so forth, you

10  know, the Court is tasked to look at the publication and look

11  at the context of the publication and then create -- you know,

12  determine what the gist of the publication was and whether or

13  not it was defamatory.

14       If it's defamatory in Kentucky, it would tend to expose

15  somebody to hatred, ridicule, and contempt.  And we allege in

16  our complaint that this, in fact, you know, did occur.  But

17  we're not asking the Court to step outside of the complaint

18  and say, oh, there's a social media outrage; therefore, it

19  subjected this person to hatred, ridicule, and contempt, but

20  only to know what social media is and how it works.

21       In other words, there are millions and millions of people

22  out there talking about this, or were talking about this,

23  talking about this at the time that it occurred.  And that is

24  a subtext as to, you know, why the publication was made, what

25  the purpose of the publication was, what the gist of the

18

1    publication was.  So we think that that is an addition to our

2    argument that is helpful to make the amended complaint not

3    futile.

4        And I think I've got two or three minutes here so I'll

5    try to --

6            THE COURT:  I took up some of your time.

7            MR. McMURTRY:  Okay.  I guess one thing I'd like to

8    jump to, Your Honor, is something that you said in your order

9    of your judgment.  On page 28 of your judgment, you said,

10   "However, Phillips did not see it that way.  He concluded that

11   he was being 'blocked' and not allowed to 'retreat.'  He

12   passed these conclusions on to the Post.  They may have been

13   erroneous, but, as discussed above, they are opinions

14   protected by the First Amendment."

15       And we think that that, you know, very much goes to the

16   heart of what we're saying

17           THE COURT:  Well, that's based on the video I'm

18   talking about.

19           MR. McMURTRY:  Okay.

20           THE COURT:  Mr. Sandmann is standing there, and the

21   next day, or within a couple of days, he gave an interview to

22   NBC, as I recall, saying, I stood there.  I didn't see why I

23   should have to move.

24       And Phillips was there, according to the video, using

25   your video, Phillips is there beating his drum, and you don't

1    really see anybody else.  There's a bunch of kids around, but
2    you don't see anybody else.  So you don't see whether he could
3    retreat or not.  You don't see what would happen if he said,
4    Please excuse me.  I'd like to go through and get up to the
5    Lincoln Memorial.  You just see the two of them standing
6    there.
7            MR. McMURTRY:  Right.
8            THE COURT:  So I assume that Mr. Sandmann would -- I
9    would have said, yeah, I would've let them pass.  If he had
10   said, Please excuse me, I would like to get by, I assume he
11   would have let him pass.  So that's why, on that one, I said
12   it would be his opinion that he was being blocked.  He wasn't
13   really being blocked.
14           MR. McMURTRY:  Right.  So I'd like to take the
15   Court's statement that that could have been erroneous and just
16   bring that into what the Supreme Court said in the *Milkovich*
17   case.  And it basically said, "Even if the speaker states the
18   facts upon which he bases his opinion, that those facts are
19   either incorrect or incomplete, or if his assessment of them
20   is erroneous, the statement may still imply a false assertion
21   of fact."
22       And I think, from this discussion with you, Your Honor,
23   it's clear that the expanded video would be able to
24   demonstrate that there really was no blocking, there was no
25   targeting, there was no taunting, there was no surrounding.  I

1  mean, this is discussed -- much of this is discussed in the

2  Post's editor's notes where they retreated from their initial

3  factual assertions on this point and said what Mr. Phillips

4  said is not true.

5          So it does seem that we can take what Mr. Phillips said,

6  from the protection of the opinion that the Court has given

7  that, and by looking and showing that what he said is

8  erroneous, then show that it's really a false factual

9  statement in that -- or a false factual narrative and

10 something that is not subject to protection as opinion.

11         So I think the Court even -- you know, you recognize that

12 yourself in your opinion.  You've articulated more clearly why

13 you said that.  Bringing that into context with the *Milkovich*

14 case and the fact that additional video which has now been

15 pled and demonstrated in our first amended complaint shows

16 that our first amended complaint is not futile and can

17 proceed.

18         You know, and then turning to the issue of -- you know,

19 we talked about the of and concerning.  We talked about the

20 defamation.  I think the other thing that we would like to --

21 the reason we would like to argue that an amended complaint

22 would not be futile is because we provide more context as to

23 what actually happened and what was said on the Post's

24 website.

25         So going back to this issue of you have to look at the

1    four corners of the document, when you get online with the

2    Washington Post or the New York Times or the Cincinnati

3    Enquirer or whatever and you read an article, you'll get a

4    screen.  Your Honor, you probably know, you scroll down,

5    there's different things.  There's an advertisement.  There's

6    a menu by which to guide yourself.  But there's also

7    something -- and this is referenced on page 45 of our amended

8    complaint -- which is called a Read More section, which

9    provides context.

10        And as we talk about the defamatory nature of what the

11   Post published, we're really talking about its assertions of

12   racist conduct.  In other words, that what Mr. Sandmann did by

13   standing still and doing nothing, which the Court acknowledged

14   in your order, how that is racist, or how it's racist conduct.

15        And, you know, I think --

16            THE COURT:  I happened to just be reading before

17   lunch, and they said, well, he had the hat on.  A lot of

18   people somewhere in these papers has stated that some people

19   regard that hat as being as racist as the confederate flag.

20   Maybe I read it someplace else.  But the hat seemed to have a

21   great deal more significance than the boys probably realized.

22   That's my opinion.  A lot of the people interpret that hat as

23   a red flag to a bull.

24            MR. McMURTRY:  That's true.  And probably --

25            THE COURT:  That's where some of this is coming from.

1          MR. McMURTRY:  I agree and accept Your Honor's, you

2     know, conclusion with regard to the hat.

3          THE COURT:  That's not a finding of fact.  That's

4     just an opinion that I've gathered from reading all this --

5     remember, I have five cases I've been through, and they all

6     seem to have this same common denominator, this hat.

7          MR. McMURTRY:  Right.  But recognizing that half the

8     population might feel one way and half the other, again, it

9     doesn't mean that (A) it can't be defamatory, can't be of a

10    racist act or racist conduct.  We would allege that, in

11    fact --

12         THE COURT:  There's cases that say somebody calling

13    somebody a racist is a matter of opinion.

14         MR. McMURTRY:  Well, but not the conduct.  So what

15    we're saying here is -- we think our case would be perfectly

16    fine if Mr. Sandmann was wearing a, you know, Cincinnati Reds

17    cap.  It wouldn't make any difference.  It might have changed

18    the Post's reporting because they might not have been able to

19    capitalize on it for their own agenda to the same extent they

20    would if he had a Reds cap or a Bengals cap on.

21         But the fact that they accused him of basically

22    identifying, targeting, blocking, taunting, and surrounding a

23    Native American, when combined with the Read More and the

24    computer portion of the Post article.  The Read More section

25    says, "Repugnant Image:  Indiana School Officials Investigate

Soccer Team Appearing to Give Nazi Salute."  I think there is

case law that says the Nazi salute is a racist act.

Then the next article, "Apparent Nazi Salute at Prom

Investigated by Wisconsin School District."

Next article, "Black R&B Artist Hoped Singing for Trump

Would Build a Bridge but Derailed Her Career Instead."

Next article, "Rebuke from Iowa.  It's Time for Steve

King to go."

But you can see in some of these articles, they're

referring to other racist conduct.  And I think if you look at

the Phillips statements, the context of the entire article --

and even I think it's fair to include these Read More

statements because they were part of the electronic article --

it shows that the Post reporting and use of the Phillips false

factual narrative were -- that they were defamatory, and

defamatory per se, and that generally speaking racist conduct.

THE COURT:  Before I forget, here's what I want you

to do when you get back.  I want you to put on DVD or several

DVDs every video you want me to watch, because there's been

some confusion about the names of these videos.  Maybe it's

just my confusion.  But I'm not sure I watched the ones you're

telling me to watch.

MR. McMURTRY:  Okay.

THE COURT:  And, of course, showing them to opposing

counsel and everything.  File them in the record or send them

1    to me with a label on them what you're calling them so I'm

2    sure I'm looking at the right video.

3             MR. McMURTRY:  That's fine.  We will do that.

4             THE COURT:  There's a mix-up about that.  I'm not

5    sure -- the one I watched, you say there's two of them like

6    that?

7             MR. McMURTRY:  I took from your order that you

8    read -- there was a Taitano video that was longer than a

9    minute, two minutes or whatever.

10            THE COURT:  This was about five minutes.

11            MR. McMURTRY:  Okay.  And then there was one that was

12   edited down to less than a minute.  We believe that's the

13   one --

14            THE COURT:  I only watched two.  They were given to

15   me on DVD.  I assumed it had been filed in the record.

16            MR. McMURTRY:  Yeah.  I'll take a look at those and

17   make sure you have the right ones.

18            THE COURT:  If the defendant wants me to watch

19   something else, you do the same thing.

20            MR. McMURTRY:  Okay.  Your Honor, thank you for the

21   20 minutes.

22            THE COURT:  This is the first case I've ever had

23   where these videos and links appeared.  And it seems strange

24   to me -- apparently it's the law though -- that you can put a

25   link in there to a video, but if somebody wanted to introduce

1    it in evidence, you'd have to call a witness that explains

2    what it shows, a witness who -- it may not have to be the

3    witness who took it, but it would have to be somebody who was

4    there and can say what it shows.

5        But here you're putting in links and who knows who made

6    these videos or where they came from, what they show.  You

7    don't have any witnesses for it.  This seems strange to me,

8    but it's the first time I've had it come up.

9            MR. McMURTRY:  Well, and for purposes of our case, we

10   alleged, you know, that's not really directly related to the

11   of and concerning and defamatory nature of the case.  It's

12   more of the negligence of the Post posting this unsourced

13   viral video on its website as part of one of its articles

14   about our client.

15           THE COURT:  But through your papers, you've got how

16   many links to different videos in there?

17           MR. McMURTRY:  Well --

18           THE COURT:  If I'm sitting in my living room reading

19   it, I'd have to go find a computer and look at it.  Put it on

20   a DVD and send it to me.

21           MR. McMURTRY:  We'll provide an accurate record of

22   those.

23           THE COURT:  Same for the defendant.

24           MR. McMURTRY:  Thank you, Your Honor.

25           THE COURT:  Okay.  You still have your ten-minute

1    closing.

2             MR. McMURTRY:  Yes.  Thank you.

3             MR. BAINE:  Good morning, Your Honor.  Good

4    afternoon, I should say.  Kevin Baine for the Washington Post.

5    And with me today are Phil Collier and Bethany Breetz from the

6    Stites & Harbison firm here in Kentucky and Thomas Hentoff and

7    Katie Meeks from Williams & Connolly, and Kalea Clark I have

8    here of counsel.

9             THE COURT:  The Post is well represented.  I'm not

10   surprised.

11            MR. BAINE:  Your Honor, there are three categories of

12   amendments here.  I want to address each one of them and

13   demonstrate that each one is futile.  None of them and none of

14   the arguments that have been made show that any error has been

15   made in the Court's decision dismissing the original

16   complaint.

17        The first set of amendments relate to these videos.  To

18   simplify things a little bit, if you read the plaintiff's

19   papers, the significance of the videos that were embedded in

20   the online articles is to show that the plaintiff was

21   identified.  And on that basis, they say, well, okay.  It's

22   all about of and concerning the plaintiff.  That's the

23   argument.  That's why the videos are arguably relevant.

24        There is no --

25            THE COURT:  One of the reasons anyway.  Go ahead.

1    MR. BAINE:  There is no claim in the case that the

2  Washington Post defamed the plaintiff by something that was in

3  one of the videos.  The substance of the videos is not the

4  basis of the defamation claim.

5    The allegedly false and defamatory statements --

6    THE COURT:  Well, they're saying the one where he's

7  standing in front there -- that's the one that causes me some

8  concern, because I'm not sure what it's supposed to stand for.

9  Maybe that's what you're saying.

10   Do you remember which one I'm talking about?  I'm sure

11  you do.

12    MR. BAINE:  Yes.  What I'm trying to say is that the

13  complaint is very specific on what they claim are the false

14  and defamatory statements.

15    THE COURT:  Right.

16    MR. BAINE:  And they're statements in the article.

17  They're not statements in the video.  So you don't have to

18  worry about the content of these long videos to decide this

19  motion because there's no dispute of what they say, and

20  they're not saying the Post is liable because of something in

21  a two-and-a-half-minute video.  That's not what the videos are

22  there to show.  The videos have been submitted --

23    THE COURT:  Well, they may show or they may not show

24  that Mr. Phillips was blocked or he wasn't blocked.

25    MR. BAINE:  Well, let's talk about that for a second.

1      THE COURT:  That's why I said it was an opinion,

2  because there was nothing to accuse Mr. Sandmann.  Had

3  Mr. Phillips said, Please excuse me, I'd like to go on up to

4  the Lincoln Memorial, he would have let him pass.  That's why

5  I said it was his opinion that he was blocked.

6      MR. BAINE:  And the videos will not alter that, Your

7  Honor, in any way.  Here's why:

8      There are -- the only things that are alleged to be false

9  about that incident are the words in the Post article.  Okay.

10  So the words in the Post articles are basically that Sandmann

11  didn't move, that he remained motionless, that he didn't

12  budge, that he and Phillips were at an impasse, and that

13  Phillips was blocked.

14      Now, some of those statements are factual statements that

15  are indisputably true.  It is indisputably true that

16  Mr. Sandmann did not move.  They allege that themselves in

17  their complaint, in paragraph 50 of the original complaint and

18  I forget what it is in the amended complaint.

19      THE COURT:  We've said it on --

20      MR. BAINE:  They allege it, and they said it in the

21  interview.  He did not move.  He remained motionless.  There

22  was an impasse.  He didn't move, as did all of the other

23  students.  Those are the facts.

24      Now, whether Sandmann -- whether Phillips was blocked was

25  something, as the Court said, in which Sandmann and Phillips

1    had this perception.  The fact that Mr. Sandmann didn't move,

2    that he remained motionless, that he stood in the path, and

3    that he didn't budge, those are facts that are true,

4    undisputed.

5        Mr. Phillips' perception was that because of all that, he

6    was blocked.  Mr. Sandmann's perception was, well, I didn't

7    block him.  The Court has said the nature of that statement,

8    the word "blocked" is in the nature of an opinion based upon

9    those disclosed facts.  The video can't change that

10   conclusion.  That's a legal conclusion that the statement that

11   he was blocked is an opinion based upon the facts.

12       THE COURT:  You're leaving part of it out.  He says,

13   I couldn't retreat.

14       MR. BAINE:  Right.

15       THE COURT:  And the video might show whether or not

16   he could have retreated and paint a broader picture.  There

17   might be some video among all of these videos that would show

18   that.

19       MR. BAINE:  And that, too, was Phillips' perception,

20   that he couldn't retreat.

21       Now, as I argued the last time I was at this podium, if

22   you read that article in its entirety, no one can take

23   literally as a factual statement the statement that "I

24   couldn't retreat," because the article makes clear that he

25   did.  The article says the incident ended when Phillips walked

1   away.  He could retreat literally.  So he wasn't making a --

2          THE COURT:  Well, the incident ended when the boys

3   went to catch the bus.

4          MR. BAINE:  That may be true, but that's not what the

5   article says.  The article says the incident ended when

6   Phillips walked away.

7      So if you're asking did the article say something false,

8   the article, taken as a whole, makes clear that Phillips was

9   not prevented from walking away literally.  His perception

10  was, I couldn't retreat.  I think what he meant was, I

11  couldn't retreat up to the Memorial.  But you cannot read that

12  first article literally to say that he couldn't move away,

13  because the article says that he did.

14     Now, as I said, the relevance of this video is on this of

15  and concerning point.  And I thought that the gist of the

16  plaintiff's motion was that the Court erred when it said that

17  certain statements weren't about Mr. Sandmann.  I just want to

18  make clear that we didn't read the Court's opinion to say that

19  the statement about blocking wasn't about Mr. Sandmann.  To

20  the contrary, the Court, at page 13 of its opinion, identifies

21  nine statements from the first article that are being

22  challenged.  One to 3, 8, 10, 13, 15 to 17.  And then the

23  Court said, eight of those were not about Sandmann.  All but

24  statement 10.

25     The Court did not say statement 10 is not about Sandmann.

Statement 10 is a statement that the guy in the hat just stood there, we're at an impasse, he blocked my way.  The Court did not rule that was not about Sandmann.

The Court ruled that was not actionable.  And this is on pages 22 and -- no, excuse me.  Just to confirm this, at pages 22 and 23 of the transcript, the Court said to me that his friends and acquaintances knew who that sentence is referring to.  I agreed.

And then at page 11 of the transcript, you said, "The only sentence in the whole article that refers to the plaintiff that they complain about is that statement about blocking."  And I agreed.  And so that wasn't the basis for the Court's ruling that wasn't actionable.

Rather, at pages 17 and 22, the Court gave its reasons. And the Court said that statement's not actionable because blocking is a matter of opinion and there's nothing defamatory about what was described.  This description of this impasse, of Mr. Sandmann not moving, of being blocked, wasn't defamatory.

In the context of this rambunctious, boisterous incident that's going on, the fact that two people are standing at an impasse doesn't subject Mr. Sandmann to public hatred, contempt, or ridicule.  It's not defamatory.  That was the basis for the Court's opinion.

And the only thing that that video and that thumbnail

1   picture from the video tie Mr. Sandmann to is that

2   confrontation.  Because the thumbnail shows Phillips,

3   Sandmann, staring at each other.  That's the function of that

4   video.  It shows that was the person staring at Mr. Phillips.

5       All of the other statements in the article about tomahawk

6   chops and build the wall that are attributed to students, that

7   picture doesn't tie Mr. Sandmann to those statements at all.

8   And so that's why I say, these videos don't change anything

9   about the Court's rulings, because the Court said that

10  statement 10 was about Mr. Sandmann, and the videos don't show

11  that any of the other statements were about him.  So the video

12  doesn't change anything.

13      The second category of statements -- of amendments

14  rather -- are amendments relating to the editor's notes.

15  They've now alleged in their complaint all these editor's

16  notes.  Those editor's notes don't have anything to do with

17  whether or not the statement about being blocked isn't a

18  matter of opinion or not.  They don't have anything to do with

19  whether or not these articles were defamatory.

20          THE COURT:  They have to do with whether they were

21  inaccurate.

22          MR. BAINE:  To some degree, yes.  But not in any way

23  that matters for this motion.

24          THE COURT:  Because, as I recall -- I've got five

25  cases now about this.  But as I recall, in this case, they

said that Sandmann was standing there and more or less implied that he had walked up to Phillips when actually it was -- and the boys had approached Phillips.  But actually it was Phillips that approached the boys, which is what I understand the editor's notes to make clear.

MR. BAINE:  Well, I don't know that the editor's notes do that.

THE COURT:  I have a lot of paper here.  I have notes --

MR. BAINE:  I don't recall if the editor's notes addressed that specific thing, but I'd like to go through a couple of the editor's notes to explain the way I view them.

THE COURT:  Go ahead.

MR. BAINE:  The editor's notes were not labeled corrections.  One of them was, and I'll get to that; but for the most part, they're not labeled corrections.  They're labeled editor's notes, because they were not correcting, for the most part, misstatements in fact.

The first editor's note -- and this is in paragraph 221 of the amended complaint.  But it makes clear the difference between an editor's note and a correction.  It said there had been a correction the week before of the incorrect fact that Phillips had fought in the war.  That was a mistake, and that was subject to something called a correction.

But this was different.  This is called an editor's note.

1   And here's what it says.  It says, "Subsequent reporting, a
2   student's statement, and additional video allow for a more
3   complete assessment of what occurred."  "A more complete
4   assessment of what occurred."
5       That doesn't say those are factual falsehoods.  An
6   opinion can be subject to more complete assessment just as a
7   statement of fact can.  That's not necessarily a statement
8   there was a factual error.
9       Then the note continues, and it says that the subsequent
10  reporting and the students' statements and additional video
11  either contradicted or failed to confirm accounts provided by
12  Phillips and others, including the following:  That Phillips
13  was prevented by one student from moving on.
14      The note explained that the high school student,
15  Mr. Sandmann, facing Phillips, had issued a statement
16  contradicting his opinion, giving his different assessment of
17  what had occurred.  That's not an admission of factual error.
18  It's the reporting that, as the Court said, that Sandmann and
19  Phillips had different perceptions of what had occurred.
20      What Sandmann said himself in his public statement is
21  interesting.  He says, "I never felt I was blocking the Native
22  American protester."  That's a quote.  "I never felt" I was
23  blocking him.
24      That sure sounds like just what the Court has said.  Sure
25  sounds like an opinion.  That was his perception.  "I never

1    felt that."  Not that's a false statement of fact.

2        The other things that the editor's note updated or

3    provided additional information relating to were the

4    statements that the group had been taunted in the lead-up to

5    the encounter.

6        The problem with that sentence was the timing.  Lead-up

7    was wrong.  The group hadn't been taunted in the lead-up to

8    the encounter.  It was after the encounter began.  So there

9    was a timing issue there.

10           THE COURT:  Which group are we speaking of now?

11           MR. BAINE:  Beg your pardon?

12           THE COURT:  I'm sorry.  Which group are you saying

13   had been taunted?  The Israelites or the boys or the Indians?

14           MR. BAINE:  The initial article says that Phillips'

15   group had been taunted in the lead-up to the encounter.  In

16   fact, they were taunted after the encounter began.  That was a

17   mistake in after or before.  But that has nothing to do with

18   this claim of defamation.

19       The third thing that the Post --

20           THE COURT:  Does your article say that Sandmann

21   taunted them --

22           MR. BAINE:  No, it didn't say that.

23           THE COURT:  -- the Native American group?

24           MR. BAINE:  The article did not say that Mr. Sandmann

25   taunted anybody.  It only said that he didn't move and that he

arguably blocked him.  All the statements about taunting were attributed to students, the teens, some students, never connecting Mr. Sandmann.

So then we get to the group liable problem that when you have a big group and you say, well, some of them were taunting, you can't assume that any particular person was taunting.

The editor's note says that all the subsequent reporting failed to confirm that the students were trying to institute a conflict.  Now, remember, that was another thing that the Court said was an opinion.  That was an opinion expressed by one of the Native American protesters based upon his observation that there was a rambunctious and aggressive display going on.

Since then, Mr. Sandmann had issued a statement saying they weren't trying to instigate a conflict.  So the Post responsibly did an editor's note saying, well, subsequent reporting, Mr. Sandmann's statement contradicts this opinion of this Native American protester's that the students were trying to instigate a conflict.  Different perspectives offering different opinions on what was going on.

The version of the note that appears in the newspaper also addressed the last article.  And here's what it says by way of editor's note.  "The story reported denial of one student," Mr. Sandmann, "that he's heard any student say

anything hateful or racist at any time.  The story should have
noted that widely circulated video from that day does not
corroborate that such statements were made."

So that's not correcting some false statement of fact.
It's just saying it's additional information that confirms
Mr. Sandmann's statement that he didn't hear anything.

The next note in paragraph 224 of the amended complaint
was a correction, not an editor's note.  That was because the
Post was correcting a mistake.  It had reported the diocese
had apologized for the students' actions.  The correction said
it had not apologized.  It had condemned their behavior but
had not apologized.  So they corrected that misstatement.

And then I think another editor's note explained that the
Philip Bump column had been revised to delete references to
public perceptions, based upon the initial video, that the
student facing Phillips appeared to physically intimidate him.
A more complete video does not show that the student
physically intimidated Phillips.

This is obviously referring to public perceptions.  So
they deleted the reference to public perceptions based upon
video that were negated by subsequent video.

Well, public perceptions are opinions based upon
disclosed facts and available video, not a correction of
factual error.

Then finally, the editor's note on the last article

says -- this is the one that's entitled "Viral Standoff is More Complicated Than It First Seemed."  It refers to subsequent coverage and noted the article had been revised -- this is a quote, "revised to clarify that certain statements are not corroborated by widely available video of the incident."

Again, that does not indicate that any of the statements challenged in this lawsuit were factual mistakes as opposed to opinions.  But the Court has given multiple grounds for rejecting the claim based upon each of the statements in these articles.  And our view is that none of those grounds has been affected by either the editor's notes or the video.

So the third category of amendments are a whole bunch of paragraphs about Mr. Phillips' credibility, which they do say in their brief, at one point, bear upon the issue of negligence.  And if this case were ever to go to trial and the issue were whether the Post reasonably relied upon a factual statement Mr. Phillips made or whether they had reckless disregard for truth, I suppose we can get into Mr. Phillips' credibility.

But as the plaintiff acknowledges -- well, maybe they don't acknowledge it.  Even if these were statements of opinion, as the plaintiff says, they say the Post is liable for failing to disclose facts that bore upon Mr. Phillips' credibility.  That's why they think this is relevant.  They

1    feel that they've now alleged facts that show that he was not

2    reliable and that's important because the Post should have

3    disclosed those facts.

4         Well, the law doesn't require the Post to disclose facts

5    bearing upon the credibility of the person's opinion that's

6    being reported.  The reader can judge that opinion based upon

7    the facts that are offered to support the opinion.  There's no

8    case anywhere that says an opinion becomes actionable because

9    the person that reports it doesn't talk about the credibility

10   of the person who offered the opinion.  That's just not the

11   law.

12        It's obvious, though, that Mr. Phillips was an antagonist

13   of Mr. Sandmann.  He was at a standoff with Mr. Sandmann.

14   Obviously, he's not a supporter of Mr. Sandmann.  So the

15   reader knew that about Mr. Phillips.  He wasn't a neutral

16   third party.  He was a participant in the whole incident.  And

17   so they know that, well, we can take that into account in

18   assessing his credibility.

19        And all these other allegations about Mr. Phillips are

20   primarily to the effect that, oh, he protests a lot and he's

21   always on the leftist side of causes.  He's protested against

22   the pipeline.  He's talked about healthcare.  He's always off

23   on the left.

24        Well, I'm not sure what that has to do with credibility

25   to begin with, but it certainly doesn't bear upon whether the

1    Post has some obligation to disclose more facts about him.

2    And, in fact, they did disclose that he'd been involved in

3    previous protests.  So if that's what the reader needs to

4    know, they knew that from the Post article.

5        And then finally, I should say one thing.  Counsel didn't

6    touch on it here but --

7        THE COURT:  I think the point -- I've been over this

8    proposed amended complaint several times.  The point they're

9    trying to make with discussing Phillips is they're trying to

10   rebut what the Court said that it was an opinion that he was

11   being blocked, and they're saying it wasn't his opinion; he

12   was lying.  He knew he wasn't being blocked.  That's what I

13   understand that amendment to be driving at.

14       MR. BAINE:  That is -- that is the argument I was

15   about to address, and it's one of the things that they say in

16   their papers.

17       THE COURT:  Because if you allege somebody's lying

18   and it's not really his opinion, maybe that opinion rule won't

19   fly.  That's their argument.

20       MR. BAINE:  Right.

21       THE COURT:  I'm not sure it's correct, but that's

22   their argument.

23       MR. BAINE:  But they cite no cases to support that,

24   and we cite two cases that dispose of that argument.

25       In the *Milkovich* case, Supreme Court case involving an

opinion by Chief Justice Rehnquist, here's what he says in Footnote 7. "The issue of falsity relates to the defamatory facts implied by a statement of opinion. For instance, the statement, 'I think Jones lied' may be provable as false on two levels. First, that the speaker really did not think Jones had lied but said it anyway. And second, that Jones really had not lied. It is," the Chief Justice says, "the second level of falsity which would ordinarily serve as the basis for a defamation action." In other words, the substance of the statement, not whether or not the speaker really believed the opinion.

That's what Chief Justice Rehnquist is saying in Footnote 7. He says, if they didn't really believe the opinion, that might bear upon malice, if that's an issue, but it's false as to the underlying statement here that Phillips was blocked -- that Sandmann was blocked. That's either a false statement of fact or it's an opinion, but whether or not Mr. Phillips really believed he was blocked is not the basis for a lawsuit.

In the *Hammer v. City of Osage* case in the Eighth Circuit, the Court said, "Statements of opinion, even if made maliciously or insincerely, are afforded absolute privilege under the free speech clause of the First Amendment and cannot be made actionable libel." "Even if made insincerely or maliciously." And if the law were otherwise, every person who misstates an opinion would be subject to sue based upon the

1   allegation that he didn't really hold the opinion.

2       Look at restaurant reviews.  Everybody knows classically

3   restaurant reviews are opinions; they can't be the basis for a

4   libel suit.  Well, if the plaintiff's argument were correct,

5   they could come to court and say, well, the restaurant

6   reviewer didn't really believe the substance of his opinions.

7   I can sue and prove as a fact that he didn't believe it.

8       Every public opinion of any kind can be the basis for a

9   libel suit, and we would then have you plumbing the depths of

10  people's souls and minds to find out, gee, do they really

11  believe what they said or are they saying it for some ulterior

12  purpose.

13      How can we impose liability on the ground that, well, we

14  really think that he's got some hidden agenda?  Everybody

15  knows what Mr. Phillips' agenda was on the mall.  He was

16  protesting for Native American recognition and respect.

17  Everybody knows that he was in a face-to-face confrontation

18  with Mr. Sandmann.  And he wasn't Mr. Sandmann's ally.  He was

19  his adversary.  Everybody knows that.

20      He expressed his opinion about how he felt in that

21  incident on the mall, and the Post reported his opinions and

22  reported the facts that proved -- that supported that opinion

23  in Mr. Phillips' mind.

24      The readers can judge that, whether or not that opinion

25  is sound or not sound.  They have Mr. Sandmann expressing his

position.  I didn't feel -- I didn't think that I was blocking
him in any way.  But to argue simply that the person who
expresses these opinions is not a credible source and,
therefore, the Post can't report his opinions would tie every
reporter's hands in reporting on every incident, every
political demonstration that they cover.  They'd have to talk
to the participants.  They're all giving their perceptions.
Then the Post would have to say, well, I wonder whether that
person really believes that.  Maybe they didn't really believe
it.

There's no case that suggests that that can be the basis
for liability.  The sub-suit of the alleged defamation is the
opinion itself.  And if it's an opinion, it's not actionable.
If the facts are disclosed, people can look at the facts and
look at the opinion and weigh it.

Finally, I know I've taken a lot of time --

THE COURT:  You're right on time.

MR. BAINE:  -- but they have argued that the Court
failed to consider the context of these articles, and I think
that's an unfair criticism.  The Court considered the entire
context and said in its opinion, I'm looking at these
statements in the context of the entire article.

They say that -- let me just look at my notes here for a
second.  I wanted to find a point.

Oh, they argue that part of the context is the Make

1    America Great hat.  Well, Mr. Sandmann was wearing the hat.

2    So if the hat is the context that turns everything into a

3    racist statement, that's true.  He was wearing the hat.

4         And the Court considered the context of the article in

5    its entirety.  They want you to consider things that aren't in

6    the article.  And to the extent they're asking you to consider

7    context outside the article, those are extrinsic facts.

8    That's a libel per quod claim.  It's not a libel per se claim.

9         And if they're asking you to consider context outside the

10   four corners of the article, they have to allege special

11   damages, which they have not done.  They're not arguing that

12   they've alleged special damages, even in the amended

13   complaint.  And we've explained in our brief why they have

14   not.

15        Finally, they say that the Court should look at the

16   comments on the Post website to tell the Court how to

17   interpret the article.  Well, it's the Court's job, as a

18   matter of law, to decide how the article can reasonably be

19   understood by an average reader.  And the Court applies its

20   judgment and its experience to decide whether or not it would

21   be reasonable to read an article to mean certain things.

22        The Court doesn't do that by asking what a self-selected

23   group of commenters on the Internet might have said.  For one

24   thing, the people who comment don't say, I interpret the

25   article above to mean X.  They generally go off and launch

1    into their own opinions, based upon their own preconceptions

2    and they're own biases.

3         They're not purporting to tell anybody what that article

4    I just read means.  They're giving their take on the whole

5    issue.  And even if they did say, I think that's what the

6    article means, it's for the Court to decide whether that's

7    reasonable.

8         And the reality is that these commenters, we don't know

9    whether they've read the whole article at all, whether they

10   went beyond the headlines.  We don't know whether they saw

11   some video on the Internet and then saw a Post headline and

12   decided to write, comment, without reading any of the article.

13   That's why the Court does this on its own asking itself how

14   could a reasonable reader interpret this article.

15         THE COURT:  Well, here's the heart of the assessment.

16   If I take the pictures of Mr. Sandmann that he can be

17   identified with most of the public, what I see as the main

18   thing is about Phillips, these new allegations about Phillips.

19         They allege, as I understand it, that Phillips knew darn

20   well that he had a way to retreat when he said "I didn't have

21   a way to retreat," and he knew that he wasn't really being

22   blocked.  This is additional stuff that wasn't in the original

23   complaint.  And that's the allegation.  It has to be proved.

24   If we reopen the case, it has to be proved.  But it's an

25   allegation.  It's a new allegation.

1          MR. BAINE:  Well, but there's a question of law for

2    the Court to decide, Your Honor, whether or not one can state

3    a claim, based upon an opinion, on the ground that the person

4    expressly didn't really believe that opinion.

5          It doesn't alter -- the new allegations about

6    Mr. Phillips' credibility don't alter in any way the nature of

7    the statement.  The Court has said that certain parts of that

8    statement, such as "didn't move" are facts, but the assessment

9    that someone was blocked is a perception or an opinion by its

10   nature.

11         If, by its nature, it's an opinion, it's not actionable.

12   And the allegation that Mr. Phillips didn't really believe it

13   doesn't transform it into a statement of fact.  It's still a

14   statement of opinion.  And it's the substance of the opinion

15   that is arguably hurtful.  But it can't be false because it's,

16   by its nature, a matter of perception.

17         THE COURT:  If he says, I had no way to retreat, I

18   wasn't allowed to retreat, and if you had a broader view of

19   it, there is plenty room for him to retreat --

20         MR. BAINE:  Well, Your Honor --

21         THE COURT:  I had a very narrow picture of it when I

22   made that statement at the conclusion of the first opinion;

23   that he was standing there and they wouldn't get out of his

24   way if he says excuse me.  That's when he said there was no

25   reasonable way to retreat; it was too crowded or too steep or

1    whatever that he couldn't retreat.

2        But if they came up with a video that shows that he had

3    plenty of room to retreat, I would say that they've shown a

4    false statement.

5            MR. BAINE:  Well, Your Honor --

6            THE COURT:  And then the Post -- there would be a

7    jury issue, of course.  It would be a jury issue whether the

8    Post was negligent in that case when they allege all the other

9    new stuff that they've got in there.

10           MR. BAINE:  Well, on that particular statement that I

11   couldn't retreat, as I said, the first article, reading that

12   in context makes clear he was able to retreat because it said

13   it ended when he walked away.  And so you have to read that in

14   its entirety and then it's obvious that Phillips was engaging

15   in, I would say, rhetorical hyperbole, which is, by its

16   nature, opinion.

17       He wasn't literally saying, I could not move in any

18   direction because the article says he moved away.  And even if

19   that's what he could be understood to mean, the Post said

20   unequivocally, as a fact, not qualified in any way, that he

21   ended the confrontation by walking away.

22       So he was able to walk away.  He was able to retreat.

23   And the Post did not say otherwise.

24       Even if one considered that as a factual statement by

25   Phillips that I couldn't walk away, the Post then says he did

1    walk away.  So the Post did not publish that he could not at

2    all walk away.

3        So I think, read in context, he is saying, I felt

4    blocked.  I couldn't move on.  I couldn't move forward.  I

5    think what he probably meant was, I couldn't move forward

6    rather than I couldn't go away, because he did go away.

7        The Post cannot be responsible for the meaning that he

8    couldn't move at all because it said he decided to walk away.

9            THE COURT:  Well, he didn't go away because somewhere

10   in this record it said this is all going on and somebody told

11   the boys, come on, the bus is here, get on the bus, and the

12   boys went and got on the bus.

13           MR. BAINE:  Well, Your Honor --

14           THE COURT:  And I guess somebody in the indigenous

15   people's crowd said, "We won.  We won."  And the boys went

16   home.  It's alleged someplace the boys went home, didn't even

17   know all this was going to hit the fan.

18           MR. BAINE:  Your Honor, with respect, I think

19   you're --

20           THE COURT:  When they got home, they found all this

21   stuff on the media and other things that had been described.

22           MR. BAINE:  With respect, I think you're blurring

23   together what we learned later on, what Mr. Sandmann said

24   later on, what he says now in his complaint, and what the Post

25   said in the first article.

1      The Post said unequivocally in the first article that the

2   confrontation ended when Mr. Phillips walked away, not when

3   someone said, hey, the bus is here; it's time to go.  That's

4   what people said later on.

5           THE COURT:  I don't know how important that is.

6           MR. BAINE:  And this statement about being blocked

7   only appears in that first article.  By the time we get to

8   subsequent reporting by the Post, the Post doesn't say blocked

9   at all.  It just says neither budged.

10     But I would refer the Court to the article.  The article

11  that contains the word "blocked" has to be read in its

12  entirety.  And that article says that the whole thing ended

13  when Phillips and his group walked away.  It said nothing

14  about it ended when the boys decided to leave because buses

15  came.

16     So you have to look at the article itself as a whole, not

17  what someone said some days or weeks later.  The question is

18  whether or not the person read that article, who knows from

19  that article that Phillips, in fact, was able to and did walk

20  away.  That's the context of his rhetorical statement that I

21  couldn't retreat.

22          THE COURT:  Okay.

23          MR. BAINE:  Thank you, Your Honor.

24          MR. WOOD:  May I argue for our ten minutes, Your

25  Honor?

1          THE COURT:  Yeah, go ahead.

2          MR. WOOD:  Thank you.

3       Mr. Baine says -- and this is a quote -- "I think what he

4    meant was."  Your Honor is trying to look at these various

5    videos to figure out what was Phillips saying.  The problem

6    is, the only way to answer that question is to depose

7    Mr. Phillips.

8          One of the reasons that we believe this case has to go

9    beyond motion to dismiss is because it needs a fully developed

10   factual record.  Because under defamation law, Your Honor, you

11   just don't see a term and go, that's opinion.  You have to

12   look at the factual circumstances to determine whether the

13   speaker -- in this instance, Mr. Phillips -- was expressing an

14   opinion or whether Mr. Phillips was expressing a factual

15   narrative.  That's a jury issue, unless the evidence is

16   overwhelming on motion for summary judgment where it could be

17   decided by the Court.

18         And I have to admit, Judge, I've done a lot of defamation

19   work.  This does sound confusing.  It's not.  Here's what

20   happened.

21         There is about a one-minute video clip that went viral.

22   There were other longer videos out there, but that was not

23   what was getting played in the media.  That was not getting

24   what was posted on the Washington Post articles.  It was just

25   the one-minute clip that shows, as Your Honor noted, Nicholas

standing with Nathan Phillips pounding the drum in front of
him.

What happened before?  What happened afterwards?  That
video doesn't tell us anything.

But here's what happened to Nicholas.  At the time that
video of one minute went viral, Nathan Phillips hit the
airwaves.  Nathan Phillips was on CBS, talking to ABC, talking
to NBC, talking to the Washington Post; and he was telling
them, this is what happened.

Now, his stories changed.  His factual narrative changed.
He wasn't believable.  But they post articles republishing his
factual narrative of what happened.  "He blocked me.  I was
intimidated by him.  He was taunting me."

You can't label that opinion unless you know, under the
evidence, what Mr. Phillips was intending to convey.  And I
believe the evidence, if we're allowed to develop it in a
fully developed record, will be such that a jury could easily
find that Mr. Phillips was intending to convey facts.  And
even the Washington Post, in their notes, has admitted that
fact.

Instead of talking about what they say, let me just read
to you three or four of what the Post notes say.

Subsequent reporting.  That would be investigation.  "A
student statement and additional video allow for a more
complete assessment of what occurred."

1        "Either contradicting or failing to confirm accounts

2     provided in that story, including that Native American

3     activist Nathan Phillips was prevented by one student from

4     moving on, that his group had been taunted by the students in

5     the lead-up to the encounter, and that the students were

6     trying to instigate a conflict."

7        The Post went in after the fact, after we sent them a

8     retraction demand, and they said that part of Mr. Phillips'

9     narrative is not true.

10       There's no such thing as a false opinion.  This is not

11    what Mr. Baine said, we're trying to sue them because they

12    republished a false opinion that Mr. Phillips didn't believe

13    was false.  That's nonsense.

14       This young man wears a MAGA cap.  You may look at him and

15    you may see racist.  Others may see Make America Great Again;

16    I love my country.  That's an opinion.

17       We're not here because of people's opinions about the

18    caps.  We're here because whatever color cap he was wearing,

19    if it was plain white, Mr. Phillips went out and told a

20    factual narrative that this young white student, with a white

21    cap let's say, got in front of him to instigate a conflict,

22    blocked his way, while he was being subjected as a Native

23    American to taunting and being blocked so that he couldn't get

24    away from the taunting.  And that describes a boy, in that

25    instance, wearing a white cap, as someone who is engaging in

1    racist misconduct.

2         We wouldn't tolerate having any young white person get in

3    front of a Native American, block his way, not let him retreat

4    while he's taunting him and jeering him.  That was the

5    narrative factually of Nathan Phillips.  It's not the truth.

6    Nathan Phillips is a liar.

7         And they published his lies.  They published his

8    narrative.  Because they didn't take the time to go back and

9    look at what happened before or what happened afterwards.

10   They just took the one-minute clip and republished the

11   description factually of Nathan Phillips.  That's why they're

12   sued, because to do that without investigation was negligent.

13        This case is only in front of you, Your Honor, to

14   determine whether the lawsuit, lengthy as it is, whether it

15   sets forth a plausible cause of action for the negligent

16   republication of false and defamatory statements.

17        They admitted in the other notes, taunting they proved

18   was not true.  That was false.  Blocking him, not true.  That

19   was false.  Physically intimidating, more complete videos,

20   does not show that the students physically intimidated

21   Phillips.  They have admitted that the factual narrative --

22             THE COURT:  What were you just reading from?

23             MR. WOOD:  I'm reading from the -- I can cite them,

24   Your Honor.  It's the editor's notes from the Washington Post.

25             THE COURT:  Okay.

1          MR. WOOD:   In those notes, what the Post did, after

2     we sent them a retraction demand, over a month and a half

3     after the event, is they went out and investigated the factual

4     narrative of Nathan Phillips.  They should have done that

5     before they published it.

6          But when they finally got around to looking into the

7     factual narrative of Phillips about taunting and intimidating

8     and blocking, they admitted that it was false, in part because

9     they finally took the time to look at the before video that

10    was available but undisclosed by them and the after video.

11         This is not about Nathan Phillips' opinion, Your Honor.

12    If he can somehow, in his testimony, convince the Court or a

13    jury that he was merely giving his opinion, well, more power

14    to him.

15         I think anyone will easily see that Nathan Phillips was

16    out on television and in news broadcasts talking about his

17    recollection of what happened that day.  And that is factual.

18    It either happened or it didn't happen.  And we now know and

19    the Washington Post admits it didn't happen.

20         Yet they took that false narrative of Phillips and used

21    it to convey a gist that this young boy was engaged in racist

22    misconduct.  Not because he's wearing the hat.  That might

23    have been the straw that broke Jeff Bezos' back and said let's

24    run with this story because of the cap.  But that's not what

25    this case is about.

1      This young boy was accused of racist misconduct, blocking

2   a Native American, jeering at him, taunting him, physically

3   intimidating him.  That's the gist of their articles in the

4   four corners of the articles.  And it is a gist that is based

5   on false factual statements by Nathan Phillips.

6      So it's not an opinion case, Your Honor, unless

7   Mr. Phillips can convince a jury that he went on all these

8   television networks to give his opinion.  I bet you that -- I

9   bet you when NBC's asked or CNN, why did you interview Nathan

10  Phillips, I bet when I ask the reporter from the Washington

11  Post, why did you interview Nathan Phillips, to get his

12  opinions?  No.

13     They interviewed Nathan Phillips repeatedly to get the

14  facts, as he allegedly gave them.  Facts that turned out to be

15  like shifting sand, changing from interview to interview,

16  which ultimately, even the defendant admits, his factual

17  narrative was false.

18     That's why it's important for this young man to have not

19  just a day in court.  Your Honor has recognized the magnitude

20  of this case to the public in general.  The magnitude of the

21  case that I care about is Nicholas Sandmann, a young boy who

22  aspires to be a lawyer.  I don't believe --

23         THE COURT:  After he sees this case, he may change

24  his mind.

25         MR. WOOD:  Or he may be inspired to fight for

1    justice.

2         But, Your Honor, I make that point only because -- and I

3    know enough to know about the demur practice.

4         THE COURT:  What?

5         MR. WOOD:  They used to practice law by filing

6    demurs, and you would get lawsuits thrown out because they

7    didn't meet a technical pleadings requirement.  The Civil

8    Practice Act and the Federal Rules of Civil Procedure came

9    along and they said, we're going to have a broad scope for

10   amendments because we're not going to have cases thrown out on

11   technical issues like a demur because somebody didn't plead

12   right.

13        He just wants the Court to look at his lawsuit, as best

14   he can develop it before discovery, and say, you know what, if

15   you can prove all this, it's plausible.  You set out a

16   plausible case for the negligent republication of false and

17   defamatory statements, and now you get to move on,

18   Mr. Sandmann.

19        Because at the end of the day, what we really want for

20   Nicholas Sandmann is we want a final ruling on this case,

21   whether it be by Your Honor or by a jury.  We want it to be

22   decided on a fully developed factual record.

23        We do not want it to be decided on what Mr. Baine thinks

24   that Nathan Phillips was trying to say or what Joe Blow said

25   in a comment.  We want to go to the principals; Nathan

1    Phillips, the eyewitnesses, the reporters.  We want to get the

2    facts and fully develop the facts.

3        And then, and then only, whether he wins or whether he

4    loses, he will have the satisfaction of knowing, win or lose,

5    that at least this Court, and hopefully, I believe, a jury,

6    will reach its decision based on a fully developed factual

7    record.

8        This case should not be thrown out on motion to dismiss.

9    The original complaint should not have, in my opinion.  The

10   amended complaint, we think, makes it abundantly clear that we

11   should move this case to discovery.  Not to the Sixth Circuit,

12   but to discovery.

13       Thank you, Your Honor.

14            THE COURT:  All right.

15            MR. BAINE:  May I have 30 seconds, Your Honor?

16            THE COURT:  Pardon me?

17            MR. BAINE:  May I have 30 seconds?

18            THE COURT:  Thirty seconds.  I'll time you.

19            MR. BAINE:  Got it.  I just want to direct the Court

20   to two of its holdings in its opinion which I think are

21   unchanged.

22       At page 17, the Court wrote that whether Mr. Phillips

23   was, quote, blocked "is simply not capable of being proved

24   objectively incorrect" by the nature of this statement.  I

25   think that holding stands.  It is unaffected by any evidence

1    or additional allegations.

2        Secondly, the Court said on page 22, "The article quotes

3    Phillips, who stated that an individual in a hat 'blocked' his

4    path and we were at an impasse."  The Court went on to say

5    there's nothing defamatory about that.

6        So there were two alternative grounds for holding that

7    the blocking statement was not actionable.  One, it was an

8    opinion by its nature.  Not that Mr. Phillips intended

9    opinions, but by its nature, it stated opinion.  And secondly,

10   there's nothing defamatory about suggesting that, in the

11   context of a rambunctious, three-sided confrontation, two

12   people are at an impasse where one blocked the other.  Just

13   not defamatory.

14       Thank you.

15       THE COURT:  All right.  Well, get those DVDs to me,

16   and I'll get you -- it's going to take me several days, at

17   least, but I'll get you a decision on this as quick as I can.

18       Again, my compliments to both sides, which makes my job

19   difficult.

20       (Proceedings concluded at 2:23 p.m.)

                              - - -

21                    C E R T I F I C A T E

22       I, JOAN LAMPKE AVERDICK, RDR, CRR, certify that the

23   foregoing is a correct transcript from the record of
     proceedings in the above-entitled case.

24

     _\s\ Joan Lampke Averdick____        _  October 21, 2019  _
25   JOAN LAMPKE AVERDICK, RDR, CRR        Date of Certification
     Official Court Reporter