```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
 2                   NORTHERN DIVISION AT COVINGTON
                              - - -
 3      NICHOLAS SANDMANN, by and through his :  Docket No. 19-CV-19
        parents and natural guardians,        :
 4      TED SANDMANN and JULIE SANDMANN,       :  Covington, Kentucky
                                               :  January 7, 2020
 5                       Plaintiffs,           :  1:00 p.m.
                                               :
 6              versus                         :
                                               :
 7      WP COMPANY, LLC, d/b/a                 :
        THE WASHINGTON POST,                   :
                                               :
 8                       Defendant.            :
                              - - -
 9
                     UNITED STATES DISTRICT COURT
10                   EASTERN DISTRICT OF KENTUCKY
                     NORTHERN DIVISION AT COVINGTON
11                            - - -
        NICHOLAS SANDMANN, by and through his :  Docket No. 19-CV-31
12      parents and natural guardians,        :
        TED SANDMANN and JULIE SANDMANN,       :  Covington, Kentucky
13                                             :  January 7, 2020
                         Plaintiffs,           :  1:00 p.m.
14              versus                         :
                                               :
15      CABLE NEWS NETWORK, INC.,              :
                                               :
16                       Defendant.            :

17                            - - -

18                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
19                   NORTHERN DIVISION AT COVINGTON
                              - - -
20      NICHOLAS SANDMANN, by and through his :  Docket No. 19-CV-56
        parents and natural guardians,        :
21      TED SANDMANN and JULIE SANDMANN,       :  Covington, Kentucky
                                               :  January 7, 2020
22                       Plaintiffs,           :  1:00 p.m.
                versus                         :
23                                             :
        NBC UNIVERSAL MEDIA, LLC,              :
24                                             :
                         Defendant.            :
25                            - - -
```

```
 1                      TRANSCRIPT OF ORAL ARGUMENT
                       BEFORE WILLIAM O. BERTELSMAN
 2                     UNITED STATES DISTRICT JUDGE

 3                              - - -
       APPEARANCES:
 4
       For the Plaintiffs:        TODD V. McMURTRY, ESQ.
 5                                Hemmer, DeFrank, Wessels PLLC
                                  250 Grandview Drive
 6                                Suite 500
                                  Ft. Mitchell, KY 41017
 7
                                  L. LIN WOOD, ESQ.
 8                                G. TAYLOR WILSON, ESQ.
                                  L. Lin Wood, PC
 9                                1180 W. Peachtree Street
                                  Suite 2040
10                                Atlanta, GA 30309

11
       For the Defendant,         KEVIN T. BAINE, ESQ.
12     WP Company, LLC:           NICHOLAS G. GAMSE, ESQ.
                                  Williams & Connolly
13                                725 12th Street, N.W.
                                  Washington, DC 20005
14
                                  WILLIAM G. GEISEN, ESQ.
15                                Stites & Harbison, PLLC
                                  100 E. RiverCenter Boulevard
16                                Suite 450
                                  Covington, KY 41011
17
18     For the Defendant,         JOHN C. GREINER, ESQ.
       NBCUniversal Media, LLC:   J. STEPHEN SMITH, ESQ.
19                                Graydon, Head & Ritchey, LLP
                                  312 Walnut Street
20                                Suite 1800
                                  Cincinnati, OH 45202
21

22     For the Defendant,         CHARLES D. TOBIN, ESQ.
       Cable News Network, Inc.:  LEITA WALKER, ESQ.
23                                Ballard spahr LLP
                                  1909 K Street, NW
24                                12th Floor
                                  Washington, DC 20005
25
```

1    Court Reporter:                  JOAN LAMPKE AVERDICK, RDR, CRR
                                      Official Court Reporter
2                                     35 W. Fifth Street
                                      Covington, KY 41011
3



        Proceedings recorded by mechanical stenography,
25   transcribed by computer.

4

1    (Proceedings commenced at 1:00 p.m.)

2    THE COURT:  All right.  We all know what case it is

3    so I won't have to call it like in the courtroom.

4    I usually hold these conferences in the courtroom.  In

5    the average case, one will take about five minutes, if you

6    have an automobile case on liability like damages.  These

7    cases are obviously much more complicated.

8    So first of all, I think all three defendants are

9    represented here; is that right?  So we need to go around the

10   table and get everybody's appearance.

11   First let me introduce Magistrate Judge Smith who will

12   supervise the discovery in this case under whatever guidelines

13   we set at this meeting.  She's well experienced.  Been a

14   magistrate, what, ten years?  So she's well experienced and

15   she will move it along.

16   So first of all, let's go around and get everybody's

17   appearances.

18   MR. BAINE:  I'm Kevin Baine from Williams & Connolly.

19   I represent the Washington Post.

20   MR. GAMSE:  Nicholas Gamse from Williams & Connolly

21   also on behalf of the Post.

22   MR. GEISEN:  Bill Geisen with Stites & Harbison, also

23   counsel for the Washington Post.

24   MR. GREINER:  Jack Greiner from Graydon Head

25   representing NBC.

1          MR. KUMER:  Daniel Kummer, in-house at NBC Universal.

2          MS. BETA:  Justine Beta, also in-house at NBC.

3          MR. SMITH:  Steve Smith, Your Honor, from Graydon on

4     behalf of NBC.

5          MS. WALKER:  Leita Walker with Ballard Spahr on

6     behalf of CNN.

7          MR. TOBIN:  Charles Tobin with Ballard Spahr, Your

8     Honor, also on behalf of CNN.

9          MR. McMURTRY:  Todd McMurtry here on behalf of the

10    plaintiff.

11         MR. WOOD:  Lin Wood, Your Honor, on behalf of

12    Nicholas Sandmann, the plaintiff.

13         MR. WILSON:  Good afternoon, Your Honor.  Taylor

14    Wilson on behalf of the plaintiff.

15         THE COURT:  All right.  Thank you all.

16      So we're going to review the case a little bit.  Then

17    we're going to get into some specific rules.  Those of you who

18    aren't lawyers, try to stay awake.

19         MR. TOBIN:  Your Honor, if I may interrupt just for a

20    moment.  I wanted to apprise the Court -- Charles Tobin on

21    behalf of CNN -- that as of yesterday afternoon, the plaintiff

22    and CNN have reached a settlement in this case, outlined the

23    terms of a settlement agreed to by Mr. Sandmann's counsel and

24    by CNN.  And so we will be asking the Court to be relieved, if

25    the Court would, from further obligations in the case pending

1     consummation of the settlement.

2          THE COURT:  Okay.  Do you want to stay for the

3     conference?

4          MR. TOBIN:  We'd like to remain for the conference.

5     We wanted to make sure the Court was aware of the proceeding.

6          THE COURT:  All right.  Well, I'm glad to hear it.  I

7     was going to talk settlement down the road here someplace, but

8     you beat me to it.

9          Okay.  So first of all, let me commend all the attorneys

10    on all sides for their hard work.  They obviously went into a

11    lot of hard work to prepare the 26(f) planning report, which

12    the rule requires.  As I said, in most cases, it's relatively

13    simple.  In this case, as the presence of all these attorneys

14    indicates, you've got a lot of parties, a lot of attorneys, a

15    lot of claims, three different lawsuits.  May be more coming.

16    I'm going to get to that in a minute.  And I know they had to

17    spend a lot of time putting that 26(f) report together, and

18    it's been a huge help.  And I think we can hold this

19    conference to about an hour; whereas without that report, it

20    probably would have taken all day.

21         Okay.  So let me ask a couple of fundamental questions

22    first.  I sat down and reviewed the pleadings in this case,

23    and I noticed that there were three complaints.  And the

24    plaintiff is demanding from all three, including CNN, the

25    overall damages of $800 million, composed of 50 million from

the Washington Post, 75 million from CNN, and another 75
million from NBC, all for compensatory damages, then punitive
damages from each in the amount of $200 million.

Okay.  What I want to ask the plaintiff at the initiative
here is, what is your proof of damages going to be?  I don't
mean what witnesses are you going to call, but just in
general -- I won't hold you to it, but just in general, what
is your outline going to be of your damages?

As I recall, I didn't see any special damages in this
record.  I think there was a doctor bill of $800.  So what is
your proof of damages going to be?

MR. WOOD:  Thank you, Your Honor.  On the issue of
actual damages from the negligence, which we contend is a
standard as a private figure plaintiff, we would be seeking
damages for damage to reputation and for emotional distress,
his own and the emotional distress he may suffer concerned
about the stress suffered by his family members, which I
believe is a compensable element of the actual damages.  And
that's the actual damage.

The medical bills, while insignificant, could be the
precursor of what, in the future, could be significant
medicals in the future, so I don't omit that.  It's just not
an emphasis at the moment.

The second element of damage, since it's a per se case
and we believe we can prove actual malice under *Gertz*, we're

1     required to get assumed, or presumed, damages under Kentucky

2     law for a per se violation, defamation per se.  And those

3     presumed damages are, in essence, Your Honor, the damages that

4     we know exist but they're not readily capable of proof, but

5     they're still compensatory damages.

6          And I've compared that in the past to the bomb that goes

7     off that creates the physical actual damage.  If it's a

8     nuclear bomb, it creates fallout.  And the damage from that

9     fallout can't be seen, but we know it exists.  That's, in

10    essence, how I describe assumed or presumed damage.

11         The third element would be punitive damages.  And we

12    understand that that law requires the showing of actual

13    malice, even with a private figure.  And under Kentucky law,

14    it requires showing additionally common law malice, which I

15    believe Kentucky says if it's a per se case, malice is

16    presumed.

17         So those are the damages.

18         And the punitive damage element goes really to the net

19    financial value of the defendant.  And the amount is designed

20    to be -- it's a quasi criminal.  It's not really designed to

21    compensate Nicholas.  It's designed to be, in effect, a

22    punishment on the defendant, not to prevent the conduct,

23    because we can't do that, but to deter, which would be, in my

24    way of saying, enough money that the jury would feel like that

25    before they do this again, they'd at least stop and think

1    twice.

2         So those are our damages in a nutshell.

3              THE COURT:  Well, let's be a little more fundamental,

4    let's say.

5         Let's start with the compensatory.  I've got an idea what

6    the proof on the punitives would be.  Let's go to the

7    compensatory damage.

8         What happened following -- all this in Washington only

9    took place in about 20 minutes or a half hour, right?

10             MR. WOOD:  The incident itself was limited time, yes.

11             THE COURT:  The boys got on the bus and they went

12   home.  This is in something -- I think one of your briefs that

13   I read said that.  They didn't know anything was wrong until

14   they got home, and then bad things started to happen.

15        So what was it that happened that caused all this

16   emotional distress?  That's what I'm trying to -- and I would

17   remind you -- maybe you don't know -- I've got four other

18   cases from different -- I don't know if he's named in any

19   others or not.  They're John Does are the plaintiffs.  But

20   I've got four other cases against various people; some of them

21   individuals, some posted on the Internet, things of that kind.

22        So what is it that -- nobody's ever explained exactly

23   what happened that caused all this emotional distress.  So if

24   you could expand on that for a couple of minutes, it would be

25   helpful.

1    MR. WOOD:  I'd be pleased to do so, Your Honor.

2 Thanks for the opportunity.

3  If I might just preface it by saying that I'm not fully

4 aware of the other cases, the nature of the other cases.  I

5 have some idea of some of them.  But I would point out only

6 that our case is different than those cases.

7    THE COURT:  I understand that.  You say he's not a

8 party to those?

9    MR. WOOD:  Correct.  And if there were to be some

10 cause of action that Nicholas has against any of those

11 defendants, that would be part of a separate lawsuit filed in

12 the appropriate jurisdiction.

13    THE COURT:  Okay.

14    MR. WOOD:  In terms of what happened --

15    THE COURT:  In the other cases, each of them, a big

16 issue is the weight of the long arm statute.

17    MR. WOOD:  Right.  Luckily, in this case we don't

18 have jurisdictional issues.

19    THE COURT:  You don't have that.

20    MR. WOOD:  To try to succinctly answer, Your Honor,

21 Nicholas Sandmann was standing there with a group of people.

22 He was physically confronted in the sense of Nathan Phillips

23 walking up to him.  And it was in the midst of a lot of people

24 yelling, chanting, singing.  Some described it as mocking and

25 jeering Mr. Phillips.  And the accusations from these

defendants was made through republishing what we contend was a

false narrative from Nathan Phillips that included

significantly that Nicholas physically undertook to block

Mr. Phillips' exit from this scene where people were believed

to be, in part, making fun of him, mocking him, and jeering

him.

We believe that with a white male, as I said to the Court

earlier, not capped -- without a cap or with a white cap, it

doesn't matter -- but to falsely state that he acted

physically in a way that kept the Native American, a minority,

in this throng of people who were seen by many as mocking and

jeering him, that that is the conduct that is capable of being

defined by a jury as a racist act by Mr. Sandmann.

And that's the case factually in a nutshell, and why we

contended in our proposed order that this is not a case that

should burden Your Honor with 50 or 10 or a hundred

eyewitnesses.

THE COURT:  That's not my question.

MR. WOOD:  I'm sorry.

THE COURT:  Somewhere there's been a mention of death

threats.  Is it true that he received death threats?

MR. Wood:  I can such state that he did receive death

threats.

THE COURT:  How did they come; mail, phone calls,

social media, or what?

1          MR. WOOD:  I think they were posted on social media

2     and may have been received by e-mails.

3          MRS. SANDMANN:  Text.

4          MR. WOOD:  And texts, if you don't mind me asking.

5          THE COURT:  No, no, no.  These are important facts.

6          MR. WOOD:  And voice mail messages.

7       In addition to those direct acts by third parties against

8     the family and Nicholas, Your Honor I know will recall,

9     Nicholas became kind of the poster child of a racist incident.

10    And we believe that that was done recklessly and in a biased

11    way because of the feelings of the defendants about the

12    president and the fact that he was --

13         THE COURT:  How has this manifested?  How did this

14    come to Nicholas' or his family's attention?  Did they get

15    phone calls?  Did people egg their house?  What happened?

16         MR. WOOD:  Phone calls, what I've described to Your

17    Honor about voice mails and death threats by e-mail and

18    otherwise, text.

19       He also turned on the television almost daily and saw him

20    being discussed as someone who had been involved in a racist

21    incident.

22       And Todd, feel free to jump in.

23         MR. McMURTRY:  Yeah.  Your Honor, I was, of course,

24    here on the ground as all this was happening, and a lot of

25    what I observed, talking to people on the phone getting

updates, you know, first off, Steve Hensley, you know, with the Homeland Security office here in Northern Kentucky was involved.  There were the death threats.  There was a bomb threat at the Diocese of Covington.  You know, and Steve coordinated the police departments from around Kenton County out of the concern because there was so much publicity on this.

And I know that the Sandmann family actually had to just get up and leave their house because they were certain, or advised, that not only would the press and other people descend, but that people seeking to retaliate against him for this alleged racist conduct might also show up and do him physical harm.

As well, there were significant posts from social media influencers, on Twitter and Facebook and otherwise, that threatened him and suggested that he be put through a wood chipper, things like that, which were inciting concern of violence such that Homeland Security, local police, Rob Sanders, all these people mobilized to protect him.

So there was a very significant perception amongst the law enforcement community that there was a real danger.

MR. WOOD:  And if I might add --

THE COURT:  You say they actually had to move out of their house?

MR. McMURTRY:  They did.

1          MR. WOOD:  And if I might add, one thing that

2     Mr. McMurtry reminds me of, when the Covington Catholic

3     students returned to school the next week, they did not allow

4     Nicholas to come back to school.

5          THE COURT:  I didn't know that.

6          MR. WOOD:  We had to threaten litigation.  Because

7     Nicholas was supposed to participate that weekend in a moot

8     court argument for his school.  I think I told Your Honor that

9     he aspires to be a lawyer.  We'll see how this case changes

10    his feelings.

11         THE COURT:  After all this, he may change his mind.

12         MR. WOOD:  Or he may decide to be a better lawyer.

13    They did not want him back in school.  He got ostracized.

14    Only Nicholas.  And because he was not going to be allowed in

15    school within 24 hours of the extracurricular school activity

16    of the moot court, he was told he could not participate on his

17    team that weekend.

18    Mr. McMurtry and I interceded, and the net result was

19    they let him back into school on the day before so that he

20    would qualify.  Number one, they let him back in; and number

21    two, he was eligible to participate in the moot court event

22    that weekend.

23    But the net effect on this young man of being ostracized

24    from school was not insignificant.  And when he had to sit in

25    the auditorium of the school when I believe it was one of the

administrators addressing the situation at the Lincoln

Memorial -- I don't want to speak for him.  I can only speak

to what he said.  He sat there feeling like everybody in the

school -- well, particularly the administration of the

school -- was blaming him for something he had not done.

Because as that video shows, Nicholas never made a move that

day, except to look over at a friend and ask him to be quiet.

THE COURT:  Now, from work on other parts of the

case, it seems like it all started to blow over within five or

six days?  They started printing retractions.  People came

forth saying no, that's not what happened.  So how long did

this ostracizing, if you want to put it that way, how long did

that go on and other effects?

MR. WOOD:  Some members of the media, it blew over

pretty quickly.  For the defendants that are here, they let it

hang around for many days.  And none of these defendants, the

two remaining, the Post and NBC, they have never retracted and

said that the Nathan Phillips story was false; and yet the

videotape shows that it is false.

So they know that the Phillips narrative that was

republished was false, but they've never admitted it publicly.

They've never retracted what they've said.

THE COURT:  It seems to me, in reference to

something, we talked about editor's notes that they posted.

Wasn't that the Washington Post?

1          MR. WOOD:  There were editor's notes very

2     carefully --

3          THE COURT:  Didn't they take some of it back?

4          MR. WOOD:  No.  Actually, Your Honor, they did not.

5     Because what they did in their editor's notes, which I'm

6     confident, and correctly so, was done with the strong input

7     and advice of counsel, they said as much as they could without

8     admitting themselves into a problem liability-wise before this

9     Court.

10         So they did not correct.  They did not retract.  They did

11    not apologize.  They simply gave an explanation that said,

12    well, we reported what we knew on day one and day two and what

13    people were saying, and then when it finally came out that it

14    was not true, we reported that, so we shouldn't be sued.

15    That's not a retraction.  That's not a correction.  That's an

16    explanation.

17         THE COURT:  That's on the damages.  But after all

18    that came out, these other things that were causing all this

19    distress, didn't that die down?

20         MR. WOOD:  The issue about Nicholas and his

21    reputation as being tied to a Trump supporter, which he may or

22    may not be -- he bought a souvenir cap that day -- that has

23    never really died down.  Nicholas Sandmann will be recognized

24    by many people throughout his life as the person that

25    everybody thought was a racist because he favored Trump and he

obstructed a Native American's path, or they'll still believe that he did it.

Because you can have everybody in the world whispering that he's innocent, but it will never, for the rest of his life, overcome the shouts of guilty that these major members of the media broadcast about this boy for days on end.  So it will never end for Nicholas from a damage standpoint, Your Honor.

THE COURT:  Okay.  Now, listen carefully to this next question because it's important procedurally.

Will you have evidence that can attribute any specific part of the damages to any specific defendant, or is it all one big ball of wax?  Is all this publicity together is affecting him, or can you point out they had to move out of their house and that was the fault of this Defendant 1 and that he was denied from participating in his school, and that was Defendant 2?  It's my impression that it was all pretty general.  Is that correct?

MR. WOOD:  I agree with your impression.  It would be more -- there may be some specific slices, but the overall forest is, I believe, consistent with Your Honor's impression that it's not separable by a defendant or by statement.  Each statement is unique, and the jury will have to evaluate the whole of the damage as to each defendant.

THE COURT:  Okay.  Now, so far, we have three

1  defendants.  I recall someone made the statement -- I'm not

2  sure if it was you or somebody else -- that there were going

3  to be 40 more defendants or 20 more defendants.  So do we have

4  that to look forward to, or can we just try to resolve what we

5  have?

6          MR. WOOD:  This is a dangerous question.  I'm going

7  to tell you the truth, Judge.  I always try to.  I was the guy

8  on Sean Hannity on one of two interviews I gave that he asked

9  me how many more lawsuits, and I said, well, it could be

10  hundreds; it could be thousands.  That was pretty early on.

11      Analyzing this case with time, and with all due respect,

12  Your Honor's analysis, which I believe was spot-on in your

13  reconsideration, I think that the number of lawsuits that

14  could be brought in this court related to the republication of

15  Nathan Phillips' false narrative or his lies -- and that's

16  without investigation of him or the incident, looking at the

17  video -- is probably -- and I'm going to comfortably say this.

18  If anybody's uncomfortable, punch me.  I don't see myself,

19  sitting here today -- from our analysis, we probably max out

20  at 12.

21      Does that include the ones we've filed?

22          MR. McMURTRY:  No, 15.

23          MR. WOOD:  So 15 is the maximum number of putative

24  defendants who republished this type of story, three of which

25  are before the Court.

1        In all candor, I expect, in the next 60 days or so, we

2    will sue Gannett.  And we will sue Gannett in this court where

3    you have jurisdiction, and it will be for the same essential

4    factual situation as these cases.

5        Whether the other ten or so are jurisdictionally before

6    Your Honor or whether we ultimately decide to sue them or not,

7    I'm not in a position to answer that question today.

8            THE COURT:  When does the statute run?

9            MR. WOOD:  The statute runs -- let me get my dates

10   right.  Nicholas turns 18 in July of 2021.

11           THE PLAINTIFF:  The 24th.

12           MR. WOOD:  July the 24th of what year?

13           THE PLAINTIFF:  I turn 18 this year.

14           MR. WOOD:  In 2020?

15           THE PLAINTIFF:  Yes.

16           MR. WOOD:  The statute runs July the 23rd of 2021.

17   Thank you.  I'm sorry I didn't get it right.

18           THE PLAINTIFF:  You're welcome.

19           THE COURT:  Well, do you want to go ahead with -- of

20   course, we have to ask other people too, the defense.

21       Do you want to go ahead with this and bring it to

22   discovery and trial, or what do you want to do?

23           MR. WOOD:  In the interest of judicial economy, which

24   is consistent with an efficient and economic handling of this

25   matter for my client, I think I can state unequivocally today

1    that if I had the choice, I would have this scheduling

2    conference postponed for a certain number of days to allow us,

3    within a represented number of days, if Your Honor wishes, say

4    30 or 45, to go ahead and file the lawsuit against Gannett.

5    Because I think Gannett needs to be under the same scheduling

6    order as these two remaining defendants, and it makes sense.

7    And it certainly, I think, makes sense from Your Honor's

8    standpoint if we did that.  But I don't want to impose a delay

9    because I didn't file the suit yet, but I also am filing them

10   when I can and when I feel like they're appropriate.

11       But I would say that if you told me today, Mr. Wood --

12       THE COURT:  It's you that's going to tell me.  You're

13   the one that's got the suit, then it doesn't seem to me to

14   make much sense to do a lot of it --

15       MR. WOOD:  I can file --

16       THE COURT:  Just a second.  To do a lot of discovery

17   on these two now remaining cases and then you file five, ten

18   more next summer.

19       MR. WOOD:  Don't want to do that.  In other words,

20   I'd like to have -- let's assume -- I think we'll sue Gannett

21   within 30 days.  I could represent that comfortably.

22       THE COURT:  All right.

23       MR. WOOD:  So then we'd have three cases; Gannett,

24   NBC, Washington Post, and there would be no reason for anybody

25   to have to depose Nicholas three times.

1      Each witness could be deposed -- and the parties have

2    agreed on this, I believe.  Each witness in the case would

3    only have to be deposed once for use in all two or three or

4    four cases.  That's efficient.

5      The issues involved in each by the admission of both

6    parties are different enough that we've agreed that they

7    should not be consolidated for purposes of trial, but they can

8    be a practical consolidation on an as-makes-sense basis such

9    as I've described, one deposition for use in all cases.  There

10   can be a consolidation on the issue of discovery.

11           THE COURT:  Well, subject to what the defendants

12   might have to say about it, which I'm going to ask you in a

13   minute, are you making a motion for me to continue this

14   conference until you file the additional suit?

15           MR. WOOD:  May I have one second?

16           THE COURT:  Yes.  I'll take a recess for five

17   minutes.

18           MR. WOOD:  Could I ask Your Honor for that?

19           THE COURT:  Yes.  It's kind of important, don't you

20   think?

21           MR. WOOD:  I do.  I do.  And I appreciate you

22   addressing it.  If you give me five minutes, I will address

23   it.

24           THE COURT:  We will do that.

25           MR. WOOD:  Thank you, Your Honor.

22

1     (Recess taken from 1:20 p.m. until 1:30 p.m.)

2         THE COURT:  Okay.  Have you reached some kind of

3    consensus, or do we have to discuss it further?

4         MR. WOOD:  We have, Your Honor.  Based on the

5    discussions -- and Mr. Baine can speak for the defense, but I

6    think this is generally acceptable to them.

7         On behalf of Mr. Sandmann, we would move the Court to

8    continue the 26(f) conference for a minimum of 60 days.  And

9    we would submit to the Court, from the plaintiff's side, a

10   status report within -- just to give myself a little holiday

11   break -- no more than 40 days, a status report to tell you

12   exactly who we have actually sued, although you may already

13   know it because of your docket, or really, more importantly,

14   if there's anybody else to be sued.  So that would give the

15   Court a good idea of when to reschedule the 26(f) conference

16   for all of the defendants.

17        THE COURT:  Have you sued anybody other than these

18   three?

19        MR. WOOD:  Have we?

20        THE COURT:  Have you sued anybody other than these

21   three --

22        MR. WOOD:  We have not.

23        THE COURT:  -- in some other court perhaps?  In the

24   state court?

25        MR. WOOD:  We have not.  And we have no present

23

1     plans -- we may in the future, but it won't be in this court,

2     and it would be probably for something less, being related to

3     Mr. Phillips.  Nathan Phillips will be sued eventually, but

4     he's in Detroit.

5          THE COURT:  Mr. Phillips?

6          MR. WOOD:  Mr. Phillips lives in Michigan.  And I

7     think that the option to sue him remains.  The defendants may

8     third-party him in if they can prove legally he's a joint

9     tortfeasor.

10         THE COURT:  Does he have $800 million?  $50 million?

11         MR. WOOD:  He does not, Your Honor, but the figures

12    are not relevant to suing someone when they've done something

13    wrong.  The jury will decide what it's worth.  I'm just trying

14    to give them an idea that it's significant.  The dollar

15    figures are only meant to convey that this is a very

16    significant damage.  It's not to say this is what he's been

17    damaged dollar for dollar.

18         THE COURT:  Well, you ought to consider your

19    obligations under Rule 11 before you stick that in the

20    complaint then.

21         MR. WOOD:  I have, Your Honor.  And when I look at

22    the net financial assets of the defendants and I try to make a

23    good faith, reasonable calculation on the amount of money that

24    would sufficiently and reasonably deter the defendant, I

25    believe that my figures on both reputation damage and punitive

1    damages meet every requirement of a good faith pleading under

2    the Federal Rules of Civil Procedure.

3          THE COURT:  But the Supreme Court has said -- they

4    didn't give a percentage -- in the vast majority of the cases,

5    punitive damages should be limited to nine times the

6    compensatory damages.

7          MR. WOOD:  And I believe that if you look at the

8    complaint and you look at what we've pled as at least -- our

9    position is it's within nine times.

10         THE COURT:  It's not what you plead.  It's what you

11    can prove.

12         MR. WOOD:  And if I prove -- if the jury awards $5

13    million or a million dollars, I'm going to be smart enough to

14    know that my punitive damage claims under present law cannot

15    be more than eight or nine times that actual compensatory

16    damage.  I would not ask for more.  That would be in bad

17    faith.

18         THE COURT:  That's somewhat short of $800 million.

19         MR. WOOD:  In all likelihood, Your Honor, yes.

20         THE COURT:  All right.  While we're here, let's go

21    through a couple other things that I wanted to do.

22     Are defendants in accord with what's being stated,

23    continue it until we get the rest of the defendants in here?

24         MR. BAINE:  What Mr. Wood proposes is acceptable to

25    the defendants, Your Honor.

1    THE COURT:  All defendants, both remaining

2  defendants?

3    MR. GREINER:  Your Honor, I would only add that I

4  think obviously a 26(f) conference is going to have to be

5  farther out than 60 days from today.  I mean, assuming that he

6  sues Gannett in 30 days, they're going to have the right to

7  respond, to answer to the --

8    THE COURT:  Why don't you folks get together on an

9  agreed order after we adjourn.

10    MR. WOOD:  We will do that.  And I did not mean to

11  suggest you had to reset it within 60 days.  I meant for you

12  to give you 60 days to figure out when down the road to reset

13  it.  So we can give you a proposed order.

14    THE COURT:  You all can figure that out.  I've got a

15  pretty open docket.  I don't do criminal anymore so I've got a

16  pretty open docket.

17    MR. WOOD:  That has to make you feel somewhat better.

18  It must be tough to do criminal and civil.  I always wondered

19  how you did both.

20    THE COURT:  It wasn't easy.

21    MR. WOOD:  I bet.  I couldn't do criminal law.

22    THE COURT:  Okay.  Let me go through my notes here

23  and see if there's other things that would be productive to

24  address before you bring in these other people.

25    Okay.  The defendant was talking -- I'll just give you

1   my -- these won't be final since I was going to hear argument
2   on them, but these are the tentative decisions I had in mind.
3        Okay.  I don't think doing the discovery in phases is
4   practical.  You'd get into endless objections when you take a
5   witness.  Somebody would say no, that doesn't belong to this
6   phase; it belongs to the other phase, and I don't think it's
7   practical.
8        As to the deadlines, I was going to go with the deadlines
9   requested by the defendants.  I think that those will change
10  because you're going to have the delay of bringing in these
11  other parties, and they're going to have to answer, and
12  they're going to have to file the same motions to dismiss as
13  you file, and we're going to have to rule on those.  I think
14  we're going to be next fall before we get all that done.  If
15  we go sooner, I'll be happy.
16       As far as the number of depositions, I think the
17  plaintiff's -- or the defendant's rather -- statement of 50 is
18  probably conservative, considering all the issues we've got.
19  You have to depose all the editorial staffs, all the media
20  entities, probably most of the people that were on the trip.
21  I was going to approve the 50 with leave to allow Magistrate
22  Smith to extend it if she wanted, if she thought it
23  appropriate.
24       Okay.  And then think of this.  Suppose the plaintiff
25  goes to trial against one of the defendants and recovers a

1    million dollars, or whatever the figure would be.  Then they

2    go to trial against the next defendant.  The next defendant

3    says well, you already got your million dollars.  The jury

4    says that was all -- you said the damages weren't separable.

5    You already got awarded damages of a million dollars.  You

6    can't get more because you're collaterally estopped.  Your

7    first jury says you're entitled to a million dollars, which

8    that they have to pay.  If we're libel also, you could sue us

9    for contribution, but we wouldn't have to pay a new figure.

10        What do you say about that?

11            MR. WOOD:  Thank you, Your Honor.

12            THE COURT:  I see that coming down the road.  Now

13   it's more farther away than I thought, but we ought to be

14   thinking about it anyway.

15            MR. WOOD:  And its on-point thinking.

16        Our position is, I believe, consistent with the law of

17   defamation.  Each defendant has published the false and

18   defamatory accusations to different audiences, different third

19   parties.  Therefore, by definition, there cannot be another

20   person or entity that is a joint tortfeasor.  They are all

21   different as to the publications to different third parties.

22            THE COURT:  They all have abridged the same

23   interests, the interest he has in a good reputation.

24            MR. WOOD:  There may be some overlap in the audience.

25   There is certainly a consistent damage of reputation.  But

28

your reputation is not damaged by you in your eyes.

If I publish a statement to Mr. Baine about Nicholas that damages his reputation, it's going to have a damage to Nicholas about what he's learned.  If I, in a separate case or statement, publish it to Mr. Grimes, he's going to have a certain opinion of this man's reputation.

So it's the same person, it's his reputation, but the statements are being published to different people. Therefore, there cannot be, I believe, a joint tortfeasor where there's contribution, even though there may be, in some instances, an overlap where I publish it to Mr. Baine and Mr. Wilson and I publish it to Mr. Greiner and Mr. Wilson. It's different audiences.

THE COURT:  That's why I asked you the second question, could you apportion out which stories, separate damage that each story did, or was it all collective, and you said it was all collective.

MR. WOOD:  I may have misspoke.  You cannot apportion --

THE COURT:  You may wish you hadn't spoke.

MR. WOOD:  I know Your Honor's fair and you'll give me a chance to correct myself, so let me try to make sure I get it right the second time because I didn't get it right the first time.

THE COURT:  Well, I think you got it right.  The

29

1 point is your problem.

2 MR. WOOD: Well, the point is -- and I thought about

3 this. The point is, the Washington Post has to stand on its

4 own for a jury to evaluate what its statements published to

5 its audience did to his reputation. Then they've got to look

6 at NBC separately and decide what their statements did to

7 their audience to Nicholas Sandmann.

8 That's why they can't be consolidated ultimately for

9 trial, and we agree on that. And that's why under Kentucky

10 law, as I understand it, you can only apportion damages

11 between a joint -- with respect to a joint tortfeasor who has

12 either settled or who has been sued in a third-party

13 complaint. There is no empty chair apportionment under

14 Kentucky law as I understand it.

15 So that's why each case has to stand or fall on its own

16 both as to liability and damage. If I suggested to the

17 contrary in my earlier answers, accept my apologies and I

18 stand corrected. But what I had just told you, I believe, is

19 the correct analysis from my standpoint.

20 THE COURT: I think you would have to have a joint

21 trial among these media defendants. Or you could have

22 separate trials, I guess. But then they would all have to

23 contribute to whatever the recovery was.

24 And also, whatever you got in the first trial would be --

25 you'd be collaterally estopped to try to exceed it in the

1    second trial because you would have actually tried that issue

2    with the first jury.

3         This is not simple stuff, I know.  I'll give you time to

4    think about it.

5              MR. WOOD:  Well, and here's what I would ask Your

6    Honor.  I recognize the issue, and I believe that my answers

7    are correct with my initial research.  But what I can assure

8    the Court is, is that when the time comes -- and it will --

9    that we will thoroughly brief these issues to the Court after

10   I've had it, knowing the Court's general feelings, to make

11   sure that either we're right or wrong and the Court is right.

12   And if we've concluded that the Court's initial thinking is

13   not right, we're going to respectfully give you the case

14   authority to the contrary.  And I think that would be what you

15   can expect without any question from us.

16             THE COURT:  Let me tell you how I see it now.  You

17   can try to change my mind.

18             MR. WOOD:  Sure.

19             THE COURT:  I had a case several years ago.  You came

20   in from the airport down that hill over there.  It was a much

21   steeper hill several years ago.  And a car was coming down

22   that hill, and it came to the bridge, the bridge that goes to

23   Cincinnati, and there was a traffic jam on the bridge.  The

24   car stopped.  Behind it came another car, and it ran into the

25   first car.  Behind it came nine or ten more cars, and they

each ran into the other.  And like you see with the thing with the balls go back and forth on the little stand, you hit the first one, the one over here is the one that goes up, it was the first car that got the brunt of it.

So the way we had to resolve that was to look at the fault.  That was a joint tort, I held.  I don't think it ever had to be tried, but there was a lot of argument about this. I don't think it's published or anything.

But you would have had to try everything, and the jury would have had to apportion the liability to each driver according to the degree of his or her own negligence.  We never got that far.  We got it settled before we ever got to that point.  But I had held it.

And that's what the Kentucky apportionment statute requires, in my opinion.

MR. WOOD:  And I agree with Your Honor if you're dealing with joint tortfeasors who have either been sued or --

THE COURT:  They didn't plan it together.  They just happened to be involved in this incident together.

MR. WOOD:  And I understand completely, and I agree with you that if those individuals or entities are joint tortfeasors as defined by law and they have either been sued or they have settled under Kentucky law, you would have to apportion the damage between all of those joint tortfeasors sued or joint tortfeasors who have settled.  You would not add

32

1    anybody in that was an empty chair.

2        What I reserve the right to argue to the Court is --

3        THE COURT:  Actually, if the plaintiff did not sue

4    one of them, one of the other defendants could sue him.

5        MR. WOOD:  Exactly.

6        THE COURT:  And you do have cases where there's an

7    empty chair, where one party has settled, like in this case.

8    You'd have an empty chair and say, well, no, no, it wasn't my

9    fault; it was CNN's fault.  And you do have empty chairs in

10   these cases.

11       MR. WOOD:  I agree with Your Honor.  But the empty

12   chair can only be filled by a defendant who has settled or a

13   joint tortfeasor who has settled.  They can fill the empty

14   chair.  Here it would be CNN.

15       THE COURT:  They don't come in.  They've settled.

16   That's why they settle, so they wouldn't have to go to trial.

17       MR. WOOD:  Well, but they won't be there.  Their

18   liability is fixed or limited.  All the defendants will be

19   doing is trying to point to CNN to lessen their own liability.

20       THE COURT:  Well, they can --

21       MR. WOOD:  But the fundamental issue is -- and I have

22   not fully researched it, but my initial feeling from what I've

23   looked at is that Your Honor is absolutely right if they are

24   joint tortfeasors.

25       I believe that when you're talking about defamation, that

1    the injury is not an injury that is indivisible, which is

2    required in a joint tortfeasor.  They're all hit and the boy

3    ends up or the woman ends up with a broken leg.  Well, they've

4    all got to pay their fair share.  They're joint tortfeasors.

5         But here, the injuries to Nicholas is not to his leg.

6    It's the reputation damage that he suffered, in my example

7    earlier, in Mr. Baine's mind about his reputation or

8    separately in Mr. Greiner's mind about his reputation.  And I

9    believe they're not joint tortfeasors, but I will concede to

10   Your Honor we have not fully briefed it.  At the appropriate

11   time, we will.

12        If I conclude that they are joint tortfeasors, I will

13   agree a hundred percent with Your Honor's initial feelings.

14        If the research leads me to believe that they are not

15   capable of being deemed joint tortfeasors as a matter of law,

16   then I will bring to the attention of the Court our

17   authorities for you to decide which you believe is the right

18   or better issue.

19             THE COURT:  All right.  So do you have in mind how

20   long you want to postpone resuming this proceeding?  You're

21   going to have to sue whoever else you want to sue, get them

22   served.  And they'll probably make a motion to dismiss on the

23   same grounds you all have.  That's going to take a while.

24        Why don't you all get together and come up with an order.

25             MR. WOOD:  We will.  And what I would envision, Your

1    Honor, is we would have some agreed-upon period, 30 or 45

2    days, maybe 60 at the most, to file all of our cases that we

3    intend to file before Your Honor.

4              THE COURT:  That sounds good.  Even though the

5    statute's going to run for another year.

6              MR. WOOD:  Statute's going to run July of 2021.

7              THE COURT:  Another 18 months.

8              MR. WOOD:  But we will go ahead because, look, the

9    card's laid now.  They've either done it or they haven't.

10   They're not going to do it in the future in this way.  So we

11   can ascertain -- and we've talked among ourselves.  We believe

12   we can get before Your Honor the other cases within 60 days,

13   if not less.

14       Then we'll have to assess -- Your Honor will assess,

15   looking at what we could potentially agree to and propose,

16   there will have to be a time period for those defendants to

17   answer or move to dismiss.  I believe that that will be,

18   because of Your Honor's consistency, not a protracted ruling.

19       And at that point, depending on when Your Honor believes

20   you would reasonably be able to rule on their motions to

21   dismiss, then and then only would you be, I think, in a

22   practical position ready to set this 26(f) conference, just as

23   you waited until all of these defendants with this motion to

24   dismiss.

25             THE COURT:  You're going to sue Gannett.  Is that for

1    something that was in the Enquirer?

2         MR. WOOD:  It was something that was in several of

3    the Gannett publications, including the Enquirer.

4         THE COURT:  You shouldn't have a personal

5    jurisdiction issue.

6         MR. WOOD:  We have no personal jurisdiction issue

7    with Gannett.  And, Your Honor, the other punitive defendants

8    are going to only be sued here if I, in good faith, believe

9    that jurisdiction exists.

10        If it's arguable and I'm not sure, in good faith I may

11   file it here and ask Your Honor to rule on their motion for

12   jurisdiction.  But I'm very careful usually.  The last thing I

13   want to do is file something here just to go through a bunch

14   of motions that I know you're going to end up sending it to

15   California.  I'm not going to do that to Your Honor or myself

16   or my client.

17        So I believe we can get people that are subject to this

18   Court's jurisdiction before you within the next 60 days

19        THE COURT:  Okay.  You're familiar, I'm sure -- I

20   won't say I'm sure -- with the Kentucky long arm statute?

21        MR. WOOD:  I am familiar with the Kentucky long arm

22   statute.

23        THE COURT:  A tortious act outside this state will go

24   along with a tortious act in this state if the defendant

25   engages in a course of conduct or derives substantial revenue

1   from activities in this state.  I know it by heart I've got so

2   many cases.

3          MR. WOOD:  You've got me on the whole -- here's what

4   I do think.

5          THE COURT:  I've got three cases pending now.

6          MR. WOOD:  It's my impression -- and I'm not going to

7   be able to quote it verbatim like Your Honor just did.

8          My impression is -- I've had the blessing to work in a

9   number of different jurisdictions.  My view, as I recall it

10  sitting here today, is that the Kentucky long arm statute

11  would generally fall into the category of being a more liberal

12  long arm statute than you might find in other jurisdictions.

13         THE COURT:  I think you'll find you're mistaken.

14         MR. WOOD:  And I'll be sure and -- I've got some

15  young bright minds working.

16         THE COURT:  It was liberal for a while.  But then

17  they came out with a case about five years ago involving a

18  casino, and it was down in the western part of the state.

19         Casino was in Indiana or Illinois, whatever.  It

20  advertised heavily in Kentucky.  The people crossed -- the

21  plaintiffs crossed the Ohio River, went to the casino.  They

22  fell over there.  She slipped and fell and broke a bone or

23  something.  They sued back in Kentucky saying look at all the

24  publicity and advertising they do in Kentucky.

25         Up until that time, the Supreme Court had said that the

long arm statute was coterminal with due process.  In that
particular case, they reversed themselves and said no, you've
got to follow the language of the statute.

     And the language of the statute in this case is a
tortious act outside the state, I guess, involving a tortious
injury in this state, if there is a regular course of conduct
by the defendant or they derive substantial revenue in this
state.  It's a mouthful, but they have started to be way more
strict.  I think it's about ten years old, that case.

          MR. WOOD:  If I might add one comment, Your Honor, in
that regard.  It is going to be my plan that long arm
jurisdiction is not going to be one of the issues you have to
worry about because in this case, the defendants that will be
brought before you will have committed the tortious acts
inside of Kentucky.  It's committed everywhere the publication
is issued to a third party.

          THE COURT:  That's why I asked you if it was the
Enquirer.

          MR. WOOD:  And they will be defendants who transact
business in this state.

          THE COURT:  Okay.  Shouldn't be a problem.

          MR. WOOD:  So we're not going to have a long arm
statute issue on anybody we sue in this court, I believe.  I
can confidently say that.

          THE COURT:  In another case arising out of this

1    situation in Washington, we've got somebody who has a Twitter

2    account in California, and they made a posting critical of the

3    plaintiffs in that case on their Twitter.  She's in

4    California.  It isn't specifically directed to Kentucky.

5    People in Kentucky read it, felt that it applied to them, and

6    have sued.  That's the tricky one.

7         MR. WOOD:  But within the confines --

8         THE COURT:  You don't have to argue that case.  I

9    think Mr. Greiner is in it.  He can argue it.

10        MR. WOOD:  I would say this.  I think the ultimate

11   issue in those cases tends to turn on would this be a

12   situation where the defendant should have expected to be haled

13   into court in Kentucky.  So we're not going to have those

14   kinds of issues, I don't believe, Your Honor, in any of the

15   cases we file.

16        THE COURT:  Well, that's good.  I've got enough of

17   them.

18        MR. WOOD:  We're filing solid jurisdictional cases,

19   even if you disagree with them on other grounds.

20        THE COURT:  All right.  So why don't you all get

21   together with an order.  I'll approve anything if you all

22   agree on it probably, unless you're going to continue it for

23   ten years or something.

24        MR. WOOD:  I don't have any prognosticator that's

25   told me I've got ten years.

1          THE COURT:  We've got to move it along.  It's a very

2     unusual situation.  That's why I raised these issues here.

3     It's better to get everybody in before the Court and maybe we

4     can get some other settlements.

5          MR. WOOD:  This young man's cases are, from my

6     experience at least -- and I also look at the world around me

7     in this area -- it is a very unique type of a situation.

8          And with all due respect and intended respect, I want to

9     commend Your Honor on the handling you've given this case so

10    far, because I think you have sliced this case down to its

11    core and you have provided all the parties with the most

12    efficient and relevant issues to litigate.  And I appreciate

13    that on behalf of my client; and as a member of the Bar, I

14    appreciate it seeing it coming from a member of the judiciary,

15    so I thank you for that.

16         THE COURT:  Thank you.  You're very welcome.  Let's

17    hope it all goes as smoothly in the future.

18         MR. WOOD:  It will go as God planned.

19         THE COURT:  Anything else?  I guess not.  So we're

20    adjourned.

21         MR. BAINE:  Thank you, Your Honor.

22       (Proceedings concluded at 1:54 p.m.)

23                              -  -  -

24

25

40

1                        C E R T I F I C A T E

2           I, JOAN LAMPKE AVERDICK, RDR, CRR, certify that the
     foregoing is a correct transcript from the record of
3    proceedings in the above-entitled case.

4
     _\s\ Joan Lampke Averdick____       _ January 15, 2020_
5    JOAN LAMPKE AVERDICK, RDR, CRR      Date of Certification
     Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25